UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

KRAFT FOODS GLOBAL, INC.,                    :        '10 CIV 09085

        Plaintiff,                            :        INDEX NO.

  -against-                                  :        **COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF**

STARBUCKS CORPORATION,                        :

        Defendant.                            :        *JUDGE SEIBEL*

------------------------------------ X

    Plaintiff Kraft Foods Global, Inc. ("Kraft"), by and through its undersigned counsel,

Morgan, Lewis & Bockius LLP, as and for its Complaint against Defendant Starbucks

Corporation ("Starbucks"), alleges as follows:

### NATURE OF THE CASE

    1.    This lawsuit arises primarily out of a contract (the "R&G Agreement") pursuant

to which Kraft owns the exclusive right to sell, market and distribute certain packaged Starbucks

roasted whole bean and ground coffee to Kraft's customer base of grocery stores and other retail

food outlets, which is referred to as the consumer packaged goods or "CPG" market. The R&G

Agreement, which requires Starbucks to manufacture and supply the Starbucks branded products

Kraft sells in those channels, has an initial term that expires in 2014 and renews automatically

for successive ten-year terms.[1]

---

[1]    Presently, there are four contracts under which Kraft owns exclusive rights to sell
Starbucks CPG products in the United States. In addition to the R&G Agreement, Kraft and
Starbucks are parties to two agreements pursuant to which Starbucks supplies coffee and tea
pods for use in the Tassimo line of single cup, on demand brewers, as well as an agreement with
respect to Tazo hot tea. The Starbucks products covered by these four agreements are referred to
herein as the "Starbucks CPG Products."

2.      During its twelve-year tenure as the exclusive seller of Starbucks CPG Products in the CPG channels covered by the R&G Agreement, Kraft has performed exceptionally well and has established Starbucks as the leading premium CPG coffee brand.  By leveraging its expertise and investing significant financial, human and other resources, Kraft has grown the sales of Starbucks CPG Products tenfold, increasing annual revenues from approximately $50 million to approximately $500 million in 2010.  Even with the recent economic downturn, when Starbucks products were held out as a quintessential example of a luxury for which consumers were no longer willing to pay, the Starbucks CPG business, under Kraft's proprietorship, emerged largely unscathed.

3.      Today, that business is performing extremely well.  Year-to-date revenues for Starbucks CPG Products have grown 8 % over the same period last year.

4.      Starbucks has repeatedly praised Kraft for the quality and effectiveness of its performance under the R&G Agreement.  In addition to crediting Kraft's "capabilities and accounts" for driving the business' growth, Starbucks has held Kraft out as an "outstanding" partner.  Just months ago, Starbucks told Kraft privately that it is "jazzed and excited about []the road ahead" with Kraft's "great team."

5.      Nevertheless, Starbucks decided earlier this year that it wanted to take over the Starbucks CPG business, which would require Starbucks to terminate the R&G Agreement.  It privately assured Kraft that its decision was not the result of dissatisfaction with Kraft's performance under the Agreement.  Instead, faced with diminishing prospects for sales growth in its network of retail coffee cafes, Starbucks' new growth strategy requires that it take ownership of the highly profitable Starbucks CPG business that Kraft has built over the years and, as a result, appropriate all of the profit stream.

6.      Paragraph 5(b)(ii) of the R&G Agreement gives Starbucks the clear right to do precisely that – so long as it provides 180 days' advance notice and compensates Kraft for the loss of its rights under the R&G Agreement in an amount tied to fair market value of the business.  Starbucks has chosen, however, to pursue a strategy for seizing control of the Starbucks CPG business without honoring its contractual promise to pay for it.

7.      In August of this year, Starbucks offered to pay Kraft $750 million to buy out Kraft's rights under the R&G Agreement and three ancillary agreements – an amount far less than the fair market value of the business and thus far less than Starbucks would be required to pay Kraft in order to terminate pursuant to the terms of the R&G Agreement.  Therefore, Kraft rejected the offer.

8.      Then Starbucks suddenly changed course.  Instead of making a reasonable buyout offer or invoking its right to terminate in accordance with Paragraph 5(B)(ii), Starbucks alleged that Kraft materially breached the agreement, an allegation that, if true, would entitle Starbucks to take over the Starbucks CPG business without paying Kraft anything at all.  This allegation came with no advance warning.

9.      As Starbucks well knows, its allegations that Kraft materially breached the R&G Agreement are entirely baseless.  They rest on factual assertions that are demonstrably false and involve alleged events and circumstances that, in most cases, occurred years ago.  Moreover, Starbucks' allegations are a concoction on which Starbucks has seized as a pretext for trying to strip Kraft of its rights under the R&G Agreement without living up to Starbucks' clear contractual obligation to pay for those rights.  Indeed, as shown below, Starbucks' own words and conduct readily disprove many of its newly-minted allegations of material breach.

10.     Starbucks has compounded this act of bad faith by refusing to comply with a contractually mandated dispute resolution process before taking steps to effectuate the purported termination.  It has instead treated termination as a *fait accompli* by, among other things, publicly announcing that it will unilaterally seize control of the Starbucks CPG business on March 1, 2011.  It has also begun to implement a "transition plan" that involves improperly meeting privately with Kraft's own customers to promote Starbucks' own product offerings, in clear violation of Kraft's exclusivity rights under the R&G Agreement.  These and other wrongful actions taken by Starbucks threaten to cause Kraft lasting and irreparable harm.

11.     Kraft accordingly brings this action to obtain a preliminary injunction to provisionally restrain Starbucks from acting on its purported termination, thus preserving the status quo pending final resolution of the termination dispute in an arbitration that Kraft recently initiated pursuant to the R&G Agreement's dispute resolution provisions.  As demonstrated below, the criteria for obtaining such an injunction under New York law are plainly satisfied here.

## THE PARTIES

12.     Kraft Foods Global, Inc., a Delaware corporation with its principal place of business located at Three Lakes Drive, Northfield, IL 60093, is the world's second largest food company.

13.     Starbucks Corporation is a Washington corporation with its principal place of business located at 2401 Utah Avenue South, Seattle, Washington 98134.  Starbucks is registered to do business in New York as a foreign business corporation.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between citizens of different States and the amount in controversy in the underlying arbitration proceeding exceeds $75,000.

15.     Personal jurisdiction and venue are proper because, in the agreements at issue in this action, Starbucks consented to resort to the United States District Court for the Southern District of New York for the purpose of seeking preliminary injunctive relief.

## FACTUAL BACKGROUND

16.     Kraft is the largest food company in the United States and the second largest food company in the world.  It conducts business in approximately 170 countries.  Kraft's products can be found in more than 99 % of households in the United States.

17.     Kraft sells primarily in the CPG market, which includes grocery and supermarket chains, wholesalers, super centers, club stores, mass merchandisers, distributors, convenience stores, drug stores, value stores and other retail food outlets.  The Kraft business unit responsible for U.S. coffee and other beverages employs approximately 500 people in Tarrytown, New York.

18.     Kraft is world renowned for its strength in the CPG sector.  Kantar Retail, a prominent global retail insights and consulting firm, recently ranked Kraft's sales force No. 1 (again) in the U.S. among all CPG companies, including Procter & Gamble, PepsiCo, Unilever, Nestlé, Kellogg, and General Mills.

19.     Starbucks manufactures specialty coffee and operates a network of retail coffee cafes.  Its portfolio of brands includes Starbucks Coffee, Seattle's Best Coffee, Tazo Tea, and others.

20.     Since the time of its founding in Seattle in 1971, Starbucks' chain of coffeehouses has grown exponentially.  In the late 1990s and into the 2000s, Starbucks was, on average, opening a new retail cafe store every workday.  The number of Starbucks stores worldwide tripled between 2001 and 2007.  As of October 3, 2010, it operated or licensed 16,858 coffeehouses in more than 50 countries.

**Starbucks And Kraft Form A Strategic Alliance To Expand The Starbucks CPG Business**

21.     In the 1990s, Starbucks decided to leverage its success in its traditional cafe-based business to gain a foothold in the CPG market.  Its goal was to establish the Starbucks brand as the preeminent player in the premium (and super premium) packaged roast and ground coffee category in grocery stores and other outlets in the CPG market.  Starbucks recognized, however, that it lacked the expertise, infrastructure, resources, and customer relationships needed to succeed in that market on its own.  It therefore turned to Kraft.

22.     Starbucks understood that a partnership with one of the world's preeminent CPG businesses would put Starbucks in a far better position to successfully compete in CPG channels.  By tapping Kraft's marketing expertise, the quality and breadth of its distribution network, and its long-standing relationships with virtually all major CPG retailers, Starbucks would be able to exploit an extremely lucrative commercial opportunity that otherwise, in all likelihood, would have been unavailable to it.

23.     Further to this goal, Starbucks entered into a September 1998 Trademark License Agreement with Kraft pursuant to which Kraft agreed to sell, market and distribute roasted whole bean and ground coffee products supplied by Starbucks and bearing Starbucks' trademarks to retail grocery stores, club stores and other retail outlets (this agreement, together

with a subsequent Amended and Restated Purchase, Supply and Royalty Agreement, is referred to herein as the "1998 Agreement").

24.     Securing Kraft as its strategic partner in developing the Starbucks CPG business was a breakthrough for Starbucks.  In the words of Starbucks Chairman and CEO Howard Schultz: "Thanks to Kraft, we are now in a position to provide Starbucks coffee through grocery stores nationally much quicker than we would have been able to do it ourselves."

25.     As Starbucks had hoped, the size and profitability of the Starbucks CPG business grew rapidly under Kraft's proprietorship.  In the first five years, Kraft increased its revenues from approximately $50 million to approximately $240 million.

### The 2004 R&G Agreement

26.     As the Starbucks CPG business became more profitable and therefore a more significant factor in Starbucks' overall company performance, Starbucks became increasingly dissatisfied with the economic terms of the bargain it struck in 1998.  Starbucks was, however, contractually bound to those terms.  The 1998 Agreement had an initial term of ten years and automatically renewed for successive ten year periods.  Moreover, because Kraft had demonstrated that its expertise, relationships and infrastructure were essential to Starbucks' continued success in the CPG segment, Starbucks recognized that, as a commercial matter, it could not afford to lose Kraft as its CPG partner.

27.     Starbucks therefore pressured Kraft into renegotiating the 1998 Agreement by, among other things, taking increasingly unreasonable positions concerning its rights and obligations under the 1998 Agreement.  Starbucks began to deny Kraft many of the commercial benefits Kraft had expected when it first agreed to partner with Starbucks, such as the opportunity to expand the Starbucks CPG business through innovation in products and

marketing. In fact, although Starbucks was introducing new products in its retail cafes, it was unreasonably denying Kraft the opportunity to sell those same products to its CPG customers.

28.     Starbucks' coercive tactics strained the parties' relationship and threatened to hamstring Kraft in its efforts to further improve the performance of the Starbucks CPG business. Kraft therefore agreed to renegotiate the existing contractual arrangement in late 2003.

29.     Those negotiations culminated in the execution of the R&G Agreement, which superseded the 1998 Agreement and is the central agreement that governs the parties' respective rights and obligations with respect to the Starbucks CPG business in the United States.

30.     Like the 1998 Agreement, the R&G Agreement grants Kraft the exclusive right to distribute Starbucks' roast and ground coffee in the retail channels covered by the Agreement.

31.     The R&G Agreement also precludes Kraft from selling certain products that potentially would compete with Starbucks products. Specifically, Paragraph 3(C)(ii) of the Agreement prohibits Kraft from "distribut[ing], market[ing] or sell[ing] ... any Super Premium Coffee" in the CPG market other than the Starbucks products covered by the Agreement. The term "Super Premium Coffee" is defined as coffee "(i) traditionally sold at the highest end of the consumer coffee market in the Territory, and (ii) generally priced (A) at a non-promotional shelf price of $6.50 or more per pound.").

32.     The R&G Agreement has an initial term of ten years and will renew automatically for successive ten-year periods. The Agreement does, however, allow Starbucks to terminate the partnership without cause by, in effect, buying out Kraft's rights. The buyout provision appears at Paragraph 5(B)(ii) of the Agreement, which states that:

> at any time . . . upon not less than one hundred eighty (180) days'
> prior written notice to Distributor. If Supplier terminates this
> Agreement pursuant to this provision, and Supplier: (x) resumes
> sale of the Licensed Products in the Licensed Channels in
> conjunction with a party other than Distributor, Supplier will pay

Distributor one hundred thirty-five (135%) of the Fair Market Value of this Agreement; or (y) directly distributes the Licensed Products in the Licensed Channels and agrees not to use a third party distributor in the Licensed Channels in the Territory for a period of two (2) years following such termination, then Supplier will pay Distributor one hundred twenty percent (120%) of the Fair Market Value of this Agreement; or (z) refrains from any and all distributions of the Licensed Products in the Licensed Channels in the Territory for a period of two (2) years following such termination, then Supplier will pay Distributor the Fair Market Value of this Agreement.

33.     For purposes of this provision, the Fair Market Value of the Agreement is determined in accordance with a valuation mechanism set forth in Paragraph 5(D).

34.     The requirement that Starbucks compensate Kraft in an amount tied to the fair market value of the business was an essential element of the bargain to which Kraft agreed. Establishing and maintaining a strong market position for Starbucks branded products required a substantial commitment of financial, human, and other resources.  In addition, as noted, the R&G Agreement precluded Kraft from selling its own and other super premium coffee brands in competition with Starbucks products during the life of the Agreement, imposing on Kraft considerable additional costs in the form of lost commercial opportunities.  For these reasons, Kraft would not have entered into the R&G Agreement if it did not require that Starbucks, upon termination, compensate it for the value of the business Kraft built.

**Kraft's Success In Building The Profitability Of The Starbucks CPG Business**

35.     Kraft has been undeniably effective in expanding sales of Starbucks products in the CPG segment.  In 1998, Starbucks CPG business had revenues of approximately $50 million with a product portfolio limited to 16 unique products ("SKUs") in 4,000 stores spread over 12 states.  In the 12 years since Kraft acquired exclusive rights with respect to the Starbucks CPG business, that business has grown to approximately $500 million in revenue annually with a product portfolio of over 65 SKU's sold in 40,000 stores across all 50 U.S. states and Canada.

This represents a compounded average growth rate in excess of 20%, which is well above the industry norm.

36.     The rapid growth of the Starbucks business, both in Starbucks' retail cafe network and in Kraft's CPG channels, stalled with the onset of the 2008 recession, which led many consumers to reduce spending, especially on luxury items.  As Starbucks' Chairman and CEO Howard Schultz acknowledged in March 2009, "Starbucks Coffee Co. ha[d] become the poster child for excess."

37.     In its 2008 and 2009 fiscal years, Starbucks experienced eight consecutive quarters of declines in U.S. comparable retail cafe sales.

38.     The effects of the economic downturn were exacerbated by unprecedented competitive pressure in the away-from-home coffee market, especially from Dunkin' Donuts, which, beginning in 2007, launched a heavily funded and effective campaign to capture market share from Starbucks.

39.     Despite the negative effect of these factors on the Starbucks brand, Kraft successfully forestalled a precipitous decline in Starbucks' market position in the CPG market. The decline that Kraft did experience was comparatively modest under the circumstances and was the unavoidable result of the recession, competitive forces and other factors beyond Kraft's control.  By way of comparison, Starbucks' CPG business growth has exceeded Starbucks' comparable store cafe sales revenue growth in 11 of the last 16 quarters.

40.     As a result of the measures taken by Kraft in the face of the challenges noted above, the Starbucks CPG coffee business is now experiencing robust growth.  Kraft's performance has been especially strong in 2010.  Revenues for Starbucks CPG Products are at an

all time high, with a year-to-date growth rate of 8 %.  By comparison, during the same period,

total U.S. coffee sales have grown by only 2%.

41.     Starbucks frequently has praised Kraft for the quality and effectiveness of its

performance in managing the Starbucks CPG business.  In December 2008, for example,

Starbucks' CEO Howard Schultz lauded Kraft as an "outstanding" company whose "capabilities

and accounts" Starbucks had succeeded in leveraging to establish Starbucks as a "leader in

product innovation."  More recently, in April 2010, Troy Alstead, Starbucks' Chief Financial

Officer, said that the Starbucks CPG business had become "highly profitable" over the years,

specifically citing Starbucks' success in "leverag[ing] the world-class capabilities that [Kraft

has] in manufacturing, research and development and marketing distribution."

42.     Starbucks' praise of Kraft in private has been similarly effusive.  For example, in

late 2009, John Culver, then President of Starbucks Global Consumer Products and Foodservice,

complimented the Kraft team for driving positive results, stating "I also wanted to thank the

entire team from both Kraft and Starbucks for a great meeting and more importantly for all of

your efforts to get our packaged coffee business back on a positive growth track.  It is great to

see that your efforts and focus on the business are having a positive effect on our base business,

and for the first time in two years we have seen share growth for the month of October."

43.     As recently as May 2010, Greg Price, then Vice President of Starbucks CPG,

expressed his excitement over the partnership with Kraft to Deanie Elsner, the newly appointed

President of Kraft Foods North American beverages business unit:

> Thank you for a great meeting today.  You had great insights,
> asked great questions, and helped set a great tone for our
> partnership moving forward, and I think the team left today's
> discussion jazzed and excited about []the road ahead. . . .  You've
> got a great team . . . .  That's it for now.  Welcome, thanks, and
> onward together."

44.     As a direct result of Kraft's highly effective marketing and promotion of Starbucks products, as well as the high quality of its proprietorship of the Starbucks CPG business over a twelve year period, that business is extremely valuable, a fact that explains Starbucks' determination to seize control of it through any available means.

### Starbucks' Decision To Terminate Kraft's Ownership of The Starbucks CPG Business

45.     Despite the explosive historical growth of Starbucks' traditional retail cafe-focused business, Starbucks realized that the prospects for future growth in that segment are far less promising than in the past.  The United States is now saturated with Starbucks retail outlets with new stores often cannibalizing the sales of existing ones.  Starbucks confronted this reality in 2009 when, despite announcing plans to open 900 new retail stores, it was instead forced to close approximately 800 outlets in the United States.

46.     Starbucks has been quite open about the fact that, to sustain the company's long term growth, it must look to other markets and especially the CPG market.  During Starbucks Q1 F2009 earnings call, CEO Schultz said that:

> In the past, I haven't typically got into great detail of our CPG business, though it has achieved steady profitable growth in recent years. Increasingly though, we're viewing the CPG business as central to our overall business strategy: enabling our packaged coffee, tea and ready-to-drink businesses to leverage existing markets and brand awareness; providing us with channels and access to customers we have not otherwise been able to reach at retail and specifically focused on the home market; and allowing us to play on both sides of the value continuum.

47.     Similarly, during an earnings call in its third quarter 2010 fiscal year, Starbucks described the CPG business as "a huge opportunity for our company" and identified as one of its goals "expanding our footprint into grocery with a more focused sell into the CPG channel." Starbucks told analysts that it "is very optimistic and confident . . . that over the long run we

would expect CPG to grow more rapidly than our other businesses in the store." Schultz added

that "[w]ith regard to CPG overall I think you can sense that we believe that we have a very

unique opportunity to build a very significant business outside of our retail stores . . . that gives

us another leg to the stool. And we're just getting started."

48.     Starbucks has admitted that its increased focus on the CPG market did not stem

from dissatisfaction with Kraft's management of that business. It told analysts during an

earnings call in its first quarter 2009 fiscal year that "[o]ur CPG business operates very

effectively with our joint venture and sales and distribution partners, and has been able to benefit

from the lessons we've learned on the retail side as it grows domestically and internationally."

49.     Starbucks' shift toward the CPG market began in earnest with its introduction in

2009 of VIA® Ready Brew, a single serving instant coffee. But Starbucks has been emphatic

that the launch of VIA is merely a first step in its strategy to "take control" of the Starbucks

brand in all CPG channels. As Schultz put it during Starbucks' Q2 2010 earnings call, "CPG,

represents another important growth vehicle for Starbucks as we accelerate both product

innovation and distribution . . . VIA is becoming an increasingly significant platform for us with

the CPG channel rollout having begun towards the end of Q2."

50.     Likewise, the Wall Street Journal reported on April 29, 2010 that "Starbucks

plans to roll out a 'pipeline' of new products in the next 12 to 18 months, all following the model

of Via, where the product makes a highly publicized debut in the company's coffee shops, then

an even more-heavily marketed transition into the grocery aisles." The article quoted Schultz as

saying that creating a "very significant consumer packaged goods" business is a "centerpiece" of

the company's growth strategy.

**Starbucks' Plan A: An Unsuccessful Attempt To Buy Out Kraft's Rights Under The R&G Agreement**

51.    By the summer of 2010, Starbucks had fully committed itself to a course of action that required it to "take control" of Starbucks CPG Products in the CPG market, something it cannot do so long as the R&G Agreement remains in effect. As noted, the contract provides a commercially reasonable method for achieving this objective. In particular, Paragraph 5(B)(ii) of the R&G Agreement gives Starbucks the right to terminate the Agreement on 180 days notice provided that it pays Kraft up to 135% of the Fair Market Value of the Agreement.

52.    Starbucks, however, has not exercised that right, presumably because it prefers, if at all possible, to take over the Starbucks CPG business without having to pay Kraft the fair market value of the business plus a premium as required under the agreement. Starbucks' own public statements show that it fully appreciates the tremendous value of the business given its current profitability and its promise of potentially dramatic future growth. It therefore necessarily realizes that termination under Paragraph 5(B)(ii) would be costly. Consequently, Starbucks elected to instead pursue a negotiated termination of the R&G Agreement at what it hoped would be a price substantially lower than the price of terminating pursuant to Paragraph 5(B)(ii).

53.    On August 9, 2010, senior executives from both companies met in Chicago to discuss Starbucks' interest in buying out Kraft's rights under the R&G Agreement. Attending for Starbucks were senior executives, including Starbucks' Chief Financial Officer and its President of CPG. During the meeting, Starbucks once again expressed Starbucks' appreciation for Kraft's effectiveness in establishing the Starbucks brand as the leading premium coffee in CPG channels.

54.     Starbucks explained that taking control of all Starbucks branded products, including those being sold in the CPG market, had become a strategic imperative for Starbucks and that, with full support of its Board of Directors, Starbucks was committed to acquiring the CPG business from Kraft either through negotiation or by invoking the valuation process pursuant to Paragraph 5(B)(ii).  To that end, Starbucks presented a proposal to pay $750 million in exchange for a consensual termination of the R&G Agreement (as well as the ancillary agreements) following a 6 to 9 month transition period.

55.     Kraft rejected Starbucks' offer because the businesses' fair market value is far greater than $750 million.  Accepting that offer would have amounted to renegotiating the bargain the parties struck when they entered into the R&G Agreement, thereby allowing Starbucks to avoid the commitment it freely made to pay the full fair market value of the Starbucks CPG business plus the contractually specified premium (if applicable).

56.     Both during the meeting and in later communications, Starbucks explicitly assured Kraft that Starbucks' decision to terminate was not the result of any dissatisfaction with the quality of Kraft's performance under the Agreement.  Moreover, Starbucks' offer to pay $750 million to buy back the business belies a genuine belief in Starbucks' ability to terminate the R&G Agreement without making such a payment.

### Starbucks' Plan B: A Wrongful Attempt to Terminate the R&G Agreement by Accusing Kraft of Material Breach

57.     Having failed to persuade Kraft to sell the Starbucks CPG business for far less than its true value, Starbucks decided to pursue a highly suspect strategy for taking the business away from Kraft.

58.     On October 5, 2010, Starbucks, through its law firm, sent a letter in which Starbucks made the surprising and untenable assertion that Kraft had materially breached the

R&G Agreement in numerous respects. The letter further stated that Starbucks was terminating

the Agreement effective March 1, 2011, unless Kraft "cured" the alleged breaches within 30

days.

59.     The letter came without warning and less than two months after Starbucks offered

to pay Kraft $750 million for the Starbucks CPG business. The alleged material breaches

mentioned in the letter dated back months and – indeed, in most cases several years – yet

Starbucks had never before suggested it had grounds for termination of the R&G Agreement

based on material breach despite the fact that the two companies have been in daily contact for

more than a decade.

60.     Viewed individually or collectively, all of Starbucks' breach allegations are

unfounded and obviously concocted to give Starbucks a pretext for attempting to acquire the

Starbucks CPG business at no cost.

61.     Perhaps the clearest example is Starbucks conclusory contention that Kraft failed

to use "commercially reasonable efforts" to market Starbucks products in the CPG market. As

shown above, Kraft's overall performance under the Agreement and its effectiveness in

promoting Starbucks CPG Products has been outstanding by any reasonable measure. Indeed,

Kraft has established Starbucks as the leading player in the super premium CPG coffee category,

a position it maintains to this day.

62.     Equally without merit is Starbucks' accusation that Kraft is to blame for the

"erosion" of Starbucks' market share, an apparent reference to the modest market share decline

in Starbucks R&G Products in the CPG market in the midst of the financial crisis in 2008-2009.

The decline was modest considering the widely-recognized consumer shift toward lower-priced

brands, unprecedented competition in the CPG channel, and other factors beyond Kraft's control.

Starbucks' contention to the contrary is not credible because it experienced even greater decline in its retail cafe revenues over the same period.

63.     Several of Starbucks' other breach allegations are so easily debunked that Starbucks' reliance on them leaves no doubt that its attempt to terminate for material breach is an act of bad faith.  As an example, the October 5, 2010 letter asserts that "[s]ince at least 2004, Kraft has not provided Starbucks with monthly or quarterly budgets, despite repeated requests by Starbucks, and the budgets that Kraft did provide were not sufficiently detailed to be meaningful."  In truth, Kraft has supplied Starbucks with detailed budgets on at least a quarterly basis, including standardized P&Ls that reflect trade, advertising and promotions.

64.     Kraft has also conducted quarterly budget reviews with Starbucks and even made its finance staff available to Starbucks to answer budget-related questions.  Indeed, Starbucks personnel with actual knowledge of this issue have *praised* Kraft for its performance in this respect.  In a recent e-mail, one of them thanked Kraft profusely for the high quality of budget information he received from Kraft, describing it as "amazingly detailed and extremely helpful!!"  He also congratulated Kraft for "setting the bar so high" and for providing "more than [he] could have ever hoped for."

65.     More proof of Starbucks' overreaching is its contention that Kraft breached the R&G Agreement by failing "to involve Starbucks in sales planning, presentations, and calls."  At Kraft's invitation, Starbucks has been extensively involved in the review and approval process for all sales presentation templates for major initiatives.  The senior Kraft director responsible for Starbucks sales frequently meets and travels with Starbucks' National Sales Manager.  He also reviews important sales-related issues with him in teleconferences conducted on a weekly basis.

In fact, Starbucks recently congratulated the parties' "collaborative customer approach" with two

of Kraft's largest and most important customers.

66.     The frivolousness of Starbucks' breach allegations is underscored by the assertion

that Kraft breached the Agreement's exclusivity provision by selling Yuban brand coffee.

Yuban is not among the competing coffee brands covered by that obligation.  More importantly,

Kraft has been selling Yuban since long before the Agreement was signed.  Never before the

October 5 letter did Starbucks suggest that doing so violated the Agreement.

67.     Even if Starbucks' accusations were factually accurate (which they are not),

Starbucks' attempt to terminate the R&G Agreement is invalid.  The R&G Agreement permits

Starbucks to terminate only if Kraft commits a "Material Breach" as defined in the Agreement.

A "Material Breach" is:

> a breach of any representation, warranty, covenant or agreement in
> this Agreement which significantly impairs the value of the other
> party's bargained-for benefits under this Agreement or which
> causes or threatens to cause significant financial, brand equity
> and/or other injury to the other party.  Breaches of certain
> provisions of this Agreement have been specifically described as
> Material Breaches, and these specific descriptions will not
> preclude either party from contending, in proceedings under
> Section 15 of this Agreement, that breaches of other provisions are
> "Material Breaches" as defined in the preceding sentence.

The parties thus agreed that a breach of the Agreement would generally only warrant termination

by the non-breaching party if the breach were fundamental and caused or threatened to cause

significant financial injury.  None of the breaches alleged by Starbucks approaches that standard.

**Starbucks' Improper Attempt to Terminate the R&G Agreement Without
Complying with Its Dispute Resolution Provisions**

68.     The R&G Agreement contains a dispute resolution provision governing all

disputes arising under or related to the Agreement, including the one triggered by Starbucks'

October 5, 2010 termination letter.  Specifically, Paragraph 15 of the Agreement requires that

such disputes first be submitted for good faith review by an Oversight Committee comprised of

senior managers from both companies.  Disputes not resolved within 30 days of submission to

the Oversight Committee may then be submitted to binding arbitration:

> The parties hereto will attempt to settle any claim or controversy
> arising out of or relating to this Agreement through consultation
> and negotiation in good faith and a spirit of mutual cooperation,
> but submitting such claim or controversy to the oversight
> Committee.  However, at any time following the first to occur of
> (i) the first meeting of the Oversight Committee concerning such
> claim or controversy, or (ii) expiration of the thirty (30)-day period
> following a party's written request to the other party to submit
> such claim or controversy to the Oversight Committee if the
> Oversight Committee has not met to consider such claim or
> controversy within such thirty (30)-day period, either party may by
> written notice to the other demand that the dispute be submitted to
> arbitration.  Such binding arbitration shall be conducted within the
> City of Chicago at JAMS or its successor, pursuant to its
> Comprehensive Arbitration Rules and Procedures, except as
> modified by the Agreement of the parties.

69.     When Starbucks first alleged that Kraft had materially breached the Agreement by

letter dated October 5, 2010, Starbucks knew or should have known that its allegations were

baseless and that Kraft would dispute them.

70.     In a November 4, 2010 letter from its counsel, Kraft not only disputed Starbucks

allegations, it provided a detailed point-by-point refutation of them.  (Attached hereto as Exhibit

1 is a copy of the letter dated November 4, 2010 from Kraft's counsel, Morgan, Lewis &

Bockius LLP, to Starbucks counsel.)

71.     Starbucks was obligated to comply with the R&G Agreement dispute resolution

provisions before unilaterally acting on its attempt to terminate the Agreement.  Starbucks has

instead repudiated that obligation.

72.     Consistent with Paragraph 15 of the R&G Agreement, Kraft requested that a

meeting of the Oversight Committee be convened to consider in good faith the merits of

Starbucks' breach allegations.  It also requested that, in connection with the requested meeting,

Starbucks provide Kraft with any documents and information it has that might corroborate its breach allegations. Starbucks refused to comply with either request. Starbucks likewise failed to present its claim that it has grounds for termination based on material breach for resolution through binding arbitration *before* unilaterally acting on its disputed attempt to terminate the R&G Agreement. These failures constitute a clear breach of the R&G Agreement.

73.     When it became clear that Starbucks was not going to comply with its obligations under Paragraph 15 of the R&G Agreement, on November 29, 2010, Kraft invoked its contractual right to contest the validity of Starbucks' purported termination by initiating binding arbitration proceedings in accordance with the terms of the Agreement.

### Starbucks' Improper Statements To The Market, Wrongful Interference With Kraft's Customer Relationships And Misleading Disparagement of Kraft

74.     Having refused to abide by the R&G Agreement's mandatory dispute resolution procedures, Starbucks immediately began to act on its purported termination of the Agreement, treating it as a *fait accompli*.

75.     In its November 4, 2010 earnings call, Starbucks announced that it is ending its relationship with Kraft. It failed to disclose, however, the fact that Kraft had already informed Starbucks in writing that no valid termination had occurred and that Starbucks' purported grounds for termination were baseless.

76.     On November 29, 2010, Starbucks issued a press release impugning Kraft's performance under the Agreement and publicly accusing Kraft of failing to meet its responsibilities under the Agreement. Starbucks also provided the media with a copy of its October 5 letter accusing Kraft of materially breaching the R&G Agreement without also providing a copy of Kraft's letter refuting each one of Starbucks' breach allegations.

77.     The purpose and effect of these actions is apparently to mislead the public about the legal status of the R&G Agreement and to portray Kraft in a false light.

78.     On December 1, 2010, Starbucks' CPG President, Jeff Hansberry, publicly reported that Starbucks has contracted with another company, Acosta, to distribute the Starbucks CPG products starting March 1, 2011, in clear breach of the Agreement.  Starbucks also again publicly disparaged Kraft's performance under the R&G Agreement, inaccurately stating that "[t]he issues between us and our dissatisfaction with Kraft's performance and their failure to protect the premium equity that we have built in our brands has been ongoing."

79.     Even as Kraft has pressed Starbucks to honor the dispute resolution provisions in the R&G Agreement, Starbucks was violating them by acting on the disputed termination before the validity of it has been determined in accordance with those provisions.  Among other things, Starbucks began contacting Kraft's CPG customers in an apparent attempt to divert business from Kraft's customers to Starbucks and its new distribution partner, Acosta.

80.     For example, on November 5, 2010, Starbucks began notifying Kraft's major retail CPG customers that Starbucks had "severed" the relationship with Kraft, causing those customers to question Kraft's ability to continue supplying them Starbucks CPG products.  Kraft promptly demanded that Starbucks cease such improper communications.

81.     Starbucks, however, has refused to stop its improper communications with Kraft's customers.  Indeed, in a December 1, 2010 letter, Starbucks informed Kraft that, unless Kraft capitulates to Starbucks' illegitimate act of termination by cooperating with its attempt to transition the CPG business to Starbucks, Starbucks "will begin contacting customers regarding the transition (effective March 1, 2011) starting December 6th, 2010."

82.     On the day that Kraft received this letter, Starbucks CEO Howard Schultz reported to investors that "I've been on the phone with the CEOs from – Mike Duke at Wal-Mart, Jim Sinegal at Costco, to Steve Bergen, Safeway, assuring them that this transition is not going to be anything but we will exceed expectations in all aspects of the CPG business transitioning from Kraft."

83.     Starbucks' attempt to divert business from Kraft's CPG customers to Starbucks is a clear breach of Kraft's exclusive rights under the R&G Agreement.  More importantly, Starbucks' wrongful actions – including its misstatements to the market and deliberate interference with Kraft's customer relationships – have caused considerable confusion in the marketplace generally and with Kraft's customers in particular.

### The Impact Of Starbucks' Actions On Kraft's Tassimo Business

84.     Starbucks' wrongful conduct also threatens to cause irreparable harm to Kraft's Tassimo business, which involves Kraft's promotion and sale of single-serve packages of coffee, tea and other beverages for use with the Tassimo line of "on demand" brewers that Kraft helped to develop.

85.     Single serve (or "on demand") brewers produce high quality coffee and other hot beverages in about one minute by forcing hot water through ground coffee (or tea leaves, cocoa mix, etc.) that has been packaged in a specialized single serve container.  The major competitors in the coffee business recognize that consumers increasingly are turning to the convenience of single cup brewers and, accordingly, consider sales of single serve systems, with their associated single serve packaged beverage products, to be both a key driver of future coffee sales and one of the most promising opportunities for product expansion.  Kraft itself has invested hundreds of

millions of dollars in building Tassimo into a global single-serve platform in recognition of the magnitude of the trend shift in coffee toward single-serve consumption.

86.     Kraft entered the single cup brewer segment in 2004 with the launch of the Tassimo line of brewers.  Kraft has invested heavily in the Tassimo business in order to expand its U.S. market share.

87.     Tassimo brewers use discs containing coffee, espresso, tea, hot chocolate, or milk (for cappuccino), referred to as "T Discs," to brew a single cup of coffee, tea, or other beverage on demand.  They were developed using proprietary technology belonging to Kraft and are manufactured and sold by Bosch of Germany in certain grocery stores and other retail outlets, including Bed, Bath and Beyond and Macy's.

88.     Tassimo is a closed brewing system, which means that only Tassimo T-Discs can be used in the Tassimo brewers and, conversely, Tassimo brewers can use only T-Discs.  As a result, the sale and placement of the brewer is essential for the sales of T-Discs.  Kraft is the exclusive manufacturer and distributor of Tassimo T-Discs.

89.     In August 2006, Kraft and Starbucks expanded their partnership to include the single cup brewer segment by entering into a Tassimo Supply and License Agreement ("2006 Tassimo Agreement"), which gave Kraft an exclusive license to sell Tassimo T-Discs bearing the Seattle's Best and Tazo brands in the United States.

90.     In July 2007, Kraft and Starbucks entered into a Starbucks Tassimo Supply and License Agreement, which granted Kraft a further license to supply, license, manufacture and distribute T-Discs containing Starbucks coffee and bearing the Starbucks trademark in the United States as well as certain other countries ("2007 Tassimo Agreement").  (The 2006 Tassimo

Agreement and 2007 Tassimo Agreement are referred to herein collectively as the "Tassimo Agreements.")

91.     Under the Tassimo Agreements, Kraft has the exclusive right to manufacture, market, distribute and sell T-Discs containing coffee and tea supplied by Starbucks and bearing the Starbucks, Seattle's Best Coffee and Tazo brands. Those rights allow Kraft to promote the Tassimo system as the only on demand system that can be used with Starbucks products, a key differentiation that gives the Tassimo system a significant competitive advantage.

92.     In 2009, nearly a quarter of Kraft's U.S. revenues from sales of T-Discs came from T-Discs bearing the Starbucks brands (*i.e.*, Starbucks, Seattle's Best, and Tazo). Likewise, in 2010, Kraft estimates that over a quarter of its U.S. T-Disc revenues will come from T-Discs bearing the Starbucks brands.

93.     Because Tassimo is a closed system (meaning that the only people who will buy, or can use, T-Discs are those who own or have access to a Tassimo brewer), the only way to create a market for the sale of Tassimo T-Discs is through sales of Tassimo brewers.

94.     Because single cup brewing systems are premium products, a substantial portion of their sales are gift purchases, *e.g.*, presents for Christmas, birthdays, special occasions, and the like. As a result, approximately 60% of all brewers are sold in the fourth quarter as part of holiday shopping. Thus, holiday sales of Tassimo brewers are critically important to its market share and Kraft's future sales of T-Discs.

95.     Kraft has promoted Tassimo in the U.S. as the only on demand system that offers Starbucks products, with positive results. For example, Safeway, a leading national grocery chain, agreed to market the Tassimo brewer and T-Discs for the 2010 holiday season in large part because consumers can use Starbucks coffee in their Tassimo brewers.

96.     A valid termination of the R&G Agreement gives Starbucks the right to terminate the Tassimo Agreements.  By letter dated November 5, 2010, Starbucks purported to terminate the Tassimo Agreements based on its purported termination of the R&G Agreement.

97.     Because Starbucks' attempt to terminate the R&G Agreement based on frivolous allegations of breach is invalid, so too is its purported termination of the Tassimo Agreements.

98.     Starbucks has, nevertheless, proceeded to act as if its termination of the Tassimo Agreements is an acknowledged fact, just as it has with the R&G Agreement.

99.     On November 12, 2010, for example, it was reported that in an interview in Kunming, China, Howard Schultz stated that Starbucks "is looking to expand its presence in the U.S. consumer packaged goods arena and will sell single-service coffee machines and instant coffee pods to accompany them."  The follow-up statements issued by Starbucks only increased the confusion and uncertainty.

100.     Other news reports suggest that Starbucks has already negotiated an agreement with a single server brewer manufacturer so that Starbucks can enter the "on demand" segment promptly upon its termination of the Tassimo Agreements with Kraft.  These announcements have led to speculation among analysts and other commentators about the future of Tassimo.

101.     Such actions by Starbucks to promote and sell single serve brewers and associated Starbucks branded single serve beverage products violate Kraft's exclusive rights under the Tassimo Agreements.

102.     Starbucks' actions have created confusion in the marketplace, including with Kraft's valued customers, and harmed Kraft's promotion and sales of Tassimo brewers and associated beverage products in the U.S. during this critical 2010 holiday season.

103.    Starbucks' disparagement of Kraft, and interference with Kraft's customers in the single serve brewer segment follows discussions between Starbucks and Kraft during which Kraft, at Starbucks' request, shared with Starbucks highly confidential information regarding its comprehensive business and marketing plans, sales information, and detailed financial data and analyses relating to Kraft's planned strategy for increasing Tassimo market share in the single serve brewer segment.  Kraft shared that information with Starbucks in furtherance of what Kraft understood to be good faith negotiations between the parties for an expansion of their partnership in that segment.

104.    Comments made by Starbucks in its December 1, 2010 investor call suggest that Starbucks may, whether inadvertently or by design, be using Kraft's trade secret information relating to the "on demand" single serve brewer segment to facilitate Starbucks' entry into that segment.  In responding to a question regarding its plans for that segment, for example, Starbucks responded, "we really understood the consumption of premium single serve.  And in countries like Germany, what's happening in Japan and also the U.K. and we mapped out what the U.S will be like, and we have a very clear understanding what the consumer needs and we have a roadmap to really capture that."  Germany and the UK are key markets for Tassimo outside of the U.S.  In the course of the parties' negotiations in early 2010, Kraft shared with Starbucks its proprietary information and strategies relating to its plans for expanding its Tassimo market share in those very markets.

105.    Given that Starbucks now possesses Kraft's proprietary information regarding Kraft's assessment of the strengths and challenges for its Tassimo product line, and Kraft's plans for expanding its Tassimo market share in light of that assessment, there is a high risk that the Starbucks personnel responsible for implementing Starbucks' plans for entering the single serve

brewer market will, whether inadvertently or deliberately, take advantage of Kraft's confidential information in order to strengthen Starbucks' competitive position against its long-time business partner.

### Kraft Faces A Substantial Risk of Irreparable Harm If A Preliminary Injunction Is Not Issued

106.    Starbucks has made misleading statements to the press, its investors and Kraft's valued CPG customers, falsely maligning Kraft's performance under the R&G Agreement and damaging Kraft's customer relationships.  In the process, Starbucks has jeopardized the Starbucks CPG business as well as Kraft's non-Starbucks related product lines.

107.    Because the R&G Agreement has not been properly terminated, Kraft has continued to honor its obligations under that agreement, including the requirement that Kraft refrain from marketing and promoting super premium coffee other than Starbucks products.

108.    In the R&G Agreement, the parties agreed that Kraft would have a six-month period to make such a transition in the event of contract termination pursuant to Paragraph 5(B)(ii).  Starbucks' refusal to effect a valid termination of the R&G Agreement – by either compensating Kraft for the transition of the Starbucks' CPG business to Starbucks and/or following the R&G Agreement's mandatory dispute resolution procedures – is damaging Kraft's ability to move forward with plans to market other super-premium coffee products in competition with Starbucks.

109.    Equally important, Starbucks' inaccurate statements regarding Kraft's performance under the R&G Agreement and Kraft's ability to supply its customers with Starbucks CPG products has caused great uncertainty and confusion with customers, consumers and investors.  This uncertainty has, among other things, damaged Kraft's valuable customer

relationships and potentially threatens the ongoing viability of Kraft's Tassimo product line. Such harm cannot be compensated with damages.

### The Impact Of Starbucks' Public Misstatements On Kraft's Tassimo Business

110. Starbucks' public attacks on Kraft have had an immediate impact on Kraft's Tassimo business. For example, before Starbucks publicly announced that it was terminating the R&G Agreement because of Kraft's purported contractual breaches, a major Kraft customer expressed interest in selling Tassimo products during the 2010 holiday season. After Starbucks' announcements, the customer declined to offer the Tassimo line in 2010. Other customers have expressed concern regarding Kraft's ability to support the Tassimo product line with super-premium coffee products.

111. The negative impact to Kraft's Tassimo business has been further enhanced by Starbucks' announcements that it intends to enter the single serve brewer segment. News reports suggest that Starbucks may have already negotiated an agreement with a single server brewer manufacturer so that Starbucks can enter the "on demand" segment promptly upon its termination of the Tassimo Agreements with Kraft. Such announcements have led to speculation among analysts and other commentators about the future of Tassimo.

112. So long as the law requires Kraft to continue to honor its obligations under its agreements with Starbucks – which Kraft must do until a proper termination is effected – Kraft is hampered from taking the steps necessary to assure its customers of its ability to provide them with super-premium Tassimo coffee products going forward.

113. Through its statements to the press and investors, and its improper contacts with Kraft's CPG customers, Starbucks may weaken the U.S. Tassimo business just as Starbucks is preparing to enter the "on demand" segment and compete directly with Tassimo.

**Starbucks' Interference With Kraft's Customer Relationships**

114.    One of Kraft's greatest assets is its strong customer relationships, relationships Kraft over the course of many years. Indeed, it is a core strength that Starbucks sought to leverage when it turned to Kraft in 1998 for help in growing Starbucks business in the CPG market. By wrongfully disparaging Kraft and by acting on its invalid declaration that it has terminated the R&G Agreement – immediately without first complying with the contractually mandated dispute resolution process – Starbucks is undermining and interfering with Kraft's customer relationships. If not enjoined, Starbucks' actions will result in irreparable harm not only to the Starbucks CPG business that Kraft owns under the R&G Agreement but also to Kraft's CPG business as a whole.

115.    Rather than abiding by the R&G Agreement's dispute resolution procedures to ensure a proper termination of the Agreement (with proper compensation to Kraft according to the terms of that Agreement) and then a proper transition of the CPG business, Starbucks has taken matters into its own hands, contacting Kraft's customers and purporting to effect a transition of the CPG business unilaterally.

116.    Indeed, Kraft has learned that Starbucks has arranged for a meeting the week of December 6, 2010 with one of Kraft's major customers to address its distribution of Starbucks CPG products.

117.    Starbucks has also indicated a willingness to cut off its supply of CPG products to Kraft altogether, leaving Kraft unable to meet its existing commitments to its CPG customers.

118.    Apart from the specific impact Starbucks' actions have had, and will have, on Kraft's sales of Starbucks CPG products pending a proper termination of the R&G Agreement,

Starbucks' actions pose a broader, and far more damaging, threat to Kraft's preeminent "Category Captain" position with its CPG customers.

119.    Each large national retailer selects a Category Captain for its coffee products. Captaincy is awarded based on multiple factors including category knowledge, resources, expertise in consumer insights and a commitment to being unbiased – putting the category above the brands that the captain represents. The Category Captain partners with the customer to develop strategy for the presentation of coffee on the retailer's shelves, including which coffee to sell, where and how much.

120.    Kraft holds the Category Captain position at over 60% of the stores in which it distributes coffee. The Category Captain position has inherent, unquantifiable value because, for many customers, it means that a Kraft employee is dedicated full time to focus on category management for that customer. That relationship development allows for Kraft to serve as a valued strategic advisor to the customer and provides Kraft with insight into the customer's plans, objectives and preferences for distribution, shelf placement and shelf space.

121.    By calling into question Kraft's ability to continue to supply its customers with Starbucks CPG products through the critical holiday season, and then effect a smooth transition from Starbucks products to other super-premium coffee products, Starbucks has exposed Kraft to a risk of losing its invaluable Category Captain position with its customers.

122.    Goldman Sachs, among others, has already recognized this impending harm to Kraft, noting that "[w]e see a heightened risk of Kraft losing its role as category captain with retailers (a key advisory role) in the event that they lose the Starbucks distribution rights. [Smuckers] has been lobbying for this role."

## COUNT ONE

### INJUNCTIVE RELIEF

123.    The allegations set forth in Paragraphs 1 through 122, above, are incorporated herein as if fully restated.

124.    Pursuant to the R&G Agreement, the parties specifically agreed upon a dispute resolution process requiring that any dispute first be submitted to the Oversight Committee and then arbitration if the dispute was not previously resolved.

125.    The R&G Agreement allows a party to commence judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction.

126.    A preliminary injunction is granted upon a showing of irreparable harm in the absence of an injunction; and either the probability of success on the merits, or sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping in the moving party's favor, balancing the hardship to the parties. *See Reuters Ltd. v. United Press Internat'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *see also Winter v. NRDC, Inc.*, __ U.S. __, 129 S.Ct. 365, 374 (2008) (citations omitted); F.R.C.P. 65.

127.    Starbucks has unilaterally purported to terminate its agreements with Kraft. Starbucks has communicated both to the public at large and to Kraft privately its intent to terminate these agreements effective March 1, 2011 and to violate the terms of those agreements between now and March 1, 2011 by contacting retail customers and engaging third party distributors.

128.    The balance of equities tips completely in favor of Kraft.  Starbucks has asserted baseless allegations of Material Breach in an overt effort to avoid its obligations under the R&G

Agreement. It will suffer no harm if the status quo is maintained pending an arbitration because Kraft has a complete marketing plan in place for the Starbucks CPG business for 2011.

129.    Starbucks' maneuvering in fabricating allegations of breach, and refusal to comply with its obligations under the R&G Agreement, including its obligation to allow Kraft sufficient transition time, threatens to cause Kraft irreparable harm.

130.    Indeed, unless Starbucks is enjoined from acting as if the agreements are terminated, thereby maintaining the status quo until completion of the arbitration, Kraft will suffer irreparable harm because:

(a)    Kraft will lose its negotiated right to have disputes between the parties over the agreements decided by a single arbitrator; a right to which there is no calculable amount of damages to compensate Kraft for its loss;

(b)    Starbucks has already begun, and is threatening to continue, to communicate to retail customers and the public the purported transition of Starbucks' CPG business away from Kraft, creating confusion in the market, and a potential loss of consumer and retail customer goodwill;

(c)    While Starbucks has been preparing for months, Kraft has not been provided with sufficient advance notice to prepare for a post-termination situation in which Starbucks will be a competitor rather than a partner;

(d)    Starbucks has launched a defamatory campaign pursuant to which it is seeking to erode Kraft's reputation and preeminence in the (food and) beverage market; and

(e)    Starbucks is requiring that Kraft be bound by the limitations of the R&G and Tassimo Agreements currently, including the exclusivity provisions, yet Starbucks itself is

not complying with the terms of the R&G Agreement and its statements raise serious doubts about its compliance with the Tassimo Agreements.

131.    Kraft has no plain, speedy or adequate remedy at law to avoid this extraordinary harm because Starbucks seeks to divest from the arbitrator the right to determine that there was no material breach on the part of Kraft, and money simply will not be able to compensate Kraft for the damage that will ensue to its business and reputation.

132.    Moreover, the crucial stage of development of the "on demand" coffee segment and the difficulty in effectively estimating both the future size of this segment and the potential impact of Starbucks actions on Tassimo also make it impossible to ensure that Kraft could be adequately compensated through monetary damages.

133.    As the party seeking to terminate the R&G Agreement for alleged material breaches, Starbucks bears the burden of proving in the underlying arbitration proceedings that Kraft has, in fact, materially breached the R&G Agreement, and that its purported termination of that Agreement is valid.

134.    Starbucks will be unable to meet its burden of proof in the arbitration proceedings because Starbucks cannot demonstrate that Kraft materially breached the R&G Agreement as alleged.

WHEREFORE, Kraft seeks an order from this Court:

1.    Granting a preliminary injunction, pending a final determination of the dispute between the Parties in arbitration, enjoining Starbucks from taking any action in furtherance of an alleged unilateral termination on or about March 1, 2011, including any public announcements and/or communications with customers or the public; and (c) enjoining

Starbucks from using any confidential, proprietary information obtained from Kraft over the course of the parties' relationship to its benefit; and

      2.      Ordering such other and further relief the Court may deem just and proper.

Dated: New York, New York.
       December ___6___, 2010

Respectfully submitted,

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0600
212.309.6000

*Of Counsel:*

William P. Quinn (pro hac to be filed)
wquinn@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Phone: 215.963.5000
Fax: 215.963.5001

By: _____
       Michael S. Kraut

       *-and-*

Kathleen A. Waters (pro hac to be filed)
kwaters@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
300 South Grand Avenue, 22nd Floor Los
Angeles, CA 90071-3132
Phone: 213.612.2500
Fax: 213.612.2501

*Attorneys for Plaintiff Kraft Foods Global, Inc.*

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. 215.963.5000
Fax: 215.963.5001
www.morganlewis.com



**William P. Quinn, Jr.**
215.963.5775
wquinn@morganlewis.com

November 4, 2010

**VIA HAND DELIVERY**

Aaron M. Panner, Esquire
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, DC 20036-3209

Re:    *Supply and License Agreement between Kraft Foods Global, Inc. ("Kraft") and*
       *Starbucks Corporation ("Starbucks") dated March 29, 2004 ("Agreement")*

Dear Mr. Panner:

This firm is counsel to Kraft. We write in response to your October 5, 2010 letter purporting, on
Starbucks' behalf, to (i) notify Kraft that it has materially breached the above-referenced
Agreement and (ii) terminate the Agreement effective March 1, 2011 unless the breaches
asserted in the letter are cured within 30 days. Having analyzed the terms of the Agreement and
investigated the facts relevant to the assertions made in your letter, we have determined that they
are, without exception, baseless.

Although Kraft would regret a decision by Starbucks to terminate what has been a successful
partnership, it would respect such a decision provided it is carried out in accordance with the
governing contractual framework and in a manner that reflects the undeniable value of the
business Kraft has built. From this perspective, Kraft finds your letter on Starbucks' behalf
disappointing, both in terms of its timing and content. Over the years of the companies'
partnership, Kraft has delivered tremendous top and bottom line growth to the benefit of both
Starbucks and Kraft. Indeed, gross revenues from the STARBUCKS, SEATTLE'S BEST, and
TAZO brands in the grocery channel have grown from less than $50 million in 1998 to more
than $500 million in 2010. And, as discussed at greater length below, Kraft's strong
performance on behalf of Starbucks' brands has continued, even as the economy faltered and
competition intensified.

Aaron M. Panner, Esquire
November 4, 2010
Page 2


Morgan Lewis
COUNSELORS AT LAW

Given Kraft's exceptional track record, it is obvious that any decision of your client to end its partnership with Kraft is clearly not motivated by any genuine deficiencies in Kraft's performance but rather because it no longer suits Starbucks. This possibility was anticipated when the Agreement was negotiated. It therefore gives Starbucks the right to acquire the business by terminating the Agreement through the operation of Paragraph 5(B)(ii), which requires Starbucks to compensate Kraft in accordance with a formula based, in part, on the appraised fair market value of the business. Kraft's undeniably strong business results and consistent record of collaboration with Starbucks preclude termination on any other basis, including termination without compensation for alleged material breach.

Before turning to some of the reasons that lead us to our conclusion that the assertions in your letter lack foundation, we call your attention to the fact that Starbucks has never before accused Kraft of materially breaching the Agreement even though many of the breaches alleged in your letter, if they had occurred, would have been known to Starbucks years ago. Starbucks would have had many occasions to bring those to Kraft's attention: the parties are in contact on a daily basis and, moreover, regularly conduct joint Management Committee meetings to provide a forum for addressing performance issues as they arise.

We do not intend to recite in this letter all the many reasons why Starbucks' allegations of breach are unfounded. Nonetheless, several of them are worth noting because they leave no doubt that Starbucks' assertions are without merit and that its attempt to terminate the Agreement pursuant to Paragraph 5(B)(iii) will not succeed.

First, there is no truth in Starbucks' contention that Kraft has failed to use "commercially reasonable efforts . . . to market the Licensed Products in the Licensed Channels in the Territory." By any measure and as mentioned above, Kraft's overall performance under the Agreement and its effectiveness in promoting Starbucks' products have been outstanding. As a result, despite increasing competitive pressure, Starbucks remains the dominant player in the super premium coffee category. Your contention that it no longer enjoys that position is refuted by objective market data and the consensus of industry analysts.

In addition, since 2004, gross revenues, net revenues and market share, the key indicators of the health of the business, have been very strong. Recent softness of the business simply mirrored Starbucks' own experience with same-store cafe sales. Starbucks knows this well as Howard Schultz was outspoken about the dramatic effects of the "cataclysmic financial crisis" on the Starbucks brand, describing Starbucks as "a leading indicator of the recession." And as he himself put it, Starbucks had "become the poster child for excess, and if you want to be really smart, you should cut out that $4 cup of coffee."

At the same time Starbucks was faced with increasingly cost-conscious consumers, the Starbucks brand experienced unprecedented competitive pressure from Dunkin' Donuts, a popular and well-known brand, which had launched an aggressive and heavily funded campaign to capture market

Aaron M. Panner, Esquire
November 4, 2010
Page 3



share from Starbucks and others in the grocery channel. Yet Starbucks repeatedly thwarted what Kraft believes would have been highly effective attempts to grow sales and market share, including through innovation.

Despite the lack of support from Starbucks in the face of these formidable challenges, Kraft was able to prevent a precipitous decline in Starbucks' market position. The decline in sales was instead quite modest under the circumstances and was the unavoidable result of factors beyond Kraft's control, including Starbucks' broader brand management strategy. The proposition that Kraft failed to take reasonable measures to overcome these challenges is absolutely and totally refuted by the robust performance of the business in 2010.

Second, Starbucks' assertion that Kraft breached the Agreement by failing "to involve Starbucks in sales planning, presentations, and calls" is simply not true. Kraft has included Starbucks in the review and approval process for all sales presentation templates for major initiatives. The senior Kraft sales director responsible for Starbucks sales frequently meets and travels with Starbucks' National Sales Manager. He also reviews important sales-related issues with him in teleconferences conducted on a weekly basis. Kraft has been equally diligent in providing Starbucks with opportunities to attend all significant customer sales calls, including sales calls in which Starbucks has no contractual right to participate. Indeed, as recently as May of this year, Starbucks applauded the parties' "collaborative customer approach" with two of Kraft's largest and most important customers.

Third, in light of the objective facts revealed by our investigation, Starbucks' contention that Kraft breached Paragraph 9(B)(v) of the Agreement by failing to supply monthly or quarterly budgets is again factually not correct. Kraft has honored this obligation to the letter. On at least a quarterly basis, Kraft has supplied Starbucks with detailed budgets, including standardized P&Ls that reflect trade, advertising and promotions. Kraft has in fact gone well beyond its obligations under Paragraph 9(B)(v) by conducting quarterly budget reviews with Starbucks, making its finance staff available to answer Starbucks' questions on budget related issues and promptly providing any additional detail requested by Starbucks. Those within Starbucks' organization who have first-hand knowledge of the quality of Kraft's performance in this area apparently agree and have expressed their thankfulness and gratitude for providing detailed and extensive information in e-mails that were sent back to Kraft personnel.

Fourth, the allegations that Kraft breached the Agreement by failing to adopt an effective marketing campaign, failing to involve Starbucks in Kraft's market research and advertising activities and failing to obtain necessary advertising approvals are equally baseless. Throughout the parties' relationship, Kraft has worked closely with Starbucks to develop effective market research and new product strategies. At Kraft's invitation, Starbucks has participated in yearly situational assessments of the entire coffee category and periodic marketing mix analyses that explore key performance drivers as well as the efficiency and effectiveness of specific marketing elements. The results of Kraft's market research and consumer testing, which have been shared

Aaron M. Panner, Esquire
November 4, 2010
Page 4



and discussed with Starbucks, demonstrate the effectiveness of Kraft's marketing campaigns.

Kraft has also closely collaborated with Starbucks on all important advertising-related issues. It conducts weekly meetings with Starbucks' personnel to discuss advertising, consumer promotions, customer programs and other marketing elements. Kraft has likewise engaged Starbucks on all significant national advertising and consumer promotion efforts beginning with the formulation of strategy and continuing through final execution. In addition to working with Starbucks on advertising initiatives from the development process through final creative development and testing, both parties participate in weekly Advertising & Media meetings that include both advertising and media agencies, Kraft and Starbucks' marketing personnel, Starbucks' advertising personnel, and Kraft Consumer Insights personnel. Consistent with the Agreement, Kraft does not implement advertising plans or executions without Starbucks' review, input, and approval. Your letter's attempt to show otherwise with respect to a small number of specific executions overlooks the important distinction between national advertising, which is commissioned by Kraft, and customer programs, which are carried out and controlled by individual customers.

Fifth, the allegation that, in every year since 2004, Kraft failed to spend an amount "at least equal to the Minimum A&P Amount" as required by Paragraph 7(B) of the Agreement is again not true. The facts are that, in 2004, 2005, 2006, 2009, and 2010, Kraft spent more than the Minimum A&P Amount. In both 2007 and 2008, Starbucks agreed – explicitly and in writing – to a reduction in the required "minimum" amount. In both of those years, Kraft's actual reduction in A&P spending was less than the amount on which Starbucks agreed.

Sixth, the assertion that Kraft's sale of Yuban brand coffee violates the exclusivity obligation imposed by the Agreement is easily disproved. Apart from the fact that Yuban is not "generally priced" above $6.50 per pound, consumers clearly perceive Yuban as a mainstream coffee, not a "super premium" brand. Yuban therefore does not meet the Agreement's definition of "Super Premium Coffee," no matter how broadly that definition is construed, and consequently is not subject to the Agreement's exclusivity provision. In any case, Kraft has been selling Yuban since long before the Agreement was executed. Until now, Starbucks never suggested that Yuban is a "Super Premium Coffee" or that Kraft has failed to respect Starbucks' exclusivity rights under the Agreement.

Finally, inasmuch as there is no merit in any of Starbucks' contentions that Kraft has failed to meet its obligations under the Agreement, the question of whether Kraft has committed a breach sufficiently material to warrant termination of the Agreement does not arise. Even if Kraft had in some respect failed to fully perform its contractual duties, Starbucks could not plausibly contend that Kraft has committed a "Material Breach" as defined in the Agreement, *i.e.*, that Kraft has breached the Agreement in a way that "significantly impairs the value of [Starbucks'] bargained-for benefits" under the Agreement or "causes or threatens to cause [Starbucks] significant financial, brand equity and/or other injury." Nor can Starbucks possibly show that

Aaron M. Panner, Esquire
November 4, 2010
Page 5



Kraft is guilty of any failure that is so material to the parties' relationship as to justify
termination under established contract law principles.

For all of these reasons, Kraft regards each of Starbucks' accusations that Kraft has materially
breached the Agreement as groundless and its attempt to terminate the Agreement based on those
alleged breaches as having no legal effect.  We are confident that an arbitrator would agree,
especially given the pretextual nature of Starbucks' breach allegations.  Kraft will continue to
operate the business in good faith and for the parties' mutual benefit and it expects Starbucks to
do the same.

Very truly yours,

William P. Quinn, Jr.