# EXHIBIT 1

# AMENDED AND RESTATED
## PURCHASE, SUPPLY AND ROYALTY AGREEMENT

THIS AMENDED AND RESTATED PURCHASE, SUPPLY AND ROYALTY AGREEMENT ("Agreement") is entered into as of November 30, 1998, by and between STARBUCKS CORPORATION, a Washington corporation ("Supplier"), and KRAFT FOODS, INC., a Delaware corporation ("Distributor").

WHEREAS, Supplier is engaged in the manufacture, sale and distribution of Super Premium Coffee (as defined herein);

WHEREAS, Distributor is engaged in the manufacture, sale and distribution of a variety of food products in the Retail Channel (as defined herein);

WHEREAS, Supplier and Distributor are parties to a Trademark License Agreement dated September 25, 1998 (the "License Agreement"), under which Supplier has agreed to grant Distributor certain trademark licenses on the terms and conditions set forth therein;

WHEREAS, pursuant to the License Agreement, Supplier and Distributor entered into a Purchase, Supply and Royalty Agreement (the "Original Supply Agreement") upon the satisfaction of certain conditions with respect to filings made by the parties with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"); and

WHEREAS, Supplier and Distributor have continued to review the terms of the Original Supply Agreement in anticipation of the commencement of the performance of their respective obligations thereunder, and now desire to amend and restate the Original Supply Agreement to clarify certain provisions in the Original Agreement, and to set forth their respective rights and responsibilities with respect to: (a) Supplier's sale and Distributor's purchase of certain assets currently owned and used by Supplier in connection with the sale of Super Premium Coffee in the Retail Channel; and (b) the parties' joint efforts to increase the market for prepackaged whole bean and ground Super Premium Coffee sold in the Retail Channel in the Territory (as defined herein), and to supply such market with the Licensed Products and Club Products (as defined herein).

NOW, THEREFORE, for the mutual consideration set forth herein, the parties hereto agree as follows:

1.    **Definitions**. For purposes of this Agreement:

*"Accounts Receivable"* shall be defined as the accounts receivable arising from the sale of the Inventory in the Retail Channel, but specifically excluding accounts receivable arising from the sale of Club Products to the Clubs.

*"A&P" or "Advertising and Promotion"* shall be defined as all sums paid by Distributor to advertise and promote Licensed Products in the Retail Channel in the Territory, including but

not limited to all expenditures associated with production and distribution of television, radio, print (including free standing inserts), direct mail, on-line (e.g., Internet), point-of-sale and other forms of advertising; trade spending; consumer promotions; public relations; and product sampling and demonstrations, but excluding any of Distributor's internal overhead costs.

*"Assets"* shall be defined as the following assets which will be sold by Supplier to Distributor pursuant to the terms of this Agreement:

(a)     the Inventory;

(b)     the Display Materials; and

(c)     the Accounts Receivable.

*"Business Day"* shall be defined as any day not a Saturday, Sunday or statutory holiday in the United States.

*"Change of Control"* occurs where any person or group of persons acting in concert who, on the date of this Agreement, does not possess Control over a party hereto, gains control over such party, or in the event of a sale of all or substantially all of the assets of Distributor, Supplier or Distributor's Maxwell House Coffee Division; provided, however, that a transaction pursuant to which the parent company of Distributor distributes all of the outstanding capital stock of Distributor to such parent's shareholders will not be deemed to be a Change of Control.

*"Club Products"* shall be defined as the whole bean and ground coffee sold by Supplier to the Clubs.

*"Club Sales"* shall be defined as the following sales by Distributor in the Territory:

(a)     sales of the Licensed Products to Costco, Sam's Club and their successors and assigns;

(b)     sales of Meridian brand coffee to Costco and its successors and assigns; and

(c)     sales of Navigator brand coffee to Meijer and its successors and assigns.

*"Clubs"* shall be defined as Costco, Sam's Club, Meijer and their successors and assigns.

*"Control"* shall be defined as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with the party in question.

*"Display Materials"* shall be defined as the display materials used in connection with the Inventory.

*"Effective Date"* is November 30, 1998; provided, however, that solely with respect to Club Sales and the parties' rights and obligations under this Agreement related to Club Sales, this Agreement will become effective on January 25, 1999.

*"Fully Landed Cost"* means the direct costs incurred by Supplier in producing roasted coffee which is sold to Distributor and supporting the sale of such coffee to and by Distributor in accordance with the terms of this Agreement. The following elements will be used to determine the Fully Landed Cost to be charged Distributor under this Agreement: (a) green coffee costs, (b) the cost of shrinkage which occurs during the roasting process, (c) decaffeination costs, (d) conversion (i.e., roasting and grinding) costs, (e) packaging costs, (f) transportation costs, (g) warehousing costs, (h) internal distribution costs (i.e., Supplier's costs for packing and moving the product in its roasting facilities), (i) an appropriate allocation of manufacturing overhead and direct costs of corporate support associated with producing the product and supporting the sale of the product to and by Distributor, and (j) direct sales and gross revenue taxes.

*"Grandfathered Grocery Kiosks"* shall be defined as kiosks in stores included in the Retail Channel in operation or under construction on the Effective Date which are owned or licensed by Supplier. A list of Grandfathered Grocery Kiosks is set forth on Schedule 1a hereto.

*"Grocery Kiosks"* shall be defined as kiosks in certain stores included in the Retail Channel which may take the form of a cart from which brewed coffee beverages and whole bean and ground Super Premium Coffee of Licensor are sold or the form of a retail store operated by Licensor within the store in question with no separate exterior entrance, in either case, the design, layout, signage and method of operation of which are determined by Licensor. Grocery Kiosks shall not include kiosks that are adjacent to or otherwise near a grocery store but have a separate entrance.

*"Inventory"* shall be defined as the inventory that qualifies as Licensed Products in the Retail Channel in the Territory, excluding Club Products, under this Agreement on the Effective Date.

*"Licensed Core Trademarks"* shall be defined as the Licensed Trademarks not including the NAVIGATOR and MERIDIAN trademarks.

*"Licensed Products"* shall be defined as the blends of Supplier's whole bean and ground coffee products bearing the Licensed Trademarks which are set forth on Schedule 1b hereto specifically excluding all Club Products.

*"Licensed Trademarks"* shall be defined as certain valuable trademarks set forth on Schedule A attached hereto and incorporated herein and any slogans, designs, devices, logos, insignias, emblems, symbols, trade dress, label designs or other proprietary identifying characteristics associated with such trademarks (collectively, the "Licensed Trademarks") used in the conduct of Supplier's business.

*"Material Breach"* shall be defined as a breach of any representation, warranty, covenant or agreement in this Agreement which significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause significant financial, brand equity and/or other injury to the other party.

*"Minimum A&P Amount"* shall be defined as:

| | |
|---|---|
| For Year 1: | Thirty Percent (30%) of Year 1 Net Sales, not including Club Sales |
| For each of Years 2 through 10: | Twenty Percent (20%) of Net Sales, not including Club Sales, for such Year. |

The Minimum A&P Amount for the years after the initial ten (10) year term of this Agreement shall be determined by the Oversight Committee (as defined below).

*"Net Sales"* shall be defined as the total dollar amount for the relevant period of gross sales of products hereunder, at the invoice selling price minus a four and one half percent (4.5%) allowance (in lieu of an actual calculation of returns and allowances) all as calculated in accordance with generally accepted accounting principles as determined in accordance with Distributor's normal accounting policies.

*"Retail Channel"* shall be defined as retail grocery stores, club stores (e.g., Costco, Sam's) and mass merchandise stores (including Supercenters). By way of clarification, examples of sales that are not intended to be included in the "Retail Channel" are sales by drug or convenience stores, sales through non-traditional channels such as Internet or direct mail and sales on or by military bases.

*"Significant Competitor"* shall be defined as a business with annual sales of One Hundred Million Dollars ($100,000,000) or more of Super Premium Coffee other than Super Premium Coffee bearing the Licensed Trademarks.

*"Super Premium Coffee"* shall be defined as whole bean or ground coffee that is (i) traditionally sold at the highest end of the consumer coffee market in the Territory, and (ii) generally priced at least seventy percent (70%) or $2.00 per pound, whichever is greater, in excess of prices of traditional whole bean or ground coffee brands marketed and sold in the Retail Channel.

*"Territory"* shall be defined as the United States.

*"Year"* except for Year 1, shall be defined as the fiscal year of Supplier which begins, for a particular year, at 12:01 a.m. on the Monday following the last Sunday in the month of September and ends at midnight on the last Sunday of the month of September of the following year. Unless the defined term "Year" is used, "year" shall mean any twelve-month period of time.

*"Year 1"* shall be defined as the period from the Effective Date through October 3, 1999.

*"Year 2"* shall be defined as the fiscal year of Supplier following Year 1, and subsequent years will also be similarly measured by reference to Supplier's fiscal years.

2. **Sale and Purchase of Assets.** Concurrently with the execution and delivery of this Agreement, Supplier hereby sells to Distributor, and Distributor hereby purchases from Supplier, the Assets.   The aggregate purchase price for the Assets shall be determined by Supplier and Distributor no later than December 15, 1998 (the "Settlement Date"), and shall be paid by Distributor to Supplier by wire transfer of immediately available funds on the Settlement Date. The purchase price shall be determined and allocated on the Settlement Date as follows::

(a)   The purchase price for the Inventory shall equal the value of the Inventory which is shipped to Distributor on the Effective Date, as such value is reflected on Supplier's books and records as of the close of business on November 29, 1998.

(b)   The purchase price for the Accounts Receivable shall equal the value of the Accounts Receivable as set forth on Supplier's books and records as of the close of business on November 29, 1998, minus a "Reserve" for product returns and trade program deductions and payments.  The Reserve shall equal the sum of: (i) $826,670, minus the product returns actually accepted and deducted by Supplier in connection with the Accounts Receivable through the close of business on November 29, 1998; plus (ii) $2,035,548 minus the trade program deductions and payments recognized by Supplier through the close of business on November 29, 1998.  Neither party will be entitled to any adjustment to the purchase price set forth in this Section to the extent that the actual amount of uncollectible Accounts Receivable is different than the Reserve.

(c)   The purchase price for the Display Materials shall equal the value for such items as set forth on Supplier's books and records as of the close of business on November 29, 1998, subject to adjustment to the extent that Distributor conducts a physical audit of the Display Materials in Supplier's warehouse and identifies errors in Supplier's books and records.   Such audit shall be conducted on or before December 15, 1998.

Supplier shall evidence the sale of the Assets, which sale will be effective as of the Effective Date, by executing and delivering a Bill of Sale in form and substance reasonably satisfactory to Distributor

3.   **Sale of Licensed Products; Exclusivity Obligations and Other Terms**

A.   **Supplier's Grant of Right to Sell Licensed Products.**  On the terms and conditions of this Agreement, Supplier hereby grants to Distributor: (i) the exclusive right to market, distribute and sell, packaged for the end consumer, the Licensed Products in the Retail Channel in the Territory; and (ii) a non-exclusive and non-transferable sublicense, with no further right to sublicense, to market, distribute and sell, packaged for the end consumer (x) Meridian brand whole bean and ground coffee to Costco for sale in the Territory, and (y) Navigator brand whole bean and ground coffee to Meijer for sale in the Territory.   Distributor expressly reserves all rights relating to the Licensed Trademarks not granted to Distributor under this Agreement.

B.   **Distributor's Obligations for Sale of Licensed Products.**  During the term of this Agreement, Distributor shall use commercially reasonable efforts, consistent with

Distributor's business practices, policies, strategies, and with the terms of this Agreement, to market the Licensed Products in the Retail Channel in the Territory.

C.    Exclusivity Obligations.

(i)    Of Supplier.

(a) During the term of this Agreement, except as provided in Subsection 3.C.i(b), Supplier shall not market, distribute or sell, or license any third party to market, distribute or sell, the Licensed Products in the Retail Channel in the Territory other than to Distributor. Notwithstanding the foregoing, Supplier retains the right to sell Super Premium Coffee in channels other than the Retail Channel, including, without limitation, in cafes, kiosks and other retail stores (e.g., without limitation, licensed operations), food service venues, direct response channels, and specialty sales (e.g., without limitation, airlines, office products, Barnes & Noble, Nordstroms). In addition, any limitations on Supplier's rights to sell Club Products shall end if Club Sales are taken back by Supplier because of Distributor's failure to meet the performance minimums set forth in Section 7.B.(iv) below.

(b) Upon consultation with Distributor, Supplier will evaluate the feasibility of establishing Grocery Kiosks within certain stores included in the Retail Channel ("Grocery Kiosks"). Supplier will determine in which stores to establish Grocery Kiosks and will negotiate to enter into license agreements with such stores. The design, layout, signage and method of operation of the Grocery Kiosks shall be determined by Supplier. Supplier shall sell coffee to the Grocery Kiosks (in food service packaging not intended for retail sale) for the purpose of selling brewed coffee. Except in the case of Grandfathered Grocery Kiosks which shall be supplied directly by Supplier, Distributor shall sell Licensed Products consisting of prepackaged whole bean and ground Super Premium Coffee to the Grocery Kiosks for retail sale.

(ii) Of Distributor. During the term of this Agreement, Distributor shall not, directly or indirectly, distribute, market or sell any Super Premium Coffee other than the Licensed Products in the Retail Channel in the Territory. Set forth on Schedule 3.C.(ii) is a list of all existing contractual obligations of Distributor relating to testing, operating or supplying Super Premium Coffee kiosks. Distributor shall not develop, establish, or operate any Super Premium Coffee kiosks or sell to any Super Premium Coffee kiosks in the Retail Channel other than as set forth in Section 3.C.i.(b) above, except to the extent necessary to comply with Distributor's obligations identified on Schedule 3.C.(ii) hereto.

D.    Distribution of Licensed Products Outside the Retail Channel and Outside the Territory.  Distributor shall have no right to sell Licensed Products outside of the Retail Channel or outside of the Territory, and Supplier expressly reserves all rights in the Licensed Products not granted to Distributor under this Agreement. .Distributor shall use commercially reasonable efforts to ensure that Licensed Products are not distributed outside of the Retail Channel or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the distribution of Licensed Products outside of the Retail Channel (e.g., distribution of Licensed Products in packaging designed for uses other than home use by end consumers in the Territory), and refraining from actions intended to facilitate the distribution of Licensed Products outside of the Territory.

E.    Product Pricing in Retail Channel.  It is the intention of the parties that Distributor will not price the Licensed Products in a manner likely to detract from such products' super premium brand positioning in the market.  Distributor shall have sole control of the pricing of the Licensed Products in the Retail Channel; *provided, however,* that Supplier may suggest price levels to Distributor consistent with the price and brand positioning of other Super Premium Coffee, and Distributor shall give due consideration to any such suggestions of Supplier when pricing the Licensed Products.

4.    Product Supply.

A.    Product Standards.  The actions taken by Supplier in connection with the purchase, roasting, distribution or sale of the Licensed Products to be supplied by Supplier to Distributor under this Agreement shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to Super Premium Coffee sold in retail outlets owned by Supplier.  When Distributor has achieved "nationwide distribution" (defined as placement of the Licensed Products in stores representing 60% ACV) of the Licensed Products, Supplier shall deliver the Licensed Products to Distributor no later than six (6) weeks after such products are packaged by Supplier.

B.    Product Supply Prices.  Supplier shall sell Licensed Products to Distributor at a price which reflects the components set forth on the attached Schedule 4.B., except for Club Products which shall be sold to Distributor in accordance with Section 7.B.

C.    Product Supply.  Supplier will select the green coffee to be used to manufacture the Licensed Products.  Distributor will provide Supplier with rolling forecasts of estimated sales of Licensed Products as set forth on Schedule 4.D. to facilitate the purchase and roasting of green coffee for ultimate sale.  Supplier shall send to Distributor an invoice setting forth amounts owed by Distributor to Supplier, concurrently with each shipment of Licensed Products .  Distributor shall remit payment to Supplier, by wire transfer of immediately available funds, of all amounts due under any such invoice within fifteen (15) days after receipt of such invoice by Distributor.  Notwithstanding the foregoing, the parties shall process invoices and payments for Club Sales in accordance with the provisions of Section 7.B(iii).

D.    Future Supply Arrangements.   Schedule 4.D. sets forth the procedures for Distributor to communicate with Supplier with regard to demand forecasts.

B.    **Orderly Transition.**    Supplier and Distributor shall act in good faith to make an orderly transition for the sale of Licensed Products and Club Products in the Retail Channel in the Territory subsequent to the Effective Date.    Distributor and Supplier shall use their commercially reasonable efforts to allow the Licensed Products and Club Products to enter into the Retail Channel upon the Effective Date and to be sold in the ordinary course of business of the particular retail outlet in the Retail Channel at which such products are located.  Supplier and Distributor shall allocate the cost of trade spending commitments that extend into the period beyond the Effective Date as follows:

(a)    Fixed trade spending commitments for the 4th quarter of 1998 shall be allocated on a pro-rata basis according to the day on which Distributor takes over administration of the sales of Licensed Products hereunder;

(b)    Variable trade spending shall be charged to the account of the party who is responsible for sales on the date the variable spending occurs;

(c)    Consumer coupons for the Licensed Products redeemed in the first 45 days after the Effective Date shall be charged to the account of Supplier; consumer coupons redeemed thereafter shall be for the account of the Distributor.

5.    **Term and Termination.**

A.    **Term.**  This Agreement shall commence as of the Effective Date and continue for a period of ten (10) years, unless sooner terminated pursuant to the terms of this Agreement. This Agreement shall renew automatically for successive ten (10) year periods, unless sooner terminated pursuant to the terms of this Agreement.

B.    **Termination.**  This Agreement may be terminated prior to the expiration of the term hereof as follows:

(i)    By mutual written agreement of Supplier and Distributor;

(ii)    By Supplier at any time after five (5) years from the Effective Date if Distributor fails to sell the "Performance Goal" of Licensed Products and does not cure such failure within one hundred twenty (120) days (the "Cure Period") following Supplier's provision of written notice of such failure to Distributor.  As used in this subsection 5.B. (ii), the "Performance Goal" means annual Net Sales by Distributor of Licensed Products in the Retail Channel in the Territory of not less than Four Hundred Twenty Five Million Dollars ($425,000,000) as measured at the end of Year 5, and increasing by twenty percent (20%) per Year after Year 5. Distributor may cure any such failure by purchasing, during the Cure Period, Licensed Products with a Net Sales value of not less than (a) the difference between the Performance Goal and the actual Net Sales of Licensed Products purchased during the Year in which the failure occurred, plus (b) one-third of the Performance

Agreement pursuant to this provision, and Supplier: (x) resumes sale of the Licensed Products in the Retail Channel in conjunction with a party other than Distributor, Supplier will pay Distributor one hundred thirty-five percent (135%) of the fair market value of this Agreement; or (y) directly distributes the Licensed Products in the Retail Channel and agrees not to use a third party distributor in the Retail Channel in the Territory for a period of two (2) years following such termination, then Supplier will pay Distributor one hundred twenty percent (120%) of the fair market value of this Agreement; or (z) refrains from any and all distributions of the Licensed Products in the Retail Channel in the Territory, other than through Grocery Kiosks and Club Stores, for a period of two (2) years following such termination, then Supplier will pay Distributor the fair market value of this Agreement.

(iii) By either party, upon a Material Breach of this Agreement by the other party which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach.

(iv) By either party, upon a termination of the License Agreement for any reason.

(v) By Supplier, upon written notice to Distributor within thirty (30) days following each Performance Minimum Calculation Date, in the event Supplier has not received the minimum payment specified for such period in Section 7.C. hereof; *provided, however*, that failure of Supplier to terminate this Agreement if a particular performance minimum contained in Section 7.C. hereof is not met shall not constitute a waiver of Supplier's right to terminate this Agreement at any future Performance Minimum Calculation Date.

(vi) By either party, in the event of insolvency or bankruptcy of the other party, if such condition is not cured within 60 days.

(vii) By either party, in the event of an assignment of this Agreement by the other party in violation of Section 15.B. hereof.

(viii) By Supplier, if, without the prior consent of Supplier, (a) Distributor assigns this Agreement to a Significant Competitor, or (b) Distributor or any of its affiliates becomes a Significant Competitor or a supplier of Super Premium Coffee to a Significant Competitor. Distributor's program, as in existence on the Effective Date, of selling branded or unbranded coffee products (as a "private label" manufacturer, and without controlling the

marketing), and franchising and/or licensing the GEVALIA trademark for use on and in connection with, foodservice operations in hotels, educational institutions, transportation centers, business offices, retail outlets, foodservice kiosks, food courts, and other host foodservice channels, shall not constitute selling Super Premium Coffee for purposes of the definition of Significant Competitor.

(ix) · By Distributor, if, without the prior consent of Distributor, Supplier assigns this Agreement to a Significant Competitor.

(x) By either party, upon a Change of Control of the other party.

In the event Supplier terminates this Agreement pursuant to Subsection 5.B.(ii) hereof, then within forty five (45) days following the effective date of the termination, Supplier shall pay Distributor the relevant termination fee based on an amount equal to the fair market value of this Agreement as determined by the Supplier-Chosen Appraiser (as defined below). In the event the fair market value of this Agreement is determined (pursuant to Section 5.C. or otherwise) to be greater than the amount determined by the Supplier-Chosen Appraiser, Supplier shall pay Distributor any additional termination payment it owes Distributor under this Agreement within thirty (30) days after such amount is determined.

C.    Valuation. Within thirty (30) days following Supplier's written notice to Distributor of Supplier's termination of this Agreement pursuant to Subsection 5.B.(ii) hereof, Supplier shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "Supplier-Chosen Appraiser"), and Distributor shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "Distributor-Chosen Appraiser"). The Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser shall jointly determine the fair market value of this Agreement.   In the event the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on the fair market value of this Agreement within forty-five (45) days after they are appointed, and further negotiations, in the opinion of either of the appraisers, would not result in such an agreement, the fair market value of this Agreement shall be the average of the appraised values of the two appraisers; provided, however, that if the appraised values of the two appraisers differ by more than ten percent (10%) of the lower of the two appraised values, the two appraisers shall select a third appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement, which appraiser shall be independent with respect to Supplier and Distributor (the "Independent Appraiser"). The Independent Appraiser shall not be affiliated with either Supplier or Distributor, shall not have performed work for either Supplier or Distributor within the twenty-four (24) month period immediately preceding its appointment pursuant to this Section 5.C. and shall otherwise not have any reason to be influenced by the interests of either Supplier or Distributor.   If the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on an Independent Appraiser, then either party may petition the presiding judge of the Federal District Court for the Southern District of New York to appoint an Independent Appraiser. The Independent Appraiser shall, within forty-five (45) days after its appointment, determine whether the appraisal prepared by the Supplier-Chosen Appraiser or the appraisal

prepared by the Distributor-Chosen Appraiser most closely reflects the fair market value of this Agreement, and shall notify the parties of such decision in writing. The appraisal selected by the Independent Appraiser shall be final and binding on Supplier and Distributor for purposes of determining the fair market value of this Agreement. Supplier and Distributor shall bear the costs of their respective appraisers and shall share the cost equally of the Independent Appraiser, if any.

6.   **Post-Termination Rights and Obligations**.

A.   Transition from Distributor to Supplier. Subject to Section 6.C. below, upon termination of this Agreement, Supplier shall buy from Distributor (i) Licensed Products and Club Products that remain in the Retail Channel on the date of termination of this Agreement, (ii) the display materials related thereto, and (iii) accounts receivable generated by sales of Licensed Products and Club Products under this Agreement. The purchase price paid by Supplier to Distributor pursuant to this Section 6.A. shall be calculated as follows:

(i)   The purchase price for the Licensed Products and Club Products referred to in this subsection shall be the purchase price paid by Distributor when it purchased such products from Supplier.

(ii)   The purchase price for the display materials referred to in this subsection shall be the depreciated book value thereof.

(iii)   The purchase price for the accounts receivable referred to in this subsection shall be the face value thereof.

The parties shall allocate advertising and promotional commitments relating to the Licensed Products existing on the date of termination of this Agreement in the same manner as set forth in Section 4.E. hereof.

B.   Payment of Fair Market Value of this Agreement. In the event this Agreement is terminated pursuant to Subsection 5.B.(ii), the payment by Supplier to Distributor of the amount set forth in any such provision shall be deemed to be the purchase by Supplier of the Licensed Products and Club Products owned by Distributor that remain in the Retail Channel, the display materials used in connection therewith, the existing advertisement and promotional commitments relating to such Licensed Products and Club Products, and the then-outstanding accounts receivable generated by sales of Licensed Products and Club Products under this Agreement.

C.   Orderly Transition. Supplier and Distributor shall act in good faith to make an orderly transition for the sale of the Licensed Products and Club Products following termination of this Agreement. Distributor and Supplier shall use their best efforts to allow the Licensed Products and Club Products remaining in the Retail Channel to be sold in the ordinary course of business of the particular retail outlet in the Retail Channel at which such Licensed Products or Club Products remain.

7.   **Royalties and Other Consideration.** Royalties and Performance Minimums calculated pursuant to Sections 7.A. and 7.C., respectively, shall include all sales of Licensed Products, but shall not include Club Sales, the terms of which are as described in Section 7.B. below.A.   **Royalties.**

   (ii)   <u>Periodic Royalty Payments.</u>  Within fifteen (15) days after the end of each fiscal month, Distributor shall pay to Supplier, by wire transfer of immediately available funds, royalties as follows, computed on Net Sales (excluding Club Sales):

      (a)   For each of the first three (3) years of this Agreement:

         (x) five percent (5%) of Net Sales, excluding Club Sales, in the Retail Channel in the Territory, for such Net Sales up to and including Fifty Million Dollars ($50,000,000) during the then-current year;

         (y) seven percent (7%) of Net Sales, excluding Club Sales, in the Retail Channel in the Territory for such Net Sales in excess of Fifty Million Dollars ($50,000,000) and up to One Hundred Million Dollars ($100,000,000) during the then-current year;

         (z) ten percent (10%) of Net Sales, excluding Club Sales, in the Retail Channel in the Territory, for such Net Sales in excess of One Hundred Million Dollars ($100,000,000) during the then-current year.

      (b)   Commencing the 4th Year of this Agreement and continuing for the subsequent years during the term of this Agreement, ten percent (10%) of Net Sales, excluding Club Sales, in the Retail Channel in the Territory.

B.   <u>Special Arrangements for Club Sales</u>

   (i)   During Year 1 and Year 2, Distributor's purchase price for Club Products shall equal the gross sales revenues generated from such Club Sales. Supplier shall pay Distributor a brokerage fee of four percent (4%) of Net Sales generated from Club Sales, which Distributor may deduct from the purchase price payable to Supplier.  The following additional amounts will also be deducted from the purchase price payable to Supplier:

      (a) the current cash discount allowance for Club Sales and the three percent (3%) performance allowance for qualifying customers (Costco is the only qualifying customer to date);

      (b) the cost of actual returned or unsalable goods, if any; provided that Distributor will not change Supplier's policy of restricting returns by Clubs, unless Supplier consents to such change; and

(c) Distributor's Advertising and Promotion expenses with regard to Club Sales shall be deducted from the purchase price payable to Supplier, but shall not exceed seven cents ($0.07) per pound.

(ii)   For Club Sales generated in Year 3 and each Year thereafter during the term of this Agreement, Distributor's purchase price for Club Products shall equal the gross sales revenues generated from such Club Sales. Supplier shall pay Distributor the greater of (x) fifty percent (50%) of Supplier's Profits generated by Club Sales for such Year in excess of Supplier's Profits of Club Sales generated in Year 2 and (y) four percent (4%) of Club Sales for such Year. "Profits" as used in this Subsection 7.B. means the gross sales of Club Products less the cost of goods sold in connection with such gross sales as recorded on Supplier's books and records in accordance with generally accepted accounting principles. The cash discount allowance for Club Sales, the three percent (3%) performance allowance for qualifying accounts, the cost of any unsalable or returned goods (subject to Supplier's right to approve Distributor's return policies) and Distributor's Advertising and Promotion expenses with regard to Club Sales in an amount not to exceed seven cents ($0.07) per pound shall be deducted from the purchase price payable to Supplier.

(iii)  Distributor shall deliver invoices to the Clubs as soon as reasonably practical for all Club Sales, and shall provide Supplier a copy of each such invoice concurrently with the delivery of the invoice to the Club. Within fifteen (15) days following Distributor's delivery of an invoice to a Club, Distributor shall pay Supplier the purchase price for the Club Products sold under such invoice.

(iv)   Distributor's Club Sales under this Agreement shall generate minimum gross sales revenues of not less than $39,375,000 in Year 2. This amount shall be reduced pro-rata in the event a Club closes stores or determines not to continue ordering the Club Products notwithstanding the reasonable commercial efforts of Distributor to maintain and grow such sales. For each Year thereafter, Club Sales shall generate minimum average gross sales revenue growth of not less than three percent (3%) per Year. Supplier shall determine Distributor's compliance or noncompliance with the minimum gross sales revenues set forth in this subsection on or before the 60th day following the end of the applicable Year. In the event Distributor fails to meet the minimum gross sales revenues targets for such Year, Supplier may, by written notice delivered not later than December 31 of the subsequent Year, notify Distributor that Supplier is (a) terminating Distributor's rights to distribute the Club Products to the Clubs, and any and all other rights and licenses related to such distribution rights, and (b) resuming the distribution of Club Products to the Clubs on its own behalf.   Supplier's termination under this subsection of

Distributor's right to make Club Sales shall not constitute, in and of itself, grounds for termination of Distributor's other rights under this Agreement.

    (v)    Distributor shall not be required to pay a royalty on Club Sales.

C.    <u>Performance Minimums for Sales of Licensed Products.</u>

    (i)    Calculations shall be made within sixty (60) days after the conclusion of each of Year 5, Year 6, Year 8 and Year 10 (each such date, a "Performance Minimum Calculation Date") of the amount of Net Sales, excluding Club Sales, for each such year. At each Performance Minimum Calculation Date, Distributor shall have achieved the following minimum Net Sales, excluding Club Sales:

    (a)    $110,000,000 in Year 5;

    (b)    Such sales for each of Year 5 and Year 6 resulting in average Net Sales, excluding Club Sales, for each of Year 5 and Year 6 equal to at least $115,000,000;

    (c)    Such sales for each of Year 7 and Year 8 resulting in average Net Sales, excluding Club Sales, for each of Year 7 and Year 8 equal to at least $137,000,000;

    (d)    Such sales for each of Year 9 and Year 10 resulting in average Net Sales, excluding Club Sales, for each of Year 9 and Year 10 equal to at least $159,000,000;

(ii)    Distributor's failure to achieve the minimum Net Sales amounts (excluding Club Sales) set forth or referred to in this Section 7.C. shall be a Material Breach of this Agreement.

(iii)    The Sales Performance Minimums for the years after the initial ten (10) year term of this Agreement shall be determined by the Oversight Committee (as defined below).

D.    <u>Advertising and Promotion.</u>

(i)    Distributor shall spend, per year, on Advertising & Promotion, at least the Minimum A&P Amount for such year.

(ii)    The failure of Distributor to spend, in any year, the designated Minimum A & P Amount shall constitute a Material Breach of this Agreement on the part of Distributor; *provided, however*, that any such failure on the part of Distributor shall not be deemed a Material Breach of this Agreement if (a) Distributor has spent at least ninety percent (90%) of the minimum expenditure in question and Distributor pays to Supplier, within thirty (30) days following the end of such

year, the amount by which the Minimum A & P Amount exceeds Distributor's actual advertising and promotional expenditures; or (b) Distributor's failure to spend the Minimum A & P Amount for a particular year results solely from the inability of Distributor, due to invoicing timing and payment issues, to recognize as an expense any advertising or promotional expenditure in Distributor's financial statements prepared in accordance with Distributor's usual and customary accounting practices.

E. <u>Disputes Regarding Royalties</u>. In the event of any dispute between the parties regarding the payment or computation of royalties, Supplier may, in its discretion, have a certified public accountant of its own choice conduct an audit or audits during the term of this Agreement, and for up to one year following termination of this Agreement. Such audit(s) shall be made with particular reference to all applicable terms of this Agreement, shall determine the total sales of Licensed Products for which Distributor is obligated to pay royalties and the total royalties due to Supplier. Supplier shall pay all audit costs unless the audit discloses a royalty payment shortfall of five percent (5%) or more, in which case Distributor shall pay all audit costs. All records of Distributor as may reasonably be necessary to verify the audit will be made available to Supplier's certified public accountant upon its request.

F. <u>Statements and Payments</u>.

(i) Distributor shall render quarterly reports to Supplier, no later than thirty (30) days after the end of each quarter. Such reports shall each contain the following information, nationally and by Distributor's sales regions (including a breakout of information for Hawaii with respect to items (a), (b), (c) and (f) below), in a form reasonably satisfactory to Supplier:

(a) gross sales of Licensed Products and Club Products during the quarter;

(b) Net Sales of Licensed Products and Club Products during the quarter;

(c) unit sales by Licensed Product and Club Product during the quarter;

(d) Advertising and Promotion by Licensed Product and Club Product during the quarter;

(e) distribution, retail pricing and share data for Licensed Products and Club Products;

(f) a computation of the royalty payments paid to Supplier during the quarter; and

(g) Distributor's analysis of business results (i.e., reports or studies prepared by Distributor's Marketing Services Department, Sales Division or Maxwell House Division) of the Licensed Products and Club Products for the quarter, in a form reasonably adequate to inform Supplier of the state of Distributor's business contemplated by this Agreement.

(ii) The quarterly report shall be accompanied by payment in immediately available funds to Supplier or its designee for any unpaid royalty amounts, if any, due to Supplier.

(iii) By no later than November 30 of the succeeding Year, Distributor shall provide Supplier with a final accounting of all sums due for the prior Year and a statement from Distributor's Controller certifying the accuracy and consistency of the quarterly reporting given to Supplier by Distributor during the Year then ended. By no later than December 15 of the succeeding Year, Distributor or Supplier, as applicable, shall make any additional payment or refund necessary in light of the final accounting.

G.     Records.  Distributor shall maintain for a period consistent with Distributor's normal retention practices, complete and accurate records and accounts covering the transactions related to this Agreement. Such records and accounts shall be kept in accordance with generally accepted accounting procedures and principles. Distributor shall make such records and accounts available for inspection and audit at Supplier's expense during the term of this Agreement and for one (1) year thereafter; provided that (i) any such inspection and audit by Supplier shall be conducted during reasonable business hours and upon reasonable notice by Supplier or its nominees; and (ii) Distributor shall not be obligated to provide access to any records for longer than its normal retention periods.

8.     **Quality Standards and Quality Control.**

A.     Supplier's Quality Obligations.  Supplier shall use all commercially reasonable efforts to ensure that the Licensed Products manufactured by Supplier will be of high quality consistent with the quality of the products of Supplier sold outside the Retail Channel. All Licensed Products and Club Products manufactured by Supplier shall be manufactured in compliance with all applicable laws and regulations. Supplier will provide Distributor with such samples of Supplier's coffee products as Distributor may reasonably request for Distributor to ensure compliance of such products with all applicable laws. Prior to the Effective Date, Supplier shall have permitted Distributor to inspect any premises on which the Licensed Products or Club Products are manufactured, packaged, stored or distributed; and after the Effective Date, Supplier shall permit such inspections to continue; provided, however, that any such inspection by Distributor pursuant to this Section 8.A. may be undertaken only to verify compliance of the Licensed Products and Club Products with all applicable laws and regulations, and Distributor shall require any person conducting such an inspection to execute an appropriate confidentiality agreement with Supplier.

B.     Distributor's Quality Obligations.  Distributor shall use all commercially reasonable efforts to ensure that the Licensed Products distributed and sold by Distributor will be of high quality. To ensure that the Licensed Products are consistent with the requirements of the approved super premium brand positioning for the Licensed Products, Distributor will:

(i) Observe the quality and freshness policy of Supplier that provides for a twenty (20) week shelf life for ground coffee products and a twenty-six (26) week shelf life for whole bean coffee. Distributor

shall ensure that code dates on packages of Licensed Products and Club Products that permit the calculation of the date when such products should be removed from retail stores due to age are not obscured. Failure of Distributor to comply with the provisions of this subsection in all material respects shall constitute a Material Breach of this Agreement.

(ii) Keep complete records for a period consistent with Distributor's normal retention practices and in a form reasonably satisfactory to Supplier, regarding the quantity and quality of the Licensed Products and Club Products sold and distributed by Distributor and permit Supplier's agents to have access to such records during regular business hours and upon reasonable notice.

C. **Supplier's Approval of Product Display in Retail Channel.** Supplier and Distributor shall cooperate to develop practices and procedures to be followed for the display of the Licensed Products in the Retail Channel and Club Products in the Clubs, which practices and procedures shall be consistent with the approved super premium brand positioning of the Licensed Products and the brand equity of Supplier. Supplier shall have the right to inspect and approve the "racking system" and other methods of display of the Licensed Products in the Retail Channel and of the Club Products at the Clubs by Distributor (collectively, the "Display Methods"). If Supplier is dissatisfied with any of the Display Methods, the matter shall be presented in writing to the members of the Oversight Committee. Any information regarding displays at individual stores which are believed to be inconsistent with the super premium positioning of the Licensed Products shall be communicated to Distributor promptly. Distributor will use all commercially reasonable efforts to improve the display in said store, it being understood by the parties that Supplier and Distributor have no ability to control the management of any retail store that they do not own. If Distributor cannot induce the management of said store to improve the display to the satisfaction of Supplier within sixty (60) days after the matter was communicated to the members of the Oversight Committee, Distributor shall remove all Licensed Products from said store and make no further sales of Licensed Products to such store. The failure of Distributor to either (i) induce management of the store to correct the circumstances causing Supplier's dissatisfaction with the Display Methods or (ii) remove all Licensed Products or Club Products from such store and cease making sales of Licensed Products or Club Products to such store shall constitute a Material Breach of this Agreement; provided, however, that a de minimis failure of Distributor to cure Supplier's dissatisfaction with the Display Methods that could not reasonably be expected to have a material adverse effect on the super premium brand image of the Licensed Products or the brand equity of Supplier shall not constitute a Material Breach of this Agreement. For the purposes of this Section 8.C., the failure of Distributor to resolve the circumstances causing Supplier's dissatisfaction with Display Methods in stores representing, in the aggregate, no more than five percent (5%) of all Net Sales by Distributor of Licensed Products in the Retail Channel in the Territory shall be deemed a de minimis failure.

D. **Consumer Complaints.** As soon as reasonably practicable following the Effective Date, Distributor shall publicize Supplier's toll-free consumer hotline telephone number

dedicated to matters concerning the Licensed Products and the Club Products. Supplier shall place said number on the packaging of the Licensed Products and the Club Products sold to Distributor. Distributor shall cooperate with Supplier in all efforts to educate the individual(s) handling any consumer hotline on behalf of Supplier as to the characteristics of Distributor's distribution of the Licensed Products and Club Products. With respect to end-user customer complaints relating to the Licensed Products received by Supplier, Supplier shall be entitled, in addition to any measures taken by Supplier at its own expense, to request that Distributor take appropriate steps, consistent with Distributor's policies for resolving such consumer complaints relating to its coffee products. Distributor shall provide Supplier with a quarterly log of all positive and negative incidents or consumer complaints received by Distributor, and Distributor shall immediately notify Supplier of any consumer or product quality issues with respect to the Licensed Products or the Club Products that are brought to Distributor's attention.

E.     Recalls and Withdrawals. Either party may initiate a recall or a market withdrawal ("market withdrawal") of the Licensed Products or the Club Products due to contamination, adulteration or public health risk. If the purported reason for the withdrawal turns out to be unfounded, the party which initiated the withdrawal shall bear all costs related thereto. Supplier will bear all costs related to any market withdrawal of the Licensed Products or the Club Products that results from contamination or adulteration of the Licensed Products or the Club Products in the manufacturing or packaging stages or while the Licensed Products or the Club Products were otherwise in the physical control of Supplier. Distributor will bear all costs related to any market withdrawal of the Licensed Products or the Club Products that results from contamination or adulteration of the Licensed Products or the Club Products after such products have been delivered by Supplier to Distributor or otherwise placed in Distributor's distribution channels. In the event the parties are unable to determine when the contamination or adulteration of the Licensed Products or the Club Products occurred, the parties shall share all initial costs related to any market withdrawal of the Licensed Products or the Club Products, and the parties shall negotiate in good faith to arrive at an equitable division of the costs associated with such market withdrawal, with reimbursement of the appropriate party not responsible for the contamination. Supplier will notify Distributor if any contamination, adulteration, or public health issues arise outside the Retail Channel that are likely to have a material impact on Distributor's sales of the Licensed Products or the Club Products in the Territory. Distributor will notify Supplier of any contamination, adulteration or public health issues that arise due to contamination while the Licensed Products or the Club Products in question are in the custody and control of a retail customer.

9.     **Brand Positioning and Development of Materials.**

A.     Procedure for Development of Brand Strategy.

(i)     To ensure consistency with Supplier's premium image, Supplier and Distributor shall meet as necessary to enable Supplier to educate and provide guidance concerning Supplier's branding strategy, including brand image, messaging and positioning. Supplier and Distributor shall develop and agree on a branding strategy for the Licensed Products in the Retail Channel and for the Club Products that supports Supplier's overall branding strategy. Distributor agrees that representatives of Supplier (initially up to two representatives) will work on site with Distributor's brand management team to provide

guidance as Distributor develops and implements the promotional, advertising and marketing concepts approved by Supplier. The representatives of Supplier will provide guidance concerning Supplier's branding strategy and will facilitate communication between Supplier's marketing department and Distributor's brand management team.

(ii)     Distributor shall submit to the Senior Vice President of Marketing of Supplier (or such executive's designee), for Supplier's approval, all proposed promotions, advertising, packaging and other programs and materials that support the Licensed Products, Club Products or use the "Starbucks" name or brand or other Licensed Trademarks. Such submission by Distributor shall be made during the concept or initial planning stages and again at the final stage prior to launch. The Senior Vice President of Marketing of Supplier will have the right to reject any ideas, proposals, programs, materials or other uses of the Licensed Trademarks; provided, however, that any such objection shall be accompanied by a written statement setting forth in reasonable detail the nature of Supplier's objections and, if practical, suggestions for removing or replacing the objectionable aspects. Supplier shall approve or object to proposed materials of Distributor within five (5) days after receipt from Distributor and all approvals must be set forth in writing and executed by the Senior Vice President of Marketing of Supplier (or such executive's designee identified by written designation of such executive).

B.     <u>Submission to Oversight Committee</u>.  In the event Supplier and Distributor are unable to agree on a brand positioning strategy for the Licensed Products or the Club Products, Distributor may submit such matter to the Oversight Committee, which shall use its best efforts to resolve such disagreement.

C.     <u>Samples of Materials</u>.  At the reasonable request of Supplier, Distributor shall provide Supplier with a reasonable number of copies, photographs, or reasonable quantities of samples of approved materials.

D.     <u>Failure to Comply with this Section 9</u>.  Distributor's failure to comply with any provision contained in this Section 9 shall constitute a Material Breach of this Agreement.

**10.     <u>Coordinated Marketing Efforts</u>.**

A.     <u>Coordination</u>.  In order to maximize sales of Licensed Products and Club Products, the parties agree to cooperate to coordinate their marketing efforts with respect to the Licensed Products and Club Products sold under the Licensed Trademarks. Notwithstanding the foregoing, except as expressly provided herein, neither party shall be obligated to undertake any specific marketing effort or conduct any research on its own or in conjunction with the other party.

B.     <u>Committees; Meetings; Contracts</u>.  As soon as reasonably practicable following the Effective Date, the parties shall form the following committees:

(i)     <u>Oversight Committee</u>.  Supplier and Distributor shall form a committee ( the "Oversight Committee") to be comprised of top

executives of each party to review the parties' joint efforts pursuant to this Agreement and to oversee such financial, management and business issues as the members of the Oversight Committee deem appropriate. The initial members of the Oversight Committee shall be: 1) President, Kraft Foods, Inc., 2) President, Maxwell House Division, 3) President of Supplier, and 4) Supplier's President of Non-Retail. The Oversight Committee shall meet at least semi-annually and shall hold additional meetings as issues arise that require guidance from or resolution by the Oversight Committee.

(ii)     <u>Joint Business Opportunity Committee ("JBOC")</u>. Supplier and Distributor shall form a committee (the "JBOC") which shall be comprised of executives of each party to explore the possibility of expanding the parties' joint efforts into: 1) geographic markets outside the Territory, 2) existing and new Licensed Products other than whole bean and ground coffee, 3) foodservice and other distribution channels other than the Retail Channel, including sales to drugstores and convenience stores and sales on or by military bases, and 4) additional business ventures, as well as to formulate a framework for such efforts.

The initial members of the JBOC shall be: 1) President, Maxwell House Division, 2) Vice President, Business Development, Kraft Foods, Inc., 3) President of Supplier, 4) Supplier's President of Non-Retail. The JBOC (or subcommittees thereof) shall meet monthly for a period of no less than twelve (12) months beginning within thirty (30) days following the Effective Date.

(iii)    Additional meetings and additional key employee participants may be initiated by either party when any new product or significant business initiatives are contemplated.

(iv)    Meetings will be held alternately in Tarrytown, New York and Seattle, Washington unless otherwise agreed to by the parties. Each party shall use its best efforts to secure the attendance of all other appropriate participants, including from outside agencies, at such meetings to ensure a full understanding of the parties' respective businesses and cultures.

(v)     Each party shall appoint a primary contact person who shall act as the principal point of contact (outside of meetings of the Oversight Committee and the JBOC) with the other party. The parties will consult with each other regarding who will serve as the primary contact person, and each party will select a primary contact person who is satisfactory to the other party. Distributor's primary

contact person shall be the President of the Maxwell House Division.

**11.**   **Confidentiality.**

A.   Information. Each party (the "Receiving Party") shall regard as confidential and proprietary all of the information communicated to it by the other party (the "Disclosing Party") in connection with this Agreement, including but not limited to, information concerning equipment, processes, Licensed Products, and data compilation and analysis (the "Information"). Information shall at all times be the property of the Disclosing Party and the disclosure of Information to the Receiving Party does not convey any right, title or license in the Information to the Receiving Party. The Receiving Party shall not, without the Disclosing Party's prior written consent, at any time use such Information for any purpose other than in connection with the performance of its obligations under this Agreement or disclose any portion of such information to third parties; provided, however, that the Receiving Party may disclose Information on a "need-to-know" basis to third-party suppliers (e.g., advertising agencies), with the Receiving Party to be responsible for any misuse or disclosure of such Information by such third-party suppliers. The Receiving Party shall disseminate Information to its employees only on a "need-to-know" basis. The Receiving Party shall cause each of its employees who has access to such Information to comply with the terms and provisions of this Section in the same manner as the Receiving Party is bound hereby, with the Receiving Party remaining responsible for the actions and disclosures of any such employees.

B.   Exceptions. Notwithstanding the provisions of Section 11.A., the Receiving Party's confidentiality obligations shall not apply to (i) information that, at the time of disclosure is, or after disclosure becomes, part of the public domain other than as a consequence of the Receiving Party's breach; (ii) information that was known or otherwise available to the Receiving Party prior to the disclosure by the Disclosing Party; (iii) information disclosed by a third party to the Receiving Party after the disclosure by the Disclosing Party, if such third party's disclosure neither violates any obligation of the third party to Disclosing Party nor is a consequence of Receiving Party's breach; (iv) information developed independently by the Receiving Party; (v) information that Disclosing Party authorizes, in writing, for release; or (vi) information that the Receiving Party is legally compelled to disclose; provided, however, that to the extent such party becomes so legally compelled, it may only disclose such information if it shall first have used reasonable efforts to, and, if practicable, shall have afforded the other party and its affiliates the opportunity to obtain an appropriate protective order, or other satisfactory assurance of confidential treatment, for the information required to be disclosed. Without in any way limiting the generality of the foregoing, in no event shall the varieties of Supplier's products, or ingredients thereof, be deemed to constitute "Information."

C.   Non-Solicitation. During the term of this Agreement, and for a period of one (1) year following expiration or termination of this Agreement, neither party shall employ or make an offer of employment to any employee of the other party who is or has in the prior year been involved significantly in the business which is the subject of this Agreement. The restrictions of this Section 11.C. shall apply only to Distributor and Supplier and not their respective parents or affiliates.

12.     Purchase of Shares.

A.     Unless specifically requested in writing in advance by or on behalf of Supplier, neither Distributor nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "1934 Act")), will, and neither Distributor nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to, beneficial ownership (as defined in Rule 13d-3 under the 1934 Act)) of (a) Supplier or any of its assets or businesses, (b) any securities listed by Supplier or (c) any rights or options to acquire such ownership (including from a person other than Supplier), by any means, including a negotiated purchase of securities or assets, tender, or exchange offer, merger or other business combination, recapitalization, restructuring, or other extraordinary transaction (a "Business Combination Transaction"), (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Supplier, (iii) otherwise seek or propose to control the board of directors, management or policies of Supplier, (iv) take any action that could reasonably be expected to force Supplier to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing.  Distributor also agrees during such period not to request Supplier or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence).  Distributor hereby acknowledges that neither it nor any of its affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Supplier.

B.     Unless specifically requested in writing in advance by or on behalf of Distributor, neither Supplier nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the 1934 Act), will, and neither Supplier nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two (2) years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to, beneficial ownership (as defined in Rule 13d-3 under the 1934 Act) of (a) Distributor or any of its assets or businesses, (b) any securities listed by Distributor or (c) any rights or options to acquire such ownership (including from a person other than Distributor), by any means, including a Business Combination Transaction, (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Distributor, (iii) otherwise seek or propose to control the board of directors, management or policies of Distributor, (iv) take any action that could reasonably be expected to force Distributor to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into

any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing. Supplier also agrees during such period not to request Distributor or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence). Supplier hereby acknowledges that neither it nor any of its affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Distributor.

13.    **Right of Notice.**    During the term of this Agreement, Supplier shall give Distributor twenty-one (21) days advance notice, through the JBOC, prior to entering into any licensing, joint venture, or similar agreement (a "Business Venture") for the manufacturing, marketing, distribution or sale of any packaged whole bean or ground coffee bearing the Licensed Trademarks in retail channels other than the Retail Channel in the Territory or in the Retail Channel in geographies outside of the Territory, but only in the event any such Business Venture has projected annual sales of greater than Five Million Dollars ($5,000,000).

14.    **Indemnification.**

A.    **Distributor's Indemnity.**    Distributor hereby indemnifies, and undertakes to defend and hold Supplier, its officers, directors, employees, agents, affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

> (i)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all product liability claims and/or any other actions involving Licensed Products where such claims are a result of Distributor's negligence or intentional acts, except claims that Distributor's use of the Licensed Trademarks in accordance with this Agreement infringes a third party's proprietary rights;

> (ii)   any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Distributor's breach of any representation or warranty made hereunder, or any other act or deed, whether in contract or tort, committed or omitted by Distributor hereunder; and

> (iii)  any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Supplier as a direct result of the execution, delivery or performance of this Agreement by Distributor in breach of another agreement to which Distributor is a party.

B.    **Supplier's Indemnity.**    Supplier hereby indemnifies Distributor and undertakes to defend and hold Distributor, its officers, directors, employees, agents, affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

> (i) expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims arising out of Distributor's exercise of the rights granted to it hereunder;
>
> (ii) any and all claims, suits, losses, damages, costs, liabilities and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Supplier's breach of any representation or warranty made hereunder, or any other act or deed, whether in contract or tort, committed or omitted by Supplier hereunder.
>
> (iii) any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Distributor as a direct result of the execution, delivery or performance of this Agreement by Supplier in breach of another agreement to which Supplier is a party.

C.     <u>No Consequential Damages</u>.  Neither party shall have any liability to the other party for any indirect, consequential, punitive or other special damages.  Nothing in this Section 14.C. shall limit a party's indemnification obligations with respect to third party claims under Sections 14.A. or 14.B. above.

### 15.     <u>Binding Agreement; Assignability</u>.

A.     <u>Binding Agreement</u>.  Unless assigned or transferred in violation hereof, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

B.     <u>Assignment</u>.  Neither party may assign this Agreement or any of its rights hereunder without the prior written approval of the other party; provided, however, that either party may assign this Agreement, and its rights and obligations hereunder (in whole or in part), without the prior written approval of the other party, to a subsidiary or other corporate affiliate, other than the parent, of such party.  In the event of any assignment of this Agreement, the assignor shall, following such assignment, remain liable for all of its obligations under this Agreement.

### 16.     <u>Dispute Resolution</u>.

A.  The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation.  However, at any time before or during such negotiations, or following any unsuccessful negotiations, either party may by written notice to the other demand that the dispute be submitted to mediation.  When such a demand is made, the parties shall within ten (10) days jointly make arrangements for the mediation of the dispute within the State of Washington, New York or Illinois with the Center for Public Resources (CPR), whose Model Procedure for Mediation of Business Disputes in effect on the date of the written demand for mediation shall govern the mediation in all respects, except as modified by agreement of the parties.  If the

dispute has not been resolved within sixty (60) days of any written demand for mediation, or within a longer time period to which the parties may agree, the dispute shall be submitted to binding arbitration. Such binding arbitration shall be conducted within the State of New York, Washington or Illinois, in accordance with the then current CPR Rules for Non-Administered Arbitration of Business Disputes by a single arbitrator selected by mutual agreement of the parties within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by CPR in accordance with the procedures outlined in Section 6 of the CPR Rules. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended), and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator is empowered to award attorney's fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement.

B. Nothing in this Agreement will prevent either party from resorting to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction or to avoid the barring of the claim under the applicable statute of limitations. In addition, resort by either party to negotiation, mediation or arbitration pursuant to this Agreement shall not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party to pursue any such judicial relief; *provided, however*, that irrespective of the filing of any such request for judicial relief the party shall continue to participate in the dispute resolution proceedings required by this paragraph. Any negotiation or mediation which takes place pursuant to this Agreement shall be confidential and shall be treated as a compromise and settlement negotiation for purposes of the Federal Rules of Evidence and State rules of evidence.

17. <u>Miscellaneous</u>.

A. <u>Representations and Warranties</u>. Each of Distributor and Supplier hereby represents and warrants to the other that (i) it has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and (ii) this Agreement has been duly authorized by all necessary action on its part.

B. <u>Force Majeure</u>. Neither party to this Agreement shall be held liable for failure to comply with any of the terms of this Agreement, nor shall any such failure be deemed a default or give rise to a right to terminate this Agreement, when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy such default.

C. <u>Notices</u>.

(i) Any notice, demand or other communication required or permitted to be given or made hereunder shall be in writing and shall be well and sufficiently given or made if to the address set forth below and:

(a)    enclosed in a sealed envelope and delivered during normal business hours on a Business Day and left with a receptionist or other responsible employee at the relevant address set forth below in this Agreement;

(b)    sent by certified mail deposited in a post office within the United States;

(c)    sent by facsimile or sent by other means of recorded electronic communication during normal business hours on a Business Day and confirmed by mail as aforesaid; or

(d)    sent by a reputable air courier for overnight delivery.

(ii)    Any notice, demand or other communication so given or made shall be deemed to have been provided and to have been received on:

(a)    the day of delivery, if delivered as aforesaid;

(b)    on the third Business Day after the postmark date thereof (excluding each day during which there exists any general interruption of postal service due to strike, lockout, labor disturbance or other cause), if mailed as aforesaid;

(c)    on the day of sending if sent by facsimile or other means of recorded electronic communication (or on the next Business Day if sent on a day other than a Business Day); or

(d)    on the air courier's scheduled day of delivery if sent by air courier.

(iii)    All significant notices or other communications to be sent under this Agreement shall be sent to the parties at the following addresses, subject to each party's right to change its address for notice from time to time by giving notice in writing of such change.

If to Supplier:    Starbucks Corporation
2401 Utah Avenue South
Seattle, Washington 98134
Attn.: Orin Smith, President

With a copy to:    Starbucks Corporation
2401 Utah Avenue South
Seattle, Washington 98134
Attn.: Shelley Lanza, Sr. Vice President
    & General Counsel

|  |  |
|---|---|
| If to Distributor: | Kraft Foods, Inc.<br>Maxwell House & Post Division<br>555 S. Broadway<br>Tarrytown, NY 10591<br>Attention: Executive Vice President |
| With copy to: | Kraft Foods, Inc.<br>3 Lakes Drive<br>Northfield, IL 60093<br>Attention: General Counsel |

(iv) Notwithstanding the foregoing, routine notices and communications hereunder (e.g., quarterly reports, requests for review of Materials and the like) may be sent to employees of the other party responsible therefor.

D.    Relationship. Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, franchise or agency relationship between the parties hereto or shall be deemed to render either party liable for any of the debts or obligations of the other. Neither party shall in any way be considered an agent or representative of the other in any dealings with any third party, and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

E.    Sole Agreement. This Agreement, the License Agreement and the schedules and exhibits attached hereto and thereto constitute and contain the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect. This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto. Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect. This Agreement supersedes all prior agreements, discussions and negotiations between the parties, including, without limitation, the Original Supply Agreement.

F.    No Waiver. The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the party of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

G.    Construction. The captions of the various articles and sections of this Agreement have been inserted for the purpose of convenience of reference only, and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. The recitals set forth prior to Section 1 of this Agreement are statements setting forth the intentions of the parties and shall not be deemed to create, modify, supersede or eliminate any obligation of the parties under this Agreement.

H.     Invalidity.  If any provision or provisions of this Agreement, or any portion of any provision hereof or thereof, shall be deemed invalid or unenforceable pursuant to a final determination of any arbitrator or court of competent jurisdiction, or as a result of future legislative action, such determination or action shall be construed so as not to affect the validity or effect of any other portion hereof or thereof, unless, as a result of such determination or action, the consideration to be received or enjoyed by any party hereto would be materially impaired or reduced.

I.     CHOICE OF LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO THE SUBSTANTIVE LAWS, BUT NOT THE PRINCIPLES OF CONFLICTS OF LAWS, OF THE STATE OF NEW YORK AS IF THIS AGREEMENT WERE NEGOTIATED, EXECUTED, AND TO BE FULLY PERFORMED IN THE STATE OF NEW YORK.

J.     Compliance with Laws.  Distributor shall, at its own cost and expense, obtain all licenses, permits and other governmental approvals which may be required in the Territory for performance of its obligations hereunder.

K.     Counterparts.  This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

L.     Arm's Length Contract.  This Agreement has been negotiated "at arm's length" by the parties hereto, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof.  Accordingly, in construing the provisions of this Agreement neither party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

[Signature page follows]

**STARBUCKS CORPORATION**                    **KRAFT FOODS, INC.**

By:                                          By:

Its: President                               Its: Senior Vice President, Finance

## Schedule A – Licensed Trademarks

**<u>Licensed Core Trademarks</u>:**

STARBUCKS

STARBUCKS LOGO:



LIGHTNOTE BLEND

**<u>Other Licensed Trademarks</u>:**

MERIDIAN

NAVIGATOR

Schedule 1a – Grandfathered Grocery Kiosks

## Grandfathered Grocery Locations

### Starbucks Retail Stores within Grocery Stores

| Store# | StoreName | City | State |
|---|---|---|---|
| 214 | Dom. Park Ridge | Park Ridge | Illinois |
| 218 | Dom. Bannockburn | Bannockburn | Illinois |
| 315 | Top Foods Everett | Everett | Washington |
| 319 | Qfc - Edmonds | Edmonds | Washington |
| 320 | Haggen's Bellingham | Bellingham | Washington |
| 326 | Qfc - Mill Creek | Mill Creek | Washington |
| 327 | Qfc - 145Th | Seattle | Washington |
| 332 | Qfc - Everett | Everett | Washington |
| 333 | Max Foods -- Lynnwood | Lynnwood | Washington |
| 338 | Top Food's - Federal Way | Federal Way | Washington |
| 345 | Top Foods -- Tacoma | Tacoma | Washington |
| 347 | Mukilteo | Lake Serene-North Lynnwood | Washington |
| 349 | Redmond Center | Redmond | Washington |
| 351 | Haggen's Sehome | Bellingham | Washington |
| 382 | Rainier Plaza | Seattle | Washington |
| 2266 | Highland Park | Highland Park | Illinois |
| 2267 | Higgins Rd.-Dominicks | Schaumburg | Illinois |
| 3201 | Haggen's Barkley Village | Bellingham | Washington |
| 3205 | Federal Way (Qfc) | Federal Way | Washington |
| 3212 | Stanwood - Haggen | Stanwood | Washington |
| 6245 | San Felipe & Sage - Randalls | Houston | Texas |
| 6251 | Hwy 183 & Braker Lane - Randall | Austin | Texas |
| 7211 | Allston | Boston | Massachusetts |
| 7212 | Norwood - Star Market | Norwood | Massachusetts |
| 7213 | Quincy - Star Market | Quincy | Massachusetts |
| 7214 | West Roxbury | West Roxbury | Massachusetts |
| 7283 | Medford - Star | Medford | Massachusetts |
| 8203 | Sandy Plains - Publix | Marietta | Georgia |
| 8216 | Morrocroft - Ht | Charlotte | North Carolina |
| 8218 | Cameron Village - Ht | Raleigh | North Carolina |
| 8219 | Matthews Township - Ht | Matthews | North Carolina |
| 8220 | The Commons - Ht | Durham | North Carolina |
| 8221 | Friendly - Ht | Greensboro | North Carolina |
| 8229 | Woodlawn-Publix | Marietta | Georgia |

### Starbucks Licensed Stores within Grocery Stores

| 72128 | Dominick's - North Clyborn (304) | North Clyborn | Illinois |
|---|---|---|---|
| 72129 | Grand Central Markets | Grand Central Markets | California |
| 72102 | QFC #1 University Village | Seattle | Washington |
| 72104 | QFC #2 Factoria | Bellevue | Washington |
| 72105 | QFC #3 Crown Hill | Seattle | Washington |

**Schedule 1b – Licensed Products**

| *UPC Code* | *Unit Size* | *Product Description/Blend* |
|---|---|---|
| 7 62111 20602 2 | 12 oz. | Espresso/Whole Bean |
| 7 62111 20603 9 | 12 oz. | Espresso/Ground |
| 7 62111 20604 6 | 12oz. | House Blend/Whole Bean |
| 7 62111 20605 3 | 12oz. | House Blend/Ground |
| 7 62111 20606 0 | 12 oz. | LightNote Blend/Whole Bean |
| 7 62111 20607 7 | 12 oz. | LightNote Blend/Ground |
| 7 62111 20608 4 | 12 oz. | Decaf House/Whole Bean |
| 7 62111 20609 1 | 12 oz. | Decaf House/Ground |
| 7 62111 20610 7 | 12 oz. | Colombia/Whole Bean |
| 7 62111 20611 4 | 12 oz. | Colombia/Ground |
| 7 62111 20612 1 | 12 oz. | French Roast/Whole Bean |
| 7 62111 20613 8 | 12 oz. | French Roast/Ground |
| 7 62111 20598 8 | 2.5 oz. | Colombia/Ground |
| 7 62111 20599 5 | 2.5 oz. | House/Ground |
| 7 62111 20600 8 | 2.5 oz. | French Roast/Ground |
| 7 62111 20601 5 | 2.5 oz. | LightNote Blend/Ground |

### Schedule 3.C.(ii) – Super Premium Coffee Kiosk
### Obligations of Distributor

Coffee Bar Sales Agreement between Kraft Foods, Inc. and Rainbow Foods, Inc., dated July, 1998, covering Rainbow Foods grocery stores in Bloomington and Burnsville, MN.

**Schedule 4.B. – Products and Pricing**

The following products are included in this Agreement,

| UPC Code | Unit Size | Product Description/Blend |
|---|---|---|
| 7 62111 20602 2 | 12 oz. | Espresso/Whole Bean |
| 7 62111 20603 9 | 12 oz. | Espresso/Ground |
| 7 62111 20604 6 | 12oz. | House Blend/Whole Bean |
| 7 62111 20605 3 | 12oz. | House Blend/Ground |
| 7 62111 20606 0 | 12 oz. | LightNote Blend/Whole Bean |
| 7 62111 20607 7 | 12 oz. | LightNote Blend/Ground |
| 7 62111 20608 4 | 12 oz. | Decaf House/Whole Bean |
| 7 62111 20609 1 | 12 oz. | Decaf House/Ground |
| 7 62111 20610 7 | 12 oz. | Colombia/Whole Bean |
| 7 62111 20611 4 | 12 oz. | Colombia/Ground |
| 7 62111 20612 1 | 12 oz. | French Roast/Whole Bean |
| 7 62111 20613 8 | 12 oz. | French Roast/Ground |
| UPC Code | Unit Size | Product Description/Blend |
| 7 62111 20598 8 | 2.5 oz. | Colombia/Ground |
| 7 62111 20599 5 | 2.5 oz. | House/Ground |
| 7 62111 20600 8 | 2.5 oz. | French Roast/Ground |
| 7 62111 20601 5 | 2.5 oz. | LightNote Blend/Ground |

Prices for the Licensed Products will be determined as follows:

Year 1 Price. During Year 1, the purchase price for the Licensed Products (excluding Club Sales) will be $2.81 per roasted pound (the "Year 1 Price"), subject to the following:

(i)    The Year 1 Price is based upon Supplier's estimate of its Fully Landed Cost, discounted as described in subsection (ii) below, of producing the types and quantities (the "Product Mix") of the products shown on the attached Product Mix Schedule during Year 1.

(ii)    Supplier has derived the Year 1 Price by allocating $1.48 of the Year 1 Price to its green coffee costs (based on Supplier's estimate of its actual green coffee costs to Distributor); the remaining $1.33 of the Year 1 Price represents Supplier's estimate of all of the remaining components (the "Non-commodity Components")

of the Fully Landed Cost, less an $0.215 per pound discount from Supplier's actual costs for the Non-commodity Components.

(iii)    If there are material changes to the Product Mix during Year 1, Supplier may increase the Year 1 Price to the extent that the changes in the Product Mix cause a corresponding increase in Supplier's Fully Landed Costs. At the end of each calendar quarter, Supplier will provide Distributor written notice of any adjustments to the Year 1 Price for such quarter which are caused by adjustments to the Product Mix..

(iv)    The parties will work together to share information that may lead to lower costs of production in the future through enhanced efficiencies and economies. The parties recognize that an aggressive program to improve the value of the Licensed Products is necessary for the long-range market viability of the Agreement.

<u>Post-Year 1 Price</u>. Following Year 1, the purchase price for the Licensed Products (excluding Club Sales) will be established every six months (commencing at the beginning of Year 2) at the Fully Landed Cost for such products. Notwithstanding the foregoing, if Supplier is able to reduce the cost of the Non-commodity Components below $1.33 per pound (the "Cost Threshold"), excluding any reductions solely due to green coffee costs, Supplier may increase the purchase price for the Licensed Products (excluding Club Sales) by an amount equal to one-quarter of the difference between the Cost Threshold and the actual cost per pound of the Non-commodity Components. In the event the actual Product Mix is materially different from the Product Mix shown on the attached Schedule, Supplier and Distributor will adjust the Cost Threshold to the extent the cost of the Non-commodity Components is directly affected by the changes in the Product Mix.

<u>Confirmation of Prices; Audit Rights</u>. Distributor will have the right to audit the books and records of Supplier to confirm the accuracy of Supplier's calculation of Fully Landed Costs and the purchase price for the Licensed Products. The first audit will be performed by Distributor immediately following the execution and delivery of the Agreement, and Distributor will be entitled to perform subsequent audits every six months during the term of the Agreement. If any of Distributor's audits indicates any errors in Supplier's calculation of Fully Landed Cost or the purchase price payable for Licensed Products purchased by Distributor prior to the date of the audit, Distributor will be entitled to a retroactive adjustment of the purchase price, provided that no retroactive adjustment shall be made with respect to any period which is more than 18 months prior to the audit in which such errors are first identified. To the extent Supplier purchases products or services from related parties, all cost components included herein shall be based on the lesser of actual costs to Supplier or the fair market value of the component based upon the open market cost for such item in an arm's length transaction between unrelated parties. Any disputes concerning the audits will be resolved by the Oversight Committee.

**Attachment to Schedule 4.B.**
## PRODUCT MIX SCHEDULE

| 12 oz WHOLE BEAN | Percentage |
|---|---|
| French Roast | 8.1% |
| Espresso Roast | 5.6% |
| Colombia | 6.9% |
| House Blend | 11.0% |
| LightNote Blend | 3.9% |
| Decaf House | 5.9% |
| SUBTOTAL | 41.5% |

| 12oz GROUND | |
|---|---|
| French Roast | 9.5% |
| Espresso Roast | 5.5% |
| Colombia | 8.4% |
| House Blend | 15.5% |
| LightNote Blend | 7.0% |
| Decaf House | 8.4% |
| SUBTOTAL | 54.4% |

| 2.5oz GROUND | |
|---|---|
| French Roast | 1.1% |
| Colombia | 1.1% |
| House Blend | 1.1% |
| LightNote Blend | 0.8% |
| SUBTOTAL | 4.2% |

| TOTAL | 100% |
|---|---|

Schedule 4.D. – Demand Forecasting and Future Supply

Distributor shall forecast its anticipated demand to Supplier as follows:

During the last week (Tuesday or Wednesday) of each of Supplier's fiscal months, Distributor will provide Supplier a rolling 12-month forecast of Distributor's anticipated demands for Licensed Products and Club Products. The forecast shall begin with the second month following issuance. (For example, a forecast issued in September covers the forecasted period beginning the following November.)  The demand reflected in the first month of each rolling 12-month forecast (November in the above case) shall constitute a binding commitment by Distributor to order the total quantity of Licensed Products and Club Product so forecast, and may not be increased or decreased without Supplier's written consent; provided, however, that Distributor may revise the mix of Licensed Products and Club Products by written purchase order issued no later than fifteen (15) calendar days prior to the beginning of the month for which such order is applicable. (Under the example above, the forecasted November demand issued in September becomes a firm commitment to purchase the quantity forecast , the October commitment having been set in the previous forecast, but Distributor may issue a purchase order setting forth the specific quantities of each Licensed Product and Club Product by SKU as late as October 16.)  Supplier will make all reasonable efforts to support said changes recognizing that it also supports other parts of Starbucks ongoing business. The first three months of each 12 month forecast shall be a firm projection and Distributor shall use its reasonable commercial efforts to purchase those volumes; provided that Distributor shall be deemed to have acted in a commercially reasonable manner if Distributor revises such forecasts as a result of unexpected changes in demand for the Licensed Product and/or the Club Products.

Supplier will notify Distributor in writing within ten (10) days of receipt of any rolling forecast whether or not it will be able to fulfill such requirements. Failure by Supplier to inform Distributor of its inability to fulfill such requirements will be deemed a binding commitment by Supplier to ship any orders made by Distributor within the rolling forecast. In the event of a shortage of any particular variety of product, Supplier will use reasonable commercial efforts to allocate product fairly between Distributor's orders and Supplier's owned outlets.

In the event that Distributor's orders for the Licensed Products and Club Products are forecast to exceed Supplier's capacity to supply the Licensed Products and Club Products within 12 months, either from Supplier's own manufacturing facilities or facilities with which Supplier has or enters into manufacturing agreements, Supplier and Distributor shall negotiate in good faith the terms and conditions under which Distributor would manufacture the Licensed Products and Club Products using proprietary processes and trade secrets of Supplier according to the following key principles:

- All negotiations and information sharing shall be subject to appropriate confidentiality agreements regarding Distributor's use of such processes and trade secrets of Supplier;
- Distributor may utilize existing facilities or may construct new facilities for this purpose;
- Products produced by Distributor under Supplier's proprietary process shall only be sold pursuant to the terms of this Agreement; and

- Supplier will provide technical help to Distributor to enable it to utilize Supplier's proprietary technology so as to enable Distributor to produce a product identical to product produced by Supplier in its own plants or plants under contract to Supplier.