# EXHIBIT 2

## SUPPLY AND LICENSE AGREEMENT

THIS SUPPLY AND LICENSE AGREEMENT ("*Agreement*") is entered into as of March 29, 2004, by and between STARBUCKS CORPORATION, a Washington corporation ("*Supplier*"), and KRAFT FOODS GLOBAL, INC., a Delaware corporation ("*Distributor*"), and shall become effective on the Effective Date (as defined herein).

WHEREAS, Supplier is engaged in the manufacture, sale and distribution of various types of coffee, including Super Premium Coffee (as defined herein);

WHEREAS, Distributor is engaged in the manufacture, sale and distribution of a variety of food products in the Licensed Channels (as defined herein);

WHEREAS, Supplier and Kraft Foods, Inc. (now known as Kraft Foods Global, Inc.) are parties to a Trademark License Agreement dated September 25, 1998 (the "Original License Agreement"), under which Supplier has granted to Distributor the rights to use certain trademarks of Supplier on the terms and conditions set forth therein;

WHEREAS, pursuant to the Original License Agreement, Supplier and Kraft Foods, Inc. (now known as Kraft Foods Global, Inc.) entered into an Amended and Restated Purchase, Supply and Royalty Agreement dated November 30, 1998 (the "*Original Supply Agreement*") upon the satisfaction of certain conditions with respect to filings made by the parties with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"); and

WHEREAS, Supplier and Distributor have continued to review the terms of the Original Supply Agreement and the Original License Agreement and now desire to enter into this Agreement that reflects certain changes in the distribution arrangement between the parties as set forth herein, and that is intended to supersede the Original Supply Agreement and the Original License Agreement.

NOW, THEREFORE, for the mutual consideration set forth herein, the parties hereto agree as follows:

1. **Definitions**. For purposes of this Agreement:

"*A&P*" or "*Advertising and Promotion*" shall be defined as all sums expensed pursuant to U.S. generally accepted accounting principles by Distributor to advertise and promote Licensed Products in the Licensed Channels in the Territory, including but not limited to all expenses associated with production and distribution of television, radio, print (including free standing inserts), direct mail, on-line (e.g., internet), point-of-sale and other forms of advertising; trade spending; consumer promotions; public relations; and product sampling and demonstrations, but excluding any of Distributor's internal overhead costs.

"*Affiliate*" shall be defined as, with respect to a party, any person or entity which, directly or indirectly, is in control of, is controlled by, or is under common control with, such party. For the purposes of this definition, "control" of a person or entity means the power,

directly or indirectly, either to (i) vote a majority of the securities having ordinary voting power; (ii) determine the majority of the board of directors of such person or entity; or (iii) direct or cause the direction of the management and policies of such person or entity whether by contract or otherwise.

"*Business Day*" shall be defined as any day not a Saturday, Sunday or statutory holiday in the United States.

"*By-the-Cup Coffee Products*" shall be defined as whole bean, ground or bulk coffee products which are sold or supplied by Supplier to Kiosks to the extent such Kiosks use such products in the preparation of coffee or espresso beverages to be served by the cup.

"*Change of Control*" shall be defined as any occurrence where any person or group of persons acting in concert who, on the date of this Agreement, does not possess Control over a party hereto, gains control over such party, or in the event of a sale of all or substantially all of the assets of Distributor, Supplier or Distributor's Coffee Division; *provided, however*, that a transaction pursuant to which the ultimate parent company of Distributor distributes any or all of the outstanding capital stock of Kraft Foods Inc. to such parent's shareholders will not be deemed to be a Change of Control.

"*Club Products*" shall be defined as Licensed Products which, by virtue of large package sizes or similar cost saving attributes, are targeted to customers of Club Stores.

"*Club Stores*" shall be defined as all warehouse club stores that generally require retail customers to pay membership fees, including Sam's Club, Costco and BJ's.

"*Committee Schedule*" shall be defined as the list, attached as <u>Schedule 9</u>, of (i) the members of the Supplier's Brand Management Team, (ii) the members of the Oversight Committee, (iii) the members of the Joint Opportunity Committee; (iv) the members of the SBC/TI Transition Team; and (v) the members of the Military Transition Team. Either party may change its designated members of such teams and committees upon notice to the other party, and the parties agree to amend the Committee Schedule from time to time to reflect such changes.

"*Control*" shall be defined as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an executive position with the party in question.

"*Distributor Net Sales*" shall be defined as the total dollar amount for the relevant period of sales of Licensed Products generated for all applicable SKUs across all Licensed Channels, at the invoice selling price minus actual returns and allowances, all as determined in accordance with Distributor's normal accounting policies and referred to therein as "Operating Revenue."

"*Distributor's P&L Statement*" shall be defined as, for any period, Distributor's statement of profit and loss for such period for the Licensed Products sold in all Licensed Channels. The form of Distributor's P&L Statement is attached as part of <u>Schedule 1d</u> hereto.

"*Drug Stores*" shall be defined as in ACNielsen's Scan Track database, as amended from time to time.

"*Effective Date*" shall be defined as March 29, 2004.

"*Fair Market Value of this Agreement*" shall be defined as the value of this Agreement as determined in accordance with the procedures set forth in Section 5.D.

"*Field Auditor*" shall be defined as an independent third party that will be jointly retained by Supplier and Distributor to conduct field audits of Distributor's compliance with its obligations with respect to freshness goals and display methods under Section 8 of this Agreement. The Field Auditor as of the date of this Agreement is Mosaic Info Force. Any future Field Auditor shall have qualifications reasonably similar to Mosaic Info Force, except as otherwise agreed by the parties.

"*Fully Landed Cost*," means all direct and indirect costs in accordance with U.S. generally accepted accounting principles comprising Cost of Goods Sold ("*COGS*") for the Licensed Products. Schedule 1a contains a complete listing of the elements of COGS, a description of how the cost elements are derived (including indirect cost allocation methodologies), when they are updated, and whether any refunds shall be due to Supplier or Distributor based upon differences between standard and actual costs. To the extent Supplier purchases products or services from Affiliates of Supplier, all cost components included herein shall be based on the lesser of actual costs to Supplier or the fair market value of the component based upon the open market cost for such item in an arm's length transaction between unrelated parties. Any changes to the components and/or allocations set forth in Schedule 1a must be agreed upon in writing by Supplier and Distributor and, once agreed, will be deemed incorporated into this Agreement upon each such agreement and will be subject to the audit rights provision in Section 7.C of this Agreement.

"*Kiosks*" shall be defined as all cafes, coffee shops, restaurants, carts, kiosks, retail coffee stores, "fresh brew" coffee stands and similar food and beverage service establishments which are located adjacent to (and having a common wall and an entrance into) or inside establishments which are within the Licensed Channels and from which brewed coffee beverages and whole bean, ground or bulk Super Premium Coffee of Supplier are sold. Notwithstanding the foregoing, Kiosks which are owned or leased by, and operated by employees of, Supplier or a wholly owned subsidiary of Supplier ("*Company Operated Kiosks*") shall not be considered Kiosks for purposes of this Agreement unless the total number of Company Operated Kiosks exceeds 150 (increasing by 5 on April 1 of each Year, commencing in 2005), in which case and at such time all Company Operated Kiosks shall automatically be considered Kiosks for all purposes of this Agreement from such time through the remainder of the term of this Agreement.

"*Kiosk Net Sales*" shall be defined as (i) the total dollar amount of sales (or equivalent arm's length value if not sold but supplied) of Kiosk Products (including the value of whole bean or ground coffee contained in all gift packages or other SKUs containing more than two ounces of coffee) by Supplier (or its distributor) to Kiosks based on approved items sold or supplied at the greater of the invoice selling price (or equivalent arm's length value) or the Fully

Landed Cost thereof for the relevant period minus (ii) five percent (5%) of sales reflective of returns, allowances, and bagged coffee converted to By-the-Cup Coffee Products, minus (iii) actual freight for Supplier's accounts with freight-included pricing, all as determined in accordance with Supplier's normal accounting policies. Kiosk Net Sales shall not include sales of By-the-Cup Coffee Products. The value of coffee contained in a gift pack or other SKU will be an amount equal to the cost of such coffee multiplied by the total invoice value of the gift pack or other SKU divided by the total cost of the gift pack or other SKU.

"*Kiosk Products*" shall be defined as Super Premium Coffee, for distribution in bulk bins or packaged for resale, supplied by Supplier or its Affiliates (whether directly or through distributors) to Kiosks and Company Operated Kiosks. Kiosk Products shall not include By-the-Cup Coffee Products.

"*Licensed Channels*" shall be defined as Retail Grocery Stores, Club Stores, Drug Stores, Natural Food Stores, Military Exchanges and Commissaries and Mass Merchandise Stores, plus any online sites owned, operated, licensed or authorized by (or otherwise co-branded with) a retail business primarily engaged in a Licensed Channel. By way of clarification, sales that are not intended to be included in the "*Licensed Channels*" include sales direct to consumers through internet-based stores (with respect to sales in the Territory) that have no physical sales locations other than incidental outlet locations (i.e., that have predominantly online sales), direct mail and other direct marketing activities, and convenience stores.

"*Licensed Products*" shall be defined as (i) all the sizes of the blends, brands and flavors of Supplier's whole bean, ground and bulk coffees bearing the Licensed Trademarks and which are set forth on Schedule 1b hereto, (ii) all gift packages sold through the Licensed Channels, so long as they contain any whole bean, ground or bulk coffees of Supplier bearing the Licensed Trademarks, and (iii) with respect to each Licensed Trademark, all sizes of each blend, brand and flavor of Supplier's whole bean, ground and bulk coffees bearing such Licensed Trademark that become Top Ten Selling Products after the date of this Agreement. The Licensed Products shall not include By-the-Cup Coffee Products. In addition, the Licensed Products shall not include bottled Frappuccino®, Starbucks branded ice creams, chocolate covered espresso beans and similar goods that may contain coffee or processed coffee but which are not brewed to create coffee beverages.

"*Licensed Trademarks*" shall be defined as those certain valuable trademarks set forth on Schedule 1c attached hereto and incorporated herein (as may be amended from time to time) and any slogans, designs, devices, logos, insignias, emblems, symbols, trade dress, label designs or other proprietary identifying characteristics associated with such trademarks used in the conduct of Supplier's business.

"*Mass Merchandise Stores*" shall be defined as in ACNielsen's Scan Track database, as amended from time to time, including Kmart, Target, Wal-Mart and similar stores (including Supercenters).

"*Material Breach*" shall be defined as a breach of any representation, warranty, covenant or agreement in this Agreement which significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause

4

significant financial, brand equity and/or other injury to the other party.  Breaches of certain provisions of this Agreement have been specifically described as Material Breaches, and these specific descriptions will not preclude either party from contending, in proceedings under Section 15 of this Agreement, that breaches of other provisions are "Material Breaches" as defined in the preceding sentence.

"*Measurement Criteria*" shall be defined as the criteria pursuant to which the Field Auditor will measure Distributor's compliance with its obligations under Section 8.

"*Military Exchanges and Commissaries*" shall be defined as all exchanges and commissaries in the Territory owned, leased or occupied by the U.S. Defense Commissary Agency.

"*Minimum A&P Amount*" shall be defined as, for any Year, an amount equal to (i) REDACTED of Distributor Net Sales during such Year with respect to all Licensed Products in the Licensed Channels excluding Club Stores plus (ii) REDACTED per pound of all Licensed Products sold in Club Stores during such Year.

"*Natural Food Stores*" shall be defined as Whole Foods, Wild Oats, Trader Joe's and stores that similarly focus on carrying organic and other "natural" products.

"*Net Profits*" shall be defined as, for any period, the sum of (i) the amount reflected as Operating Contribution, before payment of any royalties or profits to Supplier, on the Distributor's P&L Statement covering such period, (ii) 40% of the Kiosk Net Sales for such period and (iii) the amount reflected as Operating Contribution on the Supplier's P&L Statement covering such period. The methodology for calculating Operating Contribution on the Distributor's P&L Statement shall be as set forth on Schedule 1d hereto.  The methodology for calculating Operating Contribution on the Supplier's P&L Statement shall be as set forth on Schedule 1e hereto.

"*Retail Grocery Stores*" shall be defined as in ACNielsen's Scan Track database, as amended from time to time.

"*SBC/TI/Military Transition Plan*" shall be defined as the transition plan attached to this Agreement as Schedule 1f, under which (i) the distribution of Seattle's Best Coffee and Torrefazione Italia brand Licensed Products in all Licensed Channels, and (ii) the distribution of Starbucks brand Licensed Products to Military Exchanges and Commissaries, will transition from Supplier to Distributor.

"*Significant Competitor*" shall be defined as a business with annual sales of One Hundred Million Dollars ($100,000,000) or more of Super Premium Coffee within the Territory other than Super Premium Coffee bearing one or more of the Licensed Trademarks.

"*Super Premium Coffee*" shall be defined as bulk, whole bean or ground coffee that is (i) traditionally sold at the highest end of the consumer coffee market in the Territory, and (ii) generally priced (A) at a non-promotional shelf price of $6.50 or more per pound in the Territory at Retail Grocery Stores when sold in traditional packaging in package sizes of two ounces or more or (B) at a comparable differential to non-promotional shelf prices of non-

premium coffee when sold in the Territory in package sizes of less than two ounces or in nontraditional packaging or delivery systems (e.g., "pods"). In addition, Distributor's Gevalia brand of coffee and Supplier's Starbucks, Seattle's Best Coffee and Torrefazione Italia brands of coffee shall each be deemed to be Super Premium Coffee, regardless of the retail price of each such brand from time to time. If Supplier and Distributor are unable to agree on whether a particular coffee is "Super Premium Coffee" pursuant to the foregoing definition, the dispute shall be submitted to the Oversight Committee for resolution.

"*Supplier's Net Sales Statement*" shall be defined as, for any period, Supplier's statement of Kiosk Net Sales for such period for the Kiosk Products sold or supplied by Supplier to Kiosks.

"*Supplier's P&L Statement*" shall be defined as, for any period, Supplier's statement of profit and loss for such period for the sale of (i) all Licensed Products in Military Exchanges and Commissaries and (ii) all Licensed Products bearing the Seattle's Best Coffee and Torrefazione Italia Licensed Trademarks in all Licensed Channels. The form of Supplier's P&L Statement is attached as part of Schedule 1e hereto.

"*Territory*" shall be defined as the fifty states of the United States, plus Guam, Puerto Rico and the District of Columbia. The Territory shall include military bases located in the foregoing geographic areas.

"*Top Ten Selling Products*" shall be defined, for coffees sold under the Starbucks Licensed Trademark, as the blends of Supplier's whole bean, ground and bulk coffees that bear such Licensed Trademark that rank during the previous Year among Supplier's ten highest revenue-producing blends among coffees bearing such Licensed Trademark, based on gross sales generated in retail stores (including Kiosks) licensed or operated by Supplier in the Territory. Notwithstanding the foregoing, Top Ten Selling Products shall not include seasonal blends and other promotional blends that are promoted by Supplier for limited sales periods of twenty (20) consecutive weeks or less, such as "Anniversary Blend," "Christmas Blend" and "Gazebo Blend"; Distributor acknowledges that some of the retail stores and Kiosks licensed or operated by Supplier may take longer than twenty (20) weeks to sell through their supply of such seasonal and promotional blends. The first determination of "Top Ten Selling Products" shall occur on October 2, 2005. If Supplier has an insufficient supply of a particular Top Ten Selling Product (a "Short Supply Product") to supply the retail stores (including Kiosks) owned, licensed or operated by Supplier and the requirements of Distributor, then Supplier will designate the next highest revenue producing Super Premium Coffee blend for which it has sufficient supply as a Top Ten Selling Product. For other Super Premium Coffee brands which are owned or acquired by Supplier and which are distributed by Distributor hereunder (including but not limited to the Seattle's Best Coffee and Torrefazione Italia brands), the Oversight Committee shall establish similar criteria pursuant to which Supplier shall make available to Distributor a similar representative sample of the popular blends of coffee sold under such Super Premium Coffee brands.

"*Year*" except for Year 1, shall be defined as the fiscal year of Supplier which begins, for a particular year, at 12:01 a.m. on the Monday following the Sunday closest to

September 30 and ends at midnight on the Sunday closest to September 30 of the following year. Unless the defined term "*Year*" is used, "*year*" shall mean any twelve-month period of time.

"*Year 1*" shall be defined as the period from the Effective Date through October 3, 2004.

"*Year 2*" shall be defined as the fiscal year of Supplier following Year 1, and subsequent years will also be similarly measured by reference to Supplier's fiscal years.

2.    **Trademark Use.**

A.    Grant of Right to Use.  On the terms and conditions of this Agreement, Supplier hereby grants to Distributor on and as of the Effective Date a non-transferable right, with no right to grant further rights, to use the Licensed Trademarks solely in connection with the full exploitation of the Distributor's rights and the performance of Distributor's obligations under this Agreement.

B.    Reservation of Rights.  Supplier expressly reserves all rights relating to the Licensed Trademarks not granted to Distributor under this Agreement.

C.    Prohibition.  Distributor shall have no right to use the Licensed Trademarks outside of the Licensed Channels or outside of the Territory, and shall use commercially reasonable efforts to ensure that the Licensed Trademarks are not used outside of the Licensed Channels or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the use of the Licensed Trademarks outside of the Licensed Channels or the Territory.

3.    **Sale of Licensed Products; Exclusivity Obligations and Other Terms.**

A.    Supplier's Grant of Right to Sell Licensed Products.  On the terms and conditions of this Agreement, Supplier hereby grants to Distributor the exclusive right to market, distribute and sell, (i) the Licensed Products in the Licensed Channels in the Territory, (ii) the KIRKLAND private label brand bulk, whole bean and ground coffee to Costco for resale by Costco in the Territory and (iii) any future private label brand bulk, whole bean and ground Super Premium Coffee sold by Supplier in the Licensed Channels.  Notwithstanding the foregoing, this grant of rights shall be non-exclusive with respect to online sites owned, operated, licensed or authorized by (or otherwise co-branded with) a retail business primarily engaged in a Licensed Channel, and Supplier shall be free to distribute any Super Premium Coffee directly or through a third party to such online sites.  Supplier represents and warrants to Distributor that the grant contained in this Section 3.A does not conflict with the rights of any third party in or to any product, brand or trademark included in such grant, except as otherwise set forth in the SBC/TI/Military Transition Plan.  Distributor acknowledges that the representation and warranty in the preceding sentence shall not apply to any Super Premium Coffee brand that Supplier may acquire after the date of this Agreement, and that any representation and warranty with respect to such brand will be provided, if at all, in a separate and specific representation and warranty provided in writing by Supplier to Distributor.

B.    <u>Distributor's Obligations for Sale of Licensed Products</u>.  During the term of this Agreement, Distributor shall use commercially reasonable efforts, consistent with Distributor's business practices, policies, strategies, and with the terms of this Agreement, to market the Licensed Products in the Licensed Channels in the Territory.

C.    <u>Exclusivity Obligations</u>.

    (i)    <u>Of Supplier</u>.

        (a)    During the term of this Agreement, neither Supplier nor its Affiliates shall, directly or indirectly, market, distribute or sell, or license any third party to market, distribute or sell, any Super Premium Coffee in the Licensed Channels other than (i) the sale of the Licensed Products to Distributor in accordance with this Agreement and (ii) as provided in Subsection 3.C(i)(b). Supplier and its Affiliates retain the rights to sell Super Premium Coffee in channels other than the Licensed Channels and to sell coffees which are not Super Premium Coffees in all channels, including the Licensed Channels.

        (b)    Supplier and its Affiliates may sell or supply Kiosk Products to Kiosks and Company Operated Kiosks located in the Licensed Channels for resale by such parties in accordance with this Agreement.  Supplier and its Affiliates may also sell any By-the-Cup Coffee Products to Kiosks and Company Operated Kiosks.  Supplier and its Affiliates may from time to time establish additional Kiosks and Company Operated Kiosks.  Supplier and its Affiliates will determine in which stores to establish Kiosks and Company Operated Kiosks and will negotiate to enter into license agreements or food service agreements (if and as applicable) with such stores. The design, layout, signage and method of operation of the Kiosks and Company Operated Kiosks shall be determined by Supplier and/or the owners or operators of the Kiosks.  All Kiosks and Company Operated Kiosks will be supplied directly by Supplier and its Affiliates, including through third-party shippers, such as United Parcel Service, or through third party food service distributors such as SYSCO.

        (c)    During the term of this Agreement, neither Supplier nor its Affiliates shall grant any rights to any third party to use the Licensed Trademarks for purposes of marketing, distributing or selling the Licensed Products in the Licensed Channels in the Territory other than to Distributor, except as contemplated by the SBC/TI/Military Transition Plan.  Notwithstanding the foregoing, (a) Supplier and its Affiliates may, during the term of this Agreement, establish additional Company Operated Kiosks and enter into license agreements with certain stores included in the

Licensed Channels to establish additional Kiosks, as described in Subsection 3.C(i)(b), (b) Supplier and its Affiliates retain the right to use, and grant rights to third parties to use, the Licensed Trademarks in connection with any products distributed in channels other than the Licensed Channels, and in all channels outside the Territory, (c) Supplier and its Affiliates retain the right to use, and grant rights to third parties to use, the Licensed Trademarks in connection with any products other than whole bean, ground or bulk Super Premium Coffee, both within and outside the Licensed Channels and (d) Supplier and its Affiliates may engage in sales of Super Premium Coffee to online sites as contemplated in Section 3.A.

(ii)    Of Distributor.    During the term of this Agreement, neither Distributor nor its Affiliates shall, directly or indirectly, distribute, market or sell any Super Premium Coffee other than (a) the Licensed Products in the Licensed Channels in the Territory and (b) products bearing the GEVALIA trademark sold through the internet, direct mail or food service operations, or in kiosks located outside the Licensed Channels. Neither Distributor nor its Affiliates shall develop, establish, or operate any Super Premium Coffee kiosks or similar establishments or sell to any Super Premium Coffee kiosks or similar establishments in the Licensed Channels.

D.    Distribution of Licensed Products Outside the Licensed Channels and Outside the Territory.    Distributor shall have no right to sell Licensed Products outside of the Licensed Channels or outside of the Territory, and Supplier expressly reserves all rights in the Licensed Products not granted to Distributor under this Agreement.    Distributor shall use commercially reasonable efforts to ensure that Licensed Products are not distributed outside of the Licensed Channels or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the distribution of Licensed Products outside of the Licensed Channels (e.g., distribution of Licensed Products in packaging designed for uses other than home use by end consumers in the Territory), and refraining from actions intended to facilitate the distribution of Licensed Products outside of the Territory.

E.    Product Pricing in Licensed Channels.    It is the intention of the parties that Distributor will not price the Licensed Products in a manner likely to detract from such products' super premium brand positioning in the market. Distributor shall have sole control of the pricing of the Licensed Products in the Licensed Channels; provided, however, that Supplier may suggest price levels to Distributor consistent with the price and brand positioning of other Super Premium Coffee, and Distributor shall give due consideration to any such suggestions of Supplier when pricing the Licensed Products.

4.    Product Supply.

A.    Product Standards.    The actions taken by Supplier in connection with the purchase, roasting, distribution or sale of the Licensed Products to be supplied by Supplier to

Distributor under this Agreement shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to Super Premium Coffee sold in retail outlets owned, licensed or operated by Supplier. Supplier shall deliver the Licensed Products bearing the Starbucks Licensed Trademark to Distributor no later than eight (8) weeks after such products are packaged by Supplier and those bearing the Seattle's Best Coffee and Torrefazione Italia Licensed Trademarks no later than eighteen (18) weeks after such products are packaged by Supplier, in each case, except to the extent forecasting errors by Distributor cause Supplier to use coffee with an earlier packaging date in order to fulfill Distributor's orders, in which event the parties will use their commercially reasonable efforts to agree on appropriate changes in the applicable packaging and delivery dates. In addition, for Super Premium Coffee brands that are acquired by Supplier after the date of this Agreement, the parties agree to establish commercially reasonable dates following packaging by which Supplier must deliver products of such brands to Distributor.

        B.    <u>Product Supply Prices</u>. Supplier shall sell the Licensed Products to Distributor at a price equal to the Fully Landed Cost for such products, as established every six months. To the extent Supplier purchases products or services from related parties, all cost components included in the Fully Landed Cost shall be based on the lesser of actual costs to Supplier or the fair market value of the component based upon the open market cost for such item in an arm's-length transaction between unrelated parties. At the end of each six month period, Supplier shall "true-up" any and all variances between the actual and the invoiced Fully Landed Costs for such Year. Audits of Supplier's Fully Landed Cost (including the end of Year "true-up" calculation) shall be performed as provided in <u>Section 7.C</u> below.

        C.    <u>Product Supply</u>. Supplier will select the green coffee to be used to manufacture the Licensed Products. Distributor will provide Supplier with rolling forecasts of estimated sales of Licensed Products as set forth on <u>Schedule 4.C</u> to facilitate the purchase and roasting of green coffee for ultimate sale. Supplier shall send to Distributor an invoice setting forth amounts owed by Distributor to Supplier, concurrently with each shipment of Licensed Products. Distributor shall remit payment to Supplier, by wire transfer of immediately available funds, of all amounts due under any such invoice within fifteen (15) days after receipt of such invoice by Distributor.

        D.    <u>Future Supply Arrangements</u>. <u>Schedule 4.C</u> sets forth the procedures for Distributor to communicate with Supplier with regard to demand forecasts.

        **5.**    **<u>Term and Termination</u>.**

        A.    <u>Term</u>. This Agreement shall commence as of the Effective Date and continue for a period of ten (10) years, unless sooner terminated pursuant to the terms of this Agreement. This Agreement shall renew automatically for successive ten (10) year periods, unless sooner terminated pursuant to the terms of this Agreement.

        B.    <u>Termination</u>. This Agreement may be terminated prior to the expiration of the term hereof as follows:

        (i)    By mutual written agreement of Supplier and Distributor;

(ii)    By Supplier at any time after five (5) years from the Effective Date upon not less than one hundred eighty (180) days' prior written notice to Distributor.  If Supplier terminates this Agreement pursuant to this provision, and Supplier: (x) resumes sale of the Licensed Products in the Licensed Channels in conjunction with a party other than Distributor, Supplier will pay Distributor one hundred thirty-five percent (135%) of the Fair Market Value of this Agreement; or (y) directly distributes the Licensed Products in the Licensed Channels and agrees not to use a third party distributor in the Licensed Channels in the Territory for a period of two (2) years following such termination, then Supplier will pay Distributor one hundred twenty percent (120%) of the Fair Market Value of this Agreement; or (z) refrains from any and all distributions of the Licensed Products in the Licensed Channels in the Territory for a period of two (2) years following such termination, then Supplier will pay Distributor the Fair Market Value of this Agreement.  In the event Supplier terminates this Agreement pursuant to this Subsection 5.B(ii), then within forty five (45) days following the effective date of the termination, Supplier shall pay Distributor the relevant termination fee based on an amount equal to the appropriate percentage (135%, 120% or 100%) times the Fair Market Value of this Agreement as determined by the Supplier-Chosen Appraiser (as defined below).    In the event the Fair Market Value of this Agreement is determined (pursuant to Section 5.D or otherwise) to be greater than the amount determined by the Supplier-Chosen Appraiser, Supplier shall pay Distributor any additional termination payment it owes Distributor under this Agreement within thirty (30) days after such amount is determined.

(iii)    By either party, upon a Material Breach of this Agreement by the other party which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach.

(iv)    By either party, in the event of insolvency or bankruptcy of the other party, if such condition is not cured within sixty (60) days.

(v)    By either party, in the event of an assignment of this Agreement by the other party in violation of Section 14.B hereof.

(vi)    By Supplier, if, without the prior consent of Supplier, (a) Distributor assigns this Agreement to a Significant Competitor, or (b) Distributor or any of its Affiliates becomes a Significant Competitor or a supplier of Super Premium Coffee in the Licensed Channels in the Territory.  Distributor's program, as in existence on the date hereof, of selling branded or unbranded coffee products (as a "private label" manufacturer, and without controlling the marketing), and franchising and/or licensing the GEVALIA trademark for use on and in connection with foodservice operations in hotels, educational institutions, transportation centers, business offices, retail outlets (other than those in the Licensed Channels), foodservice kiosks, food courts, and other host foodservice channels, shall not constitute selling Super Premium Coffee for purposes of the definition of Significant Competitor.  After the date of this Agreement, Distributor shall withdraw in an

11

orderly fashion from selling coffee bearing the GEVALIA trademark in Natural Food Stores; Supplier acknowledges and agrees that each Natural Food Store will sell through its supply of such coffees in the ordinary course of its business.

(vii)   By Distributor, if, without the prior consent of Distributor, Supplier assigns this Agreement to a Significant Competitor.

(viii)   By either party, upon a Change of Control of the other party.

C.   Termination of Rights to Licensed Products in Specific Licensed Channels. If Distributor fails to achieve the minimum Distributor Net Sales amounts for all Licensed Products set forth in this Section 5.C for the applicable channel within Licensed Channels in any specified Year, Supplier may terminate Distributor's rights under this Agreement to distribute the Licensed Products solely in such channel, subject in each case to Distributor's right to cure such failure as provided below in this Section 5.C.

(i)   The minimum Distributor Net Sales amounts with respect to the aggregate amount of sales of Licensed Products bearing the Starbucks Licensed Trademark in Retail Grocery Stores and Mass Merchandise Stores, collectively, shall be as follows:

(a)   $57.5 million for Year 1;

(b)   $137.0 million for Year 2;

(c)   $137.0 million for Year 3;

(d)   $159.0 million for Year 4; and

(e)   $159.0 million for Year 5.

(ii)   The minimum Distributor Net Sales amounts with respect to sales of all Licensed Products in Club Stores shall be as follows:

(a)   $22.1 million for Year 1;

(b)   $45.6 million for Year 2;

(c)   $47.0 million for Year 3;

(d)   $48.4 million for Year 4; and

(e)   $49.8 million for Year 5.

(iii)   The minimum Distributor Net Sales amounts with respect to sales of all Licensed Products (including Seattle's Best Coffee and Torrefazione Italia coffees) in Natural Foods Stores shall be as follows:

(a)   $0.0 for Year 1;

      (b)    $1.0 million for Year 2;

      (c)    $2.4 million for Year 3;

      (d)    $2.5 million for Year 4; and

      (e)    $2.6 million for Year 5.

      (iv)   The minimum Distributor Net Sales amounts (plus amounts reflected on Supplier's P&L Statement) with respect to sales of all Licensed Products (including Seattle's Best Coffee and Torrefazione Italia coffees) in Military Exchanges and Commissaries shall be as follows:

      (a)    $0.0 for Year 1;

      (b)    $1.0 million for Year 2;

      (c)    $2.2 million for Year 3;

      (d)    $2.4 million for Year 4; and

      (e)    $2.5 million for Year 5.

      (v)   The minimum Distributor Net Sales amounts with respect to sales of all Licensed Products (including Seattle's Best Coffee and Torrefazione Italia coffees) in Drug Stores shall be as follows:

      (a)    $0.0 for Year 1;

      (b)    $1.0 million for Year 2;

      (c)    $2.5 million for Year 3;

      (d)    $2.8 million for Year 4; and

      (e)    $3.1 million for Year 5.

      (vi)   The minimum Distributor Net Sales amounts, including bulk coffee, plus amounts reflected on Supplier's P&L Statement, with respect to sales of Licensed Products bearing the Seattle's Best Coffee or Torrefazione Italia Licensed Trademarks in all Licensed Channels combined shall be as follows:

      (a)    $0.0 for Year 1;

      (b)    $25.0 million for Year 2;

      (c)    $42.3 million for Year 3;

      (d)    $51.8 million for Year 4; and

(e)    $65.0 million for Year 5.

For each Year after Year 5, Distributor will continue to be required to achieve minimum Distributor Net Sales for each of the business and brand categories set forth above in amounts to be determined by the Oversight Committee. If the Oversight Committee is unable to agree on one or more of such minimums, the matter shall be resolved pursuant to Section 15. Distributor shall report to Supplier, within sixty (60) days following the end of the applicable Year, the Distributor Net Sales by the business and brand categories set forth in this Section 5.C for each Year. If Distributor fails to achieve the minimums for any business or brand category set forth in this Section 5.C, Supplier will have ninety (90) days from its receipt of Distributor's report to elect to terminate this Agreement with respect to any such business or brand category upon written notice to Distributor (the "*Termination Notice*"). Upon receipt of such Termination Notice, Distributor shall have a period of thirty (30) days following receipt of such notice within which to cure such failure by paying to Supplier, in cash, an amount equal to the Cure Amount (defined below). Notwithstanding any other provision of this Section 5.C, if Distributor pays the Cure Amount for any such business or brand category to Supplier within such 30-day period, Supplier shall not have any right to terminate this Agreement with respect to such business or brand category pursuant to this Subsection 5.C for the relevant Year. Distributor may exercise this right to cure once with respect to each of its several obligations under Subsections 5.C(i) through 5.C(vi) above (including its obligation to meet thresholds set by the Oversight Committee after Year 5), and if it exercises such right and duly cures a failure, it will have no right to cure any subsequent failures under the applicable subsection. If Supplier does not provide Distributor the Termination Notice within the ninety (90) day period described above, Supplier will be deemed to have waived its right to terminate the Agreement with respect to the applicable business or brand category pursuant to this Section 5.C in the relevant Year. For purposes of this Agreement, "*Cure Amount*" shall mean, for each business or brand category in any Year, an amount equal to 20% of the remainder of (i) the minimum Distributor Net Sales in such business or brand category for such Year less (ii) the actual amount of Distributor Net Sales in such business or brand category for such Year. If Supplier develops or acquires new brands which will be distributed by Distributor in accordance with this Agreement, the parties will establish similar reasonable minimum Distributor Net Sales requirements for such new brands.

D.    Valuation. Within thirty (30) days following Supplier's written notice to Distributor of Supplier's termination of this Agreement pursuant to Subsection 5.B(ii) hereof, Supplier shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "*Supplier-Chosen Appraiser*"), and Distributor shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "*Distributor-Chosen Appraiser*"). The Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser shall jointly determine the Fair Market Value of this Agreement. In the event the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on the Fair Market Value of this Agreement within forty-five (45) days after they are appointed, and further negotiations, in the opinion of either of the appraisers, would not result in such an agreement, the Fair Market Value of this Agreement shall be the average of the appraised values of the two appraisers; *provided, however*, that if the appraised values of the two appraisers differ by more than ten percent (10%) of the lower of the two appraised values, the two appraisers shall select a third appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this

14

Agreement, which appraiser shall be independent with respect to Supplier and Distributor (the "*Independent Appraiser*"). The Independent Appraiser shall not be affiliated with either Supplier or Distributor, shall not have performed work for either Supplier or Distributor within the twenty-four (24) month period immediately preceding its appointment pursuant to this Section 5.D and shall otherwise not have any reason to be influenced by the interests of either Supplier or Distributor. If the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on an Independent Appraiser, then either party may petition the presiding judge of the Federal District Court for the Southern District of New York to appoint an Independent Appraiser. The Independent Appraiser shall, within forty-five (45) days after its appointment, determine whether the appraisal prepared by the Supplier-Chosen Appraiser or the appraisal prepared by the Distributor-Chosen Appraiser most closely reflects the Fair Market Value of this Agreement, and shall notify the parties of such decision in writing. The appraisal selected by the Independent Appraiser shall be final and binding on Supplier and Distributor for purposes of determining the Fair Market Value of this Agreement. Supplier and Distributor shall bear the costs of their respective appraisers and shall share the cost equally of the Independent Appraiser, if any.

### 6.    Post-Termination Rights and Obligations.

A.    Transition from Distributor to Supplier. Subject to Section 6.C below, upon termination of this Agreement, (i) Supplier shall buy from Distributor (A) Licensed Products that remain in Distributor's inventory on the date of termination of this Agreement, and (B) the display materials related thereto and (ii) each party shall retain all accounts receivable generated by its own sales of Licensed Products under this Agreement. The purchase price paid by Supplier to Distributor pursuant to this Section 6.A shall be calculated as follows:

(i)    The purchase price for the Licensed Products referred to in this subsection shall be the purchase price paid by Distributor when it purchased such products from Supplier.

(ii)    The purchase price for the display materials referred to in this subsection shall be the depreciated book value thereof.

The parties shall allocate advertising and promotional commitments relating to the Licensed Products existing on the date of termination of this Agreement as follows: (x) fixed trade and variable spending commitments shall be allocated based on the date of termination of this Agreement, so that the party who benefits from the sales generated by the spending shall bear the cost of such spending, and (y) consumer coupons redeemed after the termination of this Agreement shall be for the account of Distributor.

B.    Payment of Fair Market Value of this Agreement. In the event this Agreement is terminated pursuant to Subsection 5.B(ii), the payment by Supplier to Distributor of the appropriate percentage (135%, 120% or 100%) times the Fair Market Value of the Agreement shall be deemed to include the purchase by Supplier of the Licensed Products owned by Distributor that remain in Distributor's inventory, the display materials used in connection therewith, and the existing advertisement and promotional commitments relating to such Licensed Products that are allocated to Supplier pursuant to Section 6.A above.

15

C.    Orderly Transition.  Supplier and Distributor shall act in good faith to make an orderly transition for the sale of the Licensed Products following termination of this Agreement.  Distributor and Supplier shall use their best efforts to allow the Licensed Products remaining in the Licensed Channels to be sold in the ordinary course of business of the particular retail outlet in the Licensed Channels at which such Licensed Products remain.

D.    Trademark Use.  Following termination of this Agreement for any reason, and except for such uses reasonably necessary to effect an orderly transition or otherwise as permitted herein, Distributor shall discontinue its use of the Licensed Trademarks, and Supplier shall be permitted to use or license the Licensed Trademarks on any products without restriction.

**7.    Royalty Payments.**

A.    Periodic Payments; Adjustments for Short Months.  During the term of this Agreement, Distributor shall make royalty payments to Supplier (the "*Distributor Payments*") as follows:

(i)    Distributor shall pay to Supplier REDACTED of the first REDACTED of Net Profits generated in each month (after taking into account true-up differences calculated pursuant to Schedule 1d) (the "*First Royalty Payment*"); plus

(ii)    with respect to Net Profits in excess of the first REDACTED generated in each month (after taking into account true-up differences calculated pursuant to Schedule 1d), Distributor shall pay to Supplier an amount equal to REDACTED of such Net Profits; minus

(iii)    REDACTED of Kiosk Net Sales generated in such month, minus

(iv)    the amount reflected as Operating Contribution on Supplier's P&L Statement for each such month occurring during the transition period contemplated in Schedule 1f (after taking into account true-up differences calculated pursuant to Schedule 1e);

by wire transfer of immediately available funds within fifteen (15) days after the end of such month.

If for any reason the First Royalty Payment in a particular month (a "*Short Month*") is less than REDACTED, then Distributor shall pay Supplier the actual amount, if any, of Net Profits for the Short Month, and in the following month shall pay Supplier a First Royalty Payment equal to the difference between REDACTED and the actual profits in the Short Month, plus the next REDACTED of Net Profits generated in such month. If necessary, this adjustment shall continue during the Year so that at the end of the Year (excluding Year 1) Supplier shall be entitled to have received, on a cumulative basis, the first REDACTED of Net Profits.  If for any reason the cumulative Net Profits during a Year (excluding Year 1) are less than REDACTED, Supplier shall be entitled to retain the actual Net Profits for the Year, and shall refund to Distributor the funds, if any, it has received under this Section 7 in excess of the actual Net Profits.  For Year 1, the cumulative Net Profits that Supplier shall be entitled to receive pursuant to the First Royalty Payment shall equal REDACTED.  In order to facilitate the proper calculation of Distributor

16

Payments for each month, Supplier shall deliver to Distributor, within ten (10) days after the end of such month, written copies of the Supplier's Net Sales Statement and the Supplier's P&L Statement for such month.  Distributor shall retain for its own account all Net Profits not required to be distributed to Supplier in any month pursuant to the foregoing provisions.

      B.    <u>Advertising and Promotion</u>.

        (i)    Distributor shall spend that amount per year on Advertising and Promotion such that, pursuant to U.S. generally accepted accounting principles, the expense is at least equal to the Minimum A&P Amount for such year, unless otherwise agreed by the parties.

        (ii)    The failure of Distributor to expense at least the amount described in <u>Subsection 7.B(i)</u> above in the applicable year, unless otherwise agreed by the parties, shall constitute a Material Breach of this Agreement on the part of Distributor; *provided, however,* that any such failure on the part of Distributor shall not be deemed a Material Breach of this Agreement if Distributor has expensed at least ninety percent (90%) of the minimum expenditure in question and Distributor pays to Supplier, within thirty (30) days following the end of such year, the amount by which the Minimum A&P Amount for such year exceeds Distributor's actual advertising and promotional expenditures.

      C.    <u>Audits</u>.  During the term of this Agreement, and for the year immediately following termination of this Agreement, each party shall have the right to conduct an annual audit of the books and records of the other party at the end of each fiscal year of the party being audited, provided that such audit shall be scheduled so as to not interfere with the other party's year-end closing activities; and provided that such audit is preceded by a procedures report which sets out to the audited party what scope and focus the audit is intended to cover.  The party requesting the audit may conduct the audit using its own internal auditing department, or at its option, a nationally recognized auditing firm selected by such party (the "*Auditor*") to confirm (i) in the case of Distributor, the accuracy of Supplier's calculation of Fully Landed Costs and the aggregate purchase price for the Licensed Products during such Year and of the Supplier's Net Sales Statements and Supplier's P&L Statements for each month in such Year and (ii) in the case of Supplier, the accuracy of the Distributor's P&L Statement for each month in such Year and Distributor's calculation of the Distributor Payments.  Such audits shall be made with particular reference to all applicable terms of this Agreement.  Distributor and Supplier shall each bear their own audit costs, which costs shall not be reflected or included in the Distributor's P&L Statement, the Supplier's Fully Landed Cost or the Supplier's P&L Statement, as applicable.  All records of Distributor and Supplier as may reasonably be necessary to verify the audit will be made available to the other party's Auditor upon its request.  The Auditor's determination as to the calculations of Net Profits, Distributor Payments, Fully Landed Costs and Supplier's Operating Contribution shall be in writing and delivered within 180 days after the end of each Year and shall be conclusive and binding upon Distributor and Supplier (the "*Final Determination*"), unless contested in writing by the other party within fifteen (15) days following its receipt of the audit report.  If the Final Determination indicates any errors in (x) Supplier's calculation of Fully Landed Cost, the purchase price payable for Licensed Products purchased by Distributor, the Net Profits attributable to the sale or supply of Kiosk Products to Kiosks or

17

Supplier's Operating Contribution during such Year or (y) Distributor's calculation of the Distributor Payments or the Net Profits attributable to the sale or supply of Licensed Products through all Licensed Channels during such Year, then the Auditor shall calculate the net amount of a payment to be made by Supplier or Distributor, as applicable, to correct such errors, which payment shall be made by either Supplier or Distributor, as applicable, within thirty (30) days after such determination; *provided however* that no retroactive payment shall be made with respect to any period which is more than eighteen (18) months prior to the commencement of the audit in which such errors are first identified. In addition, no party shall be required to make a payment if, and only to the extent, it disputes the audit results, in which case the audit dispute will be submitted to the Oversight Committee for resolution. If the Oversight Committee is unable to resolve the dispute, the matter shall be resolved in accordance with the dispute resolution provisions of Section 15.

D.     Statements and Payments. Each of Distributor and Supplier shall render the following monthly reports to the other party, no later than ten (10) days after the end of each fiscal month (or covering such other periods, with delivery at such other intervals, as specifically set forth below):

(i)     Distributor shall render reports with the following information on a national basis (except as specifically set forth below) in a form reasonably satisfactory to Supplier:

(a)     unit sales and gross sales of Licensed Products by Licensed Channel by Licensed Trademark during each week delivered within two (2) Business Days following the end of the applicable week;

(b)     unit sales and gross sales of Licensed Products by Licensed Trademark by Distributor's sales regions (including a breakout of information for Distributor's direct shipments to Hawaii and Puerto Rico) during each month;

(c)     Distributor's P&L Statement of Licensed Products by Licensed Trademark during the month;

(d)     distribution, retail pricing and share data for Licensed Products (provided that if Supplier has direct access to the Nielsen database as contemplated in Section 9.B(iv), then Distributor shall not be obligated to provide this report);

(e)     a computation of the Distributor Payments paid to Supplier during the month;

(f)     an estimate of the Distributor Payments to be paid to Supplier for the month within three (3) days of the end of Supplier's fiscal month; and

(g)     Distributor's analysis of business results (i.e., reports or studies prepared by Distributor's Marketing Services Department, Sales Division or Coffee Division) of the Licensed Products for the quarter, in a form reasonably adequate to inform Supplier of the state of Distributor's business contemplated by this Agreement. (Supplier may, in its reasonable discretion, request more frequent updates of this analysis, to the extent such analysis is available in the ordinary course of Distributor's business).

(ii)     Supplier shall render reports with the following information, by Licensed Channel, nationally and by Supplier's sales regions, in a form reasonably satisfactory to Distributor:

(v) gross sales and Net Sales of Kiosk Products sold or supplied to Kiosks during the month,

(w) unit sales of Kiosk Products sold or supplied to Kiosks during the month;

(x) an estimate of the amount reflected as Operating Contribution for the month on the Supplier's P&L Statement and Kiosk Net Sales for the month within three (3) days of the end of Distributor's fiscal month;

(y) Supplier's analysis of business results (i.e., reports or studies prepared by Supplier's Licensed Stores business unit) of the Kiosk Products sold or supplied to Kiosks for the quarter, in a form reasonably adequate to inform Distributor of the state of Supplier's business contemplated by this Agreement; and

(z) the transfer price for Licensed Products by Licensed Channel, by SKU, in dollars per pound to be included with each reset of transfer prices (currently semi-annually), as well as the SKU weighting used to determine the weighted average cost per pound for invoicing purposes.

(iii)    By no later than November 30 of the succeeding Year, each of Distributor and Supplier shall provide the other party with a final accounting of all sums due for the prior Year and a statement from such party's Controller certifying the accuracy and consistency of the monthly reporting given to such other party during the Year then ended. By no later than December 15 of the succeeding Year, Distributor or Supplier, as applicable, shall make any additional payment or refund necessary in light of the final accounting.

E.      Records.  Each of Distributor and Supplier shall maintain for a period consistent with such party's normal retention practices, complete and accurate records and accounts covering the transactions related to this Agreement. Such records and accounts shall be kept in accordance with generally accepted accounting procedures and principles. Each of Distributor and Supplier shall make such records and accounts available for inspection and audit at the other party's expense during the term of this Agreement and for one (1) year thereafter;

19

*provided* that (i) any such inspection and audit by the other party shall be conducted during reasonable business hours and upon reasonable notice by the other party or its nominees; and (ii) neither Distributor nor Supplier shall be obligated to provide access to any records for longer than its normal retention periods.

### 8.    Quality Standards and Quality Control.

A.    Supplier's Quality Obligations.   Supplier shall use all commercially reasonable efforts to ensure that the Licensed Products manufactured by Supplier will be of high quality consistent with the quality of the products of Supplier sold outside the Licensed Channels. All Licensed Products manufactured by Supplier shall be manufactured in compliance with all applicable laws and regulations. Supplier will provide Distributor with such samples of Supplier's coffee products as Distributor may reasonably request for Distributor to ensure compliance of such products with all applicable laws. Prior to the Effective Date, Supplier shall have permitted Distributor to inspect any premises on which the Licensed Products are manufactured, packaged, stored or distributed; and after the Effective Date, Supplier shall permit such inspections to continue; *provided, however,* that any such inspection by Distributor pursuant to this Section 8.A may be undertaken only to verify compliance of the Licensed Products with all applicable laws and regulations, and Distributor shall require any person conducting such an inspection to execute an appropriate confidentiality agreement with Supplier.

B.    Distributor's Quality Obligations.   Distributor shall use all commercially reasonable efforts to ensure that the Licensed Products distributed and sold by Distributor will be of high quality. To ensure that the Licensed Products are consistent with the requirements of the approved super premium brand positioning for the Licensed Products, Distributor will:

(i)    Observe the shelf life policies of Supplier. Such policies provide for a REDACTED        shelf life for ground and whole bean coffee products bearing the Starbucks Licensed Trademark with flavor lock packaging, REDACTED REDACTED for products bearing the Starbucks Licensed Trademark which are distributed in packages that do not have flavor locks and REDACTED REDACTED for products bearing the Seattle's Best Coffee and Torrefazione Italia Licensed Trademarks. Supplier will establish commercially reasonable shelf life policies for (a) bulk coffee products (if applicable) and (b) new Super Premium Coffee brands acquired by Supplier during the term of this Agreement, and shall communicate those policies in writing to Distributor (it being understood and agreed that Distributor is not responsible for complying with any policy with respect to which it has not received advance written notice from Supplier). Distributor shall ensure that code dates on packages of Licensed Products that permit the calculation of the date when such products should be removed from retail stores due to age appear on the exterior of the package. The current Measurement Criteria are set forth on Schedule 8.B(i). In the event Supplier and Distributor disagree with respect to setting future Measurement Criteria, the matter shall be referred to the Oversight Committee for resolution, but in the event the Oversight Committee is unable to resolve the dispute, this subject shall be closed and will not be subject to the dispute resolution procedures of Section 15.

(ii)    Keep complete records for a period consistent with Distributor's normal retention practices and in a form reasonably satisfactory to Supplier, regarding the quantity and quality of the Licensed Products sold and distributed by Distributor and permit Supplier's agents to have access to such records during regular business hours and upon reasonable notice.

C.    Supplier's Approval of Product Display in Licensed Channels.  Supplier and Distributor shall cooperate to develop practices and procedures to be followed for the display of the Licensed Products in the Licensed Channels, which practices and procedures shall be consistent with the approved Super Premium brand positioning of the Licensed Products and the brand equity of Supplier.   Supplier shall have the right to inspect and approve the "racking system" and other methods of display of the Licensed Products in the Licensed Channels by Distributor (collectively, the "*Display Methods*").  If Supplier is dissatisfied with any of the Display Methods, the matter shall be presented in writing to the Oversight Committee.  Any information regarding displays at individual stores which are believed to be inconsistent with the Super Premium positioning of the Licensed Products shall be communicated to Distributor promptly.  Distributor will use all commercially reasonable efforts to improve the display in said store, it being understood by the parties that Supplier and Distributor have no ability to control the management of any retail store that they do not own.   If Distributor cannot induce the management of said store to improve the display to the then-current Measurement Criteria for Display Methods as measured by the Field Auditor within sixty (60) days after the matter was communicated to the Oversight Committee, Distributor shall remove all Licensed Products from said store and make no further sales of Licensed Products to such store, unless otherwise agreed by the parties hereto.

D.    Consumer Complaints.   Distributor shall publicize Supplier's toll-free consumer hotline telephone number dedicated to matters concerning the Licensed Products.  Supplier shall place said number on the packaging of the Licensed Products sold to Distributor.  Distributor shall cooperate with Supplier in all efforts to educate the individual(s) handling any consumer hotline on behalf of Supplier as to the characteristics of Distributor's distribution of the Licensed Products.  With respect to end-user customer complaints relating to the Licensed Products received by Supplier, Supplier shall be entitled, in addition to any measures taken by Supplier at its own expense, to request that Distributor take appropriate steps, consistent with Distributor's policies for resolving such consumer complaints relating to its coffee products.  Distributor shall provide Supplier with a quarterly log of all positive and negative incidents or consumer complaints received by Distributor, and Distributor shall immediately notify Supplier of any consumer or product quality issues with respect to the Licensed Products that are brought to Distributor's attention.

E.    Recalls and Withdrawals. Either party may initiate a recall or a market withdrawal ("market withdrawal") of the Licensed Products due to contamination, adulteration or public health risk.  If the purported reason for the withdrawal turns out to be unfounded, the party which initiated the withdrawal shall bear all costs related thereto.  Supplier will bear all costs related to any market withdrawal of the Licensed Products that results from contamination or adulteration of the Licensed Products in the manufacturing or packaging stages or while the Licensed Products were otherwise in the physical control of Supplier.  Distributor will bear all costs related to any market withdrawal of the Licensed Products that results from contamination

21

or adulteration of the Licensed Products after such products have been delivered by Supplier to Distributor or otherwise placed in Distributor's distribution channels.  In the event the parties are unable to determine when the contamination or adulteration of the Licensed Products occurred, the parties shall share all initial costs related to any market withdrawal of the Licensed Products, and the parties shall negotiate in good faith to arrive at an equitable division of the costs associated with such market withdrawal, with reimbursement of the appropriate party not responsible for the contamination.   Supplier will notify Distributor if any contamination, adulteration, or public health issues arise outside the Licensed Channels that are likely to have a material impact on Distributor's sales of the Licensed Products in the Territory.  Distributor will notify Supplier of any contamination, adulteration or public health issues that arise due to contamination while the Licensed Products in question are in the custody and control of a retail customer.

       F.     <u>Measurement Criteria and Field Audits</u>.

       (i)     <u>Measurement Criteria</u>.  Set forth on <u>Schedule 8.B(i)</u> are the current Measurement Criteria, the actions the parties have agreed to undertake in the event the Measurement Criteria are not satisfied, and the means by which the parties will agree upon changes to the Measurement Criteria.

       (ii)     <u>Costs and Conduct of Field Audits</u>.   The parties shall retain the Field Auditor to conduct audits of Distributor's performance of its obligations under this <u>Section 8</u>.   Each party shall pay 50% of the costs of such audits. Distributor's payments with respect to such costs will be included on Distributor's P&L Statement, and Supplier's payments with respect to such costs will be billed back by Supplier to Distributor and included on Distributor's P&L Statement.  The field audit will be conducted quarterly using a statistically valid sample size of stores to generate, at a ninety percent (90%) confidence level, the accuracy of the Field Auditor's measurement of the Measurement Criteria.   Distributor and Supplier agree that the methodology used by the Field Auditor as of the date of this Agreement (as set forth on <u>Schedule 8.B(i)</u>) provides a currently acceptable confidence level, and the results of audits conducted using such methodology will be binding on the parties for purposes of this Agreement, absent manifest error. Supplier and Distributor agree to review the performance of the Field Auditor, and change the methodology and/or the Field Auditor as may be reasonably necessary from time to time to help ensure that the audit continues to be conducted efficiently and accurately.  In the event a party desires to change the then-current audit methodology or the then-current Field Auditor, it will notify the other party in writing of its proposed changes.  The other party will not unreasonably withhold its consent to such proposed changes.  If the parties are unable to agree on the proposed changes, the issue shall be submitted to the Oversight Committee for resolution.  If the Oversight Committee is unable to resolve the issue, it shall be resolved pursuant to the dispute resolution provisions of <u>Section 15</u>.

       (iii)     <u>Field Audit Results</u>.  If a field audit indicates that Distributor has failed to meet or exceed the then-current Measurement Criteria, the parties will undertake the actions described in <u>Schedule 8.B(i)</u>.

9.      **Brand Positioning and Development of Materials.**

A.      Procedure for Development of Brand Strategy.

(i)      Supplier will, from time to time, designate in writing to Distributor the name(s) of individual(s) (the "*Brand Management Team*") responsible for reviewing and approving the matters submitted to Supplier in accordance with this Section 9.A. The current members of Supplier's Brand Management Team are listed on the Committee Schedule. To ensure consistency with Supplier's premium image, Supplier and Distributor shall meet as necessary to enable Supplier to educate Distributor and provide guidance concerning Supplier's branding strategy, including brand image, messaging and positioning. Supplier and Distributor shall develop and agree on a branding strategy for the Licensed Products in the Licensed Channels that supports Supplier's overall branding strategy. Distributor agrees that Supplier's Brand Management Team will work with Distributor's brand management team to provide guidance as Distributor develops and implements the promotional, advertising and marketing concepts approved by Supplier. Supplier may incur expenses arising from its consultation on marketing programs and strategies, including charges for packaging development and creative services, which expenses will be charged to Distributor at actual cost and reflected on Distributor's P&L Statement.

(ii)      Distributor shall submit to Supplier's Brand Management Team, for Supplier's approval, all proposed promotions, advertising, packaging and other programs and materials that support the Licensed Products or use the Licensed Trademarks. Such submission by Distributor shall be made during the concept or initial planning stages and again at the final stage prior to launch. Supplier and Distributor shall work informally and cooperatively to resolve any issues arising from Supplier's review of the foregoing. Supplier's Brand Management Team will have the right to reject any ideas, proposals, programs, materials or other uses of the Licensed Trademarks; *provided, however,* that upon reasonable request by Distributor, any such objection shall be accompanied by a written statement setting forth in reasonable detail the nature of Supplier's objections and, if practicable, suggestions for removing or replacing the objectionable aspects. Supplier shall approve or object to proposed materials of Distributor within ten (10) Business Days after receipt of such materials from Distributor. If the nature of certain submittals (e.g., those requiring trademark clearances) requires more than ten (10) Business Days for Supplier's review, then within ten (10) Business Days of its receipt of such submittals, Supplier will notify Distributor of its estimate for completing such review and shall use all reasonable efforts to complete its review within such time period. All final approvals or objections must be set forth in writing and executed by a member of Supplier's Brand Management Team.

(iii)      Supplier shall have the right to reasonably object to sales by Distributor of–certain of Licensed Products to specific accounts, if Supplier determines in its reasonable discretion that the applicable account is detrimental to

23

the brand positioning strategy for the Licensed Products. Supplier and Distributor shall work informally and cooperatively to resolve any such objection.

B.    Management of the Agreement. Distributor will provide Supplier the reasonable opportunity to consult with Distributor on matters affecting Distributor's management of distributing and marketing the Licensed Products in the Licensed Channels, and will consider in good faith all recommendations and suggestions made by Supplier with respect thereto. Supplier from time to time in its reasonable discretion will designate the employees to be dedicated (both full and part time) to the distribution and promotion of the Licensed Products in the Licensed Channels. Distributor and Supplier will use all reasonable efforts to cooperate to ensure regular and open communication between their management teams. Without limiting the generality of the preceding sentences:

(i)    Distributor will provide Supplier the reasonable opportunity to be involved in all significant sales planning by Distributor for the Licensed Products, and Distributor and Supplier will, prior to the commencement of each calendar year during the term of this Agreement, cooperate to jointly develop and agree upon a marketing plan covering Distributor's distribution of the Licensed Products (each annual marketing plan will include the A&P budget);

(ii)    Supplier may, in its reasonable discretion, consult on sales action plans for all accounts selected by Supplier;

(iii)    Supplier will have the right to review significant sales presentations and attend (only with Distributor) significant sales calls on accounts selected by Supplier in its reasonable discretion;

(iv)    Distributor will consult with Supplier on all marketing research conducted by or on behalf of Distributor regarding the Licensed Products, including the design and scope of all marketing research projects and the research questionnaires and methodology. Distributor will promptly provide Supplier with copies of all marketing research reports received by Distributor, including interim and draft reports. In addition, Distributor will provide Supplier access to detailed Nielsen reports in Distributor's possession (including SKU-level data by market) for the Licensed Products and key competitors on a weekly and monthly basis. Distributor will undertake to investigate the feasibility of establishing a terminal for direct access to the Nielsen database at the Supplier's office, and if it is reasonably feasible to establish such terminal, Distributor and Supplier will cooperate to do so.

(v)    Distributor will provide Supplier with detailed marketing and trade budgets, including key assumptions, monthly to the extent such reports are regularly generated by Distributor on a monthly basis, otherwise quarterly. Upon reasonable request by Supplier, Distributor will also provide Supplier copies of Distributor's analyses of projects, including incremental volume/payout analyses and other information that is relevant to the marketing, sale and distribution of the Licensed Products; and

24

(vi)    Supplier will keep Distributor reasonably informed of its efforts to promote and expand the Seattle's Best Coffee and Torrefazione Italia brands. Distributor acknowledges that these brands have been recently acquired by Supplier and Supplier has not determined the extent, scope or manner in which these brands will be developed.

C.    Submission to Oversight Committee.    In the event Supplier and Distributor are unable to agree on a brand positioning strategy for the Licensed Products, Distributor may submit such matter to the Oversight Committee, which shall use its best efforts to resolve such disagreement.  In no event will Distributor pursue a significant brand strategy that has not been approved by either Supplier or the Oversight Committee.

D.    Samples of Materials.  At the reasonable request of Supplier, Distributor shall provide Supplier with a reasonable number of copies, photographs, or reasonable quantities of samples of approved materials.

E.    Failure to Comply with this Section 9.  Either Distributor's or Supplier's failure to comply in any material respect with any provision contained in this Section 9 shall constitute a Material Breach of this Agreement by such party.

10.    **Coordinated Marketing Efforts.**

A.    Coordination.  In order to maximize sales of Licensed Products, the parties agree to cooperate to coordinate their marketing efforts with respect to the Licensed Products sold under one or more of the Licensed Trademarks.  Notwithstanding the foregoing, except as expressly provided herein, neither party shall be obligated to undertake any specific marketing effort or conduct any research on its own or in conjunction with the other party.

B.    Committees; Meetings; Contracts.

(i)    Oversight Committee.  The "*Oversight Committee*" shall be comprised of two top executives of each party and shall continue to review the parties' joint efforts pursuant to this Agreement and to oversee such financial, management and business issues as the members of the Oversight Committee deem appropriate.  The Oversight Committee's roles will include: (a) reviewing annual profit targets as part of a long range business plan (to be developed by Distributor, with input from Supplier); (b) providing guidance on strategic issues and opportunities; (c) reviewing new business opportunities; (d) approving Display Methods to the extent provided in Section 8.C; (e) reviewing and approving any proposed changes to Schedule 1a, Schedule 1d or Schedule 1e; and (f) providing a forum to resolve issues that are not able to be resolved at lower levels.  Each party may designate other senior executives as substitutes for its existing delegates to the Oversight Committee.  The members of the Oversight Committee as of the date of this Agreement are listed on the Committee Schedule.  The Oversight Committee shall meet at least quarterly and shall hold additional meetings as issues arise that require guidance from or resolution by the Oversight Committee.

25

(ii)    <u>Joint Opportunity Committee ("*JOC*")</u>.  The joint opportunity committee (the "*JOC*") shall be comprised of executives of each party to explore the possibility of expanding the parties' joint efforts into: 1) geographic markets outside the Territory, 2) new Licensed Products other than bulk, whole bean and ground coffee, 3) foodservice and other distribution channels other than the Licensed Channels, and 4) additional business ventures, as well as to formulate a framework for such efforts.

The members of the JOC as of the date of this Agreement are listed on the Committee Schedule. The JOC (or subcommittees thereof) shall meet at least quarterly. Each party may designate other senior executives as substitutes for its existing delegates to the JOC. JOC meetings may be combined with meetings of the Oversight Committee, as agreed by the parties.

(iii)    Additional meetings and additional key employee participants may be initiated by either party when any new product or significant business initiatives are contemplated.

(iv)    Meetings will be held alternately in Tarrytown, New York and Seattle, Washington unless otherwise agreed to by the parties. Each party shall use its best efforts to secure the attendance of all other appropriate participants, including from outside agencies, at such meetings to ensure a full understanding of the parties' respective businesses and cultures.

(v)    Each party shall appoint a primary contact person who shall act as the principal point of contact (outside of meetings of the Oversight Committee and the JOC) with the other party. The parties will consult with each other regarding who will serve as the primary contact person, and each party will select a primary contact person who is satisfactory to the other party. Distributor's primary contact person shall be the President of the Coffee Division. Supplier's primary contact person shall be the President of North America.

(vi)    Final decisions of each of the Oversight Committee and the JOC shall be made by unanimous consent. If unanimous consent of the Oversight Committee cannot be obtained either to affirmatively decide a matter or to table such matter, then such matter shall be subject to resolution as provided in <u>Section 15</u>. If the JOC is unable to achieve unanimous consent, the matter at issue shall be deemed withdrawn and no further action shall be taken by the JOC with respect thereto, and neither party shall have any obligation to pursue the matter in conjunction with the other party.

## 11.   **Confidentiality.**

A.   <u>Information</u>.  Each party (the "*Receiving Party*") shall regard as confidential and proprietary all of the information communicated to it by the other party (the "*Disclosing Party*") in connection with this Agreement, including but not limited to, information concerning equipment, processes, Licensed Products, and data compilation and analysis (the

"*Information*"). Information shall at all times be the property of the Disclosing Party and the disclosure of Information to the Receiving Party does not convey any right, title or license in the Information to the Receiving Party. The Receiving Party shall not, without the Disclosing Party's prior written consent, at any time use such Information for any purpose other than in connection with the performance of its obligations under this Agreement or disclose any portion of such information to third parties; *provided, however,* that the Receiving Party may disclose Information on a "need-to-know" basis to third-party suppliers (e.g., advertising agencies), with the Receiving Party to be responsible for any misuse or disclosure of such Information by such third-party suppliers. The Receiving Party shall disseminate Information to its employees only on a "need-to-know" basis. The Receiving Party shall cause each of its employees who has access to such Information to comply with the terms and provisions of this Section in the same manner as the Receiving Party is bound hereby, with the Receiving Party remaining responsible for the actions and disclosures of any such employees.

B.    Exceptions.    Notwithstanding the provisions of <u>Section 11.A</u>, the Receiving Party's confidentiality obligations shall not apply to (i) information that, at the time of disclosure is, or after disclosure becomes, part of the public domain other than as a consequence of the Receiving Party's breach; (ii) information that was known or otherwise available to the Receiving Party prior to the disclosure by the Disclosing Party; (iii) information disclosed by a third party to the Receiving Party after the disclosure by the Disclosing Party, if such third party's disclosure neither violates any obligation of the third party to Disclosing Party nor is a consequence of Receiving Party's breach; (iv) information developed independently by the Receiving Party; (v) information that Disclosing Party authorizes, in writing, for release; or (vi) information that the Receiving Party is legally compelled to disclose; *provided, however,* that to the extent such party becomes so legally compelled, it may only disclose such information if it shall first have used reasonable efforts to, and, if practicable, shall have afforded the other party and its Affiliates the opportunity to obtain an appropriate protective order, or other satisfactory assurance of confidential treatment, for the information required to be disclosed. Without in any way limiting the generality of the foregoing, in no event shall the varieties of Supplier's products, or ingredients thereof, be deemed to constitute "*Information*."

C.    Non-Solicitation.    During the term of this Agreement, and for a period of one (1) year following expiration or termination of this Agreement, neither party shall employ or make an offer of employment to any employee of the other party who is or has in the prior year been involved significantly in the business which is the subject of this Agreement. The restrictions of this <u>Section 11.C</u> shall apply only to Distributor and Supplier and not their respective parents or Affiliates.

## 12.    Purchase of Shares.

A.    Unless specifically requested in writing in advance by or on behalf of Supplier, neither Distributor nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "*1934 Act*")), will, and neither Distributor nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to,

27

beneficial ownership (as defined in Rule 13d-3 under the 1934 Act)) of (a) Supplier or any of its assets or businesses, (b) any securities listed by Supplier or (c) any rights or options to acquire such ownership (including from a person other than Supplier), by any means, including a negotiated purchase of securities or assets, tender, or exchange offer, merger or other business combination, recapitalization, restructuring, or other extraordinary transaction (a *"Business Combination Transaction"*), (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Supplier, (iii) otherwise seek or propose to control the board of directors, management or policies of Supplier, (iv) take any action that could reasonably be expected to force Supplier to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing. Distributor also agrees during such period not to request Supplier or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence). Distributor hereby acknowledges that neither it nor any of its affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Supplier.

B. Unless specifically requested in writing in advance by or on behalf of Distributor, neither Supplier nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the 1934 Act), will, and neither Supplier nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two (2) years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to, beneficial ownership (as defined in Rule 13d-3 under the 1934 Act)) of (a) Distributor or any of its assets or businesses, (b) any securities listed by Distributor or (c) any rights or options to acquire such ownership (including from a person other than Distributor), by any means, including a Business Combination Transaction, (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Distributor, (iii) otherwise seek or propose to control the board of directors, management or policies of Distributor, (iv) take any action that could reasonably be expected to force Distributor to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing. Supplier also agrees during such period not to request Distributor or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence). Supplier hereby acknowledges that neither it nor any of its affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Distributor.

13.   **Indemnification.**

A.   Distributor's Indemnity.   Distributor hereby indemnifies Supplier, and undertakes to defend and hold Supplier, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

(i)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all product liability claims and/or any other actions involving Licensed Products where such claims are a result of Distributor's negligence or intentional acts, except claims that Distributor's use of any of the Licensed Trademarks in accordance with this Agreement infringes a third party's proprietary rights;

(ii)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Distributor's breach of any representation or warranty made hereunder, or any other act or deed, whether in contract or tort, committed or omitted by Distributor hereunder; and

(iii)   any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Supplier as a direct result of the execution, delivery or performance of this Agreement by Distributor in breach of another agreement to which Distributor is a party.

B.   Supplier's Indemnity.   Supplier hereby indemnifies Distributor, and undertakes to defend and hold Distributor, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

(i)     expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims arising out of Distributor's exercise of the rights granted to it hereunder, including without limitation claims arising out of Distributor's use of the Licensed Trademarks in accordance with this Agreement;

(ii)    any and all claims, suits, losses, damages, costs, liabilities and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Supplier's breach of any representation or warranty made hereunder, or any other act or deed, whether in contract or tort, committed or omitted by Supplier hereunder.

(iii)   any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Distributor as a direct result of the execution, delivery or performance of this Agreement by Supplier in breach of another agreement to which Supplier is a party.

C.   No Consequential Damages.   Neither party shall have any liability to the other party for any indirect, consequential, punitive or other special damages. Nothing in this

29

Section 13.C shall limit a party's indemnification obligations with respect to third party claims under Sections 13.A or 13.B above.

### 14.    Binding Agreement; Assignability.

A.    Binding Agreement.  Unless assigned or transferred in violation hereof, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

B.    Assignment.  Neither party may assign this Agreement or any of its rights hereunder without the prior written approval of the other party; *provided*, *however*, that either party may assign this Agreement, and its rights and obligations hereunder (in whole or in part), without the prior written approval of the other party, to a subsidiary or other corporate Affiliate, other than the parent, of such party.  In the event of any assignment of this Agreement, the assignor shall, following such assignment, remain liable for all of its obligations under this Agreement.

### 15.    Dispute Resolution.

A.    The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation, by submitting such claim or controversy to the Oversight Committee. However, at any time following the first to occur of (i) the first meeting of the Oversight Committee concerning such claim or controversy, or (ii) expiration of the thirty (30)-day period following a party's written request to the other party to submit such claim or controversy to the Oversight Committee if the Oversight Committee has not met to consider such claim or controversy within such thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration.  Such binding arbitration shall be conducted within the City of Chicago at JAMS or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures, except as modified by the Agreement of the parties.  The arbitration shall be conducted by a single arbitrator selected by mutual agreement of the parties within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by JAMS.  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended), and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator is empowered to award attorney's fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement.  If JAMS or its successor is no longer operative, then the Center for Public Resources (CPR) or its successor and its rules and procedures shall be substituted for JAMS for all purposes of this Section 15.

B.    Nothing in this Agreement will prevent either party from resorting to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction or to avoid the barring of the claim under the applicable statute of limitations. In addition, resort by either party to negotiation, mediation or arbitration pursuant to this Agreement shall not be construed under the doctrine of laches,

waiver or estoppel to affect adversely the rights of either party to pursue any such judicial relief; *provided, however,* that irrespective of the filing of any such request for judicial relief the party shall continue to participate in the dispute resolution proceedings required by this paragraph. Any negotiation or mediation which takes place pursuant to this Agreement shall be confidential and shall be treated as a compromise and settlement negotiation for purposes of the Federal Rules of Evidence and State rules of evidence.

## 16.   Supplier's Title and Protection of Supplier's Rights.

A.    Supplier's Title.   Supplier represents and warrants that it has the right, pursuant to (i) a Trademark Protection and License Agreement, dated September 28, 1997, with Starbucks U.S. Brands L.L.C. (the successor by merger to Starbucks U.S. Brands Corporation), (ii) a Trademark License Agreement dated as of October 1, 2003, as amended, with Seattle's Best Coffee LLC, and (iii) a Trademark License Agreement dated as of October 1, 2003, as amended, with Torrefazione Italia LLC, to use and sublicense the Licensed Trademarks in the manner contemplated by this Agreement and that it has and will continue to have throughout the term of this Agreement all requisite authority to enter into and perform its obligations under this Agreement, and knows of no allegations that its use or licensing of the Licensed Trademarks would infringe or violate the rights of any third party.   Distributor acknowledges that notwithstanding the foregoing representations and warranties, certain brokers and distributors have contractual rights to sell and/or distribute certain of the Licensed Products, as contemplated in the SBC/TI/Military Transition Plan.   Distributor shall not at any time during the term of this Agreement contest or aid others in contesting the validity of the Licensed Trademarks.   Supplier represents and warrants that Starbucks U.S. Brands L.L.C. is obligated under the Trademark Protection and License Agreement to use reasonable efforts in good faith to maintain the registrations for the Licensed Trademarks in the United States.

B.    Goodwill; Control of Licensed Trademarks.   Distributor acknowledges the substantial value of the goodwill associated with the Licensed Trademarks and agrees to use the Licensed Trademarks in the form and manner prescribed by Supplier and as set forth in this Agreement.   Distributor's use of the Licensed Trademarks and any goodwill generated from the use of the Licensed Trademarks by Distributor shall inure to the benefit of the owner of the Licensed Trademarks.   Apart from this Agreement, Distributor shall hereafter neither acquire nor claim any right, title, or interest of any kind or nature whatsoever in or to the Licensed Trademarks or the goodwill associated therewith.   Supplier has approval rights over all aspects of all uses by Distributor of the Licensed Trademarks, including, without limitation, in connection with packaging materials, labels, displays, promotional items, trade spending and advertising. In the event Supplier and Distributor are unable to agree on uses by Distributor of the Licensed Trademarks, Distributor may submit the matter for resolution to Supplier's Senior Vice President of Marketing or to Supplier's President.

C.    Legend.   Distributor shall display the Licensed Trademarks only in such form and manner as is specifically approved by Supplier pursuant to the provisions of this Agreement.   Distributor shall not use the Licensed Trademarks in a manner which may reasonably give the impression that the Licensed Trademarks are owned by Distributor.   Where practical and appropriate or reasonably required by Supplier, all materials bearing the Licensed Trademarks shall include a notice that the Licensed Trademarks are owned by Starbucks U.S.

Brands Corporation and licensed by Supplier in a form approved in writing by Supplier. The following form of notice is hereby approved by Supplier for use in the United States:

> "Starbucks ®, the Starbucks logo and __ are [registered] trademarks of Starbucks U.S. Brands L.L.C."

A comparable legend may be substituted with the prior written approval of Supplier.

      D.    <u>Certain Usage Prohibited</u>. Distributor shall not use the Licensed Trademarks in a manner that would in any way disparage Supplier or the reputation of Supplier, nor shall Distributor take any action which could harm or jeopardize the Licensed Trademarks, or Supplier's or its Affiliates' (as the case may be) ownership thereof, in any way. Except for the phrase "distributed by Kraft Foods Global, Inc." (or a comparable phrase approved in writing by Supplier), and except as otherwise provided in this Agreement, Distributor shall not use any trademark of any party other than Supplier on the Licensed Products without the express written consent of Supplier.

      E.    <u>Changes to the Licensed Trademarks</u>. Supplier shall have the right at any time to make additions to, deletions from, and changes to any or all of the Licensed Trademarks at its sole and complete discretion; provided, however, that Supplier shall give Distributor reasonable prior written notice thereof. Distributor shall, after receipt of such written notice from Supplier, adopt and begin using any and all such additions, deletions and changes as soon as reasonably practicable after Supplier's adoption thereof. Supplier shall pay or reimburse Distributor for Distributor's reasonable costs associated with adopting and using any such additions, deletions and changes beyond the first such addition, deletion or change in any three (3) year period, it being understood that Supplier shall not reimburse Distributor for any additions, deletions or changes resulting from Distributor's incorrect use of any Licensed Trademark. Notwithstanding the foregoing, if Supplier requires that any such addition, deletion or change be made, Distributor shall be entitled to distribute and sell previously approved Licensed Products, and to use previously approved Materials, while adopting the additions, deletions and changes prescribed by Supplier, unless Supplier notifies Distributor in writing that such uses of Licensed Products or Materials allegedly infringe the rights of a third party.

      **17.**    **<u>Protection and Defense of Licensed Trademarks</u>.**

      A.    <u>Execution of Instruments</u>. Distributor agrees to execute, at Supplier's reasonable request and at Supplier's expense, any and all instruments as may be reasonably necessary or advisable to protect and maintain the interest of Supplier in the Licensed Trademarks.

      B.    <u>Notice of Infringement</u>. Distributor shall promptly notify Supplier of any apparent infringement of, challenge to Distributor's use of, or any claim by any person to any rights in, the Licensed Trademarks. Supplier shall promptly notify Distributor of any apparent infringement of, or any claim by any person to any rights in, the Licensed Trademarks that may materially adversely affect Distributor's use of the Licensed Trademarks under this Agreement.

      C.    <u>Protection of the Licensed Trademarks</u>. Supplier shall at all times have the right to take whatever steps it deems necessary or desirable, in its sole discretion, to protect

the Licensed Trademarks from all harmful or wrongful activities of third parties. Such steps may include, but shall not be limited to, the filing and prosecution of: (i) litigation against infringement or unfair competition by third parties, (ii) opposition proceedings against applications for trademark or service mark registration for trademarks that are confusingly similar to any one or more of the Licensed Trademarks, (iii) cancellation proceedings against registration of trademarks that are confusingly similar to any one or more of the Licensed Trademarks, and (iv) other appropriate administrative actions, and Distributor shall cooperate with Supplier, at Supplier's request, in any such actions and Supplier shall be responsible for Distributor's reasonable expenses incurred in such cooperation.

        D.    Allegations of Infringement.  Supplier shall at all times have the right to take whatever steps it deems necessary or desirable to defend all claims that the use of the Licensed Trademarks infringes the rights of a third party.  If Distributor is named as a party to such a claim and Supplier is not so named, Supplier shall defend such action at its own expense.  Distributor shall cooperate in such defense, and Supplier shall be responsible for Distributor's reasonable expenses incurred in such cooperation.

### 18.  Miscellaneous.

        A.    Representations and Warranties.  Each of Distributor and Supplier hereby represents and warrants to the other that (i) it has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and (ii) this Agreement has been duly authorized by all necessary action on its part.

        B.    Force Majeure.  Neither party to this Agreement shall be held liable for failure to comply with any of the terms of this Agreement, nor shall any such failure be deemed a default or give rise to a right to terminate this Agreement, when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, or act of God beyond the control and without fault on the part of the party involved, *provided* that such party uses due diligence to remedy such default.

        C.    Notices.

        (i)    Any notice, demand or other communication required or permitted to be given or made hereunder shall be in writing and shall be well and sufficiently given or made if to the address set forth below and:

        (a)    enclosed in a sealed envelope and delivered during normal business hours on a Business Day and left with a receptionist or other responsible employee at the relevant address set forth below in this Agreement;

        (b)    sent by certified mail deposited in a post office within the United States;

        (c)    sent by facsimile or sent by other means of recorded electronic communication during normal business hours on a Business Day and confirmed by mail as aforesaid; or

(d)      sent by a reputable air courier for overnight delivery.

(ii)      Any notice, demand or other communication so given or made shall be deemed to have been provided and to have been received on:

(a)      the day of delivery, if delivered as aforesaid;

(b)      on the third Business Day after the postmark date thereof (excluding each day during which there exists any general interruption of postal service due to strike, lockout, labor disturbance or other cause), if mailed as aforesaid;

(c)      on the day of sending if sent by facsimile or other means of recorded electronic communication (or on the next Business Day if sent on a day other than a Business Day); or

(d)      on the air courier's scheduled day of delivery if sent by air courier.

(iii)      All significant notices or other communications to be sent under this Agreement shall be sent to the parties at the following addresses, subject to each party's right to change its address for notice from time to time by giving notice in writing of such change.

> If to Supplier:          Starbucks Corporation
>                          2401 Utah Avenue South
>                          Seattle, Washington 98134
>                          Attn.:  President
>
> With a copy to:          Starbucks Corporation
>                          2401 Utah Avenue South
>                          Seattle, Washington 98134
>                          Attn.:  General Counsel
>
> If to Distributor:       Kraft Foods Global, Inc.
>                          Coffee Division
>                          555 S. Broadway
>                          Tarrytown, NY  10591
>                          Attention:  President
>
> With copy to:            Kraft Foods Global, Inc.
>                          Three Lakes Drive
>                          Northfield, IL  60093
>                          Attention:  General Counsel

(iv)      Notwithstanding the foregoing, routine notices and communications hereunder (e.g., quarterly reports, requests for review of materials and the like) may be sent to employees of the other party responsible therefore.

D.    Relationship.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, franchise or agency relationship between the parties hereto or shall be deemed to render either party liable for any of the debts or obligations of the other.  Neither party shall in any way be considered an agent or representative of the other in any dealings with any third party, and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

E.    Sole Agreement; Release and Discharge.  Effective as of the Effective Date, this Agreement and the schedules and exhibits attached hereto and thereto shall constitute and contain the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  Prior to the Effective Date, the terms and conditions of the Original Supply Agreement and the Original License Agreement shall remain in full force and effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.  Effective as of the Effective Date, this Agreement shall supersede all prior agreements, discussions and negotiations between the parties with respect to the subject matter hereof, including, without limitation, the Original Supply Agreement and the Original License Agreement.  Upon execution and delivery of this Agreement by each party, this Agreement constitutes a release, discharge and waiver by each party of all claims raised against the other party for breach or default of the Original Supply Agreement and the Original License Agreement which were subject to the Kraft/Starbucks Mediation, JAMS No. 134004376 (the "Mediation").  Each party represents to the other that it is not aware of any claims against the other party for breach of the Original Supply Agreement or the Original Trademark Agreement, except for those claims that were subject to the Mediation.

F.    No Waiver.  The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the party of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

G.    Construction.  The captions of the various articles and sections of this Agreement have been inserted for the purpose of convenience of reference only, and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.  The recitals set forth prior to Section 1 of this Agreement are statements setting forth the intentions of the parties and shall not be deemed to create, modify, supersede or eliminate any obligation of the parties under this Agreement.

H.    Invalidity.  If any provision or provisions of this Agreement, or any portion of any provision hereof or thereof, shall be deemed invalid or unenforceable pursuant to a final determination of any arbitrator or court of competent jurisdiction, or as a result of future legislative action, such determination or action shall be construed so as not to affect the validity

35

or effect of any other portion hereof or thereof, unless, as a result of such determination or action, the consideration to be received or enjoyed by any party hereto would be materially impaired or reduced.

      I.     CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO THE SUBSTANTIVE LAWS, BUT NOT THE PRINCIPLES OF CONFLICTS OF LAWS, OF THE STATE OF NEW YORK AS IF THIS AGREEMENT WERE NEGOTIATED, EXECUTED, AND TO BE FULLY PERFORMED IN THE STATE OF NEW YORK.

      J.     Compliance with Laws. Distributor shall, at its own cost and expense, obtain all licenses, permits and other governmental approvals which may be required in the Territory for performance of its obligations hereunder.

      K.     Counterparts. This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

      L.     Arm's Length Contract. This Agreement has been negotiated "at arm's length" by the parties hereto, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof. Accordingly, in construing the provisions of this Agreement neither party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

      M.     Survival of Terms. Any provisions of this Agreement which by their terms would be reasonably expected to survive termination or expiration of this Agreement shall continue in effect following such termination or expiration, including but not limited to Sections 6, 11, 13, 15 and 17.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**STARBUCKS CORPORATION**

By: _____

Name: _Michael Casey_

Its: _Exec. Vice President_

**KRAFT FOODS GLOBAL, INC.**

By: _____

Name:  Elizabeth A. Smith

Its:  Group Vice President & President,
      U.S. Beverages and Grocery Sectors

## Schedule 1a – Methodology for Calculating Fully Landed Costs

| Fully Landed Cost Component (1) | Costing Method | The Basis | Frequency Method | Time in Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Coffee (2) | Standard | Fiscal year period moving average roasted coffee cost adjusted for appropriate yield and fill weight to calculate true green coffee cost, with the moving average cost applied for each type of coffee uniformly regardless of channel of distribution for both nonlicensed and Licensed Products. | Periodic Moving Average vs. Standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Green Coffee Burden | Standard | Shipping costs from origin countries to FOB destination factored for yield | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Packaging | Standard | Bill of material for all packaging element costs and their individual standard costs, with the same bill of material cost applied for similar package types regardless of channel of distribution for both nonlicensed and Licensed Products. | Annual standard and variance created by mix and volume; roll stock and corrugate standards adjusted to moving average costs | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Conversion | Standard | Manufacturing costs including Supply Chain and Coffee Operations admin., direct and indirect manufacturing, and manufacturing overheads, with the same cost/lb allocation applied for each type of coffee uniformly regardless of channel of distribution for both nonlicensed and Licensed Products. | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |

38

| Fully Landed Cost Components(1) | Costing Method | Cost Basis | True Up Method | True Up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Coffee Manufacturing Variances | Actual | Supplier's fiscal year annual absolute $ conversion manufacturing standard vs. actual variances. | Allocated over/under absorption based on pounds shipped | End of fiscal year | N/A | N/A |
| Plant Distribution | Forecast | Distribution Operations estimated costs allocated on pick volumes | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |
| Freight Out | Prior Period Actuals | Actual shipping weight and volumes shipped by plant (Grocery only) | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |
| Business Unit Overhead | Forecast(3) | Percentage of partners' time and other overhead expenses allocated across all pounds | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |

(1) For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Distributor within 30 days after the end of each true up period and incorporated into the subsequent month's Distributor Payment calculation pursuant to Section 7A(iv).

(2) In the event some Coffee is purchased using Commodity Futures and/or Price to Be Fixed (PTBF) contracts, a common average rate per pound allocation of the costs is to be applied for each type of coffee uniformly, regardless of channel of distribution for both nonlicensed products and Licensed Products.

(3) Annual forecast allocation to Licensed Products, as reviewed and approved by the Oversight Committee

## Schedule 1b – Licensed Products

### *Product Description/Blend*

1.  All of the following products bearing the Starbucks Licensed Trademark:

    Espresso/Whole Bean
    Espresso/Ground
    House Blend/Whole Bean
    House Blend/Ground
    Breakfast Blend/Whole Bean
    Breakfast Blend/Ground
    Decaf House/Whole Bean
    Decaf House/Ground
    Colombia/Whole Bean
    Colombia/Ground
    French Roast/Whole Bean
    French Roast/Ground
    Verona Ground
    Verona Whole Bean
    Sumatra Ground
    Sumatra Whole Bean
    Gold Coast Ground
    Gold Coast Whole Bean
    Italian Ground
    Italian Whole Bean
    Yukon Ground
    Yukon Whole Bean
    Decaf Verona Ground
    Decaf Verona Whole Bean

Distributor will be entitled to offer for sale (i) fourteen (14) Starbucks coffee blends at one time in the form of 12-oz. SKUs (fourteen (14) SKUs for whole bean and fourteen (14) SKUs for ground coffee), plus (ii) Club Product SKUs, plus (iii) 2.5 oz. SKUs. For purposes of clause (i) in the preceding sentence, decaffeinated coffees blends shall be counted separately from the counterpart caffeinated blends. At the commencement of each Year, following the determination of the Top Ten Selling Products for the previous Year, Distributor will provide Supplier reasonable notice of the new SKUs, if any, it desires to distribute, and Supplier will use commercially reasonable efforts to supply such new SKUs, subject to green coffee availability and inventory levels. Supplier and Distributor will each cooperate in good faith to coordinate the addition or deletion of specific coffee blends from Distributor's portfolio as contemplated in this Schedule, in a timely and cost efficient manner.

2.  All of the following products bearing the Seattle's Best Coffee Licensed Trademark:

Current Coffee Offering*
Colombia **
Decaf Post Alley
Decaf Seattle's Best **
French Roast **
Breakfast **
Henry's **
Seattle's Best **
6th Ave Bistro **
Tazza D'Oro
Post Alley **
Italian
Portside
Saturday's
Organic Breakfast **
Organic Fair Trade French Roast **
Organic House
Organic Sumatra **
Organic Seattle's Best
Organic Twilight **
Organic Fair Trade Decaf
Organic Fair Trade
Cinnabon **
Crème Brulee **
Dceaf Javanilla **
Javanilla **
Hazelnut Cream **
Chocolate Toffee **

* The current SBC offering list includes all coffees whether whole bean or ground.

** Indicates coffees that the parties have tentatively identified, as of the Effective Date, as coffees to be included in the National roll-out of the Seattle's Best Coffee brand in January 2005, subject to further review as part of the SBC/TI/Military Transition Plan. Supplier and Distributor will cooperate to identify the appropriate number of Seattle's Best Coffee blends to be distributed by Distributor hereunder, with due consideration of brand strategy, green coffee availability and inventory levels. All other coffees will be discontinued.

Supplier will use commercially reasonable efforts to supply new SKUs, subject to green coffee availability and inventory levels. Supplier and Distributor will each cooperate in good faith to coordinate the addition or deletion of specific coffee blends from Distributor's portfolio as contemplated in this Schedule, in a timely and cost efficient manner.

3.  All of the following products bearing the Torrefazione Italia Licensed Trademark:

Current Coffee Offering
Montecatini
Napoli
Palermo
Perugia
Pisa
Sardegna
Milano
Venezia

As of the Effective Date of this Agreement, the parties have not identified the coffees or a strategy for a National or regional roll-out of the Torrefazione Italia brand.  Such strategy will be subject to development and agreement as part of the SBC/TI/Military Transition Plan.

Supplier will use commercially reasonable efforts to supply new SKUs, subject to green coffee availability and inventory levels.  Supplier and Distributor will each cooperate in good faith to coordinate the addition or deletion of specific coffee blends from Distributor's portfolio as contemplated in this Schedule, in a timely and cost efficient manner

4.    KIRKLAND brand coffee sold to Costco and its successors and assigns

**Schedule 1c – Licensed Trademarks**

STARBUCKS

STARBUCKS LOGO:



SEATTLE'S BEST COFFEE

SEATTLE'S BEST LOGO:



TORREFAZIONE ITALIA

TORREFAZIONE ITALIA LOGO:



43

## Schedule 1d – Form of Distributor's P&L Statement and Methodology for Calculating Distributor's Operating Contribution

### Form of Distributor's P&L Statement

|  | Line Number | Fiscal Year |
|---|---|---|
| Volume - Pounds | 1 | Actual |
| Gross Revenue | 2 | Actual |
| $/lb. | 3 | =Line 2/Line 1 |
| Unsaleables & Distress | 4 | Actual |
| Allowances | 5 | Actual |
| Incentives to Consumers | 6 | Actual |
| Variable Trade | 7 | See following table in this Schedule 1d |
| Fixed Trade | 8 | See following table in this Schedule 1d |
| New Distribution cost | 9 | See following table in this Schedule 1d |
| Total Trade | 10 | =Line 7+Line 8+Line 9 |
| Net Revenue Rate $/Lb | 11 | =Line 12/Line 1 |
| Net Revenue | 12 | =Line 2-Line 4-Line 5-Line 6-Line 10 |
| Product Cost |  |  |
| Variable Product Cost | 13 | See Schedule 1a |
| $/lb. | 14 | = Line 13/Line 1 |
| Variable Distribution and Warehousing | 15 | See following table in this Schedule 1d |
| $/lb. | 16 | =Line 15/Line 1 |
| Other Manufacturing Costs | 17 | Actual |
| Total Product Cost | 18 | =Line 13+Line 15+Line 17 |
| $/lb. | 19 | =Line 18/Line 1 |
| Marginal Contribution | 20 | =Line 12-Line 18 |
| $/ lb. | 21 | =Line 20/Line 1 |
| Dedicated Advertising | 22 | See following table in this Schedule 1d |
| Consumer and Other Promotion | 23 | See following table in this Schedule 1d |
| Total ACO | 24 | =Line 22+Line 23 |
| Fixed Warehousing Costs | 25 | See following table in this Schedule 1d |
| Selling/Marketing Admin/Marketing Research/Quality Assurance | 26 | See following table in this Schedule 1d |
| Operating Contribution | 27 | =Line 20-Line 24-Line 25-Line 26 |

Schedule 1d (continued) – Methodology for Calculating Selling, Distribution & Management Costs

| Cost Component | Costing Method | Cost Basis | True-up Method | True-up Frequency | Standard Update Frequency | P&L Line Number in Which Contained |
|---|---|---|---|---|---|---|
| Variable Distribution | Rate per net lb for each product form | Estimated freight charges (both into Distributor's DC and from DC to customer) given product characteristics of Licensed Products using a cube adjusted weight (CAW) basis. | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 15 |
| Variable Warehousing | Rate per net lb for each product form | Estimated warehouse handling given product characteristics of Licensed Products driven off of forecast pallet throughputs. | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 15 |
| Fixed Warehousing | Rate per net lb for each product form | Licensed Products expected % of Total Warehousing costs applied against Total Distributor's expected warehouse management overhead. Driven off of forecast pallet throughputs. | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 25 |
| Sales Force Expense | Forecast % of Gross Revenue for all Licensed Products sold by Distributor's Sales Force (one average rate across all channels) | Forecast % of Gross Revenue determined as forecast of Distributor's Sales Force total cost divided by forecast of Distributor's total Gross Revenue generated by the Sales Force | Actuals | Monthly for actual Licensed Products Gross Revenue. Annually for total Sales Force Cost and total Gross Revenue generated. | Annually | Line 26 |
| Commissions | Direct forecast | Commissions charged by brokers for selected channels[(i)] as specified in broker contracts. | Actuals | Quarterly | Annually | Line 26 |
| Advertising & Promotion | Program forecasts | Individual program, campaign, or promotion cost forecast | Annual budget accrued | Quarterly | Annually | Line 7, 8, 9 for Trade Spending; |

45

| Cost & Expense Component | Costing Method | Cost Basis | True-up Method (TUB) | True-up Frequency | Standard True-up Frequency (B) | P&L Line Number (by item) Costs are Recorded |
|---|---|---|---|---|---|---|
| Expenses (including all forms of Trade Spending). | | | quarterly to match revenues with fourth quarter reflecting balance of annual actual | | | Line 22 for Dedicated Advertising; Line 23 for Consumer/Other Promotion |
| Direct Staffing & Related Expenses[4] | Direct forecast | Salaries, Benefits & Expenses Associated with FTE staffing, plus miscellaneous expenses (e.g., team travel, meetings, allocated office expenses etc.) | Actuals | Quarterly | Annually. | Line 26 |

(1) Distributor's Fiscal Year (calendar year).

(2) For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Supplier within 30 days after the end of each true up period and incorporated into the subsequent month's Distributor Payment calculation pursuant to Section 7A(iv).

(3) Primarily for the Natural Foods Channel

(4) Annual forecast allocation to Licensed Products, as reviewed and approved by the Oversight Committee

Schedule 1e – Form of Supplier's P&L Statement and Methodology for Calculating Supplier's Operating Contribution

Methodology for Calculating Operating Expenses and Depreciation

| Cost Component | Costing Methodology | Cost Basis | Frequency Method | Timeline From (Date of the service) | Timeline From (Date of the service) | P&L / Line Number Scenario to be recorded |
|---|---|---|---|---|---|---|
| Salaries & Benefits – Direct | Actual salary expense + standard benefits allocated as a % of salary, consistent with SBUX U.S. methodology | Salaries and benefits expenses associated with partners who support the business unit(3) on a full-time basis. | NA | NA | NA | Line 6 |
| Salaries & Benefits – Indirect | % allocation based on time spent supporting the business unit | % allocation of actual salaries and benefits associated with partners who support multiple business units on a part-time basis, using an agreed-upon percentage basis. | NA | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Line 6 |
| Broker's Commissions | Actual expense | Fees associated with broker relationships; including any settlements or associated fees related to termination of broker contracts as a result of the SBC/TI/Military Transition Plan (Schedule 1f). | NA | NA | NA | Line 7 |
| Shipping | Actual expense | Costs associated with non-reimbursed shipping of products. | NA | NA | NA | Line 8 |
| Marketing/ Advertising – Direct | Actual expense | Costs associated with specific marketing/advertising activities in support of the business unit. | NA | NA | NA | Line 9 |

47

| Cost Item / Components | Costing Method | Cost Basis | True-Up Method | True-Up Frequency [2] | Statement / (Invoice) Frequency | Profit Split Line Number to Which Cost is to Report [1] |
|---|---|---|---|---|---|---|
| All Other Operating Expenses | Actual expense, as allocated as above for those expenses related to Salaries & Benefits - Indirect | Miscellaneous expenses associated with operating the business unit (e.g. travel, supplies, office expenses, etc.); including any costs related to settlements, severance and associated fees from termination of partners and/or distributors resulting from the SBC/TI/Military Transition Plan (Schedule 1f). | NA | NA | NA | Line 10 |
| Depreciation & Amortization | Straight-line depreciation, based on the useful life of each asset or group of assets, in accordance with SBUX accounting policy and as calculated by the FA system, for assets assigned to the business unit | Depreciation/amortization associated with specific assets used to support the business unit. | NA | NA | NA | Line 12 |

(1) Supplier's fiscal year.

(2) For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount is refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be advised in writing to the Distributor within 30 days after each true up frequency period and incorporated into the subsequent month's Profit Split Periodic Payment calculation pursuant to Section 7A(iv).

(3) As used in this Schedule, "business unit(s)" shall be defined as (i) Licensed Products bearing the Seattle's Best Coffee trademark, (ii) Licensed Products bearing the Torrefazione Italia trademark and (iii) Licensed Products sold through the Military Exchanges and Commissaries

48

## SCHEDULE 1e – Form of Supplier's P&L Statement

|  | Line Number | Fiscal Year |
|---|---|---|
| Revenues |  |  |
| Product Sales | 1 | Actual |
| Sales Discounts | 2 | Actual |
| Total Revenues | 3 | = Line1 + Line 2 |
|  |  |  |
| Total Cost of Goods Sold | 4 | See Schedule 1a |
|  |  |  |
| Gross Margin | 5 | =Line 3-Line4 |
|  |  |  |
| Operating Expenses |  |  |
| Salaries & Benefits | 6 | See preceding table in this Schedule 1e |
| Broker's Commissions | 7 | See preceding table in this Schedule 1e |
| Shipping | 8 | See preceding table in this Schedule 1e |
| Marketing/Advertising | 9 | See preceding table in this Schedule 1e |
| All Other Operating Expenses | 10 | See preceding table in this Schedule 1e |
|  |  |  |
| Total Operating Expenses | 11 | =Line 6 + Line 7 + Line 8 + Line 9 + Line 10 |
|  |  |  |
| Depreciation/Amortization | 12 | See preceding table in this Schedule 1e |
|  |  |  |
| Operating Contribution | 13 | =Line 5 – line 11 – Line 12 |

**Schedule 1f**

**SBC/TI/MILITARY TRANSITION PLAN**

1. **SBC/TI Transition**

    A. Goals of Transition:  Supplier and Distributor desire to conduct an orderly transition (the "*Transition*") of the Seattle's Best Coffee and Torrefazione Italia coffee wholesale business in the Licensed Channels in the Territory (the "*Business*") from Supplier's Seattle's Best Coffee LLC ("*SBC*") and Torrefazione Italia LLC ("*TI*") affiliates to Distributor, in an efficient, non-disruptive and cost-effective manner.  Supplier and Distributor will cooperate in good faith to identify the appropriate means to implement the Transition, in accordance with the following business principles:

    (i)    The parties will work to retain, to the extent practicable, the shelf space and market introduction fees which have been acquired and paid for by SBC and TI with certain of their grocery customers.  This will include identifying an appropriate strategy for either continuing the existing bulk coffee business, or transitioning bulk coffee customers in an orderly manner to packaged coffee distribution.

    (ii)   The parties will cooperate to limit, to the extent practicable, termination payments and other liabilities to brokers and distributors that are currently under contract with SBC and TI. Distributor acknowledges that doing so may require delaying the Transition with respect to certain brokers, distributors and customers until the term of their respective agreements has expired.  Supplier shall not renew or extend any such agreements.  Supplier, in consultation with Distributor, will continue to operate and manage the Business that is in existence as of March 29, 2004, to the extent that the Transition of the Business to Distributor has not been completed.  Supplier will consult with and keep Distributor reasonably informed of the status of its negotiations with the existing SBC and TI brokers and distributors.

    (iii)  Supplier will make reasonably available to Distributor information about the agreements and other commercial arrangements between SBC and TI (and/or their parent company, Seattle Coffee Company) and their customers, brokers and distributors.   Distributor will maintain the confidentiality of this information as "Information" as defined in and in accordance with Section 11 of this Agreement.

    (iv)   Supplier will endeavor, to the extent practicable, to manage any employee dislocations with an appropriate balance between cost savings and due regard for human resource and public relations concerns.  Distributor agrees that all employment and human resources decisions with respect to the SBC and TI employees affected by the Transition will be made in the sole but reasonable discretion of Supplier and/or SBC and TI, provided that in no event shall Distributor bear any portion of severance or dislocation expenses incurred by

50

Supplier as a result of any such decision or otherwise. Supplier, SBC and TI will keep Distributor reasonably informed on the current status of any employees affected by the Transition.

(v)    The costs of the Transition, including the costs associated with the Transition activities described above, will be reflected on Supplier's P&L Statement and Distributor's P&L Statement, as applicable.

B.  Transition Team:  Supplier and Distributor have identified the individuals listed on the Committee Schedule to serve on a team (the "*SBC Transition Team*") that will manage the Transition. Either party may designate another individual as a substitute for one of its members on the SBC Transition Team. If the SBC Transition Team is unable to resolve one or more issues arising from the Transition, either Supplier or Distributor may elect in its discretion at any time to submit the issue to the Oversight Committee for resolution.    Matters that cannot be resolved by the Oversight Committee will be resolved pursuant to the dispute resolution provisions of Section 15 of this Agreement.

C.  Transition Schedule:    The SBC Transition Team will establish a schedule for transitioning the Business to Distributor. The SBC Transition Team may amend or modify this schedule from time to time.

D.  Communication:  Supplier and Distributor acknowledge that communications about the Transition could be very sensitive because of the number of brokers, distributors, customers and employees that may be affected as the Business is transitioned from Supplier to Distributor. Accordingly, Supplier and Distributor agree that (i) any public communications about the Transition must be approved in writing by the vice president, consumer products North America of Supplier and Director of Communications of Distributor before such communications are disseminated, (ii) each party shall consult with the other party to the extent reasonably practicable on any internal communications about the Transition, and (iii) neither party will disclose the plans for the Transition to any third party, except as is necessary to enable such party to fulfill its obligations with respect to the Transition. Supplier and Distributor agree to cooperate in good faith to memorialize in writing their significant decisions regarding the Business and Transition.

## 2.   Military Transition

A.  Goals of Military Transition:  Supplier and Distributor desire to conduct an orderly transition (the "*Military Transition*") to Distributor of the coffee wholesale business (the "*Military Business*") conducted by Supplier and its affiliates in Military Exchanges and Commissaries in the Territory. Supplier and Distributor will cooperate in good faith to identify the appropriate means to implement the Military Transition, in accordance with the following business principles:

(i)    The parties will cooperate to limit, to the extent practicable, termination payments and other liabilities to brokers and distributors that are currently

51

under contract with Supplier or its affiliates. Distributor acknowledges that doing so may require delaying the Military Transition with respect to certain brokers and distributors until the term of their respective agreements has expired. Supplier shall not renew or extend any such agreements. Supplier will consult with and keep Distributor reasonably informed of the status of its negotiations with the existing brokers and distributors for Military Exchanges and Commissaries.

(ii)     Supplier will make reasonably available to Distributor information about the agreements and other commercial arrangements between Supplier and its affiliates and the brokers and distributors who currently conduct the Military Business. Distributor will maintain the confidentiality of this information as "Information" as defined in and in accordance with Section 11 of this Agreement.

(iii)    Supplier will endeavor, to the extent practicable, to manage any employee dislocations with an appropriate balance between cost savings and due regard for human resource and public relations concerns. Distributor agrees that all employment and human resources decisions with respect to any employees affected by the Military Transition will be made in the sole but reasonable discretion of Supplier, provided that in no event shall Distributor bear any portion of severance or dislocation expenses incurred by Supplier as a result of any such decision or otherwise. Supplier will keep Distributor reasonably informed on the current status of any employees affected by the Military Transition.

(iv)     The costs of the Military Transition, including the costs associated with the Military Transition activities described above, will be reflected on Supplier's P&L Statement and Distributor's P&L Statement, as applicable.

(v)      Supplier has advised Distributor that Supplier has applied to the U.S. Department of Labor for a waiver (the "*Waiver*") of the requirements which may otherwise be applicable to Supplier under Executive Order 11246 in connection with Supplier's undertaking of the Military Business. Supplier will use all reasonable efforts to encourage the Department of Labor to grant it the Waiver. Distributor acknowledges and agrees that Military Transition will not be implemented until and unless the Waiver is granted to Supplier, except for planning activities that do not constitute the undertaking of the Military Business by Distributor on Supplier's behalf. In the event the Department of Labor refuses to grant the Waiver, Supplier will have no obligation to transition the Military Business to Distributor, but will continue to seek said Waiver from time to time, as appropriate.

B.  Military Transition Team:  Supplier and Distributor have identified the individuals listed on the Committee Schedule to serve on a team (the "*Military Transition Team*") that will manage the Military Transition. Either party may designate another individual as a substitute for one of its members on the Military Transition Team. If the Military

Transition Team is unable to resolve one or more issues arising from the Military Transition, either Supplier or Distributor may elect in its discretion at any time to submit the issue to the Oversight Committee for resolution. Matters that cannot be resolved by the Oversight Committee will be resolved pursuant to the dispute resolution provisions of Section 15 of this Agreement.

C.   Military Transition Schedule:  The Military Transition Team will establish a schedule for transitioning the Military Business to Distributor.  The Military Transition Team may amend or modify this schedule from time to time.

D.   Communication:  Supplier and Distributor acknowledge that communications about the Military Transition could be very sensitive because of the number of brokers, distributors, customers and employees that may be affected as the Military Business is transitioned from Supplier to Distributor.  Accordingly, Supplier and Distributor agree that (i) any public communications about the Military Transition must be approved in writing by the vice president, consumer products North America of Supplier and Director of Communications of Distributor before such communications are disseminated, (ii) each party shall consult with the other party to the extent reasonably practicable on any internal communications about the Military Transition, and (iii) neither party will disclose the plans for the Military Transition to any third party, except as is necessary to enable such party to fulfill its obligations with respect to the Military Transition. Supplier and Distributor agree to cooperate in good faith to memorialize in writing their significant decisions regarding the Military Business and Military Transition.

## Schedule 4.C – Demand Forecasting and Future Supply

Distributor shall forecast its anticipated demand to Supplier as follows:

By Wednesday of the last week of each of Supplier's fiscal months, Distributor will provide Supplier 24-month rolling forecasts of Distributor's anticipated demands for Licensed Products. The forecast shall begin with the second month following issuance. (For example, a forecast issued in September covers the forecasted period beginning the following November.)   The demand reflected in the first month of each rolling 24-month forecast (November in the above case) shall constitute a binding commitment by Distributor to order the total quantity of Licensed Products.   The forecast for the month that becomes a binding commitment (November in the above example) shall not increase by greater than fifteen percent (15%) from the same period's prior month forecast.  (For example, the November forecast submitted in September shall not increase by greater than fifteen percent (15%) at the individual SKU level from the November forecast submitted in August).   Subject to the foregoing limitations, Distributor may revise the mix of Licensed Products by written purchase order issued no later than fifteen (15) calendar days prior to the beginning of the month for which such order is applicable. (Under the example above, the forecasted November demand issued in September becomes a firm commitment to purchase the quantity forecast, the October commitment having been set in the previous forecast, but Distributor may issue a purchase order setting forth the specific quantities of each Licensed Product by SKU as late as October 16.)  Supplier will meet Distributor's required product mix, as so revised, unless meeting such requirements would cause Supplier to bear undue expense or hardship.  The first three months of each 24–month forecast shall be a firm projection and Distributor shall use its reasonable commercial efforts to purchase those volumes; provided that Distributor shall be deemed to have acted in a commercially reasonable manner if Distributor revises such forecasts as a result of unexpected changes in demand for the Licensed Products.

Supplier will notify Distributor in writing within ten (10) business days of receipt of any rolling forecast whether or not it will be able to fulfill such requirements.  Failure by Supplier to inform Distributor of its inability to fulfill such requirements will be deemed a binding commitment by Supplier to ship any orders made by Distributor within the rolling forecast. In the event of a shortage of any particular variety of product, Supplier will use reasonable commercial efforts to allocate product fairly between Distributor's orders and Supplier's owned, licensed and operated outlets.

Distributor shall maintain days-of-supply (DOS) at a level agreed to by both Supplier and Distributor and shall provide Supplier with current DOS by SKU which shall accompany the monthly forecast on the last Wednesday of each fiscal month.  In the event DOS has dropped below the agreed level Distributor will use all reasonable efforts to purchase product to return DOS to the agreed-upon level.

In the event that Distributor's orders for the Licensed Products are forecast to exceed Supplier's capacity to roast and package the Licensed Products within 12 months, either from Supplier's own manufacturing facilities or facilities with which Supplier has or enters into manufacturing agreements, Supplier and Distributor shall negotiate in good faith the terms and

conditions under which Distributor would manufacture the Licensed Products using proprietary processes and trade secrets of Supplier according to the following key principles:

- All negotiations and information sharing shall be subject to appropriate confidentiality agreements regarding Distributor's use of such processes and trade secrets of Supplier;
- Distributor may utilize existing facilities or may construct new facilities for this purpose;
- Products produced by Distributor under Supplier's proprietary process shall only be sold pursuant to the terms of this Agreement; and
- Supplier will provide technical help to Distributor to enable it to utilize Supplier's proprietary technology so as to enable Distributor to produce a product identical to product produced by Supplier in its own plants or plants under contract to Supplier.
- The scope and duration of such Distributor manufacturing should be limited to the minimum practical extent necessary to fill the undercapacity.

## Schedule 8.B(i) – Measurement Criteria
## Starbucks In-Store Conditions

### Key Measures of In-Store Conditions

Supplier and Distributor intend to maintain a presentation for the Starbucks branded Licensed Products in the coffee aisle that clearly positions Starbucks as the Super-Premium Coffee segment leader. Supplier and Distributor will cooperate to continue to develop the brand positioning and brand equity of these Licensed Products through superior in-store presentations, including shelf presence, product quality, and product availability.

Supplier and Distributor have agreed that the principal means of achieving superior in-store presentation are to:
- **Maximize rack placement**
  - *Rationale:* Promotes branding, allows for proper display, and preserves shelf space.
  - *Defined Metric:* Store has Starbucks branded racks (or other attractive racks, similar to those in Publix) to hold all Starbucks SKUs in the coffee aisle.
- **Minimize competitive product on Starbucks racks**
  - *Rationale:* Implied association and/or third-party endorsement of the competitive product by Starbucks Coffee Company.
  - *Defined Metric:* Stores which have competitive product SKU tags displayed for placement on Starbucks racks. "Competitors" include any products which are not Starbucks-branded coffee, including Seattle's Best Coffee and Torrefazione Italia products.
- **Minimize past-due product**
  - *Rationale:* Applies the highest standards of excellence to the fresh delivery of our coffee to encourage the development of enthusiastically satisfied customers.
  - *Defined Metric:* Percentage of checked packages which are past-due.
- **Minimize Out-of-Stocks**
  - *Rationale:* Promotes brand equity, denotes category leadership, and increases sales.
  - *Defined Metric:* Percentage of stores with at least one out-of-stock SKU.

Supplier and Distributor will jointly review each of the metrics set forth above, as measured by the Field Auditor during each calendar quarter. This review will focus on identifying deficiencies relative to the metrics, if any, and on cooperatively establishing strategies for addressing and resolving such deficiencies.

Supplier and Distributor will jointly establish measurable standards (the "Standards") for the metrics listed above. Supplier and Distributor have established Standards for CY 2004 (starting in the 4th quarter) and CY 2005 as set forth below, except as the parties otherwise agree in writing. Either party may recommend, in its reasonable good faith discretion, modifications to the then-current Standards, including the addition of new metrics to reflect changes, if any, in retail practices in the Licensed Channels. The parties contemplate that such changes will not be implemented (if at all) more frequently than once every two (2) years, commencing with CY 2006. If a party recommends changes to the Standards or the addition of new metrics, it shall notify the other party not less than sixty (60) days prior to the proposed effective date of such changes. If the parties cannot agree on the proposed changes, the matter will be submitted to the

Oversight Committee for resolution. If the Oversight Committee is unable to agree on the proposed changes, the Standards will remain unchanged. Supplier and Distributor will jointly determine what additional alternative racks at retail constitute "other attractive racks" for the purposes of the Rack Placement measurement, except that the coffee racks at Publix are deemed to satisfy this definition.

The Standards for Grocery Stores and the Standards for Mass Merchandise Stores for CY04 (4th quarter) and CY05 in-store conditions are listed below:

### In-Store Conditions for CY04 (4th Quarter) and CY05

| Metric | Current * | Goal | Action Plan |
|---|---|---|---|
| Rack Placement (including other attractive racks) | 79% | 80% | less than 80% |
| Competitors on Racks | 7% | 4% | More than 4% |
| Past-due Product (% bags) | 4% | 4% | more than 4% |
| Out of Stocks (% stores) | 27% | 25% | More than 25% |

*Q3 FY03 Audit

- An "Action Plan" means a plan to be developed by Distributor, with consultation and approval from Supplier, to identify which stores and/or markets are causing a failure to meet the applicable Standard for the metric, and to identify and implement the most timely, efficient and effective means to address the failure. The means of addressing the failure may include (i) the deployment of Distributor's internal sales force to conduct in-store visits, (ii) calls on customers' regional and/or national headquarters to encourage resolution of the problems, (iii) additional focus by Distributor on its sub-distributors (if any) involved in the stores and markets where the problems are occurring, and (iv) market "blitzes" under which Distributor will retain third parties to conduct in-store visits to improve aisle conditions. Any costs associated with implementing the Action Plan shall be charged to the Distributor's P&L Statement.

  o The CY04 4th quarter goal will be the first applicable Standard, and deficiencies versus this goal will be first measured with Q4 (Nov/Dec) audit results.

## New Channels of Distribution (Drug, Natural Foods, Military Exchanges and Commissaries)

In the new channels of distribution (Drug Stores, Natural Food Stores and Military Exchanges and Commissaries) for the Starbucks branded Licensed Products, Distributor will use commercially reasonable efforts to place a rack in each store where such racks are appropriate and allowed, containing no competitive product, or to insure that an alternative attractive rack is in place. At least sixty (60) days prior to the first day of 2005, Supplier and Distributor will cooperate in good faith to jointly establish commercially reasonable Standards for such channels, similar to the structure set forth above for the Retail Grocery Stores and Mass Merchandise Stores channels.

**Seattle's Best Coffee (SBC) and Torrefazione Italia (TI)**

Commencing at least sixty (60) days prior to the first day of 2005, Supplier and Distributor will cooperate in good faith to jointly establish commercially reasonable Standards for the Seattle's Best Coffee and Torrefazione Italia Licensed Products in all applicable distribution channels, similar to the structure set forth above for the Retail Grocery Stores and Mass Merchandise Stores channels.

**Field Audit Methodology**

Objectives

Supplier and Distributor agree, as of the Effective Date, that the Field Auditor shall use the following methodology to measure in-store conditions for the Starbucks branded Licensed Products in the Retail Grocery Stores and Mass Merchandise Stores. The Field Auditor shall measure the following objective criteria when measuring in-store conditions:

    A.    Presence of Starbucks branded rack or other attractive rack (specify which)

    B.    Presence of non-Starbucks SKU tags on Starbucks' rack

    C.    Number of Facings by Starbucks SKU

    D.    Total Starbucks Facings on rack

    E.    Presence of competitive products on Starbucks racks (regardless of SKU tags)

    F.    Presence of Seattle's Best products or SKU tags on Starbucks racks

    G.    Presence of Starbucks products or SKU tags on non-Starbucks branded racks

    H.    Presence of Starbucks products on shelf

    I.    Presence of Starbucks "Core items"

    J.    Presence of Shelf Tags for Starbucks "Core items"   Shelf Location

    K.    Out-of-Stocks for Starbucks "Core Items" Presence of a branded/unbranded rack

    L.    Date Codes for Starbucks "Core Items" – front and back packages

    M.    Cross check of date codes (top of package vs. side of package)

    N.    Number of Past Due Products (versus the total)

    O.    Average # of Weeks to Expiration

    P.    Time and day of observation

Sample

The audit will use a rotating sample of approximately 1300 grocery stores in major US markets as well as a rotating sample of approximately 160 Target stores in 17 markets. Markets and stores audited per market will be agreed upon by the Supplier and Distributor prior to each audit. Similar samples will be used for other channels and the Seattle's Best Coffee and Torrefazione Italia branded Licensed Products.

<u>Store Selection Process</u>
To maintain consistency in mix of retailers, store size and geography from audit to audit, Supplier and Distributor will provide a pool of stores from which the Field Auditor will select stores for auditing.  Store selection will change from audit period to audit period.

**Schedule 9**

List of Committee Members – As of March 29, 2004

1.  Starbucks Brand Management Team
    REDACTED, director, Grocery and Club
    REDACTED   , brand manager, Grocery
    REDACTED, associate brand manager, Grocery

2.  Oversight Committee
    a.    Starbucks Delegates:
          REDACTED, president, North America
          REDACTED , vice president, Consumer Products North America
    b.    Kraft Delegates:
          REDACTED, Group Vice President and President, U.S. Beverages and Grocery
          Sectors
          REDACTED, President Coffee Division Kraft Foods

3.  Joint Opportunity Committee
    a.    Starbucks Delegates:
          REDACTED, president, North America
          REDACTED  , vice president, Consumer Products North America
    b.    Kraft Delegates:
          REDACTED, Group Vice President and President, U.S. Beverages and Grocery
          Sectors
          REDACTED, President Coffee Division Kraft Foods

4.  SBC Transition Team
    a.    Starbucks Delegates:
          REDACTED   , director, Strategic Planning (SBC)
          REDACTED    , cfo, Seattle Coffee Company
          REDACTED , director Grocery and Club

    b.    Kraft Delegates:
          REDACTED, Senior Category Business Director, Super Premium Coffee &
          Tea
          REDACTED        , Finance Controller, Coffee Division
          REDACTED  , Director-Customer Business Development, Super Premium
          Coffee & Tea

5.  Military Transition Team
    a.    Starbucks Delegates:
          REDACTED, director, Strategy and Planning
          REDACTED, director, Government Sales
          REDACTED  , vice president, Sales & Marketing (SBC)
          REDACTED, director, Grocery and Club

60

b.      Kraft Delegates:
        REDACTED, Senior Category Business Director, Super Premium Coffee &
        Tea
        REDACTED        , Finance Controller, Coffee Division
        REDACTED  , Director-Customer Business Development, Super Premium
        Coffee & Tea