# EXHIBIT 3

## TASSIMO SUPPLY AND LICENSE AGREEMENT

THIS TASSIMO SUPPLY AND LICENSE AGREEMENT ("*Agreement*") is entered into as of August 9, 2006, by and between STARBUCKS CORPORATION, a Washington corporation ("*Starbucks*"), and KRAFT FOODS GLOBAL, INC., a Delaware corporation ("*Kraft*"), and shall become effective on the Effective Date (as defined herein).

WHEREAS, Starbucks and its Affiliates are engaged in the manufacture, sale and distribution of various types of coffee, including Super Premium Coffee (as defined herein), and tea;

WHEREAS, Kraft is engaged in the manufacture, sale and distribution of a variety of food and beverage products;

WHEREAS, Starbucks and Kraft are parties to a Supply and License Agreement dated March 29, 2004 (the "*Coffee Agreement*"), under which Starbucks and Kraft have entered into certain agreements with respect to the marketing, distribution and sale of Super Premium Coffee, on the terms and conditions set forth therein;

WHEREAS, Tazo Tea Company, formerly a Washington corporation ("*Tazo Tea Company*"), Starbucks and Kraft are parties to a Trademark License, Supply and Distribution Agreement dated April 6, 2004 (the "*Tea Agreement*"), under which Tazo Tea Company and Kraft entered into certain agreements with respect to the marketing, distribution and sale of Tazo tea, on the terms and conditions set forth therein;

WHEREAS, Tazo Tea Company merged with and into Starbucks effective as of December 31, 2004;

WHEREAS, Seattle's Best Coffee, LLC, a Washington limited liability company, is the owner of certain trademarks that are included in the Starbucks Licensed Trademarks (as defined herein), which trademarks are licensed to Starbucks pursuant to an intercompany license agreement, dated October 1, 2003, as amended; and

WHEREAS, Starbucks and Kraft now desire to enter into this Agreement in order to accommodate the sale and distribution of Starbucks Tassimo Discs and Tassimo Packaging bearing the Starbucks Licensed Trademarks (each as defined herein).

NOW, THEREFORE, for the mutual consideration set forth herein, the parties hereto agree as follows:

1.      **Definitions.**  For purposes of this Agreement:

"*A&P*" shall be defined as all sums expensed pursuant to U.S. generally accepted accounting principles by Kraft to advertise and promote Tassimo Discs and Tassimo Machines in the Territory, including but not limited to all expenses associated with production and distribution of television, radio, print (including free standing inserts), direct mail, on-line (e.g., internet), point-of-sale and other forms of advertising; trade spending; consumer promotions;

public relations; and product sampling and demonstrations, but excluding any of Kraft's internal overhead costs.

*"Affiliate"* shall be defined as, with respect to a party, any person or entity which, directly or indirectly, is in control of, is controlled by, or is under common control with, such party. For the purposes of this definition, "control" of a person or entity means the power, directly or indirectly, either to (i) vote a majority of the securities having ordinary voting power; (ii) determine the majority of the board of directors of such person or entity; or (iii) direct or cause the direction of the management and policies of such person or entity whether by contract or otherwise.

*"Beverage Discs"* shall be defined as pre-packaged coffee, tea, milk or other beverage products contained in a cup, pod, filter, bag or other container designed to be used in machines that brew or otherwise produce convenient, single cups of coffee, tea and other beverages, including, without limitation, Tassimo Discs.

*"Business Day"* shall be defined as any day not a Saturday, Sunday or statutory holiday in the United States.

*"Change of Control"* shall be defined as any occurrence where any person or group of persons acting in concert who, on the date of this Agreement, does not possess Control over a party hereto, gains control over such party, or in the event of a sale of all or substantially all of the assets of Kraft, Starbucks or Kraft's Coffee Division; provided, however, that a transaction pursuant to which the ultimate parent company of Kraft distributes any or all of the outstanding capital stock of Kraft Foods Inc. to such parent's shareholders will not be deemed to be a Change of Control.

*"Club Stores"* shall be defined as all warehouse club stores that generally require retail customers to pay membership fees, including Sam's Club, Costco and BJ's.

*"Control"* shall be defined as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an executive position with the party in question.

*"Drug Stores"* shall be defined as in ACNielsen's Scan Track database, as amended from time to time.

*"Effective Date"* shall be defined as August 9, 2006.

*"Field Auditor"* shall have the meaning ascribed to such term in the Coffee Agreement.

*"Fully Landed Cost,"* shall be defined as, with respect to any product or material, all direct and indirect costs in accordance with U.S. generally accepted accounting principles comprising Cost of Goods Sold ("*COGS*") for such product or material. Schedule 1a contains a complete listing of the elements of COGS, a description of how the cost elements are derived (including indirect cost allocation methodologies), when they are updated, and whether any refunds shall be due to Starbucks or Kraft based upon differences between standard and actual

2

costs, but <u>Schedule 1a</u> may include elements of COGS that do not apply with respect to the coffee and tea supplied pursuant to this Agreement for production of Starbucks Tassimo Discs. To the extent Starbucks purchases products or services from its Affiliates, all cost components included herein shall be based on the lesser of actual costs to Starbucks or the fair market value of the component based upon the open market cost for such item in an arm's length transaction between unrelated parties. The parties agree to review and revise <u>Schedule 1a</u>, in good faith and as necessary, within six months hereof, <u>provided</u> that any changes to the components and/or allocations set forth in <u>Schedule 1a</u> must be agreed upon in writing by Starbucks and Kraft and, once agreed, will be deemed incorporated into this Agreement upon each such agreement and will be subject to the audit rights provision in <u>Section 7.C</u> of this Agreement. Notwithstanding the elements of COGS set forth on Schedule 1a, if the parties are unable to agree on the elements of COGS to be included in Fully Landed Costs under this Agreement within six months after the date hereof, the dispute shall be submitted to the Oversight Committee for resolution. If the Oversight Committee is unable to resolve the dispute, the matter shall be resolved in accordance with the dispute resolution provisions of <u>Section 14</u>.

"*Intellectual Property*" means any and all domestic and international rights in: (i) trademarks, service marks, trade dress, logos, trade names and Internet domain names, together with all goodwill associated therewith; (ii) patents, patent disclosures, inventions and know-how; (iii) copyrights, copyrightable works and moral rights; (iv) trade secrets and confidential information; (v) other intellectual proprietary property (of every kind and nature and however designated), whether arising by operation of law, contract, license, or otherwise; and (vi) all registrations, applications, renewals, extensions, continuations, continuations-in-part, divisions or reissues of the foregoing now or hereafter in force or hereafter acquired or adopted.

"*Licensed Channels*" shall be defined as Retail Grocery Stores, Club Stores, Drug Stores, Natural Food Stores, Military Exchanges and Commissaries, Mass Merchandise Stores, and all direct-to-consumer and online channels, including Tassimo.com. By way of clarification, Licensed Channels shall not include (i) food service accounts or (ii) vending machines.

"*List Price*" shall be defined as Kraft's published price of the Starbucks Tassimo Discs, net of applicable discounts or rebates for prompt payment or volume purchase; <u>provided, however,</u> that the List Price shall in no event exceed the lowest price for Starbucks Tassimo Discs offered by Kraft to any customer or other third party.

"*Mass Merchandise Stores*" shall be defined as in ACNielsen's Scan Track database, as amended from time to time, including Kmart, Target, Wal-Mart and similar stores (including Supercenters).

"*Material Breach*" shall be defined as a breach of any representation, warranty, covenant or agreement in this Agreement which significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause significant financial, brand equity and/or other injury to the other party. Breaches of certain provisions of this Agreement have been specifically described as Material Breaches, and these specific descriptions will not preclude either party from contending, in proceedings under <u>Section 14</u> of this Agreement, that breaches of other provisions are "Material Breaches" as defined in the preceding sentence.

"*Military Exchanges and Commissaries*" shall be defined as all exchanges and commissaries in the Territory owned, leased or occupied by the U.S. Defense Commissary Agency.

"*Natural Food Stores*" shall be defined as Whole Foods, Wild Oats, Trader Joe's and stores that similarly focus on carrying organic and other "natural" products.

"*Oversight Committee*" shall be the committee comprised of two top executives of each party that shall (a) review and approve any proposed changes to Schedule 1a, (b) provide a forum to resolve issues that are not able to be resolved at lower levels, and (c) provide guidance on strategic issues and business opportunities. Schedule 1b lists the members of the Oversight Committee. Either party may change its designated members of the Oversight Committee upon notice to the other party, and the parties agree to amend Schedule 1b from time to time to reflect such changes.

"*Retail Grocery Stores*" shall be defined as in ACNielsen's Scan Track database, as amended from time to time.

"*SBC*" shall be defined as the Seattle's Best Coffee brand and/or Seattle's Best Coffee products of Starbucks.

"*Significant Competitor*" shall be defined as (1) a business with aggregate annual sales of One Hundred Million Dollars or more of Super Premium Coffee within the Territory, other than Super Premium Coffee bearing one or more of the Starbucks Licensed Trademarks, or (2) a business with aggregate annual sales of Twenty Million Dollars or more of Beverage Discs and Single Cup Beverage Machines within the Territory, other than Tassimo Discs and Tassimo Machines.

"*Single Cup Beverage Machines*" shall be defined as appliances designed to produce convenient single cups of coffee, tea or other beverages, including without limitation, Tassimo Machines.

"*Specifications*" means the in-process and finished product descriptions, methods and acceptable limits concerning the manufacture of Starbucks Tassimo Discs that shall be mutually agreed upon by Kraft and Starbucks.

"*Starbucks Channels*" shall be defined as: (i) all Starbucks-brand retail coffee stores within the Territory that are owned or leased by, and operated by employees of, Starbucks or a wholly owned subsidiary of Starbucks; (ii) all Seattle's Best Coffee and Torrefazione Italia retail coffee stores within the Territory; (iii) all other retail coffee stores within the Territory that are operated or licensed by Starbucks or a wholly owned subsidiary of Starbucks; (iv) all cafes, coffee shops, restaurants, carts, kiosks, retail coffee stores, "fresh brew" coffee stands and similar food and beverage service establishments within the Territory (x) from which coffee, tea, other ready to drink beverages or Tassimo Discs are sold and (y) which are branded with a Starbucks Licensed Trademark but not directly operated by Starbucks or its Affiliates; and (v) online channels (e.g., Cooking.com) within the Territory.

"*Starbucks Licensed Trademarks*" shall be defined as those certain valuable trademarks set forth on <u>Schedule 1c</u> attached hereto and incorporated herein (as may be amended from time to time), including the SBC and Tazo trademarks, and any slogans, designs, devices, logos, insignias, emblems, symbols, trade dress, label designs or other proprietary identifying characteristics associated with such trademarks used in the conduct of the SBC and Tazo businesses.

"*Starbucks Tassimo Disc Net Sales*" shall be defined as the total dollar amount for the relevant period of sales of Starbucks Tassimo Discs by Kraft, at the invoice selling price minus actual returns and allowances.

"*Starbucks Tassimo Discs*" shall be defined as all sizes of Tassimo Discs bearing the Starbucks Licensed Trademarks and the product descriptions set forth on <u>Schedule 1d</u> hereto.

"*Super Premium Coffee*" shall be defined as bulk, whole bean or ground coffee that is (i) traditionally sold at the highest end of the consumer coffee market in the Territory, and (ii) generally priced (A) at a non-promotional shelf price of $6.50 or more per pound in the Territory at Retail Grocery Stores when sold in traditional packaging in package sizes of two ounces or more or (B) at a comparable differential to non-promotional shelf prices of non-premium coffee when sold in the Territory in package sizes of less than two ounces or in nontraditional packaging or delivery systems (e.g., "filter pods" or Beverage Discs). In addition, Kraft's Gevalia brand of coffee and Starbucks SBC brand of coffee shall each be deemed to be Super Premium Coffee, regardless of the retail price of each such brand from time to time. If Starbucks and Kraft are unable to agree on whether a particular coffee is "Super Premium Coffee" pursuant to the foregoing definition, the dispute shall be submitted to the Oversight Committee for resolution.

"*Supplied Products*" shall be defined as the tea and roasted coffee supplied by Starbucks to Kraft hereunder for use in the Starbucks Tassimo Discs.

"*Tassimo Discs*" shall be defined as Beverage Discs designed to be used in Tassimo Machines.

"*Tassimo Machines*" shall be defined as the Tassimo branded appliance used to produce convenient single cups of coffee, tea and other beverages.

"*Tassimo Packaging*" shall be defined as all packaging and other materials used in connection with the marketing, distribution and sale of the Tassimo Discs and Tassimo Machines.

"*Tazo*" shall be defined as the Tazo brand or Tazo products of Starbucks.

"*Termination For Cause*" shall mean a termination of any portion of this Agreement pursuant to <u>Section 5.B(ii)</u>, <u>5.B(iii)</u>, <u>5.B(iv)</u>, <u>5.B(v)</u>, <u>5.B(vi)</u>, <u>5.B(vii)</u>, <u>5.B(viii)</u> (where the termination of the Coffee Agreement was pursuant to Section 5.B(iii), 5.B(iv), 5.B(v), 5.B(vi), 5.B(vii) or 5.B(viii) thereof) or <u>5.B(ix)</u>.

"*Territory*" shall be defined as the fifty states of the United States, plus Guam, Puerto Rico and the District of Columbia. The Territory shall include military bases located in the foregoing geographic areas.

"*Year*" shall be defined as the fiscal year of Starbucks which begins, for a particular year, at 12:01 a.m. on the Monday following the Sunday closest to September 30 and ends at midnight on the Sunday closest to September 30 of the following year. Unless the defined term "*Year*" is used, "*year*" shall mean any twelve-month period of time.

### 2.    **Trademark Use.**

A.    Grant of Right to Use.  On the terms and conditions of this Agreement, Starbucks hereby grants (or shall have caused an Affiliate to grant) to Kraft, Kraft's Affiliates and Kraft's manufacturers and distributors on and as of the Effective Date a non-transferable right, with no right to grant further rights, to use its or their owned Starbucks Licensed Trademarks solely in connection with the full exploitation of Kraft's rights and the performance of Kraft's obligations under this Agreement.

B.    Reservation of Rights.  Starbucks expressly reserves all rights relating to the Starbucks Licensed Trademarks not granted to Kraft under this Agreement. Kraft shall have no right to use the Starbucks Licensed Trademarks with respect to sales of Starbucks Tassimo Discs through Kraft's Gevalia direct-to-consumer system, unless otherwise agreed in writing by Kraft and Starbucks.

C.    Brand Guidelines; Approval.  Kraft shall have the right to use the Starbucks Licensed Trademarks (i) on any Starbucks Tassimo Discs, (ii) on and in any Tassimo Packaging and (iii) on and in any point of sale materials, media and/or print advertising or materials used in connection with the marketing or sale of Tassimo Discs and/or Tassimo Machines, in each case in all channels in the Territory in conformity with the applicable guidelines and examples set forth on Schedule 2.C or as otherwise agreed in writing by Starbucks and Kraft. Except with the prior approval of Starbucks, which may be conditioned or withheld in its sole discretion, Kraft shall have no right to use the Starbucks Licensed Trademarks in any manner not expressly set forth in the guidelines and examples set forth on Schedule 2.C, which schedule may be modified from time to time by Starbucks with the prior written consent of Kraft, such consent not to be unreasonably withheld or delayed.

D.    Prohibition.  Kraft shall have no right to use the Starbucks Licensed Trademarks outside of the Territory, and shall use commercially reasonable efforts to ensure that the Starbucks Licensed Trademarks are not used by Kraft or its Affiliates outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the use of the Starbucks Licensed Trademarks outside of the Territory.

### 3.    **Sale of Tassimo Discs and Tassimo Machines; Exclusivity Obligations and Other Terms.**

A.    Starbucks Grant of Right to Sell Starbucks Tassimo Discs and Tassimo Machines.  On the terms and conditions of this Agreement, including the guidelines and

6

examples set forth on Schedule 2.C, Starbucks hereby grants (i) to Kraft and its Affiliates the exclusive right to manufacture the Starbucks Tassimo Discs anywhere in the world, and to market, distribute and sell the Starbucks Tassimo Discs in the Licensed Channels in the Territory, except that Kraft shall not have the right to sell Starbucks Tassimo Discs through Gevalia.com, and (ii) to Kraft, Kraft's Affiliates and Kraft's manufacturers and distributors the right to manufacture anywhere in the world, and to market, distribute and sell in all channels (including Tassimo.com and Gevalia.com) in the Territory, Tassimo Machines bearing, on and in the Tassimo Packaging, the Starbucks Licensed Trademarks; provided, however, that the rights granted to Kraft hereunder with respect to direct-to-consumer, online and specialty/department store sales are non-exclusive, such that Starbucks may sell any products directly or indirectly through such channels subject to the restrictions contained in the last proviso of Section 3.C and in the provisions of Section 3.H. Starbucks represents and warrants to Kraft that the grant contained in this Section 3.A does not conflict with the rights of any third party in or to any product, brand or trademark included in such grant. Kraft acknowledges that the representation and warranty in the preceding sentence shall not apply to any Super Premium Coffee or tea brand that Starbucks may acquire after the date of this Agreement, and that any representation and warranty with respect to such brand will be provided, if at all, in a separate and specific representation and warranty provided in writing by Starbucks to Kraft. Nothing in this Agreement shall be deemed to grant Kraft any rights with respect to bottled Frappuccino®, Starbucks, SBC or Tazo branded ice creams, chocolate covered espresso beans or similar goods that may contain coffee, tea or processed coffee or tea but which are not brewed to create coffee or tea beverages.

B.      Kraft's Obligations for Sale of Starbucks Tassimo Discs. During the term of this Agreement, Kraft shall use commercially reasonable efforts, consistent with Kraft's business practices, policies, strategies, and with the terms of this Agreement, to market the Starbucks Tassimo Discs in the Licensed Channels in the Territory. Kraft represents, warrants and covenants that it will:

(i)      use commercially reasonable efforts to furnish, operate, and maintain in good working condition and suitable appearance adequate equipment, devices, and facilities for the storage, loading, transporting, unloading, and delivery of the Starbucks Tassimo Discs;

(ii)      comply in all material respects with the warehouse operating procedures and quality control procedures that Kraft has in place for its warehousing network, and all applicable laws, regulations, and ordinances with respect to its handling, storage, use, sale, and distribution of the Starbucks Tassimo Discs;

(iii)      store Starbucks Tassimo Discs in such a manner as to prevent, in all material respects, migration of aromas and scents from aromatic Kraft products to such Starbucks Tassimo Discs;

(iv)      use commercially reasonable efforts to order and maintain in its custody sufficient quantities of Starbucks Tassimo Discs for reasonably anticipated volumes of Starbucks Tassimo Disc purchases by accounts in the Licensed

7

Channels within the Territory and the Starbucks Channels to the extent reasonably forecasted;

(v)     comply with the procedures that Kraft has in place with respect to non-saleable product and expired product;

(vi)     promptly notify Starbucks if it becomes aware that any of its accounts in the Licensed Channels are using or reselling the Starbucks Tassimo Discs outside the Licensed Channels or outside the Territory, or are engaged in misrepresentation or misuse of any Starbucks Licensed Trademarks; and

(vii)     should Kraft or Starbucks identify unauthorized distribution or sale of the Starbucks Tassimo Discs hereunder, cooperate with and assist Starbucks to prevent such unauthorized distribution or sales.

C.     Starbucks Exclusivity Obligations.   During the term of this Agreement, except for the rights granted by Starbucks to Kraft in this Agreement, neither Starbucks nor its Affiliates shall, directly or indirectly, market, distribute or sell, or license any third party to market, distribute or sell, any Beverage Discs containing Super Premium Coffee or any Single Cup Beverage Machines in the Licensed Channels in the Territory, provided, however that nothing herein shall prevent or restrict Starbucks from directly or indirectly, marketing, distributing or selling: (i) Starbucks Tassimo Discs in the Starbucks Channels in accordance with this Agreement, (ii) (A) coffee or espresso machines in the Starbucks Channels or (B) any other appliances that are not Single Cup Beverage Machines, and (iii) disc or machine products outside of the Licensed Channels or outside of the Territory; provided that neither Starbucks nor its Affiliates shall, directly or indirectly, manufacture, market, distribute or sell, or license any third party to manufacture, market, distribute or sell, any disc or machine products bearing the Starbucks Licensed Trademarks in any channels in connection with products owned, licensed or authorized by (or otherwise co-branded with) those brands set forth on Schedule 3.C(ii) during the 18-month period immediately following the Effective Date.

D.     Distribution of Starbucks Tassimo Discs Outside the Licensed Channels and Outside the Territory.  Kraft shall have no right to sell Starbucks Tassimo Discs other than in the Licensed Channels in the Territory, and Starbucks expressly reserves all rights in the Starbucks Licensed Trademarks not granted to Kraft under this Agreement.  Kraft shall use commercially reasonable efforts to ensure that Starbucks Tassimo Discs are not distributed outside of the Licensed Channels or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the distribution of Starbucks Tassimo Discs outside of the Licensed Channels or outside of the Territory.

E.     Product Pricing.  It is the intention of the parties that neither Kraft nor Starbucks will price the Starbucks Tassimo Discs in a manner likely to detract from such products' super premium brand positioning in the market.  Kraft shall have sole control of the pricing of all Tassimo Discs (including the Starbucks Tassimo Discs) in the Licensed Channels; provided, however, that Starbucks may suggest price levels to Kraft consistent with the price and brand positioning of other Super Premium Coffee and tea, and Kraft shall give due consideration

8

to any such suggestions of Starbucks when pricing the Starbucks Tassimo Discs. Starbucks shall have sole control of the pricing of its sale of all Starbucks Tassimo Discs in the Starbucks Channels; provided, however, that Kraft may suggest price levels to Starbucks consistent with the price and brand positioning of other Super Premium Coffee and tea, and Starbucks shall give due consideration to any such suggestions of Kraft when pricing the Starbucks Tassimo Discs.

F.     "Starbucks"-Branded Products.  Notwithstanding any provision set forth herein, if, and to the extent, the parties agree on a supply and license arrangement for "Starbucks" branded Beverage Discs and/or "Starbucks" branded Single Cup Beverage Machines generally similar to the arrangement contemplated under this Agreement, the parties acknowledge and agree that such arrangement will be the subject of a separately negotiated agreement containing terms and conditions independent and distinct from those set forth herein.

G.     Kraft Exclusivity.  During the term of this Agreement, neither Kraft nor any of its Affiliates shall, directly or indirectly, distribute, market or sell, or license any third party to market, distribute or sell, any Beverage Disc containing Super Premium Coffee in the Licensed Channels in the Territory, other than, notwithstanding anything to the contrary contained in the Coffee Agreement, (a) Starbucks Tassimo Discs in the Licensed Channels in the Territory, (b) any Beverage Discs containing Super Premium Coffee in online, direct-to-consumer and specialty/department store channels, provided that during the 18-month period immediately following the Effective Date, neither Kraft nor its Affiliates shall distribute, market or sell any Beverage Disc bearing the trademark of any brands set forth on Schedule 3.G in any channels in the Territory, and (c) products bearing the GEVALIA trademark sold through the internet, direct mail, or food service operations, or in kiosks located outside of the Licensed Channels.

H.     Online and Direct-to-Consumer Channels.  Except as set forth in the next sentence, prior to the sale of any Starbucks Tassimo Discs by either Starbucks or Kraft in an online or a direct-to-consumer channel, the party proposing to sell Starbucks Tassimo Discs in such channel (the "Proposing Party") shall provide the other party with written notice at least 180 days prior to such sale, which notice shall include the identity of the account to which such sale will be made.  Notwithstanding the foregoing, (i) Kraft shall have the right, without prior notice to Starbucks, to sell Starbucks Tassimo Discs through Tassimo.com and to any online sites owned, operated, licensed or authorized by (or otherwise co-branded with) a retail business primarily engaged in any channel other than online channels and (ii) Starbucks may sell Starbucks Tassimo Discs through any currently existing Starbucks online sites, including Cooking.com, with prior written notice to Kraft (which notice shall include the identity of such online site), provided that Kraft shall have the right in its reasonable discretion, upon receipt of such notice, to refuse to sell to Starbucks any Starbucks Tassimo Discs for use by Starbucks in any online site other than Cooking.com, provided, further, that the failure by Starbucks to give such notice to Kraft will not, in and of itself, be deemed to be a Material Breach, but the failure of Starbucks to provide Kraft with such notice (including the identity of any online site) will be deemed to give Kraft a reasonable basis to refuse to sell such Starbucks Tassimo Discs to Starbucks.

9

### 4.    **Product Supply.**

A.      Product Standards for Starbucks Tassimo Discs. The actions taken by Kraft in connection with the manufacturing, distribution or sale of the Starbucks Tassimo Discs to be supplied by Kraft under this Agreement shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to all Tassimo Discs sold in the Licensed Channels. In addition, Starbucks shall cause its authorized distributors to comply with the terms of this Agreement, including but not limited to the covenants of Starbucks contained in this Section 4.A. Starbucks represents, warrants and covenants that it will:

(i)      use commercially reasonable efforts to furnish, operate, and maintain in good working condition and suitable appearance adequate equipment, devices, and facilities for the storage, loading, transporting, unloading, and delivery of the Supplied Products;

(ii)     comply in all material respects with the warehouse operating procedures and quality control procedures that Starbucks has in place for its warehousing network, and all applicable laws, regulations, and ordinances with respect to its handling, storage, use, sale, and distribution of the Supplied Products;

(iii)    store the Supplied Products in such a manner as to prevent, in all material respects, migration of aromas and scents from aromatic Starbucks products to such Supplied Products;

(iv)    use commercially reasonable efforts to order and maintain in its custody sufficient quantities of Supplied Products for reasonably anticipated volumes of purchases by Kraft hereunder;

(v)     use commercially reasonable efforts to comply with the procedures that Starbucks has in place with respect to non-saleable product and expired product; and

(vi)    should Kraft or Starbucks identify unauthorized distribution or sale of the Starbucks Tassimo Discs hereunder, cooperate with and assist Kraft to prevent such unauthorized distribution or sales.

B.      Product Supply Prices for Roasted Coffee and Tea Used in Starbucks Tassimo Discs. Starbucks and its Affiliates shall sell the Supplied Products used in Starbucks Tassimo Discs to Kraft at a price equal to the Fully Landed Cost for such products, as established every six months. To the extent Starbucks or any of its Affiliates purchases products or services from related parties, all cost components included in the Fully Landed Cost shall be based on the lesser of actual costs to Starbucks or such Affiliate or the fair market value of the component based upon the open market cost for such item in an arm's-length transaction between unrelated parties. At the end of each six-month period, Starbucks shall "true-up" any and all variances between the actual and the invoiced Fully Landed Costs for such Year. Audits of Starbucks Fully Landed Cost (including the end of Year "true-up" calculation) shall be performed as provided in Section 7.C below.

10

C.    Product Supply for Roasted Coffee and Tea Used in Starbucks Tassimo Discs. Starbucks or its Affiliates will select the roasted coffee and tea to be used to manufacture the Starbucks Tassimo Discs. Kraft will provide Starbucks with rolling forecasts of estimated demand for Starbucks Tassimo Discs in the Licensed Channels as set forth on Schedule 4.C to facilitate the purchase of roasted coffee and tea for ultimate sale. Starbucks shall send to Kraft an invoice setting forth amounts owed by Kraft to Starbucks, concurrently with each shipment of roasted coffee and tea. Kraft shall remit payment to Starbucks, by wire transfer of immediately available funds, of all amounts due under any such invoice within fifteen (15) days after receipt of such invoice by Kraft.

D.    Future Supply Arrangements. Schedule 4.C sets forth the procedures for Kraft and Starbucks to communicate with each other with regard to demand forecasts.

E.    Starbucks Tassimo Disc Production and Delivery Obligations. Additional terms and conditions applicable to the production and delivery of Starbucks Tassimo Discs are set forth on Schedule 4.E.

F.    Product Warranties of Kraft. Kraft warrants and represents that:

(i)    All Starbucks Tassimo Discs tendered for delivery will be free from material defects and will be merchantable food products suitable for human consumption in the manner in which such food is normally or reasonably foreseeably consumed;

(ii)    The Starbucks Tassimo Discs tendered for delivery shall, at the time Starbucks accepts ownership of such products, not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "FDCA"), or any similar applicable state or municipal law in the Territory, and shall not be considered articles which may not, under the provision of Section 404 of the FDCA, be introduced into interstate commerce; and

(iii)    The Starbucks Tassimo Discs supplied under this Agreement shall have been manufactured in accordance in all material respects with all applicable laws and regulations.

(iv)    The Starbucks Tassimo Discs shall have been manufactured and delivered in accordance with the Specifications.

G.    Product Warranties of Starbucks. Starbucks warrants and represents that:

(i)    All Supplied Products tendered for delivery to Kraft will be free from material defects and will be merchantable food products suitable for human consumption in the manner in which such food is normally or reasonably foreseeably consumed;

(ii)    The Supplied Products tendered for delivery to Kraft shall, at the time Kraft accepts ownership of such products, not be adulterated or misbranded within the meaning of the FDCA, or any similar applicable state or municipal law

in the Territory, and shall not be considered articles which may not, under the provision of Section 404 of the FDCA, be introduced into interstate commerce; and

(iii)    The Supplied Products supplied to Kraft under this Agreement shall have been manufactured in accordance in all material respects with all applicable laws and regulations.

H.    Intellectual Property of Kraft; Representations and Warranties.

(i)    Any material conceived, created, developed and/or provided by Kraft (including all slogans, branding and marketing ideas) relating to Tassimo Discs or Tassimo Machines, and all Intellectual Property rights therein (other than trademarks owned by Starbucks contained therein), shall be considered Confidential Information and pre-existing Intellectual Property of Kraft.

(ii)    Kraft represents and warrants to Starbucks that: (a) Kraft has all Intellectual Property and other rights sufficient to grant to Starbucks the rights described in this Agreement; (b) Kraft has not, as of the Effective Date, entered into any enforceable agreement with, or granted any rights whatsoever, that would be in conflict in any material respect with the rights granted to Starbucks hereunder; (c) as of the Effective Date, no claims have been made and no proceedings have been brought or threatened, against Kraft or any of its Affiliates challenging the ownership, validity or improper use of Kraft's Intellectual Property in the Tassimo Discs and Tassimo Machines; (d) to Kraft's knowledge, Starbucks exercise in the Starbucks Channels of its rights to sell Starbucks Tassimo Discs in accordance with this Agreement shall not violate the Intellectual Property or other rights of any person or entity, except to the extent any such violation is based on the use by Starbucks of any of the Starbucks Licensed Trademarks or pre-existing Intellectual Property of Starbucks.   Starbucks reserves the right to return any Tassimo Discs where a claim is made that Starbucks sale or use of such goods infringes any alleged patent, design, trade name, trademark, copyright or other Intellectual Property right of a third party.

I.    Intellectual Property of Starbucks; Representations and Warranties.

(i)    Any material conceived, created, developed and/or provided by Starbucks (including all slogans, branding and marketing ideas) relating to Starbucks Tassimo Discs, and all Intellectual Property rights therein (other than trademarks owned by Kraft contained therein), shall be considered Confidential Information and pre-existing Intellectual Property of Starbucks.   Any such Intellectual Property shall be deemed to be Starbucks Licensed Trademarks and licensed to Kraft, its Affiliates and its manufacturers and distributors in accordance with the terms of this Agreement.

(ii)    Starbucks represents and warrants to Kraft that Starbucks has the right, pursuant to (a) a Trademark Protection and License Agreement, dated

12

September 28, 1997, with Starbucks U.S. Brands L.L.C. (the successor by merger to Starbucks U.S. Brands Corporation), and (b) a Trademark License Agreement dated as of October 1, 2003, as amended, with Seattle's Best Coffee LLC, to use and sublicense the Starbucks Licensed Trademarks in the manner contemplated by this Agreement and that it has and will continue to have throughout the term of this Agreement all requisite authority to enter into and perform its obligations under this Agreement.    Starbucks further represents and warrants to Kraft that (a) Starbucks has all Intellectual Property and other rights sufficient to grant to Kraft the rights described in this Agreement; (b) Starbucks has not, as of the Effective Date, entered into any enforceable agreement with, or granted any rights whatsoever, that would be in conflict in any material respect with the rights granted to Kraft hereunder; (c) as of the Effective Date, no claims have been made and no proceedings have been brought or threatened, against Starbucks or any of its Affiliates challenging the ownership, validity or improper use of Starbucks Licensed Trademarks or other Intellectual Property with respect to which Starbucks has granted rights to Kraft hereunder; and (d) to Starbucks' knowledge, Kraft's exercise in the Licensed Channels of its rights to sell Tassimo Discs and Tassimo Machines bearing the Starbucks Licensed Trademarks in accordance with this Agreement shall not violate the Intellectual Property or other rights of any person or entity, except to the extent any such violation is based on Kraft's use of any of the pre-existing Intellectual Property of Kraft Kraft reserves the right to return any Supplied Products where a claim is made that Kraft's sale or use of such goods infringes any alleged patent, design, trade name, trademark, copyright or other Intellectual Property right of a third party.

J.    Product Supply Prices for Starbucks Tassimo Discs Sold to Starbucks. Starbucks shall have the right, but not the obligation, to purchase from Kraft the Starbucks Tassimo Discs for sale in the Starbucks Channels.  Except as otherwise provided in Section 3.H with respect to online channels, Kraft shall sell the Starbucks Tassimo Discs to Starbucks, for sale in the Starbucks Channels at a price equal to the List Price for such discs.  Sales of Starbucks Tassimo Discs by Kraft to Starbucks shall be subject to such additional terms and conditions as may be reasonably agreed by the parties with respect to the implementation of the vendor relationship regarding Starbucks Tassimo Discs (including with respect to delivery obligations); provided that the terms of this Agreement shall prevail in the event of any conflict with or contradictory term in any such other agreement.

**5.    Term and Termination.**

A.    Term.  This Agreement shall commence as of the Effective Date and continue to December 31, 2011, unless sooner terminated pursuant to the terms of this Agreement.  The parties shall commence discussions on or before April 1, 2011 regarding renewing or otherwise extending the term of this Agreement.  If, on or before July 1, 2011, the parties have not reached definitive agreement with respect to renewing or otherwise extending the term of this Agreement, then Kraft and Starbucks shall cooperate to wind down the business contemplated by this Agreement and shall act in good faith to make an orderly transition pursuant to the terms of Section 6.

B.    Termination. This Agreement may be terminated prior to the expiration of the term hereof as follows:

(i)    By mutual written agreement of Starbucks and Kraft;

(ii)    By either party, upon a Material Breach of this Agreement by the other party which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach.

(iii)    By either party, in the event of insolvency or bankruptcy of the other party, if such condition is not cured within sixty (60) days.

(iv)    By either party, in the event of an assignment of this Agreement by the other party in violation of Section 13.B hereof.

(v)    By Kraft, if, without the prior consent of Kraft, Starbucks assigns this Agreement to a Significant Competitor.

(vi)    By Starbucks, if, without the prior consent of Starbucks, Kraft assigns this Agreement to a Significant Competitor.

(vii)    By either party, upon a Change of Control of the other party.

(viii)    By either party, not in its entirety but solely to the extent of the inclusion of the SBC products and SBC licensed trademarks herein, if the Coffee Agreement is terminated pursuant to Section 5.B thereof, such that Starbucks Tassimo Discs and Starbucks Licensed Trademarks would cease to include any SBC products or SBC trademarks, respectively, but would continue to include Tazo products and Tazo trademarks, respectively.

(ix)    By Kraft, on or after the first anniversary hereof, if, prior to such date, Kraft and Starbucks have not entered into a definitive written supply and license arrangement for "Starbucks" branded Beverage Discs and/or "Starbucks" branded Single Cup Beverage Machines generally similar to the arrangement contemplated under this Agreement.

## 6.    Post-Termination Rights and Obligations.

A.    Transition between Kraft and Starbucks. Subject to Section 6.B below, upon termination of this Agreement, (i) if terminated by Starbucks in a Termination For Cause, Kraft shall follow Starbucks reasonable instructions with respect to the transfer or disposal of coffee and/or tea supplied by Starbucks that remains in Kraft's inventory on the date of termination of this Agreement, (ii) if terminated by Kraft in a Termination for Cause, Kraft shall have the right to use, for a period of eight months from such date of termination, the tea and/or roasted coffee supplied by Starbucks that remains in Kraft's inventory on the date of termination of this Agreement, (iii) if terminated other than in a Termination For Cause (including upon expiration of the term), Kraft shall have the right to use, for a period of six months from such date of termination, the tea and/or roasted coffee supplied by Starbucks that remains in Kraft's

14

inventory on the date of termination of this Agreement, and (iv) Kraft shall retain all accounts receivable generated by its sales of Starbucks Tassimo Discs under this Agreement. During any post-termination transition period, the marketing, distribution or sale by Kraft of any Starbucks Tassimo Discs shall be subject to all applicable terms and conditions of this Agreement, including the pricing obligations set forth in Section 3.E and the payment obligations set forth in Section 7, but excluding the exclusivity provisions set forth in Section 3.C and Section 3.G; provided that in the event of (i), (ii) or (iii) above, all retail inventory of Starbucks Tassimo Discs and Tassimo Machines held by third parties as of the date of termination of this Agreement may be sold in the ordinary course of business and nothing herein shall require Kraft to recall products from any third party.

B.     Orderly Transition. Starbucks and Kraft shall act in good faith to make an orderly transition for the sale of the Starbucks Tassimo Discs following termination of this Agreement. Kraft and Starbucks shall use their best efforts to allow the Starbucks Tassimo Discs remaining in the Licensed Channels to be sold in the ordinary course of business of the particular retail outlet in the Licensed Channels in which such Starbucks Tassimo Discs remain.

C.     Trademark Use. Following termination of this Agreement for any reason, and except for using all existing Tassimo Packaging and collateral marketing materials existing at the time of termination as are reasonably necessary to effect an orderly transition and otherwise as permitted herein, Kraft shall discontinue its use of the Starbucks Licensed Trademarks on Tassimo Discs and Tassimo Packaging, and Starbucks shall be permitted to use or license the Starbucks Licensed Trademarks on any similar products without restriction, except as restricted by the Coffee Agreement and Tea Agreement, each as in effect from time to time; provided, however, that Kraft agrees not to create any new Tassimo Packaging containing the Starbucks Licensed Trademarks and to use its commercially reasonable efforts to effect the termination of the use of the Starbucks Licensed Trademarks on existing Tassimo Packaging and collateral marketing materials as promptly as possible following the termination of this Agreement.

D.     Fair Market Value. In the event of the termination of the Coffee Agreement pursuant to Section 5.B(ii) thereof, the Fair Market Value of the Coffee Agreement (as defined therein) shall not include the value of this Agreement.

7.     **Payments and Reports.**

A.     Periodic Payments for Licensed Channels. During the term of this Agreement, Kraft shall make monthly variable product margin payments to Starbucks (the "*Margin Payments*") by wire transfer of immediately available funds within fifteen (15) days after the end of such month, in the following amounts with respect to the following months:

(i)     [REDACTED] of Starbucks Tassimo Disc Net Sales during such month in calendar years 2006 and 2007;

(ii)    [REDACTED] of Starbucks Tassimo Disc Net Sales during such month in calendar year 2008;

(iii)    <sup>REDACTED</sup> of Starbucks Tassimo Disc Net Sales during such month in calendar year 2009;

(iv)    <sup>REDACTED</sup> of Starbucks Tassimo Disc Net Sales during such month in calendar year 2010; and

(v)    <sup>REDACTED</sup> of Starbucks Tassimo Disc Net Sales during such month in calendar year 2011.

B.    Minimum A&P.

(i)    A&P for Starbucks Tassimo Program.  Kraft shall spend, at a minimum, an amount equal to <sup>REDACTED</sup> of annual Starbucks Tassimo Disc Net Sales on A&P per calendar year with respect to the sale of Starbucks Tassimo Discs and Tassimo Machines in the Licensed Channels (the *"Minimum A&P Amount"*), except as otherwise approved by the Oversight Committee; provided, however, that any amount expended by Kraft in satisfaction of the Minimum A&P Amounts must display the Starbucks Licensed Trademarks, or must otherwise have been approved in advance in writing by Starbucks as applicable toward the Minimum A&P Amounts.

(ii)    Other Tassimo A&P.  Kraft shall have sole responsibility for all advertising and promotion spending on Tassimo Discs other than Starbucks Tassimo Discs and for all advertising and promotion spending on Tassimo Machines other than advertising featuring any of the Starbucks Licensed Trademarks.

C.    Audits.  During the term of this Agreement, and for the year immediately following termination of this Agreement, each party shall have the right to conduct an annual audit of the books and records of the other party at the end of each fiscal year of the party being audited, provided that such audit shall be scheduled so as to not interfere with the other party's year-end closing activities; and provided that such audit is preceded by a procedures report which sets out to the audited party what scope and focus the audit is intended to cover. The party requesting the audit may conduct the audit using its own internal auditing department, or at its option, a nationally recognized auditing firm selected by such party (the *"Auditor"*) to confirm (i) in the case of Kraft, the accuracy of the aggregate purchase price for the roasted coffee and tea supplied by Starbucks during such Year and (ii) in the case of Starbucks, Kraft's calculation of the Margin Payments. Such audits shall be made with particular reference to all applicable terms of this Agreement. Kraft and Starbucks shall each bear their own audit costs. All records of Kraft and Starbucks as may reasonably be necessary to verify the audit will be made available to the other party's Auditor upon its request. The Auditor's determination as to the calculations of Margin Payments and Starbucks roasted coffee and tea costs shall be in writing and delivered within 180 days after the end of the applicable party's fiscal year and shall be conclusive and binding upon Kraft and Starbucks (the *"Final Determination"*), unless contested in writing by the other party within fifteen (15) days following its receipt of the audit report.  If the Final Determination indicates any errors in (x) Starbucks calculation of the purchase price payable for roasted coffee and tea purchased by Kraft or (y) Kraft's calculation of the Margin Payments

attributable to the sale or supply of Starbucks Tassimo Discs through all Licensed Channels during such year, then the Auditor shall calculate the net amount of a payment to be made by Starbucks or Kraft, as applicable, to correct such errors, which payment shall be made by either Starbucks or Kraft, as applicable, within thirty (30) days after such determination; provided however that no retroactive payment shall be made with respect to any period which is more than eighteen (18) months prior to the commencement of the audit in which such errors are first identified. In addition, no party shall be required to make a payment if, and only to the extent, it disputes the audit results, in which case the audit dispute will be submitted to the Oversight Committee for resolution. If the Oversight Committee is unable to resolve the dispute, the matter shall be resolved in accordance with the dispute resolution provisions of Section 14.

        D.      Statements and Reports. Each of Kraft and Starbucks shall render the following monthly reports to the other party, no later than ten (10) days after the end of each calendar month or calendar quarter (or covering such other period, with delivery at such other intervals, as specifically set forth below):

        (i)      Kraft shall render the following reports to Starbucks with the following information on a national basis in a form reasonably satisfactory to Starbucks:

        (a)      unit sales and gross sales of Starbucks Tassimo Discs in the Licensed Channels by Starbucks Licensed Trademark during each month delivered within two (2) Business Days following the end of the applicable month, except for such sales in online channels, which Kraft will provide within ten (10) Business Days following the end of the applicable month, but for which Kraft will provide a forecasted figure within two (2) Business Days following the end of the applicable month;

        (b)      a computation of the Margin Payments paid to Starbucks during each month delivered within the same time period for making such Margin Payments as set forth in Section 7.A; and

        (c)      Kraft's analysis of business results (i.e., reports or studies prepared by Kraft's Marketing Services Department, Sales Division or Coffee Division) of the Starbucks Tassimo Discs for the quarter, in a form reasonably adequate to inform Starbucks of the state of Kraft's business contemplated by this Agreement. (Starbucks may, in its reasonable discretion, request more frequent updates of this analysis, to the extent such analysis is available in the ordinary course of Kraft's business).

        (ii)      Starbucks shall render the following reports to Kraft with the following information on a national basis in a form reasonably satisfactory to Kraft:

    (a)        unit sales and gross sales of Starbucks Tassimo Discs in the Starbucks Channels by Starbucks Licensed Trademark during each quarter; and

    (b)        Kraft may, in its reasonable discretion, request analysis of business results related to the Starbucks Tassimo Discs to the extent such analysis is available in the ordinary course of Starbucks business.

E.      Records.  Each of Kraft and Starbucks shall maintain for a period consistent with such party's normal retention practices, complete and accurate records and accounts covering the transactions related to this Agreement. Such records and accounts shall be kept in accordance with U.S. generally accepted accounting procedures and principles. Each of Kraft and Starbucks shall make such records and accounts available for inspection and audit at the other party's expense during the term of this Agreement and for one (1) year thereafter; provided that (i) any such inspection and audit by the other party shall be conducted during reasonable business hours and upon reasonable notice by the other party or its nominees and (ii) neither Kraft nor Starbucks shall be obligated to provide access to any records for longer than its normal retention periods.

## 8.    **Quality Standards and Quality Control.**

A.      Starbucks Quality Obligations.  Starbucks shall use all commercially reasonable efforts to ensure that the roasted coffee and tea supplied by Starbucks and its Affiliates to Kraft under this Agreement will be of high quality consistent with the quality of the SBC and Tazo products of Starbucks and its Affiliates sold outside the Licensed Channels.

B.      Kraft's Quality Obligations. All Starbucks Tassimo Discs manufactured by Kraft shall be manufactured in compliance with all applicable laws and regulations. Starbucks will provide Kraft with such samples of SBC coffee products and Tazo tea products as Kraft may reasonably request for Kraft to ensure compliance of such products with all applicable laws. Kraft shall use all commercially reasonable efforts to ensure that the Starbucks Tassimo Discs manufactured, distributed and sold by Kraft will be of high quality. To ensure that the Starbucks Tassimo Discs are consistent with the requirements of the approved super premium brand positioning for the Starbucks Tassimo Discs, Kraft will:

    (i)      Observe the shelf life policies of Starbucks for SBC coffee and Tazo tea, which shelf-life policies shall be as communicated by Starbucks to Kraft prior to the date hereof for inclusion in the Specifications. Upon completion of the joint shelf life studies being conducted as of the date of this Agreement by Starbucks and Kraft, the shelf-lives for coffee products bearing the SBC trademark and for tea products bearing the Tazo trademark may be amended by the parties in accordance with the results of such studies. Kraft shall ensure that code dates on packages of Starbucks Tassimo Discs that permit the calculation of the date when such products should be removed from retail stores due to age appear on the exterior of the package.

     (ii)     Keep complete records for a period consistent with Kraft's normal retention practices and in a form reasonably satisfactory to Starbucks, regarding the quantity and quality of the Starbucks Tassimo Discs sold and distributed by Kraft and permit Starbucks agents to have access to such records during regular business hours and upon reasonable notice.

C.     <u>Field Audits</u>.

     (i)     <u>Measurement Criteria</u>.  Commencing in calendar year 2007, in connection with the quarterly field audits conducted under the Coffee Agreement, the parties shall retain the Field Auditor to conduct audits of in-store conditions of the presentation of Starbucks Tassimo Discs in the Licensed Channels for the same stores that are being audited under the Coffee Agreement to the extent such stores sell Starbucks Tassimo Discs.  Set forth on <u>Schedule 8.C(i)</u> are the current measurement criteria ("*Measurement Criteria*") for the Starbucks Tassimo Discs, the actions the parties have agreed to undertake in the event the Measurement Criteria are not satisfied, and the means by which the parties will agree upon changes to the Measurement Criteria.

     (ii)     <u>Costs and Conduct of Field Audits</u>.  Each of the parties shall pay 50% of the costs of the field audits for the Starbucks Tassimo Discs hereunder. Starbucks and Kraft agree to change the methodology and, pursuant to the terms of the Coffee Agreement, the Field Auditor as may be reasonably necessary from time to time to help ensure that such audits continue to be conducted efficiently and accurately.  In the event a party desires to change the then-current audit methodology, it will notify the other party in writing of its proposed changes.  The other party will not unreasonably withhold its consent to such proposed changes. If the parties are unable to agree on the proposed changes, the issues shall be submitted to the Oversight Committee for resolution.  If the Oversight Committee is unable to resolve the issue, it shall be resolved pursuant to the dispute resolution provisions of <u>Section 14</u>.

     (iii)     <u>Field Audit Results</u>.  If a field audit indicates that Kraft has failed to meet or exceed the then-current Measurement Criteria, the parties will undertake the actions described in <u>Schedule 8.C(i)</u>.

D.     <u>Starbucks Approval of Product Display in Licensed Channels</u>.  Starbucks and Kraft shall cooperate to develop practices and procedures to be followed for the display of the Starbucks Tassimo Discs in the Licensed Channels, which practices and procedures shall be consistent with the approved Super Premium brand positioning of the Starbucks Tassimo Discs and the brand equity of SBC and Tazo tea.

E.     <u>Consumer Complaints and Inquiries; Escalation</u>.  Kraft shall place a toll-free consumer hotline telephone number dedicated to matters concerning Tassimo Machines and Starbucks Tassimo Discs on the packaging of such products.  Starbucks shall provide to Kraft basic information about the blends and characteristics of coffee and tea provided in the Starbucks Tassimo Discs, and Kraft shall communicate such information to customers who use the hotline

telephone number to inquire with respect to such blends and characteristics. Kraft shall use commercially reasonable efforts to educate the individual(s) handling any consumer hotline on behalf of Kraft as to the basic blends and characteristics of the coffee and tea contained in the Starbucks Tassimo Discs, as provided by Starbucks pursuant to this section. If such inquiries or complaints require more than the basic information that was provided to Kraft pursuant to this section, Kraft shall refer the caller to Starbucks.   Kraft shall provide to Starbucks basic information about the technical features and aspects of the Starbucks Tassimo Discs and Tassimo Machines, and Starbucks shall communicate such information to customer who contact Starbucks to inquire with respect to such technical features or aspects.   Starbucks shall use commercially reasonable efforts to educate the individual(s) handling any consumer hotline on behalf of Starbucks as to the basic technical features and aspects of the Starbucks Tassimo Discs and Tassimo Machines, as provided by Kraft pursuant to this section.   If such inquiries or complaints require more than the basic information that was provided to Starbucks pursuant to this section, Starbucks shall refer the caller to Kraft. Each of Kraft and Starbucks shall provide other party with a quarterly log of all positive and negative incidents or consumer complaints received by it relating to Starbucks Tassimo Discs received by Kraft and Starbucks, respectively, and each of Kraft and Starbucks shall immediately notify the other party of any consumer or product quality issues with respect to the Starbucks Tassimo Discs that are brought to its attention.

      F.    <u>Recalls and Withdrawals</u>. Either party may initiate a recall or a market withdrawal ("*Market Withdrawal*") of the Starbucks Tassimo Discs due to contamination, adulteration or public health risk. If the purported reason for the Market Withdrawal turns out to be unfounded, the party which initiated the Market Withdrawal shall bear all costs related thereto. Starbucks will bear all costs related to any Market Withdrawal of the Starbucks Tassimo Discs that results from contamination or adulteration of the Starbucks Tassimo Discs due to the contamination or adulteration of roasted coffee or tea used therein while such roasted coffee and/or tea was otherwise in the physical control of Starbucks or its Affiliates. Kraft will bear all costs related to any Market Withdrawal of the Starbucks Tassimo Discs that results from contamination or adulteration of the Starbucks Tassimo Discs (a) after the roasted coffee and tea has been delivered by Starbucks or its Affiliates to Kraft or (b) while placed in Kraft's distribution channels. In the event the parties are unable to determine when the contamination or adulteration of the Starbucks Tassimo Discs occurred, the parties shall share all initial costs related to any Market Withdrawal of the Starbucks Tassimo Discs, and the parties shall negotiate in good faith to arrive at an equitable division of the costs associated with such Market Withdrawal, with reimbursement of the appropriate party not responsible for the contamination. Starbucks will notify Kraft if any contamination, adulteration, or public health issues arise outside the Licensed Channels that are likely to have a material impact on Kraft's sales of the Starbucks Tassimo Discs in the Territory. Kraft will notify Starbucks of any contamination, adulteration or public health issues that arise due to contamination while the Starbucks Tassimo Discs in question are in the custody and control of a retail customer.

### 9.    **Marketing Efforts.**

      A.    <u>Brand Management Team</u>. Kraft's Tassimo brand management team, the initial members of which are set forth on <u>Schedule 9.A</u> attached hereto, shall have responsibility for the brand strategy and brand development of the Tassimo brand, including the Starbucks

Tassimo Discs. Kraft may change its designated members of the Tassimo brand management team upon notice to Starbucks, and Schedule 9.A will be amended from time to time to reflect such changes.

      B.    Management of the Agreement. Kraft shall keep Starbucks fully informed of its promotional plans for the Starbucks Tassimo Discs, in particular, with respect to packaging design and planned advertising, including, prior to the commencement of each calendar year, presenting Starbucks with Kraft's proposed Tassimo marketing plan. Starbucks shall have the right of final approval solely with respect to (i) the use of the Starbucks Licensed Trademarks to the extent such use is inconsistent with the guidelines and examples set forth on Schedule 2.C and (ii) the use of the Starbucks Licensed Trademarks in any planned advertising or brand strategy that would materially and adversely affect the brand positioning of the SBC or Tazo brands. Notwithstanding the foregoing, Kraft shall have the right to continue with any planned advertising or brand strategy that does not use the Starbucks Licensed Trademarks, unless otherwise determined by the Oversight Committee. Kraft will provide Starbucks the reasonable opportunity to be involved in all significant brand and sales planning and sales presentations for Starbucks Tassimo Discs, and will consider in good faith all recommendations and suggestions made by Starbucks with respect thereto. Starbucks from time to time in its reasonable discretion will designate the employees to be dedicated (both full and part time) to the distribution and promotion of the Starbucks Tassimo Discs in the Licensed Channels. Kraft and Starbucks will use reasonable efforts to cooperate to ensure regular and open communication between their management teams. Without limiting the generality of the preceding sentences, Kraft will keep the Oversight Committee apprised of the status of development of new Starbucks Tassimo Disc products.

      C.    Submission to Oversight Committee. In the event Starbucks and Kraft are unable to agree on a brand positioning strategy for the Starbucks Tassimo Discs, either party may submit such matter to the Oversight Committee, which shall use its best efforts to resolve such disagreement. In no event will either Kraft or Starbucks pursue a significant brand positioning strategy for the Starbucks Tassimo Discs that has not been approved by either the other party or the Oversight Committee.

      **10.**    **Confidentiality.**

      A.    Information. All of the information communicated to either party by the other party in connection with this Agreement, including but not limited to, information concerning equipment, processes, Tassimo Discs, Tassimo Machines, data compilation and analysis (including the information set forth on Exhibit A and Exhibit B to the letter agreement between Kraft and Starbucks dated June 28, 2006 (the "*Non-Confidentiality Letter Agreement*")), shall be governed by and subject to the confidentiality provisions of (i) the Starbucks Mutual Confidentiality Agreement by and between Starbucks and Kraft dated as of May 25, 2006 (the "*Starbucks Mutual Confidentiality Agreement*") and (ii) the Non-Confidentiality Letter Agreement; provided, however, that the exclusive dealing restriction set forth in the last sentence of Section 4 of the Starbucks Mutual Confidentiality Agreement is hereby terminated.

      B.    Non-Solicitation. During the term of this Agreement, and for a period of one (1) year following expiration or termination of this Agreement, neither party shall employ or

make an offer of employment to any employee of the other party who is or has in the prior year been involved significantly in the business which is the subject of this Agreement. The restrictions of this <u>Section 10.B</u> shall apply only to Kraft and Starbucks.

### 11.    **Purchase of Shares.**

A.    Unless specifically requested in writing in advance by or on behalf of Starbucks, neither Kraft nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "*1934 Act*")), will, and neither Kraft nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to, beneficial ownership (as defined in Rule 13d-3 under the 1934 Act)) of (a) Starbucks or any of its assets or businesses, (b) any securities listed by Starbucks or (c) any rights or options to acquire such ownership (including from a person other than Starbucks), by any means, including a negotiated purchase of securities or assets, tender, or exchange offer, merger or other business combination, recapitalization, restructuring, or other extraordinary transaction (a "*Business Combination Transaction*"), (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Starbucks, (iii) otherwise seek or propose to control the board of directors, management or policies of Starbucks, (iv) take any action that could reasonably be expected to force Starbucks to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing. Kraft also agrees during such period not to request Starbucks or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence). Kraft hereby acknowledges that neither it nor any of its affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Starbucks.

B.    Unless specifically requested in writing in advance by or on behalf of Kraft, neither Starbucks nor any of its affiliates or associates (as such terms are defined in Rule 12b-2 under the 1934 Act), will, and neither Starbucks nor any of its affiliates or associates will assist or encourage others (including by providing financing) to, directly or indirectly, during the term of this Agreement and for two (2) years following the termination or expiration of this Agreement, (i) acquire or agree, offer, seek or propose (whether publicly or otherwise) to acquire ownership (including, but not limited to, beneficial ownership (as defined in Rule 13d-3 under the 1934 Act)) of (a) Kraft or any of its assets or businesses, (b) any securities listed by Kraft or (c) any rights or options to acquire such ownership (including from a person other than Kraft), by any means, including a Business Combination Transaction, (ii) engage in any "solicitation" of "proxies" (as such terms are used in the proxy rules promulgated under the 1934 Act but disregarding clause (iv) of Rule 14a-1(l)(2) and including any exempt solicitation pursuant to Rule 14a-2(b)(1) or (2)), or form, join or in any way participate in a "group" (as defined under the 1934 Act), with respect to any securities issued by Kraft, (iii) otherwise seek or propose to

control the board of directors, management or policies of Kraft, (iv) take any action that could reasonably be expected to force Kraft to make a public announcement regarding any of the types of matters referred to in clause (i), (ii), or (iii) above, or (v) enter into any discussions, negotiations, agreements, arrangements or understandings with any third party with respect to the foregoing. Starbucks also agrees during such period not to request Kraft or any of its directors, officers, employees, legal or financial advisers, accountants or other agents or representatives to amend or waive any provision of this paragraph (including this sentence). Starbucks hereby acknowledges that neither it nor any of its Affiliates or associates is on the date hereof the beneficial owner of any shares of capital stock of Kraft Foods, Inc.

## 12.    Indemnification.

A.    Kraft's Indemnity. Kraft hereby indemnifies Starbucks, and undertakes to defend and hold Starbucks, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

(i)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all product liability claims and/or any other actions involving Starbucks Tassimo Discs where such claims are a result of Kraft's negligence or intentional acts, except to the extent of claims that Kraft's use of any of the Starbucks Licensed Trademarks or other Intellectual Property of Starbucks in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(ii)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Kraft's breach of any representation or warranty made hereunder, or any other act or deed, whether in contract or tort, committed or omitted by Kraft hereunder, except to the extent of claims that Kraft's use of any of the Starbucks Licensed Trademarks or other Intellectual Property of Starbucks in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(iii)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims and/or any other actions involving Tassimo Discs and Tassimo Machines alleging violation or infringement of a third party's Intellectual Property or other proprietary rights, except claims that Kraft's use of any of the Starbucks Licensed Trademarks or other Intellectual Property rights granted to Kraft in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights; and

(iv)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Starbucks as a direct result of the execution, delivery or performance of this Agreement by Kraft in breach of another agreement to which Kraft is a party.

B.    Starbucks Indemnity.  Starbucks hereby indemnifies Kraft, and undertakes to defend and hold Kraft, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns, harmless from and against:

(i)    expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims arising out of Kraft's exercise of the rights granted to it hereunder, including without limitation claims arising out of Kraft's use of the Starbucks Licensed Trademarks in accordance with this Agreement;

(ii)    any and all claims, suits, losses, damages, costs, liabilities and/or expenses, including but not limited to reasonable attorneys' fees, arising out of (A) Starbucks breach of any representation or warranty made hereunder, or (B) any other act or deed, whether in contract or tort, committed or omitted by Starbucks hereunder or (C) any other actions involving Starbucks Tassimo Discs where such claims are a result of Starbucks negligence or intentional acts, except to the extent of claims that Starbucks use of any Intellectual Property of Kraft in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(iii)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims and/or any other actions alleging violation or infringement of a third party's Intellectual Property or other proprietary rights, by Kraft's use of the Starbucks Licensed Trademarks and/or sale of Supplied Products; and

(iv)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by Kraft as a direct result of the execution, delivery or performance of this Agreement by Starbucks in breach of another agreement to which Starbucks is a party.

C.    No Consequential Damages.  Neither party shall have any liability to the other party for any indirect, consequential, punitive or other special damages.  Nothing in this Section 12.C shall limit a party's indemnification obligations with respect to third party claims under Sections 12.A or 12.B above.

### 13.    Binding Agreement; Assignability.

A.    Binding Agreement.  Unless assigned or transferred in violation hereof, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

B.    Assignment.  Neither party may assign this Agreement or any of its rights hereunder without the prior written approval of the other party; provided, however, that either party may assign this Agreement, and its rights and obligations hereunder (in whole or in part), without the prior written approval of the other party, to a subsidiary or other corporate Affiliate, other than the parent, of such party.  In the event of any assignment of this Agreement, the assignor shall, following such assignment, remain liable for all of its obligations under this Agreement.

24

### 14. Dispute Resolution.

A.    The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation, by submitting such claim or controversy to the Oversight Committee. All final decisions of the Oversight Committee shall be made by unanimous consent. However, at any time following the first to occur of (i) the first meeting of the Oversight Committee concerning such claim or controversy, or (ii) expiration of the thirty (30)-day period following a party's written request to the other party to submit such claim or controversy to the Oversight Committee if the Oversight Committee has not met to consider such claim or controversy within such thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration. Such binding arbitration shall be conducted within the City of Chicago at JAMS or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures, except as modified by the Agreement of the parties. The arbitration shall be conducted by a single arbitrator selected by mutual agreement of the parties within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by JAMS. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended), and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator is empowered to award attorney's fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement. If JAMS or its successor is no longer operative, then the Center for Public Resources (CPR) or its successor and its rules and procedures shall be substituted for JAMS for all purposes of this Section 14.

B.    Nothing in this Agreement will prevent either party from resorting to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction or to avoid the barring of the claim under the applicable statute of limitations. In addition, resort by either party to negotiation, mediation or arbitration pursuant to this Agreement shall not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party to pursue any such judicial relief; provided, however, that irrespective of the filing of any such request for judicial relief the party shall continue to participate in the dispute resolution proceedings required by this paragraph. Any negotiation or mediation which takes place pursuant to this Agreement shall be confidential and shall be treated as a compromise and settlement negotiation for purposes of the Federal Rules of Evidence and State rules of evidence.

### 15.    Protection of Rights.

A.    Certain Covenants. Kraft shall not at any time during the term of this Agreement contest or aid others in contesting the validity of the Starbucks Licensed Trademarks. Starbucks shall use reasonable efforts in good faith to maintain the registrations for the registered Starbucks Licensed Trademarks in the Territory.

B.    Goodwill; Control of Starbucks Licensed Trademarks. Kraft acknowledges the substantial value of the goodwill associated with the Starbucks Licensed

Trademarks and agrees to use the Starbucks Licensed Trademarks in the form and manner prescribed by Starbucks and as set forth in this Agreement, including in conformance with all style guides set forth in Schedule 1c, and any subsequent style guidelines communicated to Kraft by Starbucks from time to time. Kraft's use of the Starbucks Licensed Trademarks and any goodwill generated from the use of the Starbucks Licensed Trademarks by Kraft shall inure to the benefit of the owners of the Starbucks Licensed Trademarks. Apart from this Agreement, Kraft shall hereafter neither acquire nor claim any right, title, or interest of any kind or nature whatsoever in or to the Starbucks Licensed Trademarks or the goodwill associated therewith. Starbucks has approval rights in its sole discretion over all uses by Kraft of the Starbucks Licensed Trademarks that are inconsistent with the guidelines and examples set forth on Schedule 2.C, including, without limitation, in connection with packaging materials, labels, displays, promotional items and advertising. In the event Starbucks and Kraft are unable to agree on uses by Kraft of the Starbucks Licensed Trademarks, Kraft may submit the matter for resolution to Starbucks Senior Vice President of Marketing or to Starbucks President.

   C. Legend. Kraft shall display the Starbucks Licensed Trademarks only in such form and manner as is specifically approved by Starbucks pursuant to the provisions of this Agreement. Kraft shall not use the Starbucks Licensed Trademarks in a manner which may reasonably give the impression that the Starbucks Licensed Trademarks are owned by Kraft. Where practical and appropriate or reasonably required by Starbucks, all materials bearing the Starbucks Licensed Trademarks shall include a notice that the Starbucks Licensed Trademarks are owned by Starbucks U.S. Brands Corporation and licensed by Starbucks or its Affiliates in a form approved in writing by Starbucks. The following forms of notice are hereby approved by Starbucks for use in the United States:

  **"Seattle's Best Coffee, the Seattle's Best Coffee logo and __ are trademarks or registered trademarks of Seattle's Best Coffee, LLC"**

   **"Tazo, the Tazo logo and __ are trademarks or registered trademarks of Starbucks U.S. Brands L.L.C."**

A comparable legend may be substituted with the prior written approval of Starbucks.

   D. Certain Usage Prohibited. Kraft shall not use the Starbucks Licensed Trademarks in a manner that would in any way disparage Starbucks or the reputation of Starbucks, nor shall Kraft take any action which could harm or jeopardize the Starbucks Licensed Trademarks, or Starbucks or its Affiliates' (as the case may be) ownership thereof, in any way.

   E. Changes to the Starbucks Licensed Trademarks. Starbucks shall have the right at any time to make additions to, deletions from, and changes to any or all of the Starbucks Licensed Trademarks at its sole and complete discretion; provided, however, that Starbucks shall give Kraft reasonable prior written notice thereof. Kraft shall, after receipt of such written notice from Starbucks, adopt and begin using any and all such additions, deletions and changes as soon as reasonably practicable after Starbucks adoption thereof. Starbucks shall pay or reimburse Kraft for Kraft's reasonable costs associated with adopting and using any such additions, deletions and changes beyond the first such addition, deletion or change in any three (3) year

period, it being understood that Starbucks shall not reimburse Kraft for any additions, deletions or changes resulting from Kraft's incorrect use of any Starbucks Licensed Trademark. Notwithstanding the foregoing, if Starbucks requires that any such addition, deletion or change be made, Kraft shall be entitled to distribute and sell previously approved Starbucks Tassimo Discs and Tassimo Packaging, and to use previously approved materials, while adopting the additions, deletions and changes prescribed by Starbucks, unless Starbucks notifies Kraft in writing that such uses of such Starbucks Tassimo Discs, Tassimo Packaging or materials infringe or are alleged to infringe the rights of a third party.

### 16.   Protection and Defense of Starbucks Licensed Trademarks.

A.   Execution of Instruments.   Kraft agrees to execute, at Starbucks reasonable request and at Starbucks expense, any and all instruments as may be reasonably necessary or advisable to protect and maintain the interest of Starbucks in the Starbucks Licensed Trademarks.

B.   Notice of Infringement.   Kraft shall promptly notify Starbucks of any apparent infringement of, challenge to Kraft's use of, or any claim by any person to any rights in, the Starbucks Licensed Trademarks.   Starbucks shall promptly notify Kraft of any apparent infringement of, or any claim by any person to any rights in, the Starbucks Licensed Trademarks that may materially adversely affect Kraft's use of the Starbucks Licensed Trademarks under this Agreement.

C.   Protection of the Starbucks Licensed Trademarks.   Starbucks shall at all times have the right to take whatever steps it deems necessary or desirable, in its sole discretion, to protect the Starbucks Licensed Trademarks from all harmful or wrongful activities of third parties.   Such steps may include, but shall not be limited to, the filing and prosecution of: (A) litigation against infringement or unfair competition by third parties, (B) opposition proceedings against applications for trademark or service mark registration for trademarks that are confusingly similar to any one or more of the Starbucks Licensed Trademarks, (C) cancellation proceedings against registration of trademarks that are confusingly similar to any one or more of the Starbucks Licensed Trademarks, and (D) other appropriate administrative actions, and Kraft shall cooperate with Starbucks, at Starbucks request, in any such actions and Starbucks shall be responsible for Kraft's reasonable expenses incurred in such cooperation. Kraft shall cause its authorized manufacturers and distributors to comply with the terms of this Agreement, including but not limited to the protection of the Starbucks Licensed Trademarks as stated herein.

D.   Allegations of Infringement.   Starbucks shall at all times have the right to take whatever steps it deems necessary or desirable to defend all claims that the use of the Starbucks Licensed Trademarks infringes the rights of a third party.   If Kraft is named as a party to such a claim and Starbucks is not so named, Starbucks shall defend such action at its own expense.   Kraft shall cooperate in such defense, and Starbucks shall be responsible for Kraft's reasonable expenses incurred in such cooperation.

17.    **Miscellaneous.**

A.    Representations and Warranties.    Each of Kraft and Starbucks hereby represents and warrants to the other that (i) it has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and (ii) this Agreement has been duly authorized by all necessary action on its part.

B.    Force Majeure.    Neither party to this Agreement shall be held liable for failure to comply with any of the terms of this Agreement, nor shall any such failure be deemed a default or give rise to a right to terminate this Agreement, when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, or act of God beyond the control and without fault on the part of the party involved, provided that such party uses due diligence to remedy such default.

C.    Notices.

(i)    Any notice, demand or other communication required or permitted to be given or made hereunder shall be in writing and shall be well and sufficiently given or made if to the address set forth below and:

(a)    enclosed in a sealed envelope and delivered during normal business hours on a Business Day and left with a receptionist or other responsible employee at the relevant address set forth below in this Agreement;

(b)    sent by certified mail deposited in a post office within the United States;

(c)    sent by facsimile or sent by other means of recorded electronic communication during normal business hours on a Business Day and confirmed by mail as aforesaid; or

(d)    sent by a reputable air courier for overnight delivery.

(ii)    Any notice, demand or other communication so given or made shall be deemed to have been provided and to have been received on:

(a)    the day of delivery, if delivered as aforesaid;

(b)    on the third Business Day after the postmark date thereof (excluding each day during which there exists any general interruption of postal service due to strike, lockout, labor disturbance or other cause), if mailed as aforesaid;

(c)    on the day of sending if sent by facsimile or other means of recorded electronic communication (or on the next Business Day if sent on a day other than a Business Day); or

28

(d)      on the air courier's scheduled day of delivery if sent by air courier.

(iii)     All significant notices or other communications to be sent under this Agreement shall be sent to the parties at the following addresses, subject to each party's right to change its address for notice from time to time by giving notice in writing of such change.

If to Starbucks:          Starbucks Corporation
                          2401 Utah Avenue South
                          Seattle, Washington 98134
                          Attn.: President

With a copy to:           Starbucks Corporation
                          2401 Utah Avenue South
                          Seattle, Washington 98134
                          Attn.: General Counsel

If to Kraft:              Kraft Foods Global, Inc.
                          Beverage Sector
                          555 S. Broadway
                          Tarrytown, NY 10591
                          Attention: Group Vice President

With copy to:             Kraft Foods Global, Inc.
                          555 South Broadway
                          Tarrytown, NY 10591
                          Attention: Chief Counsel, Beverage Sector

(iv)     Notwithstanding the foregoing, routine notices and communications hereunder (e.g., quarterly reports, requests for review of materials and the like) may be sent to employees of the other party responsible therefore.

D.      Relationship.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, franchise or agency relationship between the parties hereto or shall be deemed to render either party liable for any of the debts or obligations of the other.  Neither party shall in any way be considered an agent or representative of the other in any dealings with any third party, and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

E.      Sole Agreement; Release and Discharge.  Effective as of the Effective Date, and except as provided in Section 10.A, this Agreement and the schedules and exhibits attached hereto and thereto shall constitute and contain the entire agreement of the parties hereto, and shall supercede all prior agreements, written or oral, relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed,

such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect. Effective as of the Effective Date, this Agreement shall supersede all prior agreements, discussions and negotiations between the parties with respect to the subject matter hereof.

F.   No Waiver. The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the party of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

G.   Construction. The captions of the various articles and sections of this Agreement have been inserted for the purpose of convenience of reference only, and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. The recitals set forth prior to Section 1 of this Agreement are statements setting forth the intentions of the parties and shall not be deemed to create, modify, supersede or eliminate any obligation of the parties under this Agreement.

H.   Invalidity. If any provision or provisions of this Agreement, or any portion of any provision hereof or thereof, shall be deemed invalid or unenforceable pursuant to a final determination of any arbitrator or court of competent jurisdiction, or as a result of future legislative action, such determination or action shall be construed so as not to affect the validity or effect of any other portion hereof or thereof, unless, as a result of such determination or action, the consideration to be received or enjoyed by any party hereto would be materially impaired or reduced.

I.   CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO THE SUBSTANTIVE LAWS, BUT NOT THE PRINCIPLES OF CONFLICTS OF LAWS, OF THE STATE OF NEW YORK AS IF THIS AGREEMENT WERE NEGOTIATED, EXECUTED, AND TO BE FULLY PERFORMED IN THE STATE OF NEW YORK.

J.   Compliance with Laws. Each of Kraft and Starbucks shall, at its own cost and expense, obtain all licenses, permits and other governmental approvals which may be required in the Territory for performance of its obligations hereunder.

K.   Counterparts. This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

L.   Arm's Length Contract. This Agreement has been negotiated "at arm's length" by the parties hereto, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof. Accordingly, in construing the provisions of this Agreement neither party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

M.   <u>Survival of Terms</u>.   Any provisions of this Agreement which by their terms would be reasonably expected to survive termination or expiration of this Agreement shall continue in effect following such termination or expiration, including but not limited to <u>Sections 6</u>, <u>11</u>, <u>12</u>, <u>14</u> and <u>16</u>.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**STARBUCKS CORPORATION**

By: _____

Name: Gerardo López

Its:    Senior Vice President, Global
       Consumer Products

**KRAFT FOODS GLOBAL, INC.**

By: _____

Name: Lorraine Hansen

Its:    Vice President, Marketing – Coffee on
       Demand

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**STARBUCKS CORPORATION**          **KRAFT FOODS GLOBAL, INC.**

By: _____          By: _Lorraine Hansen_____

Name: Gerardo López                   Name: Lorraine Hansen

Its:  Senior Vice President, Global     Its:  Vice President, Marketing — Coffee on
      Consumer Products                       Demand

Schedule 1a – Methodology for Calculating Fully Landed Costs

**FOR COFFEE:**

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Coffee[2] | Standard | Starbucks fiscal year period moving average roasted coffee cost adjusted for appropriate yield and fill weight to calculate true roasted coffee cost, with the moving average cost applied for each type of coffee uniformly regardless of channel of distribution for both nonlicensed and Starbucks Tassimo Discs. | Periodic Moving Average vs. Standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Green Coffee Burden | Standard | Shipping costs from origin countries to FOB destination factored for yield | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Packaging | Standard | Bill of material for all packaging element costs and their individual standard costs, with the same bill of material cost applied for similar package types regardless of channel of distribution for both nonlicensed and Starbucks Tassimo Discs. | Annual standard and variance created by mix and volume; roll stock and corrugate standards adjusted to moving average costs | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Conversion | Standard | Manufacturing costs including Supply Chain and Coffee Operations admin, direct and indirect manufacturing, and manufacturing overheads, with the same cost/lb allocation applied for each type of coffee uniformly regardless of channel of distribution for both nonlicensed and | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| | | Starbucks Tassimo Discs. | | | | |
| Coffee Manufacturing Variances | Actual | Starbucks fiscal year annual absolute $ conversion manufacturing standard vs. actual variances. | Allocated over/under absorption based on pounds shipped | End of fiscal year | N/A | N/A |
| Plant Distribution | Forecast | Distribution Operations estimated costs allocated on pick volumes | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |
| Freight Out | Prior Period Actuals | Actual shipping weight and volumes shipped by plant | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |
| | Direct | Actual freight charge from carrier | N/A | N/A | N/A | |
| Business Unit Overhead | Forecast[3] | Percentage of partners' time and other overhead expenses allocated across all pounds | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |

**FOR TEA:**

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Raw Materials | Standard | Procurement Estimates | Period Moving Average Cost and product mix at finished goods level. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Packaging | Standard | Procurement Estimates | Period Moving Average Cost and product mix at finished goods level. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Inbound/ Internal Freight | Standard | Cost Estimates allocated to product line based on COGS | Allocate actual inbound/internal freight to product lines based on standard COGS for the period in question. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Co-pack | Standard | Co-pack manufacturing contracts | Actual co-pack charges compared to standard and difference refunded to appropriate party. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Manufacturing Overhead including depreciation | Standard | Manufacturing overhead expenses allocated to products based on pounds of blend, and hours of blend. | Correct for differences between actual and forecasted mix and volumes on product sold to Kraft. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Technical Services | Standard | Technical Services expenses allocated to products based on lots produced in previous year. | Actual expenses allocated to product lines based on actual lots produced in the period. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |

| Fully Landed Cost Component [1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Distribution/ Warehousing | Standard | Distribution/Warehousing expenses allocated to product lines based on warehouse pallet positions required to store production forecast for the year. | Actual Distribution/Warehousing expenses allocated to product lines based on pallet positions required to store actual production. | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Outbound Freight | Direct | Actual freight charge from carrier | N/A | N/A | N/A | N/A |
| Packaging Design [4] | Direct | Project Identification | N/A | N/A | N/A | N/A |

(1)    For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Kraft within 30 days after the end of each true up period and incorporated into the subsequent month's Margin Payment calculation pursuant to Section 7A.

(2)    In the event some Coffee is purchased using Commodity Futures and/or Price to Be Fixed (PTBF) contracts, a common average rate per pound allocation of the costs is to be applied for each type of coffee uniformly, regardless of channel of distribution for both nonlicensed products and Starbucks Tassimo Discs.

(3)    Annual forecast allocation to Starbucks Tassimo Discs, as reviewed and approved by the Oversight Committee.

(4)    Expenses to be billed by Starbucks to Kraft for mutually agreed upon design projects and booked to joint P&L statement within A&P or other overheads.

## Schedule 1b

List of Oversight Committee Members – As of the Effective Date

<u>Starbucks Delegates:</u>

Gerardo López, Senior Vice President, Global Consumer Products
Wendy Piñero, Vice President, Global Consumer Products

<u>Kraft Delegates:</u>

Mary Beth Stone West, Group Vice President and President, U.S. Beverages Sector
Lorraine Hansen, Vice President, Marketing – Coffee on Demand

**Schedule 1c — Starbucks Licensed Trademarks**

SEATTLE'S BEST COFFEE

SEATTLE'S BEST LOGO:





*[continued on next page]*

**Schedule 1c (continued)**

**TAZO**

**TAZO LOGO:**

## ⇥⊙ Tazo Logo Standards ⊙⇤

THE TAZO LOGO symbolizes our high values, distinguishes our goods and services from our competitors, and when properly used, enhances our reputation as a premier purveyor of tea in the world. Correct and consistent use of our logo is crucial to preserving the integrity of the Tazo brand. Incorrect usage can dilute or harm the brand and can diminish our ability to prevent infringement by others. This covers the basic guidelines for proper and consistent use of the Tazo logo.

### CORRECT USE

Use the Tazo logo as shown (Fig. A) without alterations, embellishments or additions. The ⊕ symbol must be large enough to be read clearly, and the tag line must always accompany the logo in this exact configuration.



THE REINCARNATION of TEA

Fig. A – The Tazo logo.



THE REINCARNATION of TEA

Fig. B – The Tazo logo reversed.

There is a separate Tazo logo for reversing out of a black background (Fig. B). This logo has been modified and rendered specifically for this application.

NOTE: You may witness other forms or alterations of the Tazo logo on packaging and other promotional materials created by Tazo. You may also see the use of secondary marks, stamps or seals. These other forms or elements do not make it okay for you to do as you like with the Tazo logo or to create your own versions. The only approved use of the Tazo logo by anyone outside of Tazo is shown above, except as provided elsewhere in this Agreement.

### COLOR

This one is simple. The Tazo logo color is black. There are no special ink mixes, no two-color or three-color versions. It's just black. You can call it Tazo Black if it makes you feel better.

### INCORRECT USE



Do not crop the Tazo logo.



THE REINCARNATION of TEA

Do not screen back the Tazo logo.



THE REINCARNATION of TEA

Do not stretch or reshape the Tazo logo.



THE REINCARNATION of TEA

Do not place text or graphics over the Tazo logo.



THE REINCARNATION of TEA

Do not overlap other graphics with the Tazo logo.



Do not use hand-drawn versions of the Tazo logo.



THE REINCARNATION of TEA

Do not position or use the Tazo logo with any other logo.

©2001 TAZO. ALL RIGHTS RESERVED.
POST OFFICE BOX 66,
PORTLAND, OREGON 97207 USA

PLEASE NOTE: Any layout or proof containing the Tazo logo must be submitted to Tazo for ~~written approval prior to publication. Contact Tony at Tazo~~ as provided in this Agreement.

**Schedule 1d – Starbucks Tassimo Discs**

***Product Description/Blend***

1.     All of the following products bearing the Seattle's Best Coffee trademark:

       Breakfast Blend
       Henry's Blend

2.     All of the following products bearing the Tazo trademark:

       Awake

3.     All other products bearing a Starbucks Licensed Trademark as agreed by the parties from time to time during the term of this Agreement.

**Schedule 2.C**

**Guidelines and Examples for Use of Starbucks Licensed Trademarks**

See Attached

# Seattle's Best Coffee
## Identity and Logo Usage Guidelines

**The Seattle's Best Coffee logo** symbolizes the quality and approachability that makes Seattle's Best Coffee a unique brand and, when properly used, upholds that promise to the consumer.

Appropriate and consistent use of the Seattle's Best Coffee logo is integral to building and preserving the equity of the Seattle's Best Coffee brand. Incorrect usage can dilute or harm the brand and can diminish our ability to prevent infringement by others.

As the Seattle's Best Coffee brand's most recognizable symbol, the logo should be used carefully and selectively. With few exceptions, the logo should be used only to represent Seattle's Best Coffee cafes, operations and products, to identify the company or its franchisees, and/or in contexts where the company or its franchisees wish to identify an approved sponsorship or association. Any use of the mark should maintain and enhance the integrity of the Seattle's Best Coffee brand and must be approved in advance by Seattle's Best Coffee.

This publication covers the basic guidelines for proper and consistent use of the Seattle's Best Coffee logo. Seattle's Best Coffee has separate marks for use in specific trade channels and can provide additional tools and guidelines to authorized licensees, distributors and other resellers. Please refer to these additional channel- or product-specific guidelines for specific usage information.

## Correct Logo Usage

Use the **Seattle's Best Coffee logo** as shown here without alterations, embellishments or additions. Place the TM symbol in the lower right corner, outside the graphic outline.

 

## Size Guidelines

The **Seattle's Best Coffee logo** must print large enough to be clearly identified. The minimum size is 1.5" wide by 1.25" tall. Following review of your artwork, we will help you determine the appropriate size, placement and proportion. (Please note that not all logos printed on this piece are full-scale.)

If your artwork requires a logo size smaller than that at which the Seattle's Best Coffee logo can be printed clearly, you must refer to the Seattle's Best Coffee store/corporate identity and/or the branded product in text only.

Examples:
- As a store or corporate entity: Seattle's Best Coffee is located on Second and Main.
- As a branded product: Seattle's Best Coffee® is available at the espresso cart on the 8th floor.

The minimum size for online use of the Seattle's Best Coffee logo is 50x50 pixels at 72 dpi. The TM may need to be created separately to read clearly.

# Color Specifications

**Print the Seattle's Best Coffee logo in its four correct colors:**
PANTONE® 1797 C, 1807 C, 1255 C* and black. No other colors may be substituted. The colors in the Seattle's Best Coffee logo must visually match the PANTONE specifications listed here. If you are unable to print in color, or if you are unsure that you can visually match to the specified colors, you must print in black and white on a colored background, or black only on a white background.



**On white background:**
PANTONE® 1797 C, 1807 C, 1255 C and black.



**On a colored background:**
Black and white; background color must not show through.



**On a dark background:**
PANTONE® 1797 C, 1807 C, 1255 C and white; background color must not show through.



*Please note that PANTONE® 1255 C may be substituted with PANTONE® 873 C for roll stock projects. All other usages need to have PANTONE® 1255 C. Please contact Seattle's Best Coffee at SeattlesBestCoffeeBrand@seattlesbest.com for additional information.

**Correct Web logo colors:**
Hex #CC0033, Hex #990033, Hex #996600 and black. If you are unable to visually match to these colors, you must show the Seattle's Best Coffee logo in black only.



**On a dark background:**
Black or PANTONE® 1807 C and white; background color must not show through.

# Incorrect Color Usage



If the Seattle's Best Coffee logo is printed as a one-color logo, it must be black or PANTONE® 1807 C.



If printing on a colored background, remember that the logo is black and white. Color of background must not show through the logo.



The Seattle's Best Coffee logo should never be reversed out of a dark background. If the lettering in the ring or ribbon is darker than the background, the image is incorrect. See above color guidelines for applications on dark backgrounds.

Colors shown on this page and throughout this guide have not been evaluated by PANTONE, Inc. and may not match the PANTONE Color Standards. PANTONE® is a registered trademark of PANTONE, Inc.

## Usage with Other Logos



**A minimum clear space must be maintained between the Seattle's Best Coffee logo and any other logo graphic element.** This space should be equal to at least the width of the rim in which the word "COFFEE" appears.

## Incorrect Logo Usage



**Do not screen the Seattle's Best Coffee logo.** It should always print at 100% ink density. Patterns and textures or color from the background should not show through the logo.



**The Seattle's Best Coffee logo should not overlap other graphics or text.**



**Do not stretch or reshape the Seattle's Best Coffee logo.**



**Do not recreate or alter the Seattle's Best Coffee logo.** The logo may not be hand drawn or graphically re-created in any way. Use only the graphic logo files provided by Seattle's Best Coffee.

*Please note: The Seattle's Best Coffee logo should only be reproduced using an electronic file provided by Seattle's Best Coffee, and it may not be altered in any way. Do not scan any Seattle's Best Coffee trademarks from this document or any other printed piece not provided by Seattle's Best Coffee for this specific purpose. Remember that all use of the Seattle's Best Coffee logo and associated trademarks must be approved by Seattle's Best Coffee prior to production.*

Seattle's Best Coffee reserves the right to decline usage of the Seattle's Best Coffee name or brand representation in any situation the company deems inappropriate. Seattle's Best Coffee may also require you to recall and/or reprint any marketing materials that do not meet with Seattle's Best Coffee brand standards.

**For questions regarding logo usage, please contact Seattle's Best Coffee at SeattlesBestCoffeeBrand@seattlesbest.com.**

# Trademark and Style Guidelines

**Any copy using the Seattle's Best Coffee name or brand, and all related trademarks, must comply with these basic guidelines and must be approved by Seattle's Best Coffee.**

### COMPANY NAME STANDARDS

Use Seattle's Best Coffee when identifying the corporate or a retail entity by name.

For all printed materials, the bottom of each page must be properly copyrighted in the following format: **© (year) Seattle's Best Coffee, LLC. All rights reserved. Printed in (name of country).**

For example: © 2005 Seattle's Best Coffee, LLC. All rights reserved. Printed in the USA.

### BRAND AND PRODUCT NAME GUIDELINES

When referring to Seattle's Best Coffee® branded products, Seattle's Best Coffee must bear the appropriate trademark symbol: TM or ®. Attach the ® to the name at least one time per document or page, when it first appears and/or when it is most prominent. The logo must be marked with a TM every time it appears.

Always capitalize names of coffee varietals and blends and attach the designated trademark symbol ® when referencing proprietary Seattle's Best Coffee® blends. We will clarify upon review.

### Canadian and International Trademarks

Throughout this document, trademarks on the Seattle's Best Coffee logo, usage illustrations and references in copy are marked for use in the United States only. Outside of the United States, trademarks should reflect the status of the trademark in the country in which it will appear.

# Use of Names or Logos

**Any proposed use of the Seattle's Best Coffee logo, names or any other proprietary mark** by any party other than Seattle's Best Coffee must be approved by Seattle's Best Coffee as appropriate and is subject to a signed third-party logo usage agreement.

**This set of guidelines provides only basic standards.** If you have additional questions on proper use of our trademarks, trade names or on the use of trademark or copyright notices, contact Seattle's Best Coffee at SeattlesBestCoffeeBrand@seattlesbest.com.

# Thank You

We appreciate the time and energy you put into maintaining the promise of the Seattle's Best Coffee brand.

# Using the Logo

The Tazo logo symbolizes our high values, distinguishes our goods and services from our competitors, and when properly used enhances our reputation as a premier purveyor of tea. Correct and consistent use of our logo is crucial to preserving the integrity of the Tazo brand. Incorrect usage can dilute or harm the brand and will diminish our ability to prevent infringement by others. This covers the basic guidelines for proper and consistent use of the Tazo logo.

### Correct Logo Usage

Use the Tazo logo as shown (Figure A) without alterations, embellishments or additions. The ® symbol must be large enough to be read clearly, and the tagline must always accompany the logo in this exact configuration.

There is a separate Tazo logo for reversing out of a black background (Figure B). This logo has been modified and rendered specifically for this application.



| Correct Artwork Usage | |
| --- | --- |
| *Figure A* – The Tazo logo | *Figure B* – The Tazo logo reversed |

NOTE: You may witness other forms or alterations of the Tazo logo on packaging and other promotional materials created by Tazo. You may also see the use of secondary marks, stamps or seals. These other forms or elements do not make it okay for you to do as you wish with the Tazo logo or to create your own versions. The only approved uses of the Tazo logo by anyone outside Tazo are shown above.

### Correct Color Usage

This one is simple. The Tazo logo color is black. There are no special ink mixes, no two-color or three-color versions. It's just black.

### Size Specifications

The Tazo logo should not be resized any smaller than .5" in height. The minimum distance between the Tazo logo and tagline and other logos must be at least 1" (1 inch). The distance between the Tazo logo and tagline and other design elements must be at least 1/4". The Tazo logo includes the Tazo tagline, "The Reincarnation of Tea."

1

© 2004 Tazo. All rights reserved. Printed in the USA.  BRA-126

| Incorrect Logo Usage | |
|---|---|
|  | Do not crop the Tazo logo. |
|  | Do not screen back the Tazo logo. |
|  | Do not stretch or reshape the Tazo logo. |
|  | Do not place text or graphics over the Tazo logo. |
|  | Do not overlap graphics with the Tazo logo. |
|  | Do not use hand-drawn versions of the Tazo logo. |
|  | Do not position or use the Tazo logo with any other logo. |

© 2004 Tazo. All rights reserved. Printed in the USA. BRA-126

**Schedule 3.C(ii) – Starbucks Prohibited Brands**

KEURIG

## Schedule 3.G – Kraft Prohibited Brands

PEET'S

## Schedule 4.C – Demand Forecasting and Future Supply

Kraft shall forecast its anticipated demand to Starbucks as set forth below, or as the parties may otherwise agree following the execution of this Agreement.

By Wednesday of the last week of each of Starbucks fiscal months, Kraft will provide Starbucks 12-month rolling forecasts of Kraft's anticipated demands for Starbucks roasted coffee and tea. The forecast shall begin with the second month following issuance. (For example, a forecast issued in September covers the forecasted period beginning the following November.)     The demand reflected in the first month of each rolling 12-month forecast (November in the above case) shall constitute a binding commitment by Kraft to order the total quantity of roasted coffee and tea.     The forecast for the month that becomes a binding commitment (November in the above example) shall not increase by greater than fifteen percent (15%) from the same period's prior month forecast. Kraft may revise the mix of roasted coffee and tea by written purchase order issued no later than fifteen (15) calendar days prior to the beginning of the month for which such order is applicable. (Under the example above, the forecasted November demand issued in September becomes a firm commitment to purchase the quantity forecast, the October commitment having been set in the previous forecast, but Kraft may issue a purchase order setting forth the specific quantities of each Starbucks Licensed Product by SKU as late as October 16.) Starbucks will meet Kraft's required product mix, as so revised, unless meeting such requirements would cause Starbucks to bear undue expense or hardship. The first three months of each 12–month forecast shall be a firm projection and Kraft shall use its reasonable commercial efforts to purchase those volumes; provided that Kraft shall be deemed to have acted in a commercially reasonable manner if Kraft revises such forecasts as a result of unexpected changes in demand for the Starbucks Tassimo Discs.

Starbucks will notify Kraft in writing within ten (10) Business Days of receipt of any rolling forecast whether or not it will be able to fulfill such requirements. Failure by Starbucks to inform Kraft of its inability to fulfill such requirements will be deemed a binding commitment by Starbucks to ship any orders made by Kraft within the rolling forecast. In the event of a shortage of any particular variety of product, Starbucks will use reasonable commercial efforts to allocate product fairly between Kraft's orders and Starbucks owned, licensed and operated outlets.

Kraft shall maintain days-of-supply (DOS) at a level agreed to by both Starbucks and Kraft and shall provide Starbucks with current DOS by SKU which shall accompany the monthly forecast on the last Wednesday of each fiscal month. In the event DOS has dropped below the agreed level Kraft will use all reasonable efforts to purchase product to return DOS to the agreed-upon level.

**Schedule 4.E**

**Additional Terms and Conditions for Production and Delivery of Starbucks Tassimo Discs**

1.  The operations of plants and facilities where the Starbucks Tassimo Discs will be produced shall at all times be used only for the manufacture of food products and shall have cleaning procedures in place to minimize any possible product to product contamination with Starbucks Tassimo Discs.

2.  Kraft will maintain at all times all permits and authorizations necessary for the production of the Starbucks Tassimo Discs. In the event that Kraft receives any written notice from any governmental agency or other authority that could reasonably be expected to affect in any material respect Kraft's performance under this Agreement or the business reputation of Starbucks or the Starbucks Tassimo Discs, Kraft will forward to Starbucks as promptly as practicable a copy of the notice, by facsimile transmission, and will keep Starbucks reasonably apprised of the status and development of all matters relating to the notice.

3.  Kraft will produce all Starbucks Tassimo Discs in accordance with the Specifications, the product warranties set forth in <u>Section 4.F</u>, and all other terms and conditions of this Agreement. For each proposed type of Starbucks Tassimo Disc set forth on <u>Schedule 1d</u>, Kraft will submit samples of such type of Starbucks Tassimo Disc to Starbucks for its review and approval prior to the initial production of such type of Starbucks Tassimo Disc, including, without limitation, its compliance with the Specifications. Kraft will not distribute any type of Starbucks Tassimo Disc that has not received such approval in writing from Starbucks. Kraft will not thereafter materially alter its manufacture of the Starbucks Tassimo Discs that have already been approved by Starbucks without obtaining the prior written approval of Starbucks for such alteration. Furthermore, the parties agree that:

    (a)  Specifications, including test methods and acceptable limits for the Starbucks Tassimo Discs will be mutually agreed by Starbucks Global Quality Assurance and Kraft.

    (b)  Official copies of signed Specifications will maintained by Starbucks Global Quality Assurance and by the Kraft Research and Technology department.

    (c)  A process for changing Specifications will be developed indicating required approvals by Starbucks and Kraft.

4.  Kraft will retain samples of all lots of Starbucks Tassimo Discs Delivered under this Agreement for the greater of (a) one year or (b) the minimum shelf life of the applicable Starbucks Tassimo Discs. Kraft will send samples of Starbucks Tassimo Discs to Starbucks, at Starbucks expense, at such times and in such quantities as Starbucks may reasonably request. The definition of a "lot" will be clarified to Starbucks Coffee Company by Kraft but will not in any case be greater than one day (24 hours), which one-

day (24-hour) period will not be changed without the mutual written agreement of Kraft and Starbucks.

5.      Kraft shall only use roasted coffee or tea purchased from Starbucks in producing the Starbucks Tassimo Discs. Kraft shall handle, store and use the roasted coffee and tea used for Kraft's production of the Starbucks Tassimo Discs in material compliance with those reasonable standards that Starbucks from time to time may provide by written notice to Kraft.

6.      If Starbucks Tassimo Discs produced by Kraft fail to meet the Specifications in any material respects, they will be set aside by Kraft in a secure location and will not be used or sold in any way. Within ten days after such products are set aside, Kraft will furnish a written report to Starbucks specifying in reasonable detail the non-conformity and the quantity of the non-conforming item. Kraft will make available to Starbucks the non-conforming Starbucks Tassimo Discs for evaluation by Starbucks. Kraft will dispose of or arrange for the disposal (or return) of any non-conforming Starbucks Tassimo Discs upon Starbucks request and in accordance with Starbucks instructions. Kraft will bear all reasonable expenses related to such unusable items, including the cost of replacement and disposal.

7.      Starbucks Tassimo Discs shall be manufactured in material compliance with the US Code of Federal Regulations, Title 21, Part 110, Good Manufacturing Practices ("GMP"). Kraft shall maintain information on file at its offices regarding Kraft's GMP program (which program shall be to Starbucks reasonable satisfaction), and shall make such information available to Starbucks for review upon request. Kraft shall ensure that all processing area employees who may be supplying, manufacturing or assisting with the production of the Starbucks Tassimo Discs will be trained regarding applicable health code, cleanliness (including sanitary and protective clothing), and health standards.

8.      Kraft shall implement and maintain a food safety program similar to and employing the principles of Hazard Analysis and Critical Control Point (HACCP) (which program shall be to Starbucks reasonable satisfaction) or a Starbucks-approved equivalent program. At a minimum, Kraft shall comply with and train all personnel on basic sanitation requirements in accordance with GMP for Starbucks Tassimo Discs distributed in the United States. Kraft's food safety documentation shall describe the controls in place to prevent physical, chemical, microbial and allergen carry over and cross-contamination. Kraft shall employ an effective integrated pest control management program. Kraft shall make available to a third party, of Starbucks choosing, a copy of its HACCP (or equivalent) program upon request.

9.      Kraft shall maintain a current file of specifications for all raw materials, components and all primary and secondary packaging materials for the Starbucks Tassimo Discs. Kraft shall not substitute any raw materials or components without Starbucks written approval unless substitution is allowed by the Specifications. Kraft shall qualify and approve all suppliers through a process reasonably acceptable to Starbucks that verifies the ability of Kraft's suppliers to manage the food safety risks inherent to the ingredient or component. Manufacturing records shall allow tracing of all raw materials and components from

receipt records through work in process and finished good records, by lot code date as a minimum.

10.  With respect to the production and supply of Starbucks Tassimo Discs, Kraft shall:

    (a)  Document raw material compliance by certificate of analysis or measurement of critical parameters upon receipt. All incoming ingredients shall be date coded to support tracing by lot and proper rotation (FIFO) of inventory;

    (b)  Receive, transfer and store raw materials within specified temperature ranges;

    (c)  Store Starbucks Coffee in a clean dry environment at room temperature (not to exceed 90 F), and use such coffee within 7 days of receipt;

    (d)  Document and adhere to a quality hold procedure for non-conforming receipts;

    (e)  Develop and adhere to an approved foreign object removal procedure for roasted coffee;

    (f)  Maintain and document an active calibration program for scales, metal detectors, filters and thermometers, and related production equipment;

    (g)  Print a date code on the product unit (primary packaging) and the shipping container (secondary packaging) in accordance with Starbucks reasonable requirements;

    (h)  Use documented specific measurements, tests, and/or sensory evaluations to verify manufacturing process limits, and monitor such limits on a schedule or sampling plan developed by Kraft Quality Assurance;

    (i)  Maintain a retention sample program by date/lot code for the shelf life of Starbucks Tassimo Discs; and

    (j)  Document and employ a cleaning program for all equipment and facilities.

11.  Kraft will inform Starbucks of any condition that is not in material conformance or material compliance with the requirements of this Schedule 4.E within 5 days of Kraft's discovery of such a condition. Kraft will provide reasonably complete details of the non-conforming condition and a recommended solution for Starbucks review and approval. At Starbucks request, Kraft will perform a "root cause" analysis of the problem and provide a corrective action plan in an effort to prevent future occurrences of the problem. Kraft will promptly provide a reasonably satisfactory resolution to each corrective action report issued by Starbucks.

12.  Starbucks shall have the right, via an unaffiliated third party selected by Starbucks, to audit and inspect Kraft's plants and other facilities where the Starbucks Tassimo Discs are manufactured, handled, and stored. Such unaffiliated third party will be granted access to the plant(s) and records as reasonably requested by Starbucks for the purpose of

reviewing Kraft' s compliance with the terms of this Agreement, provided that prior thereto, such unaffiliated third party shall have entered into a confidentiality agreement with Kraft.  Any inspection by such unaffiliated third party will be at Starbucks expense. Starbucks agrees to provide the results of any such audit or inspection to Kraft promptly upon completion thereof and Kraft agrees to release any third party inspection reports applicable to the manufacture of Starbucks Tassimo Discs to Starbucks upon written request.

13.   In no event shall any standards, approvals or audit rights by Starbucks provided for in this Schedule 4.E relieve Kraft of the responsibility of Kraft of manufacturing, distributing, marketing and selling the Starbucks Tassimo Discs in accordance with all other requirements of this Agreement.

## Schedule 8.C(i) – Measurement Criteria
## Licensed Channel In-Store Conditions

### Key Measures of In-Store Conditions

Starbucks and Kraft intend to maintain a presentation for the Starbucks Tassimo Discs that clearly positions the Starbucks Licensed Trademarks in accordance with its Super-Premium Coffee standing and for the Tassimo Machines as a premium quality brewer. Kraft shall develop the brand positioning and brand equity of these Starbucks Tassimo Discs and Tassimo Machines through superior in-store presentations, including shelf presence, product quality, and product availability in the Licensed Channels.

Starbucks and Kraft have agreed that the principal means of achieving superior in-store presentation are to:

- **Minimize past-due product**
  - *Rationale:* Applies the highest standards of excellence to the fresh delivery of our coffee to encourage the development of enthusiastically satisfied customers.
  - *Defined Metric:* Percentage of checked packages which are past-due.
- **Minimize Out-of-Stocks**
  - *Rationale:* Promotes brand equity, denotes category leadership, and increases sales.
  - *Defined Metric:* Percentage of stores with at least one out-of-stock SKU.

Starbucks and Kraft will jointly review each of the metrics set forth above, as measured by the Field Auditor during each calendar quarter at the same stores that are audited pursuant to the terms of the Coffee Agreement. This review will focus on identifying deficiencies relative to the metrics, if any, and on cooperatively establishing strategies or an Action Plan for addressing and resolving such deficiencies.

Starbucks and Kraft will jointly establish measurable standards (the "*Standards*") for the metrics listed above.

- An "Action Plan" means a plan to be developed by Kraft, with consultation and approval from Starbucks, to identify which stores and/or markets are causing a failure to meet the applicable Standard for the metric, and to identify and implement the most timely, efficient and effective means to address the failure. The means of addressing the failure may include (i) the deployment of Kraft's internal sales force to conduct in-store visits, (ii) calls on customers' regional and/or national headquarters to encourage resolution of the problems, (iii) additional focus by Kraft on its sub-distributors (if any) involved in the stores and markets where the problems are occurring, and (iv) market "blitzes" under which Kraft will retain third parties to conduct in-store visits to improve aisle conditions. Any costs associated with implementing the Action Plan shall be charged to Kraft's P&L Statement.

**Field Audit Methodology**

Objectives

Starbucks and Kraft agree, as of the Effective Date, that the Field Auditor shall use the following methodology to measure in-store conditions for Starbucks Tassimo Discs in the Retail Grocery Stores and Mass Merchandise Stores.  The Field Auditor shall measure the following objective criteria when measuring in-store conditions:

    A.    Out-of-Stocks for Starbucks Tassimo Discs

    B.    Date Codes for Starbucks Tassimo Discs

    C.    Number of Past Due Products (versus the total)

    D.    Time, day and store location of observation

**Schedule 9.A – Tassimo Brand Management Team**

Lorraine Hansen, Vice President, Marketing – Coffee on Demand
Lori Acker, Senior Brand Manager – Tassimo
Sivonne Davis, Brand Manager – On Demand