# EXHIBIT 4

## STARBUCKS TASSIMO SUPPLY AND LICENSE AGREEMENT

THIS STARBUCKS TASSIMO SUPPLY AND LICENSE AGREEMENT ("*Agreement*") is entered into as of July 27, 2007, by and between STARBUCKS CORPORATION, a Washington corporation ("*Starbucks*"), and KRAFT FOODS GLOBAL, INC., a Delaware corporation ("*Kraft*"), and shall become effective with respect to each Country on the Effective Date (as such terms are defined herein).

WHEREAS, Starbucks is engaged in the manufacture, sale and distribution of various types of coffee, including Super Premium Coffee (as defined herein);

WHEREAS, Kraft is engaged in the manufacture, sale and/or distribution of a variety of food and beverage products, including Tassimo Machines and Tassimo Discs;

WHEREAS, Starbucks and Kraft are parties to a Tassimo Supply and License Agreement dated August 9, 2006 (the "*US SBC-Tazo Tassimo Agreement*") to accommodate the sale and distribution of Tassimo Discs and Tassimo Packaging bearing the Seattle's Best Coffee and Tazo trademarks in the United States of America;

WHEREAS, Starbucks and Kraft are parties to a Supply and License Agreement dated March 29, 2004 (the "*US Supply and License Agreement*") to accommodate the sale and distribution of whole bean and roast & ground coffee bearing the Starbucks, Seattle's Best Coffee and Torrefazione Italia trademarks in the United States of America;

WHEREAS, Starbucks and Kraft are parties to an International Supply and License Agreement dated September 28, 2006 (the "*International Supply and License Agreement*") to accommodate the sale and distribution of whole bean and roast & ground coffee bearing the Starbucks trademarks in certain International countries beginning with Canada and the United Kingdom; and

WHEREAS, Starbucks and Kraft now desire to enter into this Agreement to provide for the supply, license, manufacture and distribution of Tassimo Discs and Tassimo Packaging bearing the Starbucks trademark in certain countries, commencing with the United States and Canada, and to be extended to such additional countries as may be agreed from time to time by the parties;

NOW, THEREFORE, for the mutual consideration set forth herein, the parties hereto agree as follows:

1.      **Definitions**.  For purposes of this Agreement:

"*A&P*" shall be defined as all sums expensed pursuant to U.S. generally accepted accounting principles by Kraft to advertise and promote Tassimo Discs and Tassimo Machines in the Territory, including but not limited to all expenses associated with production and distribution of television, radio, print (including free standing inserts), direct mail, on-line (e.g., internet), point-of-sale and other forms of advertising; trade spending; consumer promotions; public relations; and product sampling and demonstrations, but excluding any of Kraft's internal overhead costs.

"*Active Sales*" shall be applicable only to EEA Countries, and shall be defined as (i) actively approaching or targeting one or more customers, including through advertisements or other promotions specifically targeted at such customers or by visits or direct mail or email; or (ii) establishing a branch, warehouse or distribution outlet for the distribution of the Licensed Products.

"*Affiliate*" shall be defined as, with respect to a party, any person or entity which, directly or indirectly, is in control of, is controlled by, or is under common control with, such party. For the purposes of this definition, "control" of a person or entity means the power, directly or indirectly, either to (i) vote a majority of the securities having ordinary voting power; (ii) determine the majority of the board of directors of such person or entity; or (iii) direct or cause the direction of the management and policies of such person or entity whether by contract or otherwise.

"*Anti-Terrorism Laws*" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other applicable present and future national, federal, state, provincial, and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority of any nation (including the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts or acts of war.

"*Applicable Laws*" shall be defined as all laws, regulations, administrative requirements, rules and orders applicable to the conduct of Kraft's or Starbucks business or the promotion, marketing, sale and distribution of the Licensed Products by Kraft or Starbucks, whether with respect to the Territory or any Country therein, including the United States of America or otherwise.

"*Auditor*" shall have the meaning assigned to it in Section 7.D.

"*Authorized Channels*" shall be defined, for each Country, as those channels in which the sale and distribution of Licensed Products by Kraft or Kraft Affiliates is permitted, as set forth in the relevant Country Addendum.

"*Beverage Discs*" shall be defined as pre-packaged coffee, tea, milk or other beverage products contained in a cup, pod, filter, bag or other container designed to be used in machines that brew or otherwise produce convenient, single cups of coffee, tea and other beverages, including, without limitation, Tassimo Discs.

"*Business Day*" shall be defined as any day not a Saturday, Sunday or statutory holiday in the United States or relevant Country.

"*Change of Control*" shall be defined as any occurrence where any entity or person or group of entities or persons acting in concert who, on the date of this Agreement, does not possess Control over a party hereto, gains control over such party, or a sale of all or substantially all of the assets of Kraft or Starbucks.

2

"*Closed System*" shall be defined as any espresso brewing system for which Starbucks offers Starbucks branded discs or pods in the Starbucks Channels, regardless of whether such discs or pods are manufactured by or for Starbucks under license or otherwise.

"*Committee Schedule*" shall be defined as the list, attached hereto as Schedule 9, of (i) the members of the Starbucks and Kraft Brand Management Teams, and (ii) the members of the United States and International Oversight Committees. Either party may change its designated members of such teams and committees upon notice to the other party, and the parties agree to amend the Committee Schedule from time to time to reflect such changes.

"*Confidential Information*" shall mean the information to be kept confidential pursuant to Section 10.A.

"*Control*" shall be defined as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an executive position with the party in question.

"*Country*" shall be defined as any state or jurisdiction (or part thereof) that comprises part of the Territory, as may be agreed by the parties pursuant to a duly executed Country Addendum.

"*Country Addendum*" shall be defined as each addendum to this Agreement that sets out any terms and conditions specific to a Country forming part of the Territory, which terms and conditions shall be deemed to supplement and supersede this Agreement only with respect to such specific Country.

"*EEA*" shall be defined as the European Economic Area.

"*Effective Date*" shall be defined, with respect to each Country, as set forth on the relevant Country Addendum.

"*Expiration Date*" shall have the meaning assigned to it in Section 5.A.

"*FDCA*" shall have the meaning assigned to it in Section 4.F(ii).

"*Field Auditor*" shall be defined as an independent third party that is jointly agreed and retained by Starbucks and Kraft to conduct field audits of Kraft's compliance with its obligations under Section 8.H.

"*Final Determination*" shall have the meaning assigned to it in Section 7.D.

"*Force Majeure Event*" shall have the meaning assigned to it in Section 16.B.

"*Fully Landed Cost*" shall be defined as, with respect to any product or material, all direct and indirect costs in accordance with U.S. generally accepted accounting principles comprising Cost of Goods Sold ("*COGS*") for such product or material, except that Starbucks shall utilize its global standard costs where local costs are not representative of long term economics and would distort profitability, as long as Kraft is not disadvantaged on a total cost

basis by the utilization of global standard costs. Schedule 1a contains a complete listing of the elements of Fully Landed Cost, a description of how the cost elements are derived (including indirect cost allocation methodologies), when they are updated, and whether any refunds shall be due to Starbucks or Kraft based upon differences between standard and actual costs. To the extent Starbucks purchases products or services from Affiliates of Starbucks, all cost components included herein shall be based on the lesser of actual costs to Starbucks or the fair market value of the component based upon the open market cost for such item in an arm's length transaction between unrelated parties. Any changes to the components and/or allocations set forth in Schedule 1a must be agreed upon in writing by Starbucks and Kraft and, once agreed, will be deemed incorporated into this Agreement upon each such agreement and will be subject to the audit rights provision in Section 7.D.

"*ICDR*" shall have the meaning assigned to it in Section 13.A.

"*Intellectual Property*" shall be defined as any and all domestic and international rights in: (i) trademarks, service marks, trade dress, logos, trade names and Internet domain names, together with all goodwill associated therewith; (ii) patents, patent disclosures, inventions and know-how; (iii) copyrights, copyrightable works and moral rights; (iv) trade secrets and confidential information; (v) other intellectual proprietary property (of every kind and nature and however designated), whether arising by operation of law, contract, license, or otherwise; and (vi) all registrations, applications, renewals, extensions, continuations, continuations-in-part, divisions or reissues of the foregoing now or hereafter in force or hereafter acquired or adopted.

"*Kraft Affiliate*" shall be defined as an Affiliate of Kraft that has been approved by Starbucks and that has executed a Country Addendum hereto in order to conduct the distribution of the Licensed Products in a particular Country, which Kraft Affiliate shall be bound by all applicable terms and conditions of such Country Addendum and of this Agreement.

"*Kraft Indemnified Parties*" shall have the meaning assigned to it in Section 11.B.

"*Kraft's P&L Statement*" shall be defined, for any period, as Kraft's statement of profit and loss for such period for the Licensed Products sold in all Authorized Channels in a particular Country, including with respect to the profit and loss realized for Licensed Products sold by any of Kraft's franchisees, licensees, distributors, Affiliates, partners, joint ventures and other such persons. The form of Kraft's P&L Statement for each Country shall be attached as part of the Country Addendum for such Country.

"*Licensed Products*" shall be defined as Tassimo Discs bearing the Licensed Trademarks and which are set forth in the Country Addenda, and which are otherwise referred to as the "Starbucks Discs."

"*Licensed Trademarks*" shall be defined as those certain valuable trademarks set forth on Schedule 1b attached hereto, or in the relevant Country Addendum, and incorporated herein (as may be amended from time to time) and any slogans, designs, devices, logos, insignias, emblems, symbols, trade dress, label designs or other proprietary identifying characteristics associated with such trademarks used in the conduct of Starbucks business.

"*List Price*" shall be defined as Kraft's published price of the Starbucks Discs, net of applicable discounts or rebates for prompt payment or volume purchase; provided, however, that the List Price shall in no event exceed the lowest price for Starbucks Discs offered by Kraft to any customer or other third party in the relevant Country.

"*Local Currency*" shall be defined as the customary currency of the relevant Country.

"*Market Withdrawal*" shall have the meaning assigned to it in Section 8.E.

"*Material Breach*" shall be defined as a breach of any representation, warranty, covenant or agreement in this Agreement which significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause significant financial, brand equity and/or other injury to the other party. Breaches of certain provisions of this Agreement have been specifically described as Material Breaches, and these specific descriptions will not preclude either party from contending, in proceedings under Section 13, that breaches of other provisions are "Material Breaches" as defined in the preceding sentence.

"*Measurement Criteria*" shall be defined as the criteria pursuant to which the Field Auditor (if any) will measure Kraft's compliance with its obligations under Section 8.

"*Minimum A&P Amount*" shall have the meaning assigned to it in Section 7.C.

"*Net Losses*" shall be defined, for any period, as the amount by which Net Profits are less than $0.

"*Net Profits*" shall be defined, for any period, as the amount reflected as Operating Contribution, before payment of any Variable Product Margin Payments to Starbucks, on Kraft's P&L Statement covering such period. The methodology for calculating Operating Contribution on Kraft's P&L Statement for each Country shall be as set forth in the Country Addendum for such Country. For the avoidance of doubt, Net Profits shall include Operating Contribution related to Passive Sales and related to sales of Licensed Products generated by Kraft Affiliates and subcontractors.

"*Non-Confidentiality Letter Agreement*" shall have the meaning assigned to it in Section 10.A.

"*Open System*" shall be defined as any coffee brewing system for which there is no patented or proprietary technology that would require a license for use or application.

"*Passive Sales*" shall be applicable only to EEA Countries, and shall be defined as sales of Licensed Products in response to unsolicited requests from retailers (including delivery of goods) outside of the Authorized Channels or outside of the Territory.

"*Relevant Period*" shall have the meaning assigned to it in Section 7.A.

"*Single Cup Beverage Machines*" shall be defined as appliances designed to produce convenient single cups of coffee, tea or other beverages, including, without limitation, Tassimo Machines, excluding any public vending machines that serve liquid beverages or food service applications.

"*Specifications*" means the in-process and finished product descriptions, methods and acceptable limits concerning the manufacture of Starbucks Discs that shall be mutually agreed upon by Kraft and Starbucks.

"*Starbucks Affiliate*" shall be defined as an Affiliate of Starbucks.

"*Starbucks Channels*" shall be defined as: (i) all Starbucks-brand retail coffee stores within the Territory that are owned or leased by, and operated by employees of, Starbucks or a wholly owned subsidiary of Starbucks; (ii) all Seattle's Best Coffee and Torrefazione Italia retail coffee stores within the Territory; (iii) all other retail coffee stores within the Territory that are operated or licensed by Starbucks or a wholly owned subsidiary of Starbucks; (iv) all cafes, coffee shops, restaurants, carts, kiosks, retail coffee stores, "fresh brew" coffee stands and similar food and beverage service establishments within the Territory (x) from which coffee, tea, or other ready to drink beverages are sold and (y) which are branded with a Licensed Trademark but not directly operated by Starbucks or its Affiliates; and (v) online channels (e.g., Cooking.com and StarbucksStore.com) within the Territory, subject to the provisions of Section 3.I.

"*Starbucks Discs*" shall have the meaning assigned to it in the definition of "Licensed Products."

"*Starbucks Indemnified Parties*" shall have the meaning assigned to it in Section 11.A.

"*Starbucks Mutual Confidentiality Agreement*" shall have the meaning assigned to it in Section 10.A.

"*Super Premium Coffee*" shall be defined as bulk, whole bean or ground coffee that is (i) traditionally sold at the highest end of the consumer coffee market in the relevant Country, (ii) with respect to a particular Country, generally priced at or above the non-promotional shelf price or price index figure set out in the relevant Country Addendum, or (iii) with respect to a particular Country, identified as "Super Premium Coffee" on the relevant Country Addendum. Coffee brands that are otherwise deemed non-Super Premium Coffee shall not be deemed Super Premium Coffee by virtue of their packaging in more expensive non-traditional forms or delivery systems, including, without limitation, filter packs, single serve pods and single serve Tassimo Discs. If Starbucks and Kraft are unable to agree on whether a particular coffee is "Super Premium Coffee" pursuant to the foregoing definition, the dispute shall be submitted to the United States Oversight Committee or the International Oversight Committee, as the case may be, for resolution. Notwithstanding the above, for the purposes of this Agreement, Tassimo Coffee Discs bearing the Starbucks or Seattle's Best Coffee Trademarks shall be deemed to contain Super Premium Coffee, and Tassimo Coffee Discs bearing the brands and trademarks owned as of the date of this Agreement by Kraft Foods

Global, Inc. or its affiliates or subsidiaries shall be deemed not to contain Super Premium Coffee, except that, in the United States and Canada only, Kraft's Gevalia brand of coffee shall be deemed to be Super Premium Coffee.

"*Supplied Products*" shall have the meaning assigned to it in <u>Section 4.A</u>.

"*Tassimo Coffee Discs*" shall be defined as all flavors and forms of pre-packaged coffee products designed to be used in Tassimo Machines.

"*Tassimo Discs*" shall be defined as all flavors and forms of pre-packaged coffee, tea or other beverage products designed to be used in Tassimo Machines.

"*Tassimo Machines*" shall be defined as the Tassimo branded appliances used to produce convenient single cups of coffee, tea and other beverages using Tassimo Discs.

"*Tassimo Packaging*" shall be defined as all packaging and other materials used in connection with the marketing, distribution and sale of the Tassimo Discs and Tassimo Machines.

"*Territory*" shall be defined as the United States of America (including Guam, the U.S. Virgin Islands, Puerto Rico and the District of Columbia and the military bases located in the foregoing geographic areas), and upon execution of the applicable Country Addendum, Canada and such other Countries as the parties may add to the Territory as evidenced by the execution of additional Country Addenda. Further clarification regarding the definition of each Country may be provided in the relevant Country Addendum.

"*Variable Product Margin Payment*" shall have the meaning assigned to it in <u>Section 7.A</u>.

"*Year*" shall be defined as the fiscal year of Starbucks which begins, for a particular year, at 12:01 a.m. on the Monday following the Sunday closest to September 30 and ends at midnight on the Sunday closest to September 30 of the following year. Unless the defined term "Year" is used, "year" shall mean any twelve-month period of time.

## 2. <u>Trademark Use</u>.

A.    <u>Grant of Right to Use</u>. On the terms and conditions of this Agreement, Starbucks hereby grants, or shall have caused the appropriate Starbucks Affiliate to grant, to Kraft, or to the appropriate Kraft Affiliate, as the case may be, on and as of the Effective Date a fully paid-up and royalty free non-transferable right (with no right to grant further rights except as set forth in this <u>Section 2</u>) to use the Licensed Trademarks solely in connection with the full exploitation of Kraft's rights and the performance of Kraft's obligations under this Agreement. No sublicense of the rights granted hereby shall be permitted or valid without the prior written consent of Starbucks. If any Kraft Affiliate undergoes a Change in Control such that it is no longer an Affiliate of Kraft, Starbucks shall have the right, upon thirty (30) days notice, to require (a) the termination of the license under this <u>Section 2.A</u> and the grant of distribution rights under <u>Section 3.A</u> with respect to such Kraft Affiliate and (b) Kraft to provide for the substitution thereof with an approved Affiliate (such approval not to be unreasonably withheld or

delayed) within thirty (30) days of receiving notice. If no substitute Affiliate satisfactory to Starbucks can be identified, then Starbucks shall have the right to terminate Kraft's rights granted in this <u>Section 2.A</u> and <u>Section 3.A</u> and with respect to any Authorized Channel or Country related to the Kraft Affiliate in question. Notwithstanding the foregoing, in the event of any sublicense or delegation of responsibility by Kraft or by a Kraft Affiliate, Kraft shall remain fully liable for the complete and timely performance of all obligations hereunder, whether or not performed, or to be performed, by Kraft, a subcontractor of Kraft, or a Kraft Affiliate. Notwithstanding the grant by Starbucks to any Kraft Affiliate of the right to use the Licensed Trademarks under this Agreement, and in addition to Kraft's obligations under <u>Sections 12.B</u> and <u>Section 17</u> with respect to each Kraft Affiliate, the parties agree that Kraft shall serve as the point of contact for communications and performance with Starbucks (other than with respect to purchase of Products under a Country Addenda, which may be handled by the relevant parties to a Country Addendum) and notice to Kraft by Starbucks shall be deemed for all purposes as notice to any Kraft Affiliate.

        B.    <u>Reservation of Rights</u>. Starbucks expressly reserves all rights relating to the Licensed Trademarks not granted to Kraft under this Agreement.

        C.    <u>Prohibition</u>. Kraft and its Affiliates shall have no right to use the Licensed Trademarks outside of the Territory, except as otherwise allowed by other agreements that may exist between Starbucks and Kraft, and shall use commercially reasonable efforts as permitted by Applicable Laws to ensure that the Licensed Trademarks are not used outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the use of the Licensed Trademarks outside of the Territory except as otherwise allowed by other agreements that may exist between Starbucks and Kraft. Nothing in this <u>Section 2.C</u> shall prevent or otherwise restrict Kraft or Kraft Affiliates from making Passive Sales of the Licensed Products within the EEA. Kraft shall have no right to use the Licensed Trademarks with respect to sales of Starbucks Discs through Kraft's Gevalia direct-to-consumer system, unless otherwise agreed in writing by Kraft and Starbucks, <u>provided</u> that this sentence shall not limit Kraft's right to use the Licensed Trademarks on or in Tassimo Packaging for Tassimo Machines sold through Kraft's Gevalia direct-to-consumer system.

        D.    <u>Marketing Principles; Brand Guidelines; Use</u>. Kraft shall have the right to use the Licensed Trademarks (i) on any Starbucks Discs, (ii) on and in any Tassimo Packaging used only in connection with Starbucks Discs and Tassimo Machines, and (iii) on and in any point of sale materials, media, online, direct-to-consumer and/or print advertising or materials used in connection with the marketing or sale of Tassimo Discs and/or Tassimo Machines, in each case in the Territory as approved in advance by Starbucks and in conformity with the applicable marketing principles set forth on <u>Schedule 2.D(1)</u>, which schedule may be modified from time to time by mutual written agreement of the parties, and the trademark use guidelines and examples set forth on <u>Schedule 2.D(2)</u>, which schedule may be modified pursuant to <u>Section 14.E</u>; <u>provided, however</u>, that Starbucks shall have the right to disapprove or prohibit any use of the Licensed Trademarks in accordance with <u>Section 2.E</u> below.

        E.    <u>Approval</u>. Starbucks shall have the right of final approval with respect to the use or application of the Licensed Trademarks, <u>provided</u> that Starbucks shall approve or reject any proposed materials of Kraft, and any use or application of a Licensed Trademark with

respect thereto, within ten (10) Business Days after receipt of such materials from Kraft, or if the nature of certain submittals (e.g., those requiring trademark clearances) requires more than ten (10) Business Days for Starbucks review, then within ten (10) Business Days of its receipt of such submittals, Starbucks will notify Kraft of its estimate for completing such review and shall use all reasonable efforts to complete its review within such time period; provided, however, that, if, after ten (10) Business Days, Kraft has received no response or communication from Starbucks, such lack of response or communication shall not be deemed an approval hereunder, but only a breach hereof.

### 3.   Manufacture and Sale of Licensed Products and Tassimo Machines; Exclusivity Obligations and Other Terms.

A.   Starbucks Grant of Right to Manufacture and Sell Licensed Products and Tassimo Machines bearing the Licensed Trademarks.   On the terms and conditions of this Agreement, including the guidelines and examples set forth on Schedule 2.D, Starbucks hereby grants, or shall have caused the appropriate Starbucks Affiliate to grant, to Kraft or to the appropriate Kraft Affiliate, as the case may be, subject to the qualifications set forth in Section 3.D(ii), (i) the exclusive right to manufacture the Licensed Products at Kraft's (or subcontractor's, if applicable) facilities anywhere in the world, and to market, distribute and sell the Licensed Products in the Authorized Channels in the Territory, and (ii) the exclusive right to manufacture anywhere in the world, including at Kraft's subcontractors, if applicable, and to market, distribute and sell in all channels (including Tassimo.com, Tassimo.ca, and any other comparable Tassimo websites for other Countries) in the Territory, Tassimo Machines bearing, on and in the Tassimo Packaging, the Licensed Trademarks; provided, however, that (a) Kraft shall not have the right to sell Licensed Products through Gevalia.com, and (b) the rights granted to Kraft hereunder with respect to direct-to-consumer, online and specialty/department store sales are non-exclusive, such that Starbucks may sell any products directly or indirectly through such channels subject to the restrictions contained in the last proviso of Section 3.D and in the provisions of Section 3.I.   The list of Licensed Products and Authorized Channels for each Country within the Territory shall be as set forth on (and further qualified by) the relevant Country Addendum.   Starbucks expressly reserves all rights not granted to Kraft under this Section 3.A, including those rights set forth in Section 3.D(ii).

B.   No Conflict with Third Party Rights.   Starbucks represents and warrants to Kraft that the grant contained in Section 3.A does not conflict with the rights of any third party in or to any product, brand or trademark included in such grant, except as otherwise set forth in the Country Addenda or in other agreements between Kraft and Starbucks.   Kraft acknowledges that the representation and warranty in the preceding sentence shall not apply to any Super Premium Coffee or tea brand that Starbucks may acquire after the date of this Agreement, and that any representation and warranty with respect to such brand will be provided, if at all, in a separate and specific representation and warranty provided in writing by Starbucks to Kraft.   Nothing in this Agreement shall be deemed to grant Kraft any rights with respect to bottled Frappuccino®, Starbucks, SBC or Tazo branded ice creams, chocolate covered espresso beans or similar goods that may contain coffee, tea or processed coffee or tea but which are not brewed to create coffee or tea beverages.

C.   Kraft Obligations for Sale of Licensed Products.  During the term of this Agreement, Kraft shall use commercially reasonable efforts, consistent with Kraft's business practices, policies, strategies, and in accordance with the terms of this Agreement and the terms of each applicable Country Addendum, to market the Licensed Products in the Authorized Channels in the Territory.  The actions taken by Kraft in connection with the manufacturing, distribution and sale of Starbucks Discs under this Agreement shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to all Tassimo Discs sold in the Authorized Channels.  Kraft represents, warrants and covenants that it will:

(i)   use commercially reasonable efforts to furnish, operate, and maintain in good working condition and suitable appearance adequate equipment, devices, and facilities for the storage, loading, transporting, unloading, and delivery of the Licensed Products;

(ii)   comply in all material respects with the warehouse operating procedures and quality control procedures that Kraft has in place for its warehousing network, and all Applicable Laws, regulations, and ordinances with respect to its handling, storage, use, sale, and distribution of the Licensed Products;

(iii)   store Starbucks Discs in such a manner as to prevent, in all material respects, migration of aromas and scents from aromatic Kraft products to such Licensed Products;

(iv)   use commercially reasonable efforts to order and maintain in its custody sufficient quantities of Licensed Products for reasonably anticipated purchases by accounts in the Authorized Channels within the Territory and the Starbucks Channels to the extent reasonably forecasted;

(v)   comply with the procedures that Kraft has in place with respect to non-saleable product and expired products;

(vi)   promptly notify Starbucks if it becomes aware that any of its accounts in the Authorized Channels are using or reselling the Licensed Products outside the Authorized Channels or outside the Territory, except as allowed via Passive Sales, or are engaged in misrepresentation or misuse of any Licensed Trademarks; and

(vii)   should Kraft or Starbucks identify unauthorized distribution or sale of the Licensed Products hereunder, cooperate with and assist Starbucks to prevent such unauthorized distribution or sales.

D.   Starbucks Exclusivity Obligations.

(i)   During the term of this Agreement, except for the rights granted by Starbucks to Kraft in this Agreement and subject to the qualifications set forth in Section 3.D(ii) below, neither Starbucks nor its Affiliates shall directly or indirectly, market, distribute or sell, or license any third party to market, distribute or sell, any Beverage

10

Discs containing Super Premium Coffee or any Single Cup Beverage Machines in the Authorized Channels in the Territory.

(ii)     Notwithstanding the provisions of <u>Section 3.D(i)</u> above, nothing in <u>Section 3.D(i)</u> or elsewhere in this Agreement shall prevent or restrict Starbucks from directly or indirectly, marketing, licensing, distributing or selling:

(a)     Licensed Products in the Starbucks Channels in accordance with this Agreement;

(b)     Beverage Discs containing Super Premium Coffee in online channels, subject to the provisions of Section 3.I;

(c)     any Single Cup Beverage Machines in the Starbucks Channels;

(d)     appliances in all channels, including the Authorized Channels and the Starbucks Channels, that are not Single Cup Beverage Machines; and

(e)     any disc, pod or machine products in food service channels or outside of the exclusive Authorized Channels or outside of the Territory.

(iii)    System Options:

(a)     In the event either party wishes to pursue an opportunity to manufacture, market, license, distribute or sell disc or pod products in connection with an Open System (an "Open System Option"), such party shall promptly notify the other party of its intention, and both parties shall then be obligated to discuss and assess in good faith the joint introduction of an Open System Option, subject to the mutual agreement of each party, which agreement shall not be unreasonably withheld.

(b)     In the event Starbucks wishes to pursue an opportunity to manufacture, market, license, distribute or sell disc or pod products in connection with a Closed System (a "<u>Closed System Option</u>"), Starbucks shall promptly notify Kraft of its intention, and, if so requested by Starbucks pursuant to such notification, Kraft shall be obligated to distribute and sell such Closed System disc or pod products hereunder, subject only to the parties reasonable and good faith determination of applicable terms, which terms shall not be materially different from those set forth in this Agreement, including with respect to payments and profits.  For the avoidance of doubt: (1) Kraft shall not be obligated to manufacture Closed System disc or pod products on terms that are not agreeable to Kraft; and (2) nothing in this Section 3.D.(iii)(b) shall serve to modify or negate Starbucks' exclusivity obligations set forth in

11

Sections 3.D.(i) and 3.D.(ii) above; provided, however, that Kraft's failure to comply with this Section 3.D.(iii)(b) shall entitle Starbucks to market, license, distribute or sell any such Closed System disc or pod products, directly or indirectly, in any and all channels, including the Authorized Channels notwithstanding, and without being deemed a breach of, any other provision of this Agreement.    Notwithstanding the above, Starbucks shall not launch, or obligate Kraft to launch, Closed System disc or pod products in the Authorized Channels prior to January 1, 2009.

E.    <u>Kraft Exclusivity Obligations</u>.    Within the Territory, during the term of this Agreement, neither Kraft nor any of its Affiliates shall directly or indirectly, distribute, market or sell, or license any third party to distribute, market or sell, any Beverage Disc containing Super Premium Coffee in the Authorized Channels, other than, notwithstanding anything to the contrary contained in the US Supply and License Agreement, (i) Licensed Products in the Authorized Channels, (ii) Licensed Products to Starbucks for sale in the Starbucks Channels, (iii) as contemplated in the US SBC-Tazo Tassimo Agreement, (iv) any Beverage Discs containing Super Premium Coffee in online, direct-to-consumer and specialty/department store channels, (v) products bearing the Gevalia trademark sold through the internet, direct mail, specialty/department stores or food service operations, or in kiosks located outside of the Authorized Channels, and (vi) products or brands that may be identified as exceptions in the Country Addenda. Notwithstanding anything to the contrary herein, nothing in this <u>Section 3.E</u> or in this Agreement shall prevent or otherwise restrict Kraft or its Affiliates from selling the Licensed Products outside the Territory (including the delivery of goods within the Territory) in direct response to unsolicited requests from retailers either inside or outside the Territory but within the EEA.

F.    <u>Distribution of Licensed Products Outside the Authorized Channels and Outside the Territory with respect to Sales Within the European Economic Area</u>.    Within the EEA, Kraft shall have no right to make Active Sales of the Licensed Products outside of the Authorized Channels or outside of the Territory.

G.    <u>Distribution of Licensed Products Outside the Authorized Channels and Outside the Territory with respect to Sales Outside the European Economic Area</u>.    Outside of the EEA, Kraft shall have no right to sell Licensed Products outside of the Authorized Channels or outside of the Territory, except as otherwise permitted by other agreements that may exist between Starbucks and Kraft. Furthermore, outside of the EEA, Kraft shall use all commercially reasonable efforts as permitted by Applicable Laws to ensure that Licensed Products are not distributed outside of the Authorized Channels or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which would be to, facilitate the distribution of Licensed Products outside of the Authorized Channels, and refraining from actions intended to facilitate the distribution of Licensed Products outside of the Territory, in each case, except as otherwise permitted by other agreements that may exist between Starbucks and Kraft.

H.    <u>Product Pricing in Authorized Channels</u>. Kraft shall have sole control of the pricing of the Licensed Products in the Authorized Channels; <u>provided</u>, <u>however</u>, that

Starbucks may recommend price levels to Kraft consistent with the brand positioning of Super Premium Coffee. Additional country-specific terms related to the pricing of the Licensed Products, if any, shall be contained in the relevant Country Addendum.

I. <u>Online and Direct-to-Consumer Channels</u>. Except as set forth in the next sentence, prior to the sale of any Licensed Products by either Starbucks or Kraft in an online or a direct-to-consumer channel, the party proposing to sell Licensed Products in such channel shall provide the other party with written notice at least 90 days prior to such sale, which notice shall include the identity of the account to which such sale will be made <u>provided</u> that Kraft shall have the right in its reasonable discretion, upon receipt of such notice, to refuse to sell to Starbucks any Starbucks Discs for use by Starbucks in any online site other than Cooking.com, StarbucksStore.com and the other comparable Starbucks owned or operated sites, and <u>provided further</u>, that the failure by Starbucks to give such notice to Kraft will not, in and of itself, be deemed to be a Material Breach, but the failure of Starbucks to provide Kraft with such notice (including the identity of any such online site) will be deemed to give Kraft a reasonable basis to refuse to sell such Licensed Products to Starbucks for sale by Starbucks in such online site. Notwithstanding the foregoing, (i) Kraft shall have the exclusive right, without prior notice to Starbucks, to sell Licensed Products through Tassimo.com and Tassimo.ca (and any other similar Tassimo websites for other Countries) and to any online sites owned, operated, licensed or authorized by (or otherwise co-branded with) a retail business primarily engaged in any exclusive Authorized Channel and (ii) Starbucks shall have the exclusive right, without prior notice to Kraft, to sell Licensed Products through Cooking.com, StarbucksStore.com and the other comparable Starbucks owned or operated sites.

## 4. <u>Product Supply.</u>

A. <u>Product Standards</u>. The actions taken by Starbucks in connection with the purchase, roasting and transportation of bulk coffee to be utilized by Kraft in the manufacture of Licensed Products under this Agreement (the "*Supplied Products*") shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to Super Premium Coffee sold in retail outlets owned, licensed or operated by Starbucks in the relevant Country. In addition, Starbucks shall cause its authorized distributors to comply with the terms of this Agreement, including but not limited to the covenants of Starbucks contained in this <u>Section 4.A</u>. Starbucks represents, warrants and covenants that it will:

(i) use commercially reasonable efforts to furnish, operate, and maintain in good working condition and suitable appearance adequate equipment, devices, and facilities for the storage, loading, transporting, unloading, and delivery of the Supplied Products;

(ii) comply in all material respects with the warehouse operating procedures and quality control procedures that Starbucks has in place for its warehousing network, and all Applicable Laws, regulations, and ordinances with respect to its handling, storage, use, sale, and distribution of the Supplied Products;

13

(iii)    store the Supplied Products in such a manner as to prevent, in all material respects, migration of aromas and scents from aromatic Starbucks products to such Supplied Products;

(iv)    use commercially reasonable efforts to order and maintain in its custody sufficient quantities of Supplied Products for reasonably anticipated volumes of purchases by Kraft hereunder;

(v)    use commercially reasonable efforts to comply with the procedures that Starbucks has in place with respect to non-saleable product and expired product; and

(vi)    should Kraft or Starbucks identify unauthorized distribution or sale of the Licensed Products hereunder, cooperate with and assist Kraft to prevent such unauthorized distribution or sales.

B.    Product Supply Prices.  Starbucks shall sell the bulk coffee to Kraft, for use by Kraft in the manufacture of Licensed Products, at a price equal to the Fully Landed Cost for such coffee, and fixed in currency of origin, as established by the Parties every six months, and determined in accordance with Schedule 1a, as modified (if at all) by the Country Addenda, plus the Variable Product Margin Payments (as defined in Section 7 below).  To the extent Starbucks purchases products or services from related parties, all cost components included in the Fully Landed Cost shall be based on the lesser of actual costs to Starbucks or the fair market value of the component based upon the open market cost for such item in an arm's-length transaction between unrelated parties.  At the end of each six month period, Starbucks shall "true-up" any and all variances between the actual and the invoiced Fully Landed Costs for such Year.  Audits of Starbucks Fully Landed Cost (including the end of Year "true-up" calculation) shall be performed as provided in Section 7.D below.

C.    Product Supply.  Starbucks will select the green coffee to be used to manufacture the bulk coffee to be utilized in the Licensed Products.  Kraft will provide Starbucks with rolling forecasts of estimated demand for Supplied Products in each Country, as set forth on Schedule 4.C, to facilitate the purchase and roasting of green coffee for ultimate sale.  The appropriate location and terms of delivery for each Country shall be subject to mutual agreement on a case-by-case basis as set forth on the relevant Country Addendum.  Starbucks shall send to Kraft or the appropriate Kraft Affiliate an invoice setting forth amounts, in currency of origin, owed by Kraft or the appropriate Kraft Affiliate to Starbucks, concurrently with each shipment of Supplied Products.  Kraft or the appropriate Kraft Affiliate shall remit payment to Starbucks, by wire transfer of immediately available funds, of all amounts due under any such invoice within thirty (30) days after receipt of such invoice by Kraft or receipt of Supplied Products, whichever is later, as long as the goods received match the invoice and subject to any other customary verification.

D.    Future Supply Arrangements.  Schedule 4.C sets forth the procedures for Kraft or the appropriate Kraft Affiliate to communicate with Starbucks with regard to demand forecasts.

14

E.    Starbucks Disc Production and Delivery Obligations.  Additional terms and conditions applicable to the production and delivery of Starbucks Discs are set forth on Schedule 4.E.

F.    Product Warranties of Kraft.  Kraft warrants and represents that:

(i)    All Starbucks Discs tendered for delivery will be free from material defects and will be merchantable food products suitable for human consumption in the manner in which such food is normally or reasonably foreseeably consumed;

(ii)    The Starbucks Discs tendered for delivery shall, at the time Starbucks accepts ownership of such products, not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "*FDCA*"), or any similar applicable state or municipal law in the Territory, and shall not be considered articles which may not, under the provision of Section 404 of the FDCA, be introduced into interstate commerce; and

(iii)    The Starbucks Discs shall have been manufactured and delivered in all material respects in accordance with the Specifications and all Applicable Laws.

G.    Product Warranties of Starbucks.  Starbucks warrants and represents that:

(i)    All Supplied Products tendered for delivery to Kraft will be free from material defects and will be merchantable food products suitable for human consumption in the manner in which such food is normally or reasonably foreseeably consumed;

(ii)    The Supplied Products tendered for delivery to Kraft shall, at the time Kraft accepts ownership of such products, not be adulterated or misbranded within the meaning of the FDCA, or any similar applicable state or municipal law in the Territory, and shall not be considered articles which may not, under the provision of Section 404 of the FDCA, be introduced into interstate commerce; and

(iii)    The Supplied Products supplied to Kraft under this Agreement shall have been manufactured and delivered in all material respects in accordance with all Applicable Laws and regulations and the Specifications.

H.    Intellectual Property of Kraft; Representations and Warranties.

(i)    Any material conceived, created, developed and/or provided by Kraft (including all slogans, branding and marketing ideas) relating to Tassimo Discs or Tassimo Machines, and all Intellectual Property rights therein (other than trademarks owned by Starbucks contained therein), shall be considered Confidential Information and pre-existing Intellectual Property of Kraft.

(ii)    Kraft represents and warrants to Starbucks that:  (a) Kraft has all Intellectual Property and other rights sufficient to grant to Starbucks the rights described in this Agreement; (b) Kraft has not, as of the Effective Date, entered into any enforceable agreement with, or granted any rights whatsoever, that would be in conflict

15

in any material respect with the rights granted to Starbucks hereunder; (c) as of the Effective Date, no claims have been made and no proceedings have been brought or threatened, against Kraft or any of its Affiliates in the Territory, challenging the ownership, validity or improper use of Kraft's Intellectual Property in the Tassimo Discs and Tassimo Machines; (d) to the knowledge of Kraft, the exercise by Starbucks of its rights to sell Starbucks Discs in accordance with this Agreement shall not violate the Intellectual Property or other rights of any person or entity, except to the extent any such violation is based on the use by Starbucks of any of the Licensed Trademarks or pre-existing Intellectual Property of Starbucks; and (e) to the knowledge of Kraft, the Intellectual Property of Kraft applicable to the Tassimo Discs does not infringe or violate the Intellectual Property rights of any third party, except as set forth on Schedule 4.H. Starbucks reserves the right to return any Tassimo Discs where a claim is made that Starbucks sale or use of such goods infringes any alleged patent, design, trade name, trademark, copyright or other Intellectual Property right of a third party.

I.     Intellectual Property of Starbucks; Representations and Warranties.

(i)     Any material conceived, created, developed and/or provided by Starbucks (including all slogans, branding and marketing ideas) relating to Starbucks Discs, and all Intellectual Property rights therein (other than trademarks owned by Kraft contained therein), shall be considered Confidential Information and pre-existing Intellectual Property of Starbucks. Any such Intellectual Property shall be deemed to be Licensed Trademarks and licensed to Kraft, its Affiliates and its manufacturers and distributors in accordance with the terms of this Agreement.

(ii)     Starbucks represents and warrants to Kraft that Starbucks has the right, pursuant to a Trademark Protection and License Agreement, dated September 28, 1997, with Starbucks U.S. Brands L.L.C. (the successor by merger to Starbucks U.S. Brands Corporation), to use and sublicense the Licensed Trademarks in the manner contemplated by this Agreement and that it has and will continue to have throughout the term of this Agreement all requisite authority to enter into and perform its obligations under this Agreement. Starbucks further represents and warrants to Kraft that (a) Starbucks has all Intellectual Property and other rights sufficient to grant to Kraft the rights described in this Agreement; (b) Starbucks has not, as of the Effective Date, entered into any enforceable agreement with, or granted any rights whatsoever, that would be in conflict in any material respect with the rights granted to Kraft hereunder; (c) as of the Effective Date, no claims have been made and no proceedings have been brought or threatened, against Starbucks or any of its Affiliates challenging the ownership, validity or improper use of Licensed Trademarks or other Intellectual Property with respect to which Starbucks has granted rights to Kraft hereunder; and (d) to the knowledge of Starbucks, Kraft's exercise in the Authorized Channels of its rights to sell Tassimo Discs and Tassimo Machines packaging bearing the Licensed Trademarks in accordance with this Agreement shall not violate the Intellectual Property or other rights of any person or entity, except to the extent any such violation is based on Kraft's use of any of the pre-existing Intellectual Property of Kraft. Kraft reserves the right to return any Supplied Products where a claim is made that Kraft's sale or use of such goods infringes any

16

alleged patent, design, trade name, trademark, copyright or other Intellectual Property right of a third party.

J.     <u>Product Supply Prices for Starbucks Discs Sold to Starbucks</u>.  Starbucks shall have the right, but not the obligation, to purchase from Kraft the Starbucks Discs for sale in the Starbucks Channels.  Except as otherwise provided in <u>Section 3.I</u> with respect to online channels, Kraft shall sell the Starbucks Discs to Starbucks for sale in the Starbucks Channels at a price equal to the List Price for such discs.  Sales of Starbucks Discs by Kraft to Starbucks shall be subject to such additional terms and conditions as may be reasonably agreed by the parties with respect to the implementation of the vendor relationship between Kraft and Starbucks.

## 5.     **Term and Termination.**

A.     <u>Term</u>.  This Agreement shall commence as of the date set forth in the recitals hereto and continue through December 31, 2010 (the "*Expiration Date*"), unless sooner terminated pursuant to the terms of this Agreement.  This Agreement shall be renewed automatically for an additional period of five (5) calendar years if the amount of Net Revenue, as shown on Kraft's P&L Statement for the United States only, for the twelve (12)-month period ended December 31, 2010 is equal to or greater than $9 million.  Unless otherwise agreed in writing by the parties, no Country Addendum will extend beyond the term of this Agreement, such that each Country Addendum shall remain in effect only so long as this Agreement remains in effect.  In the event the parties do not renew this Agreement, neither party shall have any liability for termination or otherwise resulting from such non-renewal, and the parties shall cooperate to wind down the business contemplated by this Agreement and shall act in good faith to make an orderly transition pursuant to the terms of <u>Section 6</u>.

B.     <u>Termination</u>.  This Agreement may be terminated in its entirety, or, with respect to a specific Country or Countries and corresponding Country Addendum or Country Addenda, prior to the expiration of the term hereof or thereof, as set forth below; <u>provided, however</u>, that, with respect to items (ii) and (iii) below, a terminating party shall seek to terminate only one or more Country Addenda if the cause or impairment is reasonably confined to one or more specific Countries and is not likely to cause significant financial, brand equity or other such impact to the terminating party outside of such Country or Countries.  As such, this Agreement is subject to termination:

(i)     In its entirety, or with respect to a particular Country and corresponding Country Addendum, by mutual written agreement of Starbucks and Kraft.

(ii)     In its entirety, or with respect to a particular Country and corresponding Country Addendum, by either party, upon a Material Breach of this Agreement, including any Country Addendum, by the other party, or the other party's Affiliate (as the case may be), which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach.

(iii)     In its entirety, or with respect to a particular Country and corresponding Country Addendum, by either party, in the event of insolvency or bankruptcy of the other party, if such condition is not cured within sixty (60) days.

17

(iv)    In its entirety, or with respect to a particular Country and corresponding Country Addendum, by either party, in the event of an assignment of this Agreement by the other party in violation of <u>Section 12.B</u>.

(v)    By either party, upon a Change of Control of the other party.

(vi)    By either party if the US Supply and License Agreement is terminated pursuant to <u>Section 5.A</u> thereof.

(vii)    With respect to a particular Country and corresponding Country Addendum, by either party, if the International Supply and License Agreement is terminated with respect to such Country and corresponding Country Addendum thereto.

(viii)    By Starbucks upon the closing of a sale or disposition by Kraft of all or substantially all of the Tassimo business to an independent third party.

(ix)    By Starbucks if, with respect to any claim or legal proceeding alleging violation or infringement of a third party's patentable Intellectual Property arising from the production, sale or use of Tassimo Machines or Tassimo Discs: (1) a plaintiff obtains a preliminary injunction against Kraft or Starbucks enjoining the production, sale or use of Tassimo Machines or Tassimo Discs that is not lifted or vacated within ten (10) Business Days after its effective date; (2) a plaintiff, regardless of whether any injunction is sought, prevails in a final judgment against Kraft or Starbucks; (3) such claim or legal proceeding causes a material disruption to Kraft's conduct of the Tassimo business or to Kraft's performance of its obligations hereunder; or (4) such claim or legal proceeding has a material adverse effect upon the brand equity of Starbucks.

**6.    Post-Termination Rights and Obligations.**

A.    <u>Transition Between Kraft and Starbucks</u>.  Subject to <u>Section 6.B</u> below, upon termination of this Agreement, in its entirety or with respect to a particular Country, (i) Kraft shall have the right to use, for a period of three (3) months from such date of termination, any and all of the Supplied Products that remain in Kraft's inventory on the date of expiration or termination of this Agreement, (ii) Kraft shall have the right to sell, for a period of six months from such date of termination, the finished inventory of Starbucks Discs that remains in Kraft's possession on the date of termination of this Agreement and the finished inventory created by use of the Supplied Products referenced in subsection (i) above, and (iii) Kraft shall retain all accounts receivable generated by its sales of Starbucks Discs under this Agreement.  During any post-termination transition period, the marketing, distribution or sale by Kraft of any Starbucks Discs shall be subject to all applicable terms and conditions of this Agreement, including the pricing obligations set forth in <u>Section 3.H</u> and the payment obligations set forth in <u>Section 7</u>, but excluding the provisions set forth in <u>Section 3.D</u> and <u>Section 3.E</u>; <u>provided</u> that in the event of termination hereunder, all retail inventory of Starbucks Discs and Tassimo Machines held by third parties as of the date of termination of this Agreement may be sold in the ordinary course of business and nothing herein shall require Kraft to recall products from any third party.  For the avoidance of doubt, in the event a particular Country Addendum is terminated, the corresponding

18

Country shall no longer be considered part of the Territory hereof, subject to the terms of this Section 6.

B.     Orderly Transition. Starbucks and Kraft shall act in good faith to make an orderly transition for the sale of Starbucks Discs following termination of this Agreement in its entirety or with respect to a particular Country.  Kraft and Starbucks shall use their best efforts to allow the Starbucks Discs remaining in the Authorized Channels in each relevant Country to be sold in the ordinary course of business of the particular retail outlets in the Authorized Channels in which such Starbucks Discs remain.

C.     Trademark Use.  Following termination of this Agreement for any reason, Kraft shall discontinue its use of the Licensed Trademarks on Tassimo Discs and Tassimo Packaging, except (i) as permitted under the US SBC-Tazo Tassimo Agreement and (ii) for the limited use of Licensed Trademarks on all existing Tassimo Packaging and collateral marketing materials existing at the time of termination as are reasonably necessary to effect an orderly transition and otherwise as permitted herein (but in no event shall such use continue for a period longer than six (6) months).  Following such termination, Starbucks shall be permitted to use or license the Licensed Trademarks on any similar products without restriction, except as restricted by the US Supply and License Agreement, the US SBC-Tazo Tassimo Agreement and the International Supply and License Agreement, each as in effect from time to time.

D.     Fair Market Value.  In the event of the termination of the US Supply and License Agreement pursuant to Section 5.B(ii) thereof, the Fair Market Value of the US Supply and License Agreement (as defined therein) shall not include the value of this Agreement.

### 7.     Payments, A&P, Audits, Reports, Records and Taxes

A.     Variable Product Margin Payments for Authorized Channels.  During the term of this Agreement, Kraft shall make payments (each, a "*Variable Product Margin Payment*") to Starbucks in Local Currency, separately for each relevant Country, unless otherwise agreed, on a quarterly basis for each Country as provided in the relevant Country Addendum (the "*Relevant Period*") each in an amount equal to [REDACTED] of Net Profits for such Relevant Period; *provided, however,* that (i) in any Year, Kraft may carry forward Net Losses from any quarterly period during such Year to offset Net Profits in any future Relevant Period during the same Year and (ii) if, after application of prior Net Losses during any Year, the Net Profits for any Relevant Period is calculated to be a negative number, then the Variable Product Margin Payment attributable to Net Profits for such Relevant Period shall be zero.  For the avoidance of doubt, if in the first quarter of the first full Year of the Term there is a Net Loss, such Net Loss can be applied to offset any Net Profits during the second, third and/or fourth quarters of such Year. At the end of each Year, Kraft and Starbucks will conduct a "true-up" of the total Variable Product Margin Payments made during such Year. If the total of Variable Product Margin Payments made to Starbucks for that Year is greater than [REDACTED] of the total Net Profits for that Year, then Kraft may credit the excess of Variable Product Margin Payments made to Starbucks over [REDACTED] of Net Profits against Variable Product Margin Payments to be made to Starbucks during the subsequent Year.  For the avoidance of doubt, if Net Profits for any Year are calculated to be zero, then Kraft may credit the amount of all Variable Product Margin Payments made to Starbucks during that Year against Variable Product Margin Payments to be

made to Starbucks during the subsequent Year. Except as provided herein, in no event shall Net Losses from one Year be carried forward by Kraft to offset Net Profits in any subsequent Year. All Variable Product Margin Payments shall be made by wire transfer of immediately available funds within fifteen (15) days after the end of the Relevant Period in the United States, or thirty (30) days outside of the United States. Kraft in each Country shall retain for its own account all Net Profits not required to be distributed to Starbucks in any Relevant Period pursuant to the foregoing provisions.

      B.    <u>Additional Payments</u>.:

      (i)    <u>Guaranteed Payments</u>. In addition to the payments contemplated above, during the term of this Agreement, Starbucks shall be entitled to receive from Kraft, and Kraft shall pay to Starbucks, two separate payments of REDACTED REDACTED each, on each of February 15, 2008 and February 15, 2009 by wire transfer of immediately available funds. No additional guaranteed payments shall be made by Kraft in connection with this Agreement or in connection with the marketing, sale and distribution of Starbucks Discs, whether for new countries in addition to the United States and Canada, or for new channels such as foodservice. Notwithstanding the prior sentence, neither Kraft nor Starbucks shall be obligated to expand this Agreement to include any additional countries or channels.

      (ii)    <u>Milk-Based Payment</u>. In addition to the payments contemplated above, if, on or before December 31, 2008, Starbucks and Kraft have added a Starbucks-branded milk-based product (including a cappuccino or latte beverage) to the Licensed Products, then Kraft shall pay to Starbucks, within 60 days after the introduction of such product in the Authorized Channels, REDACTED by wire transfer of immediately available funds.

      C.    <u>Minimum A&P for Starbucks Tassimo Program</u>. Unless otherwise agreed in the Country Addendum, Kraft shall spend, at a minimum, an amount equal to REDACTED of annual net sales of Licensed Products in the Authorized Channels in the Territory (at the invoice selling price minus actual returns and allowances) on A&P per calendar year (the "*Minimum A&P Amount*"); <u>provided</u>, <u>however</u>, that any amount expended by Kraft in satisfaction of the Minimum A&P Amounts must display or otherwise relate to the Licensed Trademarks or Licensed Products, and furthermore, that any shortfall (up to 10%) in spending may be remedied by payment to Starbucks of the shortfall amount within thirty (30) days of the year end.

      D.    <u>Audits</u>. During the term of this Agreement, and for the year immediately following termination of this Agreement, each party shall have the right to conduct an annual audit of the books and records of the other party after the end of each fiscal year of the party being audited, <u>provided</u> that (i) such audit shall be scheduled so as to not interfere with the other party's year-end closing activities; (ii) such audit is preceded by a procedures report which sets out to the audited party what scope and focus the audit is intended to cover and (iii) such audit shall exclude the review of proprietary or confidential information that is outside the scope or purpose of the audit contemplated by this Agreement, including with respect to blend information and other such intellectual property. The party requesting the audit may conduct the audit using its own internal auditing department, or at its option, a nationally recognized auditing firm selected by such party (the "*Auditor*") to confirm (i) in the case of Kraft, the accuracy of

Starbucks calculation of Fully Landed Costs, and (ii) in the case of Starbucks, the accuracy of Kraft's calculation of the Variable Product Margin Payments. Such audits shall be made with particular reference to all applicable terms of this Agreement and the relevant Country Addenda. Kraft and Starbucks shall each bear their own audit costs. All records of Kraft and Starbucks as may reasonably be necessary to verify the audit will be made available to the other party's Auditor upon its request. The Auditor's determination shall be in writing and delivered within 90 days after the completion of the applicable party's audit and shall be conclusive and binding upon Kraft and Starbucks (the "*Final Determination*"), unless contested in writing by the other party within fifteen (15) days following its receipt of the audit report. If the Final Determination indicates any errors in (x) Starbucks calculation of Fully Landed Cost, or (y) Kraft's calculation of the Variable Product Margin Payments attributable to the sale of Licensed Products through all Authorized Channels during such year, then the Auditor shall calculate the net amount of a payment to be made by Starbucks or Kraft, as applicable, to correct such errors, which payment shall be made by either Starbucks or Kraft, as applicable, within thirty (30) days after such determination; provided, however, that no retroactive payment shall be made with respect to any period which is more than eighteen (18) months prior to the commencement of the audit in which such errors are first identified. In addition, no party shall be required to make a payment if, and only to the extent, it disputes the audit results, in which case the audit dispute will be submitted to the US Oversight Committee or the International Oversight Committee, as the case may be, for resolution. If the relevant Oversight Committee is unable to resolve the dispute, the matter shall be resolved in accordance with the dispute resolution provisions of <u>Section 13</u>.

   E. <u>Business Reports</u>. Each of Kraft and Starbucks shall render the following business reports to the other party, no later than ten (10) days after the end of each calendar month or calendar quarter (or covering such other period, with delivery at such other intervals, as specifically set forth below):

    (i) Kraft shall render reports with the following information on a Country basis in a form reasonably satisfactory to Starbucks:

     (a) unit sales and gross sales of Licensed Products in the Authorized Channels by Licensed Trademark during the month delivered within three (3) Business Days following the end of the applicable month, except for such sales in online channels, which Kraft will provide within ten (10) Business Days following the end of the applicable month, but for which Kraft will provide a forecasted figure within two (2) Business Days following the end of the applicable month;

     (b) Kraft's P&L Statement for the month;

     (c) a computation of the Variable Product Margin Payments (per <u>Section 7.A</u>) paid to Starbucks during the month, if any; and

     (d) Kraft's analysis of business results (i.e., reports or studies prepared by Kraft's Marketing Services Department, Sales Division or Coffee Division) of the Licensed Products for the quarter, in a form reasonably adequate to inform Starbucks of the state of Kraft's

21

business contemplated by this Agreement. (Starbucks may, in its reasonable discretion, request more frequent updates of this analysis, to the extent such analysis is available in the ordinary course of Kraft's business).

(ii)   Starbucks shall render reports with the following information on a Country basis in a form reasonably satisfactory to Kraft:

(a)   unit sales and gross sales of Starbucks Discs in the Starbucks Channels by Licensed Trademark during the month, if applicable; and

(b)   Kraft may, in its reasonable discretion, request analysis of business results related to the Licensed Products to the extent such analysis is available in the ordinary course of Starbucks business.

F.   <u>Records</u>.   Each of Kraft and Starbucks shall maintain for a period consistent with such party's normal retention practices, complete and accurate records and accounts covering the transactions related to this Agreement. Such records and accounts shall be kept in accordance with U.S. generally accepted accounting procedures and principles.

G.   <u>Taxes</u>.  Each party shall be responsible for paying taxes as set forth on the relevant Country Addendum.

## 8.   **Quality; Compliance; Packaging.**

A.   <u>Starbucks Quality Obligations</u>.   Starbucks shall use all commercially reasonable efforts to ensure that the Supplied Products will be of high quality consistent with the quality of the products of Starbucks sold outside the Authorized Channels. All Supplied Products shall be manufactured, packaged, labeled, stored and shipped in compliance with all Applicable Laws and regulations. Starbucks will provide Kraft with such samples of Starbucks coffee products as Kraft may reasonably request. Starbucks shall permit a third party inspector designated by Kraft to inspect any premises on which the Supplied Products are manufactured, packaged, labeled, stored or shipped; provided, however, that any such inspection by Kraft's inspector pursuant to this <u>Section 8.A</u> may be undertaken only to verify compliance with all Applicable Laws and regulations, and Kraft shall require any person conducting such an inspection to execute an appropriate confidentiality agreement with Starbucks.

B.   <u>Kraft's Quality Obligations</u>.  Kraft shall use all commercially reasonable efforts to ensure that the Licensed Products manufactured, distributed and sold by Kraft will be of high quality and will be consistent with their Super Premium Coffee brand positioning. Kraft will observe the shelf life policies of Starbucks for the Licensed Products, which shelf-life policies shall be 34 weeks initially. Upon completion of the joint shelf life studies being conducted as of the date of this Agreement by Starbucks and Kraft, the shelf-lives for the Licensed Products may be increased by the parties in accordance with the results of such studies. Kraft shall ensure that code dates on packages of Starbucks Discs that permit the calculation of the date when such products should be removed from retail stores due to age appear on the exterior of the package.

22

      C.     <u>Starbucks Approval of Product Display in Authorized Channels</u>. Starbucks and Kraft shall cooperate to develop practices and procedures to be followed for the display of the Licensed Products in the Authorized Channels, including the Measurement Criteria described below in <u>Section 8.H</u>, which practices and procedures shall be consistent with the approved Super Premium Coffee brand positioning of the Licensed Products and the brand equity of Starbucks.

      D.     <u>Consumer Complaints</u>.  Kraft shall place a toll-free consumer hotline telephone number or related web URL dedicated to matters concerning Tassimo Machines and Tassimo Discs (including Starbucks Discs) on the packaging of such products.  All consumer calls regarding Starbucks Discs or Tassimo Machines placed to a Starbucks consumer hotline shall be referred to such Tassimo consumer hotline telephone number or related web URL. Starbucks shall provide to Kraft basic information about the blends and characteristics of coffee provided in the Starbucks Discs, and Kraft shall communicate such information to customers who use the hotline telephone number to inquire with respect to such blends and characteristics. Kraft shall use commercially reasonable efforts to educate the individual(s) handling any consumer hotline on behalf of Kraft as to the basic blends and characteristics of the coffee contained in the Starbucks Discs, as provided by Starbucks pursuant to this section.  Each of Kraft and Starbucks shall provide the other party with a quarterly log of all positive and negative incidents or consumer complaints received by it relating to the Licensed Products.  Kraft shall immediately notify Starbucks of any consumer or product quality issues with respect to the Licensed Products that are brought to Kraft's attention.  Starbucks shall immediately notify Kraft of any consumer or product quality issues with respect to the Licensed Products that are brought to Starbucks attention.

      E.     <u>Recalls and Withdrawals</u>. Either party may initiate a recall or a market withdrawal ("*Market Withdrawal*") of the Licensed Products due to contamination, adulteration or public health risk.  If the purported reason for the Market Withdrawal turns out to be unfounded, the party that initiated the Market Withdrawal shall bear all costs related thereto. Starbucks will bear all costs related to any Market Withdrawal of the Licensed Products that results from contamination or adulteration of the Supplied Products in, or a public health risk that is attributable to the purchase, roasting and transportation of bulk coffee or while the Supplied Products were otherwise in the physical control of Starbucks or Starbucks agents or subcontractors.  Kraft will bear all costs related to any Market Withdrawal of the Licensed Products that results from contamination or adulteration of the Licensed Products, or public health risk that arises, after such Supplied Products have been delivered by Starbucks to Kraft or its agent, Affiliate or subcontractor, unless the cause of such contamination, adulteration or public health risk is attributable to a time before the Supplied Products were delivered to Kraft or its agent, Affiliate or subcontractor.  In the event the parties are unable to determine when the contamination or adulteration of the Licensed Products occurred, the parties shall share all initial costs related to any Market Withdrawal of the Licensed Products, and the parties shall negotiate in good faith to arrive at an equitable division of the costs associated with such Market Withdrawal, with reimbursement of the appropriate party not responsible for the contamination. Starbucks will notify Kraft if any contamination, adulteration, or public health issues arise outside the Authorized Channels that are likely to have a material impact on Kraft's sales of the Licensed Products in the Territory.   Kraft will notify Starbucks of any contamination, adulteration or public health issues that arise, and that Kraft becomes aware of, while the

Licensed Products in question are in the custody and control of a retail customer. In the event of a Market Withdrawal, upon request by Kraft or Starbucks, the other party shall provide all requested traceability information within twenty-four (24) hours of such request.

      F.     Compliance. Kraft shall manufacture, market, sell and distribute the Licensed Products, and require that its subcontractors manufacture, market, sell and distribute the Licensed Products and otherwise conduct its and their respective businesses, in full compliance with Applicable Laws; provided, however, Kraft shall not be liable for non-compliance with Applicable Laws resulting from Starbucks failure to comply with its obligations to purchase, roast and ship the Supplied Products (per Section 4) in accordance with such Applicable Laws. Kraft shall, at its expense, obtain and maintain any necessary licenses and permits that Applicable Laws require in connection with its activities under this Agreement. Kraft shall provide Starbucks with such applicable certification or other documentation evidencing compliance that Starbucks may from time to time reasonably request. If Kraft becomes aware that any provision of this Agreement conflicts with Applicable Laws, Kraft shall provide prompt written notice of such conflict to Starbucks, and Starbucks and Kraft shall negotiate in good faith to modify the applicable provision to comply with Applicable Laws. Without limiting the generality of the foregoing, Kraft shall:

      (i)     comply with, and assist Starbucks in complying with, the Anti-Terrorism Laws (to the extent required or permissible under the Applicable Laws of each Country);

      (ii)     ensure that the Licensed Products will be exported and imported by Kraft or its Affiliates in full compliance with all applicable import and export control laws, including ensuring that no Licensed Products are, directly or indirectly, used, exported or re-exported by Kraft or its Affiliates in any manner contrary to the export laws and regulations of the United States of America or of any Country in the Territory; and

      (iii)     take no action that would violate or subject Starbucks to penalties under the U.S. Foreign Corrupt Practices Act or the OECD Anti-bribery Convention, including directly or indirectly through a third-party intermediary paying or providing, or offering to pay or provide, any monies or other items of value (including, e.g., gifts, meals, contracts, entertainment, employment, hospitalities, and sponsorships that are not permitted by the U.S. Foreign Corrupt Practices Act, the OECD Anti-bribery Convention or other Applicable Law) to (a) an officer or employee of a governmental department, agency, instrumentality (including a government-owned commercial enterprise) or public international organization, or any person acting on behalf of any such entity; or (b) any political party or official thereof or any candidate for political office, in order to obtain, retain or direct business to any person.

      G.     Labeling and Packaging. Except as set forth in the relevant Country Addendum:

      (i)     Kraft will be responsible for ensuring that the Licensed Products comply with all regulatory packaging and labeling requirements in each Country within the Territory; and

(ii)     Within the EEA, Kraft's packaging and labeling obligations under this Section 8.G are limited only to those requirements applicable to Active Sales of the Licensed Products for the Country in question.

H.     Measurement Criteria and Field Audits.

(i)     Measurement Criteria.  Commencing in calendar year 2008, in connection with the field audits conducted under the US Supply and License Agreement for the Territories covered by such agreement and under the International Supply and License Agreement for the others, the parties shall retain the Field Auditor to conduct audits of in-store conditions of the presentation of Starbucks Discs in the Authorized Channels for the same stores that are being audited under the US Supply and License Agreement or the International Supply and License Agreement, as applicable, to the extent such stores sell Starbucks Discs.  Set forth on Schedule 8.H or in the relevant Country Addenda are the Measurement Criteria for the Starbucks Discs, the actions the parties have agreed to undertake in the event the Measurement Criteria are not satisfied, and the means by which the parties will agree upon changes to the Measurement Criteria.

(ii)     Costs and Conduct of Field Audits.  Each of the parties shall pay 50% of the costs of the field audits for the Starbucks Discs hereunder.  Starbucks and Kraft agree to review the performance of the Field Auditor, change the methodology and, pursuant to the terms of the US Supply and License Agreement or the International Supply and License Agreement, as applicable, the Field Auditor as may be reasonably necessary from time to time to help ensure that such audits continue to be conducted efficiently and accurately.  In the event a party desires to change the then-current audit methodology or the then-current Field Auditor, it will notify the other party in writing of its proposed changes.  The other party will not unreasonably withhold its consent to such proposed changes.  If the parties are unable to agree on the proposed changes, the issues shall be submitted to the United States Oversight Committee or International Oversight Committee, as applicable, for resolution.  If the United States Oversight Committee or International Oversight Committee, as applicable, is unable to resolve the issue, it shall be resolved pursuant to the dispute resolution provisions of Section 13.

(iii)     Field Audit Results.  If a field audit indicates that Kraft has failed to meet or exceed the then-current Measurement Criteria, the parties shall undertake the actions described in Schedule 8.H, provided, however, that failure to meet or exceed the Measurement Criteria alone shall not be the basis for a claim of Material Breach under Section 5.A(ii) or any other Section of the Agreement, provided further that the foregoing shall not affect or limit the obligation of Kraft to develop and pursue in good faith an Action Plan as provided in Schedule 8.H.

9.     **Marketing Efforts**

A.     Brand Management Team.  Kraft's Tassimo brand management team, the initial members of which are set forth on Schedule 9 attached hereto, shall have responsibility for the brand strategy and brand development of the Tassimo brand, including the Licensed Products.  Kraft may change its designated members of the Tassimo brand management team

upon notice to Starbucks, and Schedule 9 will be amended from time to time to reflect such changes.

B.     Management of the Agreement.  Subject to Section 2 hereof, Kraft shall keep Starbucks fully informed of its promotional plans for the Licensed Products, in particular, with respect to packaging design and planned advertising, including, prior to the commencement of each calendar year, presenting Starbucks with Kraft's proposed Tassimo marketing plan. Notwithstanding the foregoing, Kraft shall have the right to continue with any planned advertising or brand strategy that does not use the Licensed Trademarks, unless otherwise determined by the United States Oversight Committee or the International Oversight Committee, as applicable.  Kraft will provide Starbucks the reasonable opportunity to be involved in all significant brand and sales planning and sales presentations for Licensed Products, and will consider in good faith all recommendations and suggestions made by Starbucks with respect thereto. Starbucks from time to time in its reasonable discretion will designate the employees to be dedicated (both full and part time) to the distribution and promotion of the Licensed Products in the Authorized Channels.  Kraft and Starbucks will use reasonable efforts to cooperate to ensure regular and open communication between their management teams. Without limiting the generality of the preceding sentences, Kraft will keep the United States Oversight Committee and the International Oversight Committee apprised of the status of development of new Licensed Products.

C.     Oversight Committees.   The roles of the United States Oversight Committee and the International Oversight Committee will include: (a) reviewing annual profit targets as part of a long range business plan (to be developed by Kraft, with input from Starbucks); (b) providing guidance on strategic issues and opportunities; (c) reviewing new business opportunities; (d) reviewing and approving any proposed changes to Schedule 1a or the form of Kraft's P&L Statement for any Country; and (e) providing a forum to resolve issues that are not able to be resolved at lower levels.

D.     Submission to United States Oversight Committee or International Oversight Committee.   In the event Starbucks and Kraft are unable to agree on a brand positioning strategy for the Licensed Products for a particular Country, Kraft may submit such matter to the United States Oversight Committee or the International Oversight Committee, as applicable, which shall use its best efforts to resolve such disagreement; *provided, however*, that, in no event will Kraft pursue a significant brand strategy for the Licensed Products that has not been approved by Starbucks.

E.     Oversight Committee Meetings.

(i)     Each of the United States Oversight Committee and the International Oversight Committee shall meet at a minimum (a) once per calendar year to review and discuss annual profit targets and the long range business plan, and (b) once per calendar quarter to resolve all other matters set forth in this Section 9.E.

(ii)     Additional meetings and additional key employee participants may be initiated by either party when any new products or significant business initiatives are contemplated.

(iii)    Meetings will be held at appropriate Kraft and Starbucks sites, unless otherwise agreed to by the parties.  Each party shall use its best efforts to secure the attendance of all other appropriate participants, including from outside agencies, at such meetings to ensure a full understanding of the parties' respective businesses and cultures.

(iv)    Each party shall appoint a primary contact person who shall act as the principal point of contact (outside of meetings of the United States Oversight Committee and the International Oversight Committee) with the other party.  The parties will consul with each other regarding who will serve as the primary contact person, and each party will select a primary contact person who is satisfactory to the other party.  Kraft's primary contact person shall be the Vice President, North America Tassimo and Gevalia.  Starbucks primary contact person shall be the Vice President, Global Consumer Products.

(v)    Final decisions of the United States Oversight Committee and the International Oversight Committee shall be made by unanimous consent.  If unanimous consent of the United States Oversight Committee or the International Oversight Committee cannot be obtained either to affirmatively decide a matter or to table such matter, then such matter shall be subject to resolution as provided in Section 13.

### 10.    Confidentiality.

A.    Confidential Information.  All of the information communicated to either party by the other party in connection with this Agreement, including information concerning equipment, processes, Tassimo Discs, Tassimo Machines, data compilation and analysis (including the information set forth on Exhibit A and Exhibit B to the letter agreement between Kraft and Starbucks dated June 28, 2006 (the "*Non-Confidentiality Letter Agreement*")), shall be governed by and subject to the confidentiality provisions of (i) the Starbucks Mutual Confidentiality Agreement by and between Starbucks and Kraft dated as of May 25, 2006, as amended by the US SBC-Tazo Tassimo Agreement (the "*Starbucks Mutual Confidentiality Agreement*") and (ii) the Non-Confidentiality Letter Agreement.

B.    Non-Solicitation.  During the term of this Agreement, and for a period of one (1) year following expiration or termination of this Agreement, neither party shall employ or make an offer of employment to any employee of the other party who is or has in the prior year been involved significantly in the business which is the subject of this Agreement.  The restrictions of this Section 10.B shall apply only to Kraft and Starbucks.

### 11.    Indemnification.

A.    Kraft's Indemnity.  Kraft hereby indemnifies Starbucks, and undertakes to defend and hold Starbucks, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns (the "*Starbucks Indemnified Parties*"), harmless from and against:

(i)    any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Starbucks Indemnified Parties, arising out of any and all product liability claims and/or any other actions involving Licensed Products where such claims are a

27

result of the negligence or intentional acts of Kraft or of Kraft's Affiliates, agents or subcontractors, except to the extent of claims that Kraft's use of any of the Licensed Trademarks or other Intellectual Property of Starbucks in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(ii) any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Starbucks Indemnified Parties, arising out of Kraft's breach of any representation or warranty made hereunder, or any breach by a Kraft Affiliate of a Country Addendum or any other act or deed, whether in contract or tort, committed or omitted by Kraft or by Kraft's Affiliates, agents or subcontractors, except to the extent of claims that Kraft's use of any of the Licensed Trademarks or other Intellectual Property of Starbucks in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(iii) any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Starbucks Indemnified Parties, arising out of any and all claims and/or any other actions involving Tassimo Discs and Tassimo Machines alleging violation or infringement of a third party's Intellectual Property or other proprietary rights, except claims that Kraft's use of any of the Licensed Trademarks or other Intellectual Property rights granted to Kraft by Starbucks in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights; provided, however, that Starbucks shall have the right to actively participate in its own defense with respect to any such claims or actions; and

(iv) any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Starbucks Indemnified Parties, resulting from the execution, delivery or performance of this Agreement by Kraft in breach of another agreement to which Kraft is a party.

B.    Starbucks Indemnity.  Starbucks hereby indemnifies Kraft, and undertakes to defend and hold Kraft, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns ("*Kraft Indemnified Parties*"), harmless from and against:

(i) any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees incurred by the Kraft Indemnified Parties, arising out of any and all claims arising out of the Kraft Indemnified Parties' exercise of the rights granted to them by Starbucks hereunder, including without limitation claims arising out of the use thereby of the Supplied Products and/or the Licensed Trademarks in accordance with this Agreement;

(ii) any and all claims, suits, losses, damages, costs, liabilities and/or expenses, including but not limited to reasonable attorneys' fees incurred by the Kraft Indemnified Parties, arising out of (a) any Starbucks breach of any

28

representation or warranty made hereunder or any breach by a Starbucks Affiliate of a Country Addendum, or (b) any other act or deed, whether in contract or tort, committed or omitted by Starbucks or by Starbucks' Affiliates, agents or subcontractors, or (c) any other actions involving Licensed Products where such claims are a result of the negligence or intentional acts of Starbucks or its Affiliates, agents or subcontractors, except to the extent of claims that Starbucks use of any Intellectual Property of Kraft in accordance with this Agreement infringes a third party's Intellectual Property or proprietary rights;

(iii)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees incurred by the Kraft Indemnified Parties, arising out of any and all claims and/or any other actions alleging violation or infringement of a third party's Intellectual Property or other proprietary rights, incurred by the Kraft Indemnified Parties' use of the Supplied Products and/or the Licensed Trademarks; provided, however, that Kraft shall have the right to actively participate in its own defense with respect to any such claims or actions; and

(iv)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees incurred by the Kraft Indemnified Parties, resulting from the execution, delivery or performance of this Agreement by Starbucks or by a Starbucks Affiliate in breach of another agreement to which Starbucks or such Affiliate is a party.

C.     No Consequential Damages.  Notwithstanding the other provisions of this Section 11, neither party shall have any liability to the other party for any indirect, consequential, punitive or other special damages.   Nothing in this Section 11.C shall limit a party's indemnification obligations with respect to third party claims under Sections 11.A or 11.B above.

## 12.     Binding Agreement; Assignability.

A.     Binding Agreement.  Unless assigned or transferred in violation hereof, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

B.     Assignment.  Neither party may assign this Agreement or any of its rights hereunder without the prior written approval of the other party; provided, however, that either party may assign this Agreement, and its rights and obligations hereunder (in whole or in part), without the prior written approval of the other party, to a subsidiary or other corporate Affiliate, other than the parent, of such party.  In the event of any assignment of this Agreement, the assignor shall, following such assignment, remain liable for all of its obligations under this Agreement.  Kraft guarantees, on an unconditional, absolute and continuing basis, the complete and timely performance by its Affiliates and its subcontractors of the obligations under this Agreement and the Country Addenda, as set forth therein.   Starbucks guarantees, on an unconditional, absolute and continuing basis, the complete and timely performance by its Affiliates of the obligations under this Agreement and the Country Addenda, as set forth therein.

29

### 13.    **Dispute Resolution.**

A.    The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation, by submitting such claim or controversy to the United States Oversight Committee or International Oversight Committee, as applicable. All final decisions by each of the United States Oversight Committee and the International Oversight Committee shall be made by unanimous consent. However, at any time following the first to occur of (i) the first meeting of the applicable Oversight Committee concerning such claim or controversy, or (ii) expiration of the thirty (30)-day period following a party's written request to the other party to submit such claim or controversy to the applicable Oversight Committee if the applicable Oversight Committee has not met to consider such claim or controversy within such thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration. Such binding arbitration shall be conducted within the City of Chicago at the International Centre for Dispute Resolution ("*ICDR*") or its successor, pursuant to its arbitration rules and procedures, except as modified by the Agreement of the parties. The arbitration shall be conducted by a single arbitrator selected by mutual agreement of the parties within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by the ICDR. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended), and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator is empowered to award attorney's fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement.

B.    Nothing in this Agreement will prevent either party from resorting to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction or to avoid the barring of a claim under the applicable statute of limitations. In addition, resort by either party to negotiation, mediation or arbitration pursuant to this Agreement shall not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party to pursue any such judicial relief; provided, however, that irrespective of the filing of any such request for judicial relief the party shall continue to participate in the dispute resolution proceedings required by this paragraph. Any negotiation or mediation which takes place pursuant to this Agreement shall be confidential and shall be treated as a compromise and settlement negotiation for purposes of the Federal Rules of Evidence and State Rules of Evidence.

### 14.    **Starbucks Title and Protection of Starbucks Rights.**

A.    Starbucks Title. Starbucks represents and warrants that it has the right to use and sublicense the Licensed Trademarks in the manner contemplated by this Agreement and that it has and will continue to have throughout the term of this Agreement all requisite authority to enter into and perform its obligations under this Agreement, and, subject to any exceptions set forth in any Country Addendum, Starbucks knows of no allegations that its use or licensing of the Licensed Trademarks would infringe or violate the rights of any third party. Kraft shall not at any time during the term of this Agreement contest or aid others in contesting the validity of the Licensed Trademarks. Starbucks represents and warrants that it shall use reasonable efforts

in good faith to maintain the registrations for the Licensed Trademarks in the United States and/or in the rest of the Territory, as applicable.

B.  Goodwill; Control of Licensed Trademarks.  Kraft acknowledges the substantial value of the goodwill associated with the Licensed Trademarks and agrees to use the Licensed Trademarks in the form and manner prescribed by Starbucks and as set forth in this Agreement. Kraft's use of the Licensed Trademarks and any goodwill generated from the use of the Licensed Trademarks by Kraft shall inure to the benefit of the owner of the Licensed Trademarks. Apart from this Agreement, Kraft shall hereafter neither acquire nor claim any right, title, or interest of any kind or nature whatsoever in or to the Licensed Trademarks or the goodwill associated therewith. Starbucks has approval rights over all aspects of all uses by Kraft of the Licensed Trademarks that are inconsistent with the guidelines and examples set forth on Schedule 2.D, including, without limitation, in connection with packaging materials, labels, displays, promotional items, trade spending and advertising. In the event Starbucks and Kraft are unable to agree on uses by Kraft of the Licensed Trademarks, the parties shall submit the matter to the United States or International Oversight Committee, as applicable.

C.  Legend.  Kraft shall display the Licensed Trademarks only in such form and manner as is specifically approved by Starbucks pursuant to the provisions of this Agreement. Kraft shall not use the Licensed Trademarks in a manner which may reasonably give the impression that the Licensed Trademarks are owned by Kraft. Where practical and appropriate or reasonably required by Starbucks, all materials bearing the Licensed Trademarks shall include a notice that the Licensed Trademarks are owned by Starbucks, the form of such notice to be approved by Starbucks in writing prior to Kraft's use thereof. The following form of notice is hereby approved by Starbucks for use in the Territory:

"Starbucks® and the Starbucks logo are registered trademarks of Starbucks Coffee Co."

A comparable legend may be substituted with the prior written approval of Starbucks.

D.  Certain Usage Prohibited.  Kraft shall not use the Licensed Trademarks in a manner that would in any way disparage Starbucks or the reputation of Starbucks, nor shall Kraft take any action which could harm or jeopardize the Licensed Trademarks, or Starbucks or its Affiliates' (as the case may be) ownership thereof, in any way. Kraft shall not use any trademark of any party other than the Licensed Trademarks on the Licensed Products without the express written consent of Starbucks, except for (i) the phrase "distributed by Kraft Foods Global, Inc." (or a comparable phrase approved in writing by Starbucks), (ii) any other trademarks of Starbucks or its Affiliates as otherwise permitted in this Agreement, (iii) TASSIMO trademarks, (iv) the KRAFT trademark and logo and (v) the address of Kraft's headquarters office for consumer contacts.

E.  Changes to the Licensed Trademarks.  Starbucks shall have the right at any time to make additions to, deletions from, and changes to any or all of the Licensed Trademarks at its sole and complete discretion; provided, however, that Starbucks shall give Kraft reasonable prior written notice thereof. Kraft shall, after receipt of such written notice

31

from Starbucks, adopt and begin using any and all such additions, deletions and changes as soon as reasonably practicable after Starbucks adoption thereof. Starbucks shall pay or reimburse Kraft for Kraft's reasonable costs associated with adopting and using any such additions, deletions and changes beyond the first such addition, deletion or change in any three (3) year period, it being understood that Starbucks shall not reimburse Kraft for any additions, deletions or changes resulting from Kraft's incorrect use of any Licensed Trademark. Notwithstanding the foregoing, if Starbucks requires that any such addition, deletion or change be made, Kraft shall be entitled to distribute and sell previously approved Licensed Products and Tassimo Packaging, and to use previously approved materials, while adopting the additions, deletions and changes prescribed by Starbucks, unless Starbucks notifies Kraft in writing that such uses of Licensed Products, Tassimo Packaging or materials infringe or are alleged to infringe the rights of a third party.

## 15. <u>Protection and Defense of Licensed Trademarks.</u>

A. <u>Execution of Instruments</u>. Kraft agrees to execute, at Starbucks reasonable request and at Starbucks expense, any and all instruments as may be reasonably necessary or advisable to protect and maintain the interest of Starbucks in the Licensed Trademarks.

B. <u>Notice of Infringement</u>. Kraft shall promptly notify Starbucks of any apparent infringement of, challenge to Kraft's use of, or any claim by any person to any rights in, the Licensed Trademarks. Starbucks shall promptly notify Kraft of any apparent infringement of, or any claim by any person to any rights in, the Licensed Trademarks that may materially adversely affect Kraft's use of the Licensed Trademarks under this Agreement.

C. <u>Protection of the Licensed Trademarks</u>. Starbucks shall at all times have the right to take whatever steps it deems necessary or desirable, in its sole discretion, to protect the Licensed Trademarks from all harmful or wrongful activities of third parties. Such steps may include, but shall not be limited to, the filing and prosecution of: (i) litigation against infringement or unfair competition by third parties, (ii) opposition proceedings against applications for trademark or service mark registration for trademarks that are confusingly similar to any one or more of the Licensed Trademarks, (iii) cancellation proceedings against registration of trademarks that are confusingly similar to any one or more of the Licensed Trademarks, and (iv) other appropriate administrative actions, and Kraft shall cooperate with Starbucks, at Starbucks request, in any such actions and Starbucks shall be responsible for Kraft's reasonable expenses incurred in such cooperation.

D. <u>Allegations of Infringement</u>. Starbucks shall at all times have the right to take whatever steps it deems necessary or desirable to defend all claims that the use of the Licensed Trademarks infringes the rights of a third party. If Kraft is named as a party to such a claim and Starbucks is not so named, Starbucks shall defend such action at its own expense. Kraft shall cooperate in such defense, and Starbucks shall be responsible for Kraft's reasonable expenses incurred in such cooperation.

### 16.    **Miscellaneous.**

A.    Representations and Warranties.   Each of Kraft and Starbucks hereby represents and warrants to the other that (i) it has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and (ii) this Agreement has been duly authorized by all necessary action on its part.

B.    Force Majeure.   Neither party to this Agreement shall be held liable for any delay of or failure to comply with any of the terms of this Agreement, nor shall any such delay or failure be deemed a default or give rise to a right to terminate this Agreement, when such delay or failure has been caused primarily by any circumstances beyond the reasonable control and without fault of the party affected including (without limitation) fire, labor dispute, strike, war, insurrection, government restrictions, or act of God ("*Force Majeure Event*"), provided that such party uses due diligence to mitigate the effects of the Force Majeure Event on the performance of its obligations under this Agreement.

C.    Notices.

(i)    Any notice, demand or other communication required or permitted to be given or made hereunder shall be in writing and shall be well and sufficiently given or made if to the address set forth below and:

        (a)    enclosed in a sealed envelope and delivered during normal business hours on a Business Day and left with a receptionist or other responsible employee at the relevant address set forth below in this Agreement;

        (b)    sent by certified mail deposited in a post office within the United States or other relevant Country;

        (c)    sent by facsimile or sent by other means of recorded electronic communication during normal business hours on a Business Day and confirmed by mail as aforesaid; or

        (d)    sent by a reputable air courier for overnight delivery.

(ii)    Any notice, demand or other communication so given or made shall be deemed to have been provided and to have been received on:

        (a)    the day of delivery, if delivered as aforesaid;

        (b)    on the third Business Day after the postmark date thereof (excluding each day during which there exists any general interruption of postal service due to strike, lockout, labor disturbance or other cause), if mailed as aforesaid;

(c)     on the day of sending if sent by facsimile or other means of recorded electronic communication (or on the next Business Day if sent on a day other than a Business Day); or

(d)     on the air courier's scheduled day of delivery if sent by air courier.

(iii)     All significant notices or other communications to be sent under this Agreement shall be sent to the parties at the following addresses, subject to each party's right to change its address for notice from time to time by giving notice in writing of such change.

| | |
|---|---|
| If to Starbucks: | Starbucks Corporation<br>2401 Utah Avenue South<br>Seattle, Washington 98134<br>Attn: President, Global Consumer Products |
| With a copy to: | Starbucks Corporation<br>2401 Utah Avenue South<br>Seattle, Washington 98134<br>Attn.: General Counsel |
| If to Kraft: | Kraft Foods Global, Inc.<br>555 South Broadway<br>Tarrytown, NY 10591<br>Attention: GVP & President, NA Beverages Sector |
| With copy to: | Kraft Foods Global, Inc.<br>Three Lakes Drive<br>Northfield, IL  60093<br>Attention: General Counsel |

(iv)     Notwithstanding the foregoing, routine notices and communications hereunder (e.g., reports, requests for review of materials and the like) may be sent to employees of the other party responsible therefore.

D.     <u>Relationship</u>.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, franchise or agency relationship between the parties hereto or shall be deemed to render either party liable for any of the debts or obligations of the other.  Neither party shall in any way be considered an agent or representative of the other in any dealings with any third party, and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

E.     <u>Sole Agreement; Release and Discharge</u>.  Subject to <u>Section 17</u>, and except as provided in <u>Section 10.A</u>, effective as of the Effective Date, this Agreement and the schedules and exhibits attached hereto and thereto shall constitute and contain the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written

34

statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect. Subject to <u>Section 17</u>, this Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto. Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect. Subject to <u>Section 17</u>, effective as of the Effective Date, this Agreement shall supersede all prior agreements, discussions and negotiations between the parties with respect to the Territory as defined herein, <u>provided</u> that the US Supply and License Agreement, the US SBC-Tazo Tassimo Agreement and the International Supply and License Agreement shall remain in full force and effect, as amended from time to time.

F.    <u>No Waiver</u>. The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the party of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

G.    <u>Construction</u>. The captions of the various articles and sections of this Agreement have been inserted for the purpose of convenience of reference only, and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. The recitals set forth prior to <u>Section 1</u> of this Agreement are statements setting forth the intentions of the parties and shall not be deemed to create, modify, supersede or eliminate any obligation of the parties under this Agreement.

H.    <u>Invalidity</u>. If any provision or provisions of this Agreement, or any portion of any provision hereof or thereof, shall be deemed invalid or unenforceable pursuant to a final determination of any arbitrator or court of competent jurisdiction, or as a result of future legislative action, such determination or action shall be construed so as not to affect the validity or effect of any other portion hereof or thereof, unless, as a result of such determination or action, the consideration to be received or enjoyed by any party hereto would be materially impaired or reduced. The parties agree to attempt in good faith to substitute for any invalid or unenforceable provision a valid and enforceable provision which achieves to the greatest extent possible the same effect as would have been achieved by the invalid or unenforceable provision.

I.    <u>CHOICE OF LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO THE SUBSTANTIVE LAWS, BUT NOT THE PRINCIPLES OF CONFLICTS OF LAWS, OF THE STATE OF NEW YORK AS IF THIS AGREEMENT WERE NEGOTIATED, EXECUTED, AND TO BE FULLY PERFORMED IN THE STATE OF NEW YORK.

J.    <u>Compliance with Laws</u>. Each of Kraft and Starbucks shall, at its own cost and expense, obtain all licenses, permits and other governmental approvals which may be required in the Territory for performance of its obligations hereunder.

K.     Counterparts.  This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

L.     Arm's Length Contract.  This Agreement has been negotiated "at arm's length" by the parties hereto, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof.  Accordingly, in construing the provisions of this Agreement neither party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

M.     Survival of Terms.  Any provisions of this Agreement which by their terms would be reasonably expected to survive termination or expiration of this Agreement shall continue in effect following such termination or expiration, including but not limited to Sections 6, 7.C, 7.E, 7.F, 10, 11, 13 and 16.

### 17.     Country Addenda.

A.     Operation.  The parties and/or Starbucks Affiliates and Kraft Affiliates may enter into one or more Country Addenda for the purpose of implementing this Agreement in the Territory including carrying out the parties' respective obligations under Sections 2, 3, 4, 6, 7, 8, 9, 10, 14, 15 and 16.  Starbucks and Kraft agree that the execution of Country Addenda by Starbucks, Starbucks Affiliates, Kraft and Kraft's Affiliates shall in no way limit or reduce the obligations of either party under this Agreement except that in the event of a conflict between the terms of this Agreement and a Country Addendum the terms of the Country Addendum shall control.

B.     Enforcement. The parties acknowledge and agree that with respect to each Country Addendum entered into by Starbucks, Starbucks Affiliates, Kraft and Kraft's Affiliates, Starbucks shall be fully responsible and liable for all obligations of the relevant Starbucks Affiliate, and Kraft shall be fully responsible and liable for all obligations of the relevant Kraft Affiliate.  Starbucks shall have the right to enforce this Agreement (including the terms of all Country Addenda) on behalf of itself and each Starbucks Affiliate that enters into a Country Addendum, and to assert all rights and exercise and receive all benefits of all remedies (including monetary damages) of each such Starbucks Affiliate, to the same extent as if Starbucks were such Starbucks Affiliate, subject to the limitations of liability applicable under this Agreement. Kraft shall have the right to enforce this Agreement (including the terms of all Country Addenda) on behalf of itself and each Kraft Affiliate that enters into a Country Addendum, and to assert all rights and exercise and receive all benefits of all remedies (including monetary damages) of each such Kraft Affiliate, to the same extent as if Kraft were such Affiliate, subject to the limitations of liability applicable under this Agreement. Any and all disputes arising under or relating to any Country Addendum shall be subject to the provisions of Section 13.  Subject to Section 17.A, any amendment, variation or modification to this Agreement will be binding upon each Starbucks Affiliate and Kraft Affiliate that is a party to any Country Addenda, whether such Country Addenda is entered into before or after the said amendment, variation or modification came into effect.

*     *     *     *     *

36

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**STARBUCKS CORPORATION**

By: _____

Name: Gerry López

Its:   SVP & President Global Consumer Products

**KRAFT FOODS GLOBAL, INC.**

By: _____

Name:  Mary Beth West

Its:   GVP & President, NA Beverages Sector

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**STARBUCKS CORPORATION**

By: _____

Name: Gerry López

Its:   SVP & President Global Consumer
       Products

**KRAFT FOODS GLOBAL, INC.**

By: _____

Name: Mary Beth West

Its:   GVP & President, NA Beverages
       Sector

Schedule 1a – Methodology for Calculating Fully Landed Costs

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True-up Method | True-up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Coffee[3] | Standard | Fiscal year period moving average roasted coffee cost adjusted for appropriate yield to calculate true roasted coffee cost, with the moving average cost applied for each type of coffee uniformly regardless of channel of distribution for both nonlicensed and Licensed Products. | Periodic Moving Average vs. Standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Green Coffee Burden | Standard | Shipping costs from origin countries to FOB destination factored for yield | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Packaging | Standard | Bill of material for all packaging element costs and their individual standard costs, with the same bill of material cost applied for similar package types regardless of channel of distribution for both nonlicensed and Licensed Products. | Annual standard and variance created by mix and volume; roll stock and corrugate standards adjusted to moving average costs | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Conversion | Standard | Manufacturing costs including Supply Chain and Coffee Operations admin, direct and indirect manufacturing, manufacturing overheads, with the same cost/lb allocation applied for each type of coffee/package uniformly regardless of channel of distribution for both nonlicensed and Licensed Products. | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Coffee Manufacturing Variances | Actual | Starbucks fiscal year annual absolute $ conversion manufacturing standard vs. actual variances. | Allocated over/under absorption based on pounds shipped | End of fiscal year | N/A | N/A |
| Plant Distribution | Forecast | Distribution Operations estimated costs allocated according to Starbucks distribution cost allocation methodology applied uniformly regardless of channel of distribution for both nonlicensed and Licensed Products. | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Freight Out | Direct | Actual freight charge from carrier | N/A | N/A | N/A | N/A |
| Special Projects (3) | Direct | Project Identification | N/A | N/A | N/A | N/A |

(1)    For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party.  The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Kraft within 30 days after the end of each true up period and incorporated into the subsequent quarter's Payment calculation pursuant to Section 7A.

(2)    In the event some Coffee is purchased using Commodity Futures and/or Price to Be Fixed (PTBF) contracts, a common average rate per pound allocation of the costs is to be applied for each type of coffee uniformly, regardless of channel of distribution for both nonlicensed products and Licensed Products.

(3)    Expenses to be billed by Starbucks to Kraft for mutually agreed upon projects and booked to joint P&L statement within A&P or other overheads.

## Schedule 1b – Licensed Trademarks

STARBUCKS

STARBUCKS LOGO:



**Schedule 2.D(1)**

**Marketing Principles**

PLEASE SEE ATTACHED

**Schedule 2.D(2)**

**Trademark Use Guidelines and Examples**

PLEASE SEE ATTACHED

**Schedule 4.C – Demand Forecasting and Future Supply**

Kraft shall forecast its anticipated demand to Starbucks as follows:

By Wednesday of the last week of each of Starbucks fiscal months, Kraft will provide Starbucks 12-month rolling forecasts of Kraft's anticipated demands for roasted coffee. The forecast shall begin with the second month following issuance. (For example, a forecast issued in September covers the forecasted period beginning the following November.)  The demand reflected in the first month of each rolling 12-month forecast (November in the above case) shall constitute a binding commitment by Kraft to order the total quantity of roasted coffee. The forecast for the month that becomes a binding commitment (November in the above example) shall not increase by greater than fifteen percent (15%) from the same period's prior month forecast. (For example, the November forecast submitted in September shall not increase by greater than fifteen percent (15%) from the November forecast submitted in August). Subject to the foregoing limitations, Kraft may revise the mix of roasted coffee by written purchase order issued no later than fifteen (15) calendar days prior to the beginning of the month for which such order is applicable. (Under the example above, the forecasted November demand issued in September becomes a firm commitment to purchase the quantity forecast, the October commitment having been set in the previous forecast, but Kraft may issue a purchase order setting forth the specific quantities of each type of roasted coffee as late as October 16.) Starbucks will meet Kraft's required product mix, as so revised, unless meeting such requirements would cause Starbucks to bear undue expense or hardship.  The first three months of each 12–month forecast shall be a firm projection and Kraft shall use its reasonable commercial efforts to purchase those volumes; provided that Kraft shall be deemed to have acted in a commercially reasonable manner if Kraft revises such forecasts as a result of unexpected changes in demand for the Licensed Products.

Starbucks will notify Kraft in writing within ten (10) business days of receipt of any rolling forecast whether or not it will be able to fulfill such requirements.  Failure by Starbucks to inform Kraft of its inability to fulfill such requirements within such period will be deemed a binding commitment by Starbucks to ship any orders made by Kraft within the rolling forecast. In the event of a shortage of any particular variety of product, Starbucks will use reasonable commercial efforts to allocate product fairly between Kraft's orders and orders from Starbucks owned, licensed and operated outlets and, in any event, shall provide products to Kraft at a level that is no less than the proportion that Kraft's product requirements represents of the total business of Starbucks.

Starbucks and Kraft shall maintain roasted coffee days-of-supply (DOS) at a level agreed to by both Starbucks and Kraft and shall provide Starbucks with current DOS by roasted coffee type which shall accompany the monthly forecast on the last Wednesday of each fiscal month.  In the event DOS has dropped below the agreed level Kraft will use all reasonable efforts to purchase product to return DOS to the agreed-upon level and Starbucks will use all reasonable efforts to supply the required product.

**Schedule 4.E**

**Additional Terms and Conditions for Production and Delivery of Starbucks Discs**

1.  The operations of plants and facilities where the Starbucks Discs will be produced shall at all times be used only for the manufacture of food products and shall have cleaning procedures in place to minimize any possible product to product contamination with Starbucks Discs.

2.  Kraft will maintain at all times all permits and authorizations necessary for the production of the Starbucks Discs. In the event that Kraft receives any written notice from any governmental agency or other authority that could reasonably be expected to affect in any material respect either Kraft's performance under this Agreement or the business reputation of Starbucks or the Starbucks Discs, Kraft will forward to Starbucks as promptly as practicable a copy of the notice, by facsimile transmission, and will keep Starbucks reasonably apprised of the status and development of all matters relating to the notice.

3.  Kraft will produce all Starbucks Discs in accordance with the Specifications, the product warranties set forth in Section 4.F, and all other terms and conditions of this Agreement. For each proposed type of Starbucks Disc set forth in each Country Addendum, Kraft will submit samples of such type of Starbucks Disc to Starbucks for its review and approval prior to the initial production of such type of Starbucks Disc, including, without limitation, its compliance with the Specifications. Kraft will not distribute any type of Starbucks Disc that has not received such approval in writing from Starbucks. Kraft will not thereafter materially alter its manufacture of the Starbucks Discs that have already been approved by Starbucks without obtaining the prior written approval of Starbucks for such alteration. Furthermore, the parties agree that:

    (a)  Specifications, including test methods and acceptable limits for the Starbucks Discs will be mutually agreed by Starbucks Global Quality Assurance and Kraft Global Technology & Quality ("*GTQ*").

    (b)  Official copies of signed Specifications will maintained by Starbucks Global Quality Assurance and by Kraft GTQ.

    (c)  A process for changing Specifications will be developed indicating required approvals by Starbucks and Kraft.

4.  Kraft will retain samples of all lots of Starbucks Discs delivered under this Agreement for the greater of (a) one year or (b) the minimum shelf life of the applicable Starbucks Discs. Kraft will send samples of Starbucks Discs to Starbucks, at Starbucks expense, at such times and in such quantities as Starbucks may reasonably request. The definition of a "lot" will be clarified to Starbucks Coffee Company by Kraft but will not in any case be greater than one day (24 hours), which one-day (24-hour) period will not be changed without the mutual written agreement of Kraft and Starbucks.

5.  Kraft shall only use roasted coffee purchased from Starbucks in producing the Starbucks Discs. Kraft shall handle, store and use the roasted coffee used for Kraft's production of the Starbucks Discs in material compliance with those reasonable standards that Starbucks from

time to time may provide by written notice to Kraft are agreed by Starbucks Global Quality Assurance and Kraft GTQ.

6. If Starbucks Discs produced by Kraft fail to meet the Specifications in any material respects, they will be set aside by Kraft in a secure location and will not be used or sold in any way. Within ten days after such products are set aside, Kraft will furnish a written report to Starbucks specifying in reasonable detail the non-conformity and the quantity of the non-conforming item. Kraft will make available to Starbucks a sample of the non-conforming Starbucks Discs for evaluation by Starbucks. Kraft will dispose of or arrange for the disposal (or return) of any non-conforming Starbucks Discs upon Starbucks request and in accordance with the reasonable instructions of Starbucks. Kraft will bear all reasonable expenses related to such unusable items, including the cost of replacement and disposal.

7. Starbucks Discs shall be manufactured in material compliance with the US Code of Federal Regulations, Title 21, Part 110, Good Manufacturing Practices ("*GMP*"). Kraft shall maintain information on file at its offices regarding Kraft's GMP program (which program shall be to Starbucks reasonable satisfaction), and shall make such information available to Starbucks for review upon reasonable request. Kraft shall ensure that all processing area employees who may be supplying, manufacturing or assisting with the production of the Starbucks Discs will be trained regarding applicable health code, cleanliness (including sanitary and protective clothing), and health standards.

8. Kraft shall implement and maintain a food safety program either similar to and employing the principles of Hazard Analysis and Critical Control Point (HACCP) (which program shall be to Starbucks reasonable satisfaction) or a Starbucks-approved equivalent program. At a minimum, Kraft shall comply with and train all personnel on basic sanitation requirements in accordance with GMP for Starbucks Discs distributed in the United States. Kraft's food safety documentation shall describe the controls in place to prevent physical, chemical, microbiological and allergen carry over and cross-contamination. Kraft shall employ an effective integrated pest control management program. Kraft shall make available to a third party, of Starbucks choosing, a copy of its HACCP (or equivalent) program upon reasonable request.

9. Kraft shall maintain a current file of specifications for all raw materials, components and all primary and secondary packaging materials for the Starbucks Discs. Kraft shall not substitute any raw materials or components without Starbucks written approval (unless substitution is allowed by the Specifications). Kraft shall qualify and approve all suppliers through a process reasonably acceptable to Starbucks that verifies the ability of Kraft's suppliers to manage the food safety risks inherent to the ingredient or component. Manufacturing records shall allow tracing of all raw materials and components from receipt records through work in process and finished good records, by lot code date as a minimum.

10. With respect to the production and supply of Starbucks Discs, Kraft shall:

    (a)    Accept Starbucks roasted coffee beans as received with the assurance from Starbucks that this bulk coffee has met Starbucks internal quality specifications.

All incoming ingredients shall be date coded to support tracing by lot and proper rotation (FIFO) of inventory;

(b)     Receive, transfer and store raw materials within specified temperature ranges;

(c)     Store Starbucks Coffee in a clean dry environment at room temperature (not to exceed 90 F), and use such coffee within 7 days of receipt;

(d)     Document and adhere to a quality hold procedure for non-conforming receipts;

(e)     Develop and adhere to an approved foreign object removal procedure for roasted coffee;

(f)     Maintain and document an active calibration program for scales, metal detectors, filters and thermometers, and related production equipment;

(g)     Print a date code on the product unit (primary packaging) and the shipping container (secondary packaging) in accordance with Starbucks reasonable requirements;

(h)     Use documented specific measurements, tests, and/or sensory evaluations to verify manufacturing process limits, and monitor such limits on a schedule or sampling plan developed by Kraft Quality Assurance;

(i)     Maintain a retention sample program by date/lot code for the shelf life of Starbucks Discs; and

(j)     Document and employ a cleaning program for all equipment and facilities.

11. Kraft will inform Starbucks of any condition that is not in material conformance or material compliance with the requirements of this Schedule 4.E within 5 days of Kraft's discovery of such a condition. Kraft will provide reasonably complete details of the non-conforming condition and a recommended solution for Starbucks review and approval. At Starbucks request, Kraft will perform a "root cause" analysis of the problem and provide a corrective action plan in an effort to prevent future occurrences of the problem. Kraft will promptly provide a reasonably satisfactory resolution to each corrective action report issued by Starbucks.

12. In the event of a supply shortage of Starbucks Discs, whether due to a Force Majeure Event or otherwise, (a) Kraft shall use its commercially reasonable efforts to meet the order demands of Starbucks for Starbucks Discs and (b) in no such event shall Kraft allocate supply of Starbucks Discs to Starbucks (in relation to Kraft's other customers and channels) on a basis that is less than pro-rata.

13. Starbucks shall have the right, via an unaffiliated third party selected by Starbucks, to audit and inspect Kraft's plants and other facilities where the Starbucks Discs are manufactured, handled, and stored. Such unaffiliated third party will be granted access to the plant(s) and records at reasonable times agreed with Kraft solely as reasonably requested by Starbucks for

the purpose of reviewing Kraft's compliance with the terms of this Agreement, <u>provided</u> that prior thereto, such unaffiliated third party shall have entered into a confidentiality agreement with Kraft in such form as required by Kraft.  Any inspection by such unaffiliated third party will be at Starbucks expense.  Starbucks agrees to provide the results of any such audit or inspection to Kraft promptly upon completion thereof and Kraft agrees to release any third party inspection reports applicable to the manufacture of Starbucks Discs to Starbucks upon written request.

14. In no event shall any standards, approvals or audit rights by Starbucks provided for in this <u>Schedule 4.E</u> relieve Kraft of the responsibility of Kraft of manufacturing, distributing, marketing and selling the Starbucks Discs in accordance with all other requirements of this Agreement.

## Schedule 4.H

### Exceptions to Kraft's Intellectual Property Representation

- In January 2007, Keurig, Incorporated ("Keurig") filed a patent infringement action against Kraft Foods Global, Inc., Tassimo Corporation and Kraft Foods Inc. in Federal Court in Delaware alleging infringement of U.S. Patent No. 6,607,762 (the "762 Patent"). The 762 Patent is directed to a disposable single-serve beverage filter cartridge. The suit alleges that the Tassimo T-Disc cartridges infringe the 762 Patent, and the relief demanded includes a preliminary injunction barring further purported infringement of the 762 Patent. Kraft believes that Keurig's claims are without merit and intends to defend this lawsuit vigorously.

**Schedule 8.H – Measurement Criteria**

**Authorized Channel In-Store Conditions**

**Key Measures of In-Store Conditions**

Starbucks and Kraft intend to maintain a presentation for the Starbucks Discs that clearly positions the Licensed Trademarks in accordance with its Super-Premium Coffee standing and for the Tassimo Machines as a premium quality brewer.   Kraft shall develop the brand positioning and brand equity of these Starbucks Discs and Tassimo Machines through superior in-store presentations, including shelf presence, product quality, and product availability in the Authorized Channels.

Starbucks and Kraft have agreed that the principal means of achieving superior in-store presentation are to:

- **Minimize past-due product**
  - *Rationale:*  Applies the highest standards of excellence to the fresh delivery of our coffee to encourage the development of enthusiastically satisfied customers.
  - *Defined Metric:*  Percentage of checked packages which are past-due.

- **Minimize Out-of-Stocks**
  - *Rationale:*  Promotes brand equity, denotes category leadership, and increases sales.
  - *Defined Metric:*  Percentage of stores with at least one out-of-stock SKU.

Starbucks and Kraft may jointly establish measurable standards for some or all of the metrics listed above, and may review each of the metrics set forth above, as measured by a Field Auditor or other means, provided, however, that failure to meet or exceed the Measurement Criteria shall not be the basis for a claim of Material Breach under Section 5.B(ii) or any other Section of the Agreement.  This review will focus on identifying deficiencies relative to the metrics, if any, and on cooperatively establishing strategies or an Action Plan for addressing and resolving such deficiencies.

- An "*Action Plan*" means a plan to be developed and pursued in good faith by Kraft, with consultation and approval from Starbucks, to identify which stores and/or markets are causing a failure to meet the applicable Standard for the metric, and to identify and implement the most timely, efficient and effective means to address the failure.  The means of addressing the failure may include (i) the deployment of Kraft's internal sales force to conduct in-store visits, (ii) calls on customers' regional and/or national headquarters to encourage resolution of the problems, (iii) additional focus by Kraft on its sub-distributors (if any) involved in the stores and markets where the problems are occurring, and (iv) market "blitzes" under which Kraft will retain third parties to conduct in-store visits to improve aisle conditions.  Any costs associated with implementing the Action Plan shall be charged to Kraft's P&L Statement.  Any shortfall discovered by a Field Auditor or other party in the existing Measures of In-Store Conditions contemplated above will not be the basis for a Material Breach of Contract.

**Field Audit Methodology**

In the United States, Starbucks and Kraft agree, as of the Effective Date, that the Field Auditor shall use the following methodology to measure in-store conditions for Starbucks Discs in the Retail Grocery Stores and Mass Merchandise Stores. The Field Auditor shall measure the following objective criteria when measuring in-store conditions:

A.   Out-of-Stocks for Starbucks Discs

B.   Date Codes for Starbucks Discs

C.   Number of Past Due Products (versus the total)

D.   Time, day and store location of observation

Sample

The audit will use a rotating sample of stores in major markets. Markets and stores audited per market will be agreed upon by Starbucks and Kraft prior to each audit.

Store Selection Process

To maintain consistency in mix of retailers, store size and geography from audit to audit, Starbucks and Kraft will provide a pool of stores from which the Field Auditor will select stores for auditing. Store selection will change from audit period to audit period.

## Schedule 9

## List of Committee Members

1. Starbucks Brand Management Team

   - Wendy Pinero, VP, Global Consumer Products
   - Rich DePencier, VP, Global Consumer Products-International

2. Kraft Brand Management Team

   - Lorraine Hansen, VP, North America Tassimo and Gevalia
   - Herve Salomon, Director, Marketing EU On Demand

3. United States Oversight Committee

   - Starbucks Delegates:

     - Gerry Lopez, SVP & President Global Consumer Products
     - Denise Bakken, VP Manufacturing

   - Kraft Delegates:

     - Mary Beth West, GVP & President, NA Beverages Sector
     - Peter Wilson, Sr. Director GTQ Refreshment Beverages

4. International Oversight Committee

   - Starbucks Delegates:

     - Gerry Lopez, SVP & President Global Consumer Products
     - Rich DePencier, VP, Global Consumer Products-International
     - Denise Bakken, VP Manufacturing

   - Kraft Delegates:

     - Hubert Weber, VP & General Manager Tassimo
     - Bob Levi, SVP, Global Partnerships & Brands
     - Adam Lloyd, Director GTQ Brew Systems Development