# EXHIBIT 5

## INTERNATIONAL SUPPLY AND LICENSE AGREEMENT

THIS INTERNATIONAL SUPPLY AND LICENSE AGREEMENT ("*Agreement*") is entered into as of September 28, 2006, by and between STARBUCKS CORPORATION, a Washington corporation ("*Supplier*"), and KRAFT FOODS GLOBAL, INC., a Delaware corporation ("*Distributor*"), and shall become effective with respect to each Country on the Effective Date (as such terms are defined herein).

WHEREAS, Supplier is engaged in the manufacture, sale and distribution of various types of coffee, including Super Premium Coffee (as defined herein);

WHEREAS, Distributor is engaged in the manufacture, sale and distribution of a variety of food products in the Authorized Channels (as defined herein);

WHEREAS, Supplier and Distributor have entered into a Supply and License Agreement dated March 29, 2004 (the *"US Supply and License Agreement")* to effect and memorialize a distribution arrangement between the parties with respect to the United States of America; and

WHEREAS, Supplier and Distributor now desire to enter into this Agreement to provide for the supply, license and distribution of certain of Supplier's products into certain new countries, commencing with the United Kingdom and Canada, and to be extended to such additional countries as may be agreed from time to time by the parties;

NOW, THEREFORE, for the mutual consideration set forth herein, the parties hereto agree as follows:

1.    **Definitions**.  For purposes of this Agreement:

"*A&P*" or "*Advertising and Promotion*" shall be defined as all sums expensed pursuant to U.S. generally accepted accounting principles by Distributor to advertise and promote Licensed Products in the Authorized Channels in the Territory, including but not limited to all expenses associated with the production and distribution of television, radio, print (including free standing inserts), direct mail, on-line (e.g., internet), point-of-sale and other forms of advertising; trade spending; listing or nuisance fees; new item introductory fees; consumer promotions; public relations; and product sampling and demonstrations, but excluding any of Distributor's internal overhead costs.

"*Active Sales"* shall be applicable only to EEA Countries, and shall be defined as (i) actively approaching or targeting one or more customers, including through advertisements or other promotions specifically targeted at such customers or by visits or direct mail or email; or (ii) establishing a branch, warehouse or distribution outlet for the distribution of the Licensed Products.

"*Affiliate"* shall be defined as, with respect to a party, any person or entity which, directly or indirectly, is in control of, is controlled by, or is under common control with, such

party. For the purposes of this definition, "control" of a person or entity means the power, directly or indirectly, either to (i) vote a majority of the securities having ordinary voting power; (ii) determine the majority of the board of directors of such person or entity; or (iii) direct or cause the direction of the management and policies of such person or entity whether by contract or otherwise. "Supplier Affiliate" shall be defined as an Affiliate of Supplier and "Distributor Affiliate" shall be defined as set forth below.

"*Anti-Terrorism Laws*" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other applicable present and future national, federal, state, provincial, and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority of any nation (including the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts or acts of war.

"*Applicable Laws*" shall be defined as all laws, regulations, administrative requirements, rules and orders applicable to the conduct of Distributor's business or the promotion, marketing, sale and distribution of the Licensed Products by Distributor, whether with respect to the Territory or any Country therein, the United States of America or otherwise.

"*Authorized Channels*" shall be defined, for each Country, in the relevant Country Addendum.

"*Business Day*" shall be defined as any day not a Saturday, Sunday or statutory holiday in the relevant Country.

"*By-the-Cup Coffee Products*" shall be defined as whole bean, ground or bulk coffee products which are sold or supplied by Supplier to cafes, coffee shops, restaurants, carts, kiosks, retail coffee stores, "fresh brew" coffee stands and similar food and beverage service establishments to the extent such establishments use such products in the preparation of coffee or espresso beverages served by the cup at such establishments.

"*Change of Control*" shall be defined as any occurrence where any person or group of persons acting in concert who, on the date of this Agreement, does not possess Control over a party hereto, gains control over such party, or in the event of a sale of all or substantially all of the assets of Distributor, Supplier or Distributor's Coffee Business; provided, however, that a transaction pursuant to which the ultimate parent company of Distributor distributes any or all of the outstanding capital stock of Kraft Foods Inc. to such parent's shareholders will not be deemed to be a Change of Control.

"*Committee Schedule*" shall be defined as the List of Committee Members, attached hereto as Schedule 9, of (i) the members of Supplier's and Distributor's International Brand Management Teams, and (ii) the members of the International Oversight Committee. Either party may change its designated members of such teams and committees upon notice to

2

the other party, and the parties agree to amend the Committee Schedule from time to time to reflect such changes.

"*Control*" shall be defined as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an executive position with the party in question.

"*Country*" shall be defined as any state or jurisdiction (or part thereof) that comprises part of the Territory, as may be agreed by the parties pursuant to a duly executed Country Addendum.

"*Country Addendum*" shall be defined as each addendum to this Agreement that sets out any terms and conditions specific to a Country forming part of the Territory, which terms and conditions shall be deemed to supplement and supersede this Agreement only with respect to such specific Country.

"*Designated Non Licensed Products*" shall be defined as (i) Seattle's Best Coffee bulk or packaged ground and whole bean coffee or (ii) any other brand of Super Premium Coffee that Supplier may acquire after the date hereof in connection with a business acquisition by Supplier, the purchase price for which business is equal to or greater than fifty million United States dollars ($50,000,000).

"*Disc Products*" shall be defined as coffee products contained in a pod or disc or other container designed to be used in machines that brew, or otherwise produce, convenient, single cups of coffee.

"*Distributor Affiliate*" shall be defined as an Affiliate of Distributor that has been approved in writing by Supplier and that has executed a Country Addendum hereto in order to conduct the distribution of the Licensed Products in a particular Country, which Distributor Affiliate shall be bound by all applicable terms and conditions of such Country Addendum and of this Agreement.

"*Distributor Net Sales*" shall be defined as the total dollar amount for the relevant period of sales of Licensed Products generated by Distributor, its Affiliates and subcontractors for all applicable SKUs across all Authorized Channels in the relevant Country, at the invoice selling price minus actual returns and allowances, all as determined in accordance with Distributor's normal accounting policies and referred to therein as "Operating Revenue" provided, however, that Distributor Net sales shall not include Passive Sales.

"*Distributor's P&L Statement*" shall be defined as, for any period, Distributor's statement of profit and loss for such period for the Licensed Products sold in all Authorized Channels in a particular Country, including with respect to the profit and loss realized for Licensed Products sold by any of Distributor's franchisees, licensees, distributors, Affiliates, partners, joint ventures and other such persons. The form of Distributor's P&L Statement is attached as part of Schedule 1d hereto.

"*EEA*" means the European Economic Area.

3

"*Effective Date*" shall be defined, with respect to each Country, as set forth on the relevant Country Addendum.

"*Fair Market Value*" shall be defined as the value of the then remainder of the term of this Agreement, or of the relevant Country Addendum, as the case may be, excluding Passive Sales, as determined in accordance with the procedures set forth in Section 5 and Section 6; provided, however, that the Fair Market Value shall be in addition to the value of inventories and display materials which Supplier would be required to purchase from Distributor in order to facilitate transition of this business from Distributor, and shall be supplemented by the value of all unutilized Payment Credits accrued under Section 7.

"*Field Auditor*" shall be defined as an independent third party that may be jointly retained by Supplier and Distributor to conduct field audits of Distributor's compliance with its obligations with respect to freshness goals and display methods under Section 8 or in the relevant Country Addendum. The Field Auditor (if any) for each Country shall be as set forth in the relevant Country Addendum.

"*Fully Landed Cost,*" shall be defined as all direct and indirect costs in accordance with U.S. generally accepted accounting principles comprising Cost of Goods Sold ("*COGS*") for the Licensed Products, except that Supplier shall utilize its global standard costs where local costs are not representative of long term economics and would distort profitability, as long as Distributor is not disadvantaged on a total cost basis by the utilization of global standard costs. Schedule 1a contains a complete listing of the elements of COGS, a description of how the cost elements are derived (including indirect cost allocation methodologies), when they are updated, and whether any refunds shall be due to Supplier or Distributor based upon differences between standard and actual costs. To the extent Supplier purchases products or services from Affiliates of Supplier, all cost components included herein shall be based on the lesser of actual costs to Supplier or the fair market value of the component based upon the open market cost for such item in an arm's length transaction between unrelated parties. Any changes to the components and/or allocations set forth in Schedule 1a must be agreed upon in writing by Supplier and Distributor and, once agreed, will be deemed incorporated into this Agreement upon each such agreement and will be subject to the audit rights provision in Section 7.D.

"*Kiosks*" shall be defined as all cafes, coffee shops, restaurants, carts, kiosks, retail coffee stores, "fresh brew" coffee stands and similar food and beverage service establishments from which brewed coffee beverages and whole bean, ground or bulk Super Premium Coffee of Supplier are sold.

"*Kiosk Products*" shall be defined as Super Premium Coffee, for distribution in bulk bins or packaged for resale, supplied by Supplier or its Affiliates (whether directly or through distributors) to Kiosks. Kiosk Products shall not include By-the-Cup Coffee Products.

"*Licensed Products*" shall be defined as (i) all the sizes of the blends, brands and flavors of Supplier's whole bean and ground coffees bearing the Licensed Trademarks and which are set forth in the relevant Country Addenda, and (ii) all gift packages sold through the Authorized Channels, so long as they contain any whole bean or ground coffees of Supplier bearing the Licensed Trademarks. The Licensed Products shall not include By-the-Cup Coffee

4

Products, Kiosk Products or Disc Products. In addition, the Licensed Products shall not include bottled Frappuccino®, Starbucks branded ice creams, chocolate covered espresso beans and similar goods that may contain coffee or processed coffee but which are not brewed to create coffee beverages.

"*Licensed Trademarks*" shall be defined as those certain valuable trademarks set forth on Schedule 1c attached hereto, or in the relevant Country Addendum, and incorporated herein (as may be amended from time to time) and any slogans, designs, devices, logos, insignias, emblems, symbols, trade dress, label designs or other proprietary identifying characteristics associated with such trademarks used in the conduct of Supplier's business.

"*Local Currency*" shall be defined as the customary currency of the relevant Country.

"*Material Breach*" shall be defined as a breach of any representation, warranty, covenant or agreement in this Agreement which significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause significant financial, brand equity and/or other injury to the other party. Breaches of certain provisions of this Agreement have been specifically described as Material Breaches, and these specific descriptions will not preclude either party from contending, in proceedings under Section 14, that breaches of other provisions are "Material Breaches" as defined in the preceding sentence.

"*Measurement Criteria*" shall be defined as the criteria pursuant to which the Field Auditor (if any) will measure Distributor's compliance with its obligations under Section 8.

"*Military Exchanges and Commissaries*" shall be defined as all exchanges and commissaries in the Territory owned, leased or occupied by the U.S. Defense Commissary Agency.

"*Minimum A&P Amount*" shall be defined as the minimum advertising and promotion expenditure required of Distributor, for any Year and with respect to each Country, as set forth on the relevant Country Addendum. The Minimum A&P Amount shall be determined for each Country in consideration of, and with reference to, advertising and promotion amounts expended (i) by third parties for other Super Premium Coffee products in such Country, and (ii) by Distributor for other premium food or beverage products in such Country.

"*Net Profits*" shall be defined as, for any period, the amount reflected as Operating Contribution, before payment of any profits to Supplier, on the Distributor's P&L Statement covering such period minus the Supplier's Business Unit Overhead for such period. The methodology for calculating Operating Contribution on the Distributor's P&L Statement shall be as set forth on Schedule 1d hereto. For the avoidance of doubt, Net Profits shall include Operating Contribution related to Passive Sales and related to sales of Licensed Products generated by Distributor's Affiliates and subcontractors.

"*Non RFO Country*" shall be defined as any of the following countries or territories: United States of America, New Zealand, People's Republic of China, Japan, the

5

Philippines, Malaysia, Republic of Korea, Bahrain, Kuwait, Lebanon, Oman, Qatar, Saudi Arabia, and the United Arab Emirates.

"*Passive Sales*" shall be applicable only to EEA Countries, and shall be defined as sales of Licensed Products in response to unsolicited requests from retailers (including delivery of goods) outside of the Authorized Channels or outside of the Territory.

"*Payment Credit*" shall be defined as stated in <u>Section 7.A.</u>

"*Significant Competitor*" shall be defined as (i) any business with annual sales of one hundred million dollars ($100,000,000.00) or more of Super Premium Coffee other than Super Premium Coffee bearing one or more of the Licensed Trademarks, and (ii) with respect to a particular Country, any business identified as such on the relevant Country Addendum.

"*Super Premium Coffee*" shall be defined as bulk, whole bean or ground coffee that is (i) traditionally sold at the highest end of the consumer coffee market in the relevant Country, (ii) with respect to a particular Country, generally priced at or above the non-promotional shelf price or price index figure set out in the relevant Country Addendum, or (iii) with respect to a particular Country, identified as "Super Premium Coffee" on the relevant Country Addendum. Coffee brands that are otherwise deemed non-Super Premium Coffee shall not be deemed Super Premium Coffee only by virtue of their packaging in more expensive non-traditional forms or delivery systems, including, without limitation, filter packs, single serve pods and discs. If Supplier and Distributor are unable to agree on whether a particular coffee is "Super Premium Coffee" pursuant to the foregoing definition, the dispute shall be submitted to the International Oversight Committee for resolution. For the purpose of this Agreement and all Country Addenda, Super Premium Coffee shall not include Disc Products, including Tassimo Discs, which shall be addressed, if at all, by a separate agreement between Distributor and Supplier.

"*Supplier's Business Unit Overhead*" shall be defined for each Country as the mutually agreed amount of salaries, benefits and expenses, for which Supplier shall be credited in accordance with the Periodic Payments formula in <u>Section 7.A</u>, which amount shall be set forth in the Business Plan for the first Year of the term hereof and revisited and revised by the parties in good faith on an annual basis.

"*Supply Schedule*" shall be defined, with respect to each Country, as the demand forecasting and future supply schedule as attached to the relevant Country Addendum, which schedule may be amended or modified by Supplier and Distributor from time to time if mutually agreed.

"*Tassimo Discs*" shall be defined as pre-packaged coffee, tea or other beverage products contained in a disc, cup, pod, filter, bag or other container designed to be used in Tassimo Machines.

"*Territory*" shall be defined as the United Kingdom (together with Isle of Man and Channel Islands), Canada and such other Countries as the parties may supplement through the execution of additional Country Addenda.

6

"*Year*" shall be defined as the fiscal year of Supplier which begins, for a particular year, at 12:01 a.m. on the Monday following the Sunday closest to September 30 and ends at midnight on the Sunday closest to September 30 of the following year. Unless the defined term "*Year*" is used, "*year*" shall mean any twelve-month period of time.

### 2. Trademark Use.

A.    Grant of Right to Use.  On the terms and conditions of this Agreement, Supplier shall grant, or shall cause the appropriate Supplier Affiliate to grant, to Distributor, or to the appropriate Distributor Affiliate, as the case may be, on and as of the Effective Date a fully paid-up and royalty free non-transferable right (with no right to grant further rights except as is set forth in this Section 2) to use the Licensed Trademarks solely in connection with the full exploitation of Distributor's rights and the performance of Distributor's obligations under this Agreement. No sublicense of the rights granted hereby shall be permitted or valid without the prior written consent of Supplier. If any Distributor Affiliate undergoes a Change in Control such that it is no longer an Affiliate of Distributor, Supplier shall have the right, upon thirty (30) days notice, to require (a) the termination of the license under this Section 2.A and the grant of distribution rights under Section 3.A with respect to such Distributor Affiliate and (b) Distributor to provide for the substitution thereof with an approved Affiliate within thirty (30) days of receiving notice.  If no substitute Affiliate satisfactory to Supplier can be identified, then Supplier shall have the right to terminate Distributor's rights granted in this Section 2.A and Section 3.A and with respect to any Authorized Channel or Country related to the Distributor Affiliate in question. Notwithstanding the foregoing, in the event of any sublicense or delegation of responsibility by Distributor or by a Distributor Affiliate, Distributor shall remain fully liable for the complete and timely performance of all obligations hereunder, whether or not performed, or to be performed, by Distributor, a subcontractor of Distributor, or a Distributor Affiliate. Notwithstanding the grant by Supplier to any Distributor Affiliate of the right to use the Licensed Trademarks under this Agreement, and in addition to Distributor's obligations under Sections 13.B and Section 18 with respect to each Distributor Affiliate, the parties agree that Distributor shall serve as the point of contact for communications and performance with Supplier (other than with respect to purchase of Products under a Country Addenda, which may be handled by the relevant parties to a Country Addendum) and notice to Distributor by Supplier shall be deemed for all purposes as notice to any Distributor Affiliate.

B.    Reservation of Rights.  Supplier expressly reserves all rights relating to the Licensed Trademarks not granted to Distributor under this Agreement.

C.    Prohibition.  Distributor and Distributor Affiliates shall have no right to use the Licensed Trademarks outside of the Authorized Channels or outside of the Territory, and shall use commercially reasonable efforts as permitted by Applicable Laws to ensure that the Licensed Trademarks are not used outside of the Authorized Channels or outside of the Territory, including, but not limited to, refraining from actions intended to, or the primary foreseeable result of which will be to, facilitate the use of the Licensed Trademarks outside of the Authorized Channels or outside of the Territory. Nothing in this Section 2.C shall prevent or otherwise restrict Distributor or Distributor Affiliates from making Passive Sales of the Licensed Products within the EEA.

7

**3.     Sale of Licensed Products; Exclusivity Obligations and Other Terms**.

A.     **Supplier's Grant of Right to Sell Licensed Products**.  On the terms and conditions of this Agreement, Supplier shall grant, or shall cause the appropriate Supplier Affiliate to grant, to Distributor or to the appropriate Distributor Affiliate, as the case may be, the exclusive right to market, distribute and sell (i) the Licensed Products in the Authorized Channels in the Territory, and (ii) subject to the provisions of Section 3.B and Section 3.I, any future Super Premium Coffee sold by Supplier in the Authorized Channels in the Territory. The list of Licensed Products and Authorized Channels for each Country within the Territory shall be as set forth on (and further qualified by) the relevant Country Addendum.  Notwithstanding the foregoing, this grant of rights specifically excludes the right to market, distribute or sell Licensed Products (i) to Costco for resale by Costco in the Territory, and (ii) to any Military Exchanges and Commissaries located in the Territory; provided, however, that, within the EEA, the aforementioned exclusions shall apply only to Active Sales by Distributor.  This grant of rights shall be further limited as follows: (i) this grant of rights shall not extend to By-the-Cup Coffee Products, which shall be sold in the Territory directly by Supplier and its Affiliates or indirectly through third party food service distributors appointed by Supplier or its Affiliates in their sole discretion; and (ii) this grant of rights shall be non-exclusive with respect to online sites, (except for online sites that are owned or operated by a retail business within an Authorized Channel, which sites shall be considered part of such Authorized Channel and shall be exclusive to Distributor); for the avoidance of doubt, sales that are not intended to be exclusive to Distributor include sales direct to consumers through internet-based stores that have no physical sales locations other than incidental outlet locations (i.e., that have predominantly online sales).

B.     **No Conflict with Third Party Rights**.  Supplier represents and warrants to Distributor that the grant contained in Section 3.A does not conflict with the rights of any third party in or to any product, brand or trademark included in such grant, except as otherwise set forth in the Country Addenda. Distributor acknowledges that the representation and warranty in the preceding sentence shall not apply to any products that are not Licensed Products or to any Super Premium Coffee brand that Supplier may acquire after the date of this Agreement, and that any representation and warranty with respect to such product or brand will be provided, if at all, in a separate and specific representation and warranty provided in writing by Supplier to Distributor and attached and made a part of any Country Addendum to which it may be relevant.

C.     **Distributor's Obligations for Sale of Licensed Products**.  During the term of this Agreement, Distributor shall use commercially reasonable efforts, consistent with Distributor's business practices, policies, strategies, and with the terms of this Agreement, to market the Licensed Products in the Authorized Channels in the Territory, as further described in the specific Country Addenda.

D.     **Exclusivity Obligations**.

(i)     **Of Supplier**.

(a)     During the term of this Agreement, neither Supplier nor its Affiliates shall, directly or indirectly, market, distribute or sell, or license any third party to market, distribute or sell, any Super

8

Premium Coffee in the Authorized Channels in the Territory other than (1) the sale of the Licensed Products to Distributor in accordance with this Agreement, (2) the sale of Super Premium Coffee through Passive Sales, and (3) the sale of Super Premium Coffee to Kiosks. Supplier and its Affiliates retain the right to sell Super Premium Coffee in channels other than the Authorized Channels (including Costco and Military Exchanges and Commissaries, among others) and, subject to <u>Section 3.J</u>, outside the Territory. In addition, nothing herein shall be deemed to limit Supplier and its Affiliates from selling or supplying Kiosk Products to its own Kiosks or to licensed Kiosks in the Authorized Channels for resale by such parties, or from selling or supplying By-the-Cup Coffee Products, as provided in <u>Section 3.A</u> above.

(b)     During the term of this Agreement, neither Supplier nor its Affiliates shall grant any rights to any third party to use the Licensed Trademarks for purposes of marketing, distributing or selling the Licensed Products in the Authorized Channels in the Territory other than to Distributor, except as contemplated by this Agreement or the Country Addenda.   Notwithstanding the foregoing, but subject to the obligations of Supplier or its Affiliates pursuant to any other agreement with Distributor or its Affiliates, (1) Supplier and its Affiliates may, during the term of this Agreement, itself establish Kiosks, or enter into license agreements with certain stores included in the Authorized Channels to establish Kiosks, (2) Supplier and its Affiliates retain the right to use, and grant rights to third parties to use, the Licensed Trademarks in connection with any Super Premium Coffee products distributed in channels other than the Authorized Channels, and in all channels outside the Territory, (3) Supplier and its Affiliates retain the right to use, and grant rights to third parties to use, the Licensed Trademarks in connection with any non-Super Premium Coffee products, both within and outside the Authorized Channels and (4) Supplier and its Affiliates may engage in non-exclusive sales of Super Premium Coffee to online sites that are not owned or operated by a retail business within an Authorized Channel, as contemplated in <u>Section 3.A</u>.

(ii)    Of Distributor.

During the term of this Agreement, neither Distributor nor its Affiliates shall, directly or indirectly, distribute, market or sell any Super Premium Coffee in the Authorized Channels in the Territory, other than (a) the Licensed Products in the Authorized Channels in the Territory and (b) products or brands that may be identified in the Country Addenda. Notwithstanding anything to the contrary within, nothing in this <u>Section</u>

9

3.D(ii) or in this Agreement shall prevent or otherwise restrict Distributor or its Affiliates from: 1) selling Tassimo Discs, which shall be addressed, if at all, by a separate agreement between Distributor and Supplier, 2) selling Licensed Products outside the Territory (including the delivery of goods within the Territory) in direct response to unsolicited requests from retailers either inside or outside the Territory but within the EEA, or 3) marketing and selling any product that is not a Licensed Product, or that is otherwise not produced, sold or licensed by Supplier, outside the Authorized Channels in the Territory or in any channels outside the Territory. Neither Distributor nor its Affiliates shall develop, establish, or operate any Super Premium Coffee kiosks or similar establishments or sell Super Premium Coffee to any Super Premium Coffee kiosks or similar establishments in the Authorized Channels in the Territory.

E.     Distribution of Licensed Products Outside the Authorized Channels and Outside the Territory with respect to Sales Within the European Economic Area. Within the EEA, Distributor shall have no right to make Active Sales of the Licensed Products outside of the Authorized Channels or outside of the Territory. Supplier expressly reserves all rights in the Licensed Products not granted to Distributor under this Agreement.

F.     Distribution of Licensed Products Outside the Authorized Channels and Outside the Territory with respect to Sales Outside the European Economic Area. Outside of the EEA, except as provided in any other agreement between Distributor or its Affiliates and Supplier or its Affiliates, Distributor shall have no right to sell Licensed Products outside of the Authorized Channels or outside of the Territory, and Distributor shall use commercially reasonable efforts as permitted by Applicable Laws to ensure that the stores and outlets comprising the Authorized Channels shall not resell the Licensed Products except to end consumers located within the applicable Territory. Supplier expressly reserves all rights in the Licensed Products not granted to Distributor under this Agreement or any other agreement between Distributor or its Affiliates and Supplier or its Affiliates. Furthermore, outside of the EEA, Distributor will not sell Licensed Products to parties that Distributor knows or suspects are likely to resell outside of the Authorized Channels or outside of the Territory.

G.     Product Pricing in Authorized Channels within the EEA and Canada. Distributor shall have sole control of the pricing of the Licensed Products in the Authorized Channels within the EEA and Canada; provided, however, that Supplier may recommend price levels to Distributor consistent with the brand positioning of Super Premium Coffee. Additional country specific terms related to the pricing of the Licensed Products, if any, shall be contained in the relevant Country Addendum.

H.     Product Pricing in Authorized Channels outside the EEA and Canada. It is the intention of the parties that, as permitted by Applicable Laws, outside of the EEA and Canada, Distributor will not price the Licensed Products in a manner likely to detract from such products' super premium brand positioning in the market. Outside of the EEA and Canada, Distributor shall have control of the pricing of the Licensed Products in the Authorized Channels; provided, however, that Supplier may suggest price levels to Distributor consistent

10

with the brand positioning of Super Premium Coffee, and Distributor shall give due consideration to any such suggestions of Supplier when pricing the Licensed Products.

I.    Right of First Offer for Designated Non Licensed Products. In the event that Supplier wishes to distribute Designated Non Licensed Products through the Authorized Channels in any Country in the Territory, Supplier will offer Distributor the right to distribute such products in accordance with the terms and conditions of this Agreement. Distributor shall have the priority right but not the obligation to elect to distribute such products, and Distributor shall be entitled to exercise such right by providing a written election notice ("*Products Election Notice*") within thirty (30) days after Supplier notifies Distributor of its desire to distribute such Designated Non Licensed Products. If such Products Election Notice is provided within the requisite period, Distributor shall have the right to distribute such Designated Non Licensed Products upon the same terms and conditions applicable to the Licensed Products as set forth in this Agreement, and the relevant Country Addenda shall be updated to include such products accordingly. If Distributor notifies Supplier that it does not wish to distribute the Designated Non Licensed Products or if Distributor fails to provide the Products Election Notice within the requisite period, Distributor acknowledges and agrees that Supplier may, directly or indirectly through a third party, distribute and sell such Designated Non Licensed Products through the Authorized Channels in the Country or Countries to which this pertains. Distributor acknowledges and agrees that such distribution and sale of the Designated Non Licensed Products shall not be deemed to be a breach of this Agreement.

J.    Right of First Offer for Countries Outside the Territory. During the five-year term of this Agreement, in the event that Supplier wishes to commence distribution of Licensed Products in the Licensed Channels (as such term is defined in the US Supply and License Agreement), in any country then outside the Territory (except for any Non RFO Country), and subject to Distributor's compliance with its material obligations hereunder, Supplier will offer Distributor the right to distribute such Licensed Products in such country in accordance with the terms and conditions of this Agreement. Distributor shall have the priority right but not the obligation to elect to distribute such Licensed Products in such country, and Distributor shall be entitled to exercise such right by providing a written election notice ("*Country Election Notice*") within thirty (30) days after Supplier notifies Distributor of its desire to distribute such Licensed Products in such country. If such Country Election Notice is provided within the requisite period, Distributor shall have the right to distribute the Licensed Products in such country upon the same general terms and conditions set forth in this Agreement with respect to the Territory, and such terms and conditions specific to such country will be embodied in a mutually agreed Country Addendum to be supplemented to this Agreement. If Distributor notifies Supplier that it does not wish to distribute in such country or if Distributor fails to provide the Country Election Notice within the requisite period, Distributor acknowledges and agrees that Supplier may, directly or indirectly through a third party, distribute and sell the Licensed Products within or without any Authorized Channels in the country or countries to which this pertains. Distributor acknowledges and agrees that such distribution and sale of the Licensed Products in such country shall not be deemed to be a breach of this Agreement.  Notwithstanding the foregoing: (i) Supplier shall have no obligation under this Section 3.J to Distributor regarding pre-existing (prior to the date of this Agreement) sales of, or commitments to sell, Licensed Products outside the Territory, it being the intention of both parties to confine this right of first offer to new initiatives in countries outside the Territory; (ii)

11

this right of first offer for countries outside the Territory shall not apply to any Non RFO Country, and Supplier shall be free, directly or indirectly, to distribute any Super Premium Coffee, including the Licensed Products, in any Non RFO Country without any obligation of consent, consultation or notice with respect to Distributor hereunder; (iii) for the avoidance of doubt, this right of first offer shall not apply to Kiosk Products or By-the-Cup Coffee Products, for which Supplier shall retain the right to distribute, directly or indirectly, inside and outside the Territory; and (iv) Supplier shall have the right to conduct limited distribution in reasonable amounts of the Licensed Products in any country outside the Territory upon written notice to Distributor in the event that Supplier deems it is necessary or advisable to do so for brand protection purposes (i.e., to establish intellectual property rights).

      K.      <u>Costco Planning Outside the EEA</u>.  Outside of the EEA, the parties will interact on issues related to Costco in the Territory, if at all, as set forth on the relevant Country Addendum.

      **4.**      **Product Supply**.

      A.      <u>Product Standards</u>. The actions taken by Supplier in connection with the purchase, roasting, packaging, distribution or sale of the Licensed Products to be supplied by Supplier to Distributor under this Agreement shall be in accordance with standards and conditions no less stringent than those standards and conditions applied to Super Premium Coffee sold in stores owned, licensed or operated by Supplier or its Affiliates in the relevant Country.  Supplier shall deliver the Licensed Products to Distributor on a time schedule established for each Country as set forth on the relevant Country Addendum.  In addition, Distributor shall, and shall cause its Affiliates to, comply with the procedures that are agreed in writing with Supplier with respect to non-saleable product and expired product.

      B.      <u>Product Supply Prices</u>.  Supplier shall sell the Licensed Products to Distributor at a price equal to the Fully Landed Cost for such products, and fixed in currency of origin, as established by the Parties every six months, and determined in accordance with <u>Schedule 1a</u>, as modified (if at all) by the Country Addenda, plus the Variable Product Margin Payments (as defined in <u>Section 7</u> below).  To the extent Supplier purchases products or services from related parties, all cost components included in the Fully Landed Cost shall be based on the lesser of actual costs to Supplier or the fair market value of the component based upon the open market cost for such item in an arm's-length transaction between unrelated parties.  At the end of each six month period, Supplier shall "true-up" any and all variances between the actual and the invoiced Fully Landed Costs for such Year.  Audits of Supplier's Fully Landed Cost (including the end of Year "true-up" calculation) shall be performed as provided in <u>Section 7.D</u>.

      C.      <u>Product Supply</u>.  Supplier will select the green coffee to be used to manufacture the Licensed Products.  Distributor will provide Supplier with rolling forecasts of estimated sales of Licensed Products as set forth on each Supply Schedule to facilitate the purchase and roasting of green coffee for ultimate sale.  The appropriate location and terms of delivery for each Country shall be subject to mutual agreement on a case by case basis as set forth on the relevant Country Addendum.  Supplier shall send to Distributor an invoice setting forth amounts, in Local Currency, owed by Distributor to Supplier, concurrently with each shipment of Licensed Products.  Distributor shall remit payment to Supplier, by wire transfer of

immediately available funds, of all amounts due under any such invoice within thirty (30) days after receipt of such invoice by Distributor or receipt of Licensed Products, whichever is later, as long as goods received match the invoice and subject to any other customary verification.

D. <u>Future Supply Arrangements</u>. Each Supply Schedule sets forth the procedures for Distributor to communicate with Supplier with regard to demand forecasts.

## 5. <u>Term and Termination</u>.

A. <u>Term</u>. This Agreement shall commence as of the date set forth in the recitals hereto and continue for a period of five (5) years, unless otherwise indicated in the Country Addenda, which Addenda shall take precedence in regard to this Term, and unless sooner terminated pursuant to the terms of this Agreement. This Agreement shall remain in effect for as long as any Country Addendum remains in effect, but only with respect to such Country Addendum. This Agreement may be renewed for additional five (5) year periods only upon the mutual written agreement of the parties, except that the execution of or renewal of a Country Addendum shall effectively renew this Agreement for an additional five (5) year period only for the purpose of such Country Addendum. The term for any new or renewed Country Addendum shall be no less than 5 years. In the event the parties do not renew this Agreement, neither party shall have any liability for termination or otherwise resulting from such non-renewal, provided that both parties shall cooperate in good faith to provide for an orderly transition of the sale and distribution of the Licensed Products in the Territory in accordance with the requirements of Supplier.

B. <u>Termination</u>. This Agreement may be terminated in its entirety, or with respect to a specific Country or Countries and corresponding Country Addendum or Country Addenda, prior to the expiration of the term hereof or thereof, as set forth below; provided, however, that, with respect to items (iii), (iv) and (vi)(b) below, a terminating party shall seek to terminate only one or more Country Addenda if the cause or impairment is reasonably confined to one or more specific Countries and is not likely to cause significant financial, brand equity or other such impact to the terminating party outside such Country or Countries. As such, this Agreement is subject to termination:

(i) In its entirety, or with respect to a particular Country and corresponding Country Addendum, by mutual written agreement of Supplier and Distributor;

(ii) In its entirety, or with respect to a particular Country and corresponding Country Addendum ("Country Agreement"), without cause, by Supplier at any time after thirty (30) months from the Effective Date of this Agreement, or from the Effective Date of the relevant Country Addendum, whichever is later, upon not less than one hundred eighty (180) days' prior written notice to Distributor. If Supplier terminates this entire Agreement or Country Agreement without cause pursuant to this provision, then Supplier will pay to Distributor the Fair Market Value of this entire Agreement (which shall be no less than the aggregate Fair Market Value of all of the relevant Country Agreements then existing) or of the relevant

13

Country Agreement, as the case may be, and which shall be in addition to the required payment by Supplier to Distributor for any and all related inventory and display materials as contemplated in <u>Section 6.A</u>. In the event Supplier terminates this Agreement in its entirety or with respect to a particular Country pursuant to this <u>Section 5.B(ii)</u>, then within forty five (45) days following the effective date of the termination, Supplier shall pay Distributor the relevant Fair Market Value and payment due under Section 6.A.

(iii)    In its entirety, or with respect to a particular Country and corresponding Country Addendum, by either party, upon a Material Breach of this Agreement, including any Country Addendum, by the other party, or the other party's Affiliate (as the case may be), which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach.

(iv)    In its entirety, or with respect to particular Country and corresponding Country Addendum, by either party, in the event of insolvency or bankruptcy of the other party, if such condition is not cured within sixty (60) days.

(v)    In its entirety, or with respect to a particular Country and corresponding Country Addendum, by either party, in the event of an assignment of this Agreement by the other party in violation of <u>Section 13.B</u>.

(vi)    In its entirety, or with respect to a particular Country and corresponding Country Addendum, by Supplier, if, without the prior consent of Supplier, (a) Distributor assigns this Agreement to a Significant Competitor, or (b) Distributor or any of its Affiliates becomes a Significant Competitor or becomes a supplier of Super Premium Coffee to a Significant Competitor in the Authorized Channels in the Territory.

(vii)    In its entirety, or with respect to a particular Country and corresponding Country Addendum, by Distributor, if, without the prior consent of Distributor, Supplier assigns this Agreement to a Significant Competitor.

(viii)    By either party, upon a Change of Control of the other party.

(ix)    By either party, upon the expiration or termination of the US Supply and License Agreement.

C.    <u>Termination of Rights</u>.  If Distributor fails to achieve the minimum Distributor Net Sales amount for the Licensed Products (such minimum to be set at 50% of the sales forecast in the Business Plan and specified in each relevant Country Addendum) in any Country in any specified Year, Supplier may terminate Distributor's rights under this Agreement to distribute any or all Licensed Products with respect to such Country.  In each case, Supplier's termination right shall be subject to Distributor's right to cure such failure as provided below in this <u>Section 5.C</u>.

14

For each Year after the initial term of this Agreement, pursuant to a written renewal of this Agreement (if any), Distributor will continue to be required to achieve minimum Distributor Net Sales for each Country set forth in each respective Country Addendum in amounts to be determined by the International Oversight Committee. If the International Oversight Committee is unable to agree on one or more of such minimums, the matter shall be resolved pursuant to Section 14. Within sixty (60) days following the end of the applicable Year, Distributor shall report to Supplier the Distributor Net Sales by Country. If Distributor fails to achieve the minimums for any Country as set forth in the relevant Country Addendum, Supplier will have ninety (90) days from its receipt of Distributor's report to elect to terminate this Agreement with respect to any such Country, upon written notice to Distributor (the "Termination Notice"). Upon receipt of such Termination Notice, Distributor shall have a period of thirty (30) days following receipt of such notice within which to cure such failure by paying to Supplier, in cash, an amount equal to the Cure Amount (defined below). Notwithstanding any other provision of this Section 5.C, if Distributor pays the Cure Amount for any such Country to Supplier within such 30-day period, Supplier shall not have any right to terminate this Agreement with respect to such Country pursuant to this Section 5.C for the relevant Year. If Supplier does not provide Distributor the Termination Notice within the ninety (90) day period described above, Supplier will be deemed to have waived its right to terminate the Agreement with respect to the applicable Country pursuant to this Section 5.C in the relevant Year. For purposes of this Agreement, "Cure Amount" shall mean, for each Country in any Year, an amount equal to 20% of the remainder of (i) the minimum Distributor Net Sales in such Country, for such Year less (ii) the actual amount of Distributor Net Sales in such Country for such Year.

D. Valuation. Within thirty (30) days following Supplier's written notice to Distributor of Supplier's termination of this Agreement or Supplier's termination of a particular Country Addendum, as the case may be, pursuant to Section 5.B(ii) hereof, Supplier shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "Supplier-Chosen Appraiser"), and Distributor shall appoint one appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement (the "Distributor-Chosen Appraiser"). The Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser shall jointly determine the Fair Market Value of this Agreement or of the relevant Country Addendum, as the case may be. In the event the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on such Fair Market Value within forty-five (45) days after they are appointed, and further negotiations, in the opinion of either of the appraisers, would not result in such an agreement, the Fair Market Value shall be the average of the appraised values of the two appraisers; provided, however, that if the appraised values of the two appraisers differ by more than ten percent (10%) of the lower of the two appraised values, the two appraisers shall select a third appraiser with recognized expertise in determining the value of distribution arrangements in the nature of this Agreement, which appraiser shall be independent with respect to Supplier and Distributor (the "Independent Appraiser"). The Independent Appraiser shall not be affiliated with either Supplier or Distributor, shall not have performed work for either Supplier or Distributor within the twenty-four (24) month period immediately preceding its appointment pursuant to this Section 5.C and shall otherwise not have any reason to be influenced by the interests of either Supplier or Distributor. If the Supplier-Chosen Appraiser and the Distributor-Chosen Appraiser are unable to agree on an Independent Appraiser, then either party may petition the presiding judge of the Federal District Court for the Southern District of New York to appoint an

15

Independent Appraiser.  The Independent Appraiser shall, within forty-five (45) days after its appointment, determine whether the appraisal prepared by the Supplier-Chosen Appraiser or the appraisal prepared by the Distributor-Chosen Appraiser most closely reflects the Fair Market Value of this Agreement or of the relevant Country Addendum, as the case may be, and shall notify the parties of such decision in writing.  The appraisal selected by the Independent Appraiser shall be final and binding on Supplier and Distributor for purposes of determining such Fair Market Value. Supplier and Distributor shall bear the costs of their respective appraisers and shall share the cost equally of the Independent Appraiser, if any.  Note that for purposes of valuation, the Fair Market Value shall (i) be an amount which is in addition to the value of inventories and display materials which Supplier would be required to purchase from Distributor as provided in Section 6.A, (ii) shall be supplemented by the value of all unutilized Payment Credits accrued under Section 7, and (iii) shall exclude the value of all Passive Sales.

## 6.  Post-Termination Rights and Obligations.

A.  Transition from Distributor to Supplier. Subject to Section 6.C below, upon termination of this Agreement or some portion hereof in accordance with Section 5.B, Supplier shall buy from Distributor: (i) the Licensed Products subject to such termination that remain in Distributor's inventory on the date of termination of this Agreement, and (ii) the display materials related thereto. The purchase price paid by Supplier to Distributor pursuant to this Section 6.A shall be calculated as follows:

(i)  The purchase price for the Licensed Products referred to in this subsection shall be the purchase price paid by Distributor when it purchased such products from Supplier.

(ii)  The purchase price for the display materials referred to in this subsection shall be the depreciated book value thereof.

The parties shall allocate advertising and promotional commitments relating to the Licensed Products existing on the date of termination of this Agreement as follows: (x) fixed trade and variable spending commitments shall be allocated based on the date of termination of this Agreement, so that the party who benefits from the sales generated by the spending shall bear the cost of such spending, and (y) consumer coupons redeemed after the termination of this Agreement shall be for the account of Distributor if reasonably related to sales that occurred while Distributor was managing the business and enjoying the benefits of such sales, otherwise coupons redeemed after the termination of this Agreement shall be for the account of Supplier.

B.  Payment of Fair Market Value. In the event this Agreement or a particular Country Addendum is terminated pursuant to Section 5.B(ii), the payment by Supplier to Distributor of the appropriate termination fee shall be deemed not to include: 1) the purchase by Supplier of the Licensed Products owned by Distributor that remain in Distributor's inventory, the display materials used in connection therewith, and the existing advertisement and promotional commitments relating to such Licensed Products that are allocated to Supplier pursuant to Section 6.A above, and 2) the value of all unutilized Payment Credits accrued under Section 7, which shall be paid by Supplier separately.

16

C.    Orderly Transition.  Supplier and Distributor shall act in good faith to make an orderly transition for the sale of the Licensed Products following termination of this Agreement.  Distributor and Supplier shall use their best efforts to allow the Licensed Products remaining in the Authorized Channels to be sold in the ordinary course of business of the particular retail outlet in the Authorized Channels at which such Licensed Products remain, it being understood that such post-termination sell-through period may be up to 90 days.

D.    Trademark Use.  Following termination of this Agreement for any reason, and except for such uses reasonably necessary to effect an orderly transition or otherwise as permitted herein, Distributor shall discontinue its use of the Licensed Trademarks, and Supplier shall be permitted to use or license the Licensed Trademarks on any products without restriction.

## 7.    Payments; Advertising and Promotion; Audits, Reports and Records.

A.    Periodic Payments.  During the term of this Agreement, Distributor shall make quarterly payments (each, a "*Variable Product Margin Payment*") to Supplier in Local Currency, separately for each relevant Country, unless otherwise agreed, each in an amount equal to:

(i)    50% of Net Profits for such quarter; plus

(ii)    100% of Supplier's Business Unit Overhead for such quarter;

provided, however, that:

(1) If Net Profits for any quarter is calculated to be a negative number, then the Variable Product Margin Payment attributable to Net Profits shall be zero, and Distributor shall pay only the Supplier's Business Unit Overhead for that quarter.  However, Distributor is then entitled to subtract from subsequent Net Profits an amount equal to such negative number (the "*Payment Credit*") and any other amounts previously constituting the Payment Credit, but only to the extent that Net Profits in subsequent quarters is positive.  For the avoidance of doubt, if Net Profits is negative, it carries over as a Payment Credit, and if Net Profits is positive, after the exhaustion of all Payment Credits, then 50% of such Net Profits is a payment owing to Supplier under the terms of this Section 7.A; and

(2) All payments shall be made by wire transfer of immediately available funds within thirty (30) days after the end of the relevant quarter; and

(3) Distributor in each Country shall retain for its own account all Net Profits not required to be distributed to Supplier in any quarter pursuant to the foregoing provisions.

B.    Taxes.  Each party shall be responsible for paying taxes as set forth on the relevant Country Addendum.

17

C.   Advertising and Promotion.

(i)   Distributor shall spend that amount per year on Advertising and Promotion in each Country such that, pursuant to U.S. generally accepted accounting principles, the expense is at least equal to the Minimum A&P Amount for such year in each Country, unless otherwise agreed by the parties. Additional country-specific amendments or additions to or reductions of the Minimum A&P Amount may be agreed by the parties and set out in the relevant Country Addendum.

(ii)   The failure of Distributor to expense at least the amount described in Section 7.C(i) above in a Country in the applicable year, unless otherwise agreed by the parties, shall constitute a Material Breach of this Agreement on the part of Distributor; provided, however, that any such failure on the part of Distributor shall not be deemed a Material Breach of this Agreement if Distributor has expensed at least ninety percent (90%) of the minimum expenditure in question and Distributor pays to Supplier, within thirty (30) days following the end of such year, the amount by which the Minimum A&P Amount for such year exceeds Distributor's actual advertising and promotional expenditures.

D.   Audits.  During the term of this Agreement, and for the year immediately following termination of this Agreement, each party shall have the right to conduct an annual audit of the books and records of the other party, provided that (i) such audit shall be scheduled so as to not interfere with the other party's year-end closing activities; (ii) such audit is preceded by a procedures report which sets out to the audited party what scope and focus the audit is intended to cover; and (iii) such audit shall exclude the review of proprietary or confidential information that is outside the scope or purpose of the audit contemplated by this Agreement, including with respect to blend information and other such intellectual property.  The party requesting the audit may conduct the audit using its own internal auditing department, or at its option, a nationally recognized auditing firm selected by such party (the "*Auditor*") to confirm (i) in the case of Distributor, the accuracy of Supplier's calculation of Fully Landed Costs and the aggregate purchase price for the Licensed Products during such Year, and (ii) in the case of Supplier, the accuracy of the Distributor's P&L Statement for each quarter and Distributor's calculation of the Variable Product Margin Payments.  Such audits shall be made with particular reference to all applicable terms of this Agreement and the relevant Country Addenda. Distributor and Supplier shall each bear their own audit costs, which costs shall not be reflected or included in the Distributor's P&L Statement or the Supplier's Fully Landed Cost, as applicable.  All records of Distributor and Supplier as may reasonably be necessary to verify the audit will be made available to the other party's Auditor upon its request.  The Auditor's determination shall be in writing and delivered within 90 days after the completion of the audit and shall be conclusive and binding upon Distributor and Supplier (the "*Final Determination*"), unless contested in writing by the other party within fifteen (15) days following its receipt of the audit report. If the Final Determination indicates any errors in (x) Supplier's calculation of Fully Landed Cost or the purchase price payable for Licensed Products purchased by Distributor, or (y) Distributor's calculation of the Variable Product Margin Payments or the Net Profits attributable to the sale or supply of Licensed Products through all Authorized Channels during

18

such Year, then the Auditor shall calculate the net amount of a payment to be made by Supplier or Distributor, as applicable, to correct such errors, which payment shall be made by either Supplier or Distributor, as applicable, within thirty (30) days after such determination; *provided however* that no retroactive payment shall be made with respect to any period which is more than eighteen (18) months prior to the commencement of the audit in which such errors are first identified. In addition, no party shall be required to make a payment if, and only to the extent, it disputes the audit results, in which case the audit dispute will be submitted to the International Oversight Committee for resolution. If the International Oversight Committee is unable to resolve the dispute, the matter shall be resolved in accordance with the dispute resolution provisions of Section 14.

       E.     Business Reports. Distributor shall render reports, by Country, in a form reasonably satisfactory to Supplier, no later than ten (10) days after the end of each fiscal month, setting forth:

       (i)     Unit sales and gross sales of Licensed Products by Licensed Trademark during each month, provided that this report shall be rendered by Distributor no later than three (3) days after the end of each fiscal month;

       (ii)     Distributor's P&L Statement of Licensed Products during the month;

       (iii)     Distribution and share data (to the extent available, otherwise at such time that it is available, but only to the extent allowed under Kraft's agreement, if any, with the local market data provider) for Licensed Products for the month; and

       (iv)     A summary of Product Supply Payments (per Section 4.C) and Variable Product Margin Payments (per Section 7.A) paid to Supplier during the period covered by the report.

       F.     Records. Each of Distributor and Supplier shall maintain for a period consistent with such party's normal retention practices, complete and accurate records and accounts covering the transactions related to this Agreement. Such records and accounts shall be kept in accordance with generally accepted accounting procedures and principles.

      **8.**     **Quality; Compliance; Packaging**.

       A.     Supplier's Quality Obligations. Supplier shall use all commercially reasonable efforts to ensure that the Licensed Products manufactured by Supplier will be of high quality consistent with the quality of the products of Supplier sold outside the Authorized Channels in each Country of the Territory. All Licensed Products manufactured by Supplier shall be manufactured, packaged and labeled in compliance with all Applicable Laws and regulations with respect to their intended markets. Supplier shall ensure that code dates on packages of Licensed Products that permit the calculation of the date when such products should be removed from retail stores due to age appear on the exterior of the package. Supplier will provide Distributor with such samples of Supplier's coffee products as Distributor may reasonably request. Supplier shall permit Distributor to inspect any premises on which the Licensed Products are manufactured, packaged, stored or distributed; provided, however, that

CHIDMS1/2462750.7

any such inspection by Distributor pursuant to this Section 8.A may be undertaken only to verify compliance of the Licensed Products with all Applicable Laws and regulations, and Distributor shall require any person conducting such an inspection to execute an appropriate confidentiality agreement with Supplier.

B.    Distributor's Quality Obligations.  Distributor shall use its best efforts to ensure that the Licensed Products distributed and sold by Distributor are consistent with the jointly agreed requirements of the approved Super Premium Coffee brand positioning for the Licensed Products.  Distributor will observe the shelf life policies of Supplier.  Such policies provide for a thirty-four (34) weeks shelf life for ground and whole bean coffee products bearing the Licensed Trademarks.

C.    Supplier's Approval of Product Display in Authorized Channels.  Supplier and Distributor shall cooperate to develop practices and procedures to be followed for the display of the Licensed Products in the Authorized Channels, which practices and procedures shall be consistent with the approved Super Premium Coffee brand positioning of the Licensed Products and the brand equity of Supplier.  Specific shelf, display or racking guidelines (if any) may be set out in the Country Addenda.

D.    Consumer Complaints.  Supplier shall place Supplier's toll free consumer hotline telephone number or related web URL on the packaging of the Licensed Products sold to Distributor.  Such toll free consumer hotline shall be accessible from the relevant Country. Distributor shall cooperate with Supplier in all efforts related to handling consumer complaints in a responsive manner.  Distributor shall immediately notify Supplier of any consumer or product quality issues with respect to the Licensed Products that are brought to Distributor's attention.  Supplier shall immediately notify Distributor of any consumer or product quality issues with respect to the Licensed Products that are brought to Supplier's attention.

E.    Recalls and Withdrawals.  Either party may initiate a recall or a market withdrawal (*"Market Withdrawal"*) of the Licensed Products due to contamination, adulteration or public health risk.  If the purported reason for the Market Withdrawal turns out to be unfounded, the party that initiated the Market Withdrawal shall bear all costs related thereto. Supplier will bear all costs related to any Market Withdrawal of the Licensed Products that results from contamination or adulteration of the Licensed Products in, or a public health risk that is attributable to, the manufacturing or packaging stages or while the Licensed Products were otherwise in the physical control of Supplier or Supplier's agents or subcontractors. Distributor will bear all costs related to any Market Withdrawal of the Licensed Products that results from contamination or adulteration of the Licensed Products, or public health risk that arises, after such products have been delivered by Supplier to Distributor or to Distributor's agent, Affiliate or subcontractor, unless the cause of such contamination, adulteration or public health risk is attributable to a time before the Licensed Products were delivered to Distributor or its agent, Affiliate or subcontractor.  In the event the parties are unable to determine when the contamination or adulteration of the Licensed Products occurred, the parties shall share all initial costs related to any Market Withdrawal of the Licensed Products, and the parties shall negotiate in good faith to arrive at an equitable division of the costs associated with such Market Withdrawal, with reimbursement of the appropriate party not responsible for the contamination. Supplier will notify Distributor if any contamination, adulteration, or public health issues arise

20

outside the Authorized Channels that are likely to have a material impact on Distributor's sales of the Licensed Products in the Territory. Distributor will notify Supplier of any contamination, adulteration or public health issues that arise, and that Distributor becomes aware of, while the Licensed Products in question are in the custody and control of a retail customer.

    F.    Measurement Criteria and Field Audits.

    (i)    Measurement Criteria. Set forth on Schedule 8.B(i) and in the Country Addenda are the Measurement Criteria and the actions the parties have agreed to undertake in the event the Measurement Criteria are not satisfied.

    (ii)    Costs and Conduct of Field Audits. The parties will, upon the written request of Supplier (such request not to be unreasonably delayed or denied by Distributor) retain a Field Auditor to conduct audits of Distributor's performance of its obligations under this Section 8. Supplier will be entitled to make such request once during the first Year and as mutually agreed in each Year thereafter, Distributor's agreement not to be unreasonably withheld. Each party shall bear 50% of the costs of such audits, as Distributor will pay for the audits, or reimburse Supplier for Supplier's payment for the audits, and include the cost on Distributor's P&L statement. The field audit shall be conducted using a statistically valid sample size of stores to generate the accuracy of the Field Auditor's measurement of the Measurement Criteria. Supplier and Distributor agree to review the performance of the Field Auditor, and change the methodology and/or the Field Auditor as may be reasonably necessary from time to time to help ensure that the audit continues to be conducted efficiently and accurately. In the event a party desires to change the then-current audit methodology or the then-current Field Auditor, it will notify the other party in writing of its proposed changes. The other party will not unreasonably withhold its consent to such proposed changes. If the parties are unable to agree on the proposed changes, the issue shall be submitted to the International Oversight Committee for resolution. If the International Oversight Committee is unable to resolve the issue, it shall be resolved pursuant to the dispute resolution provisions of Section 14.

    (iii)    Field Audit Results. If a field audit indicates that Distributor has failed to meet or exceed the then-current Measurement Criteria, the parties shall undertake the actions described in Schedule 8.B(i), provided, however, that failure to meet or exceed the Measurement Criteria alone shall not be the basis for a claim of Material Breach under Section 5.B(iii) or any other Section of the Agreement, provided further that the foregoing shall not affect or limit the obligation of Distributor to develop and pursue in good faith an Action Plan as provided in Schedule 8B(i).

    G.    Compliance. Distributor shall market, sell and distribute such Licensed Products, and require that its subcontractors market, sell and distribute such Licensed Products

and otherwise conduct its and their respective businesses, in full compliance with Applicable Laws; provided, however, that Distributor shall not be liable for non-compliance with Applicable Laws resulting from Supplier's failure to comply with its obligations to manufacture, package and label the Licensed Products in accordance with such Applicable Laws. Distributor shall, at its expense, obtain and maintain any necessary licenses and permits that Applicable Laws require in connection with its activities under this Agreement. Distributor shall provide Supplier with such applicable certification or other documentation evidencing compliance that Supplier may from time to time reasonably request. If Distributor becomes aware that any provision of this Agreement conflicts with Applicable Laws, Distributor shall provide prompt written notice of such conflict to Supplier, and Supplier and Distributor shall negotiate in good faith to modify the applicable provision to comply with Applicable Laws. Without limiting the generality of the foregoing, Distributor shall:

(i)     comply with (to the extent they apply to the Supplier's and Distributor's activities related to each Country), and assist Supplier in complying with, the Anti-Terrorism Laws (to the extent required or permissible under the Applicable Laws of each Country); and

(ii)    take no action that would violate or subject the other party to penalties under the U.S. Foreign Corrupt Practices Act or the OECD Anti-bribery Convention, including directly or indirectly through a third-party intermediary paying or providing, or offering to pay or provide, any monies or other items of value (including, e.g., gifts, meals, contracts, entertainment, employment, hospitalities, and sponsorships that are not permitted by the U.S. Foreign Corrupt Practices Act, the OECD Anti-bribery Convention or other Applicable Law) to (a) an officer or employee of a governmental department, agency, instrumentality (including a government-owned commercial enterprise) or public international organization, or any person acting on behalf of any such entity; or (b) any political party or official thereof or any candidate for political office, in order to obtain, retain or direct business to any person.

H.      Labeling and Packaging.  Except as set forth in the relevant Country Addendum:

(i)     Supplier will be responsible for ensuring that the Licensed Products comply with all regulatory packaging and labeling requirements in each Country within the Territory with respect to their intended markets.

(ii)    With respect to all Countries in the Territory, Distributor agrees not to remove Supplier's over-sticker labels or notices affixed to the Licensed Products. Furthermore, except as required to effect Passive Sales as required by Applicable Laws, Distributor will not modify or relabel any Licensed Products, and will not obscure or remove the labeling or packaging provided by Supplier without the prior written consent of Supplier. If changes to or new interpretations of Applicable Laws that require stickers to be affixed to product occur after such product is already

22

in Distributor's possession, the costs to apply such stickers shall be reflected on Distributor's P&L Statement and borne by the parties accordingly, provided, that if such changes or new interpretations occur while the product is still under the control of Supplier, Supplier shall be responsible for the costs to apply such stickers. In either event, Distributor will fully cooperate with Supplier to facilitate the application of these stickers.

(iii)    Supplier's packaging and labeling obligations under this Section 8.H are limited only to those requirements applicable to Active Sales of the Licensed Products for the Country in question.

**9.    Brand Positioning and Development of Materials.**

A.    Procedure for Development of Brand Strategy.

(i)    Supplier will, from time to time, designate in writing to Distributor the name(s) of individual(s) (the "Starbucks International Brand Management Team") responsible for reviewing and approving the matters submitted to Supplier in accordance with this Section 9.A. The current members of the Starbucks International Brand Management Team are listed on Schedule 9. To ensure consistency with Supplier's premium image, Supplier and Distributor shall meet as necessary to enable Supplier to educate Distributor and provide guidance concerning Supplier's branding strategy, including brand image, messaging and positioning, and display strategy. Supplier and Distributor shall develop and agree on a branding strategy for the Licensed Products in the Authorized Channels and Territory that supports Supplier's overall branding strategy. Distributor agrees that Supplier's International Brand Management Team will work with Distributor's International Brand Management Team (the "Kraft International Brand Management Team," as identified in Schedule 9) to provide guidance as Distributor develops and implements the promotional, advertising, marketing and display concepts approved by Supplier. With the prior consent of Distributor (such consent not to be unreasonably withheld), Supplier may incur expenses arising from its consultation on marketing programs and strategies, including charges for packaging development and creative services, which expenses will be charged to Distributor at actual cost and reflected on Distributor's P&L Statement.

(ii)    Distributor shall submit to Supplier's International Brand Management Team, for Supplier's approval, all proposed promotions, advertising, packaging, display and other programs and materials that support the Licensed Products or use the Licensed Trademarks, including translations thereof into the English language. Such submission by Distributor shall be made during the concept or initial planning stages and again at the final stage prior to launch. Supplier and Distributor shall work informally and cooperatively to resolve any issues arising from Supplier's review of the

23

foregoing.  Supplier's International Brand Management Team will have the right to reject any ideas, proposals, programs, materials or other uses of the Licensed Trademarks; provided, however, that upon reasonable request by Distributor, any such objection shall be accompanied by a written statement setting forth in reasonable detail the nature of Supplier's objections and, if practicable, suggestions for removing or replacing the objectionable aspects.  Supplier shall approve or object to proposed materials of Distributor within ten (10) Business Days after receipt of such materials from Distributor.  If the nature of certain submittals (e.g., those requiring trademark clearances) requires more than ten (10) Business Days for Supplier's review, then within ten (10) Business Days of its receipt of such submittals, Supplier will notify Distributor of its estimate for completing such review and shall use all reasonable efforts to complete its review within such time period.  All final approvals or objections must be set forth in writing and executed by a member of Supplier's International Brand Management Team.

(iii)   Supplier shall have the right to reasonably object to any sales (outside of the EEA) or Active Sales (within the EEA) of Licensed Products to specific accounts, if Supplier determines in its reasonable discretion that the applicable account is detrimental to the brand positioning strategy for the Licensed Products.  Supplier and Distributor shall work informally and cooperatively to resolve any such objection.

B.   Management of the Agreement. Distributor will provide Supplier the reasonable opportunity to consult with Distributor on matters affecting Distributor's management of, distributing and marketing the Licensed Products in the Authorized Channels, and will consider in good faith all recommendations and suggestions made by Supplier with respect thereto.  Supplier from time to time in its reasonable discretion will designate the Supplier's employees to be dedicated (both full and part time) to the distribution and promotion of the Licensed Products in the Authorized Channels. Distributor and Supplier will use all reasonable efforts to cooperate to ensure regular and open communication between their management teams. The parties have mutually developed a business plan ("*Business Plan*") covering Distributor's distribution and sale of the Licensed Products for each Country in the Territory, including appropriate sales targets for each such Country. Without limiting the generality of the preceding sentences:

(i)   Distributor will provide Supplier the reasonable opportunity to be involved in all significant sales planning by Distributor for the Licensed Products, and Distributor and Supplier will, prior to the commencement of each calendar year during the term of this Agreement, cooperate to jointly develop and agree upon a marketing plan covering Distributor's distribution of the Licensed Products (each annual marketing plan will include the A&P budget);

(ii)   Supplier may, in its reasonable discretion, consult on sales action plans for all accounts selected by Supplier;

24

    (iii)    Supplier will have the right to review significant sales presentations relating solely to Licensed Products and attend (only with Distributor) significant sales calls on Licensed Products accounts selected by Supplier in its reasonable discretion;

    (iv)    Distributor will consult with Supplier on all marketing research conducted by or on behalf of Distributor regarding the Licensed Products, including the design and scope of all marketing research projects and the research questionnaires and methodology.   Distributor will promptly provide Supplier with such marketing research reports received by Distributor.  If allowed under local market data provider agreements and Applicable Laws, Distributor may provide Supplier access to selected market reports in Distributor's possession (including SKU-level data by market) for the Licensed Products and key competitors on a monthly basis;

    (v)    Distributor will provide Supplier with routinely available marketing and trade budgets relating to the Licensed Products, including key assumptions, to the extent such reports are regularly generated by Distributor at key forecast periods, otherwise semi-annually; and

    (vi)    The parties contemplate the addition by Distributor of a general manager at some future date to manage the relationship contemplated under this Agreement.  The parties will mutually agree on the role and cost for this position, and the expense associated therewith will be allocated, as appropriate, to Distributor's P&L Statement, provided that if the general manager is added in the first year, then the parties agree that they will allocate 50% of actual costs related to such general manager to Distributor's P&L Statement. In the event the parties cannot agree on the role and costs of such general manager, then such matter shall be forwarded to the International Oversight Committee for resolution.

    C.    <u>Submission to International Oversight Committee</u>. In the event Supplier and Distributor are unable to agree on a brand positioning strategy for the Licensed Products, Distributor may submit such matter to the International Oversight Committee, which shall use its best efforts to resolve such disagreement.  In no event will Distributor pursue a significant brand strategy that has not been approved by either Supplier's International Brand Management Committee or the International Oversight Committee.

    D.    <u>Duplication</u>. To the extent appropriate and possible, the parties shall work together on the procedure for developing brand strategy, as set out in this <u>Section 9</u>, in such a way as to minimize duplication of each party's efforts across the Territory.

    E.    <u>Failure to Comply with this Section 9</u>.  Either Distributor's or Supplier's failure to comply in any material respect with any provision contained in this <u>Section 9</u> shall constitute a Material Breach of this Agreement by such party.

    10.    <u>**Coordinated Marketing Efforts**</u>.

CHIDMS1/2462750.7

A.    Coordination. In order to maximize sales of Licensed Products, the parties agree to cooperate to coordinate their marketing efforts with respect to the Licensed Products sold under the Licensed Trademarks.  Notwithstanding the foregoing, except as expressly provided herein, neither party shall be obligated to undertake any specific marketing effort or conduct any research on its own or in conjunction with the other party.

B.    Committees; Meetings; Contracts.

(i)    International Oversight Committee.    The "*International Oversight Committee*" shall be comprised of three top executives of each party and shall continue to review the parties' joint efforts pursuant to this Agreement and to oversee such financial, management and business issues as the members of the International Oversight Committee deem appropriate. The International Oversight Committee's roles will include: (a) reviewing annual profit targets as part of the Business Plan; (b) providing guidance on strategic issues and opportunities; (c) reviewing new business opportunities; (d) approving display methods; (e) reviewing and approving proposed changes to Schedule 1a and Schedule 1d; (f) providing a forum to resolve issues that are not able to be resolved at lower levels and (g) communicating on a regular basis with the oversight committee formed under the terms of the US Supply and License Agreement.    Each party may designate other senior executives as substitutes for its existing delegates to the International Oversight Committee. The members of the International Oversight Committee as of the date of this Agreement are listed on the Committee Schedule.  The International Oversight Committee shall meet at least twice a year and shall hold additional meetings as issues arise that require guidance from or resolution by the International Oversight Committee.

(ii)    Additional meetings and additional key employee participants may be initiated by either party when any new product or significant business initiatives are contemplated.

(iii)    Meetings will be held at appropriate Kraft and Starbucks sites, unless otherwise agreed to by the parties. Each party shall use its best efforts to secure the attendance of all other appropriate participants, including from outside agencies, at such meetings to ensure a full understanding of the parties' respective businesses and cultures.

(iv)    Each party shall appoint a primary contact person who shall act as the principal point of contact (outside of meetings of the International Oversight Committee) with the other party.  The parties will consult with each other regarding who will serve as the primary contact person, and each party will select a primary contact person who is satisfactory to the other party.  Distributor's primary contact person shall be the Senior Vice President, Global Beverages Sector.  Supplier's primary contact person shall be the Vice President, International CPG.

26

(v)     Final decisions of the International Oversight Committee shall be made by unanimous consent. If unanimous consent of the International Oversight Committee cannot be obtained either to affirmatively decide a matter or to table such matter, then such matter shall be subject to resolution as provided in Section 14.

C.      Active Sales Marketing Restriction. Distributor shall not provide any financing or marketing support for sales of Licensed Products outside of the Authorized Channels or outside of the Territory, and Distributor shall refrain from actions intended to, or the primary foreseeable result of which would be to, facilitate the advertising or promotion of Licensed Products outside of the Authorized Channels or outside of the Territory. Nothing in this Section 10.C shall prevent or otherwise restrict Distributor from making Passive Sales of the Licensed Products in the EEA.

11.     **Confidentiality.**

A.      Information.     Each party (the "*Receiving Party*") shall regard as confidential and proprietary all of the information communicated to it by the other party (the "*Disclosing Party*") in connection with this Agreement, including but not limited to, information concerning equipment, processes, Licensed Products, and data compilation and analysis (the "*Information*"). Information shall at all times be the property of the Disclosing Party and the disclosure of Information to the Receiving Party does not convey any right, title or license in the Information to the Receiving Party. The Receiving Party shall not, without the Disclosing Party's prior written consent, at any time use such Information for any purpose other than in connection with the performance of its obligations under this Agreement or disclose any portion of such information to third parties; provided, however, that the Receiving Party may disclose Information on a "need-to-know" basis to third-party suppliers (e.g., advertising agencies), and, in relation to Distributor, its Distributor Affiliates, with the Receiving Party to be responsible for any misuse or disclosure of such Information by such third-parties. The Receiving Party shall disseminate Information to its employees only on a "need-to-know" basis. The Receiving Party shall cause each of its employees who has access to such Information to comply with the terms and provisions of this Section 11.A in the same manner as the Receiving Party is bound hereby, with the Receiving Party remaining responsible for the actions and disclosures of any such employees.

B.      Exceptions.     Notwithstanding the provisions of Section 11.A, the Receiving Party's confidentiality obligations shall not apply to (i) information that, at the time of disclosure is, or after disclosure becomes, part of the public domain other than as a consequence of the Receiving Party's breach; (ii) information that was known or otherwise available to the Receiving Party prior to the disclosure by the Disclosing Party; (iii) information disclosed by a third party to the Receiving Party after the disclosure by the Disclosing Party, if such third party's disclosure neither violates any obligation of the third party to Disclosing Party nor is a consequence of Receiving Party's breach; (iv) information developed independently by the Receiving Party; (v) information that Disclosing Party authorizes, in writing, for release; or (vi) information that the Receiving Party is legally compelled to disclose; provided, however, that to the extent such party becomes so legally compelled, it may only disclose such information if it shall first have used reasonable efforts to, and, if practicable, shall have afforded the other party

27

and its Affiliates the opportunity to obtain an appropriate protective order, or other satisfactory assurance of confidential treatment, for the information required to be disclosed. Without in any way limiting the generality of the foregoing, in no event shall the varieties of Supplier's products, or ingredients thereof, be deemed to constitute "*Information*."

        C.     <u>Non-Solicitation</u>.   Unless otherwise agreed, during the term of this Agreement, and for a period of one (1) year following expiration or termination of this Agreement, neither party shall actively solicit for employment any employee of the other party who is or has in the prior year been involved significantly in the business which is the subject of this Agreement. The restrictions of this <u>Section 11.C</u> shall apply only to Distributor and Supplier and not their respective parents or Affiliates.

        **12.     Indemnification**.

        A.     <u>Distributor's Indemnity</u>. Distributor hereby indemnifies Supplier, and undertakes to defend and hold Supplier, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns ("*Supplier Indemnified Parties*"), harmless from and against:

        (i)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any and all product liability claims and/or any other actions involving Licensed Products where such claims are a result of the negligence or intentional acts of Distributor or of Distributor's agents, Affiliates or subcontractors, except claims that Distributor's use of any of the Licensed Trademarks in accordance with this Agreement infringes a third party's proprietary rights;

        (ii)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, arising out of Distributor's breach of any representation or warranty made hereunder, or any breach by a Distributor Affiliate of any Country Addendum hereto or any other act or deed, whether in contract or tort, committed or omitted by Distributor or by Distributor's agents, Affiliates or subcontractors; and

        (iii)     any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Supplier Indemnified Parties as a direct result of the execution, delivery or performance of this Agreement by Distributor or Distributor's Affiliate, in breach of another agreement to which Distributor or such Affiliate, is a party.

        B.     <u>Supplier's Indemnity</u>. Supplier hereby indemnifies Distributor, and undertakes to defend and hold Distributor, its officers, directors, employees, agents, Affiliates, parent, subsidiaries, successors and assigns ("*Distributor Indemnified Parties*"), harmless from and against:

CHIDMS1/2462750.7

(i)      expenses, including but not limited to reasonable attorneys' fees, arising out of any and all claims arising out of the exercise by Distributor or its Affiliate(s) of the rights granted by Supplier to Distributor or its Affiliate(s) hereunder, including without limitation claims arising out of the use thereby of the Licensed Trademarks in accordance with this Agreement

(ii)      any and all claims, suits, losses, damages, costs, liabilities and/or expenses, including but not limited to reasonable attorneys' fees, arising out of any breach of any Supplier representation or warranty made hereunder, by Supplier or its Affiliates, or any other act or deed, whether in contract or tort, committed or omitted by Supplier, its Affiliates or its agents or subcontractors hereunder; and

(iii)      any and all claims, suits, losses, damages, costs, liabilities, and/or expenses, including but not limited to reasonable attorneys' fees, incurred by the Distributor Indemnified Parties as a direct result of the execution, delivery or performance of this Agreement by Supplier or by a Supplier Affiliate in breach of another agreement to which Supplier or such Affiliate is a party.

C.      No Consequential Damages. Neither party shall have any liability to the other party for any indirect, consequential, punitive or other special damages. Nothing in this Section 12.C shall limit a party's indemnification obligations with respect to third party claims under Sections 12.A or 12.B above.

### 13.     Binding Agreement; Assignability.

A.      Binding Agreement. Unless assigned or transferred in violation hereof, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

B.      Assignment; Guarantee. Neither party may assign this Agreement or any of its rights hereunder without the prior written approval of the other party; provided, however, that either party may assign this Agreement, and its rights and obligations hereunder (in whole or in part), without the prior written approval of the other party, to a subsidiary or other corporate Affiliate, other than the parent, of such party. In the event of any assignment of this Agreement, the assignor shall, following such assignment, remain liable for all of its obligations under this Agreement. Distributor guarantees, on an unconditional, absolute and continuing basis, the complete and timely performance by its Affiliates and its subcontractors of the obligations under this Agreement and the Country Addenda, as set forth therein. Supplier guarantees, on an unconditional, absolute and continuing basis, the complete and timely performance by its Affiliates of the obligations under this Agreement and the Country Addenda, as set forth therein.

### 14.     Dispute Resolution.

A.      The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a

29

spirit of mutual cooperation, by submitting such claim or controversy to the International Oversight Committee. However, at any time following the first to occur of (i) the first meeting of the International Oversight Committee concerning such claim or controversy, or (ii) expiration of the thirty (30)-day period following a party's written request to the other party to submit such claim or controversy to the International Oversight Committee if the International Oversight Committee has not met to consider such claim or controversy within such thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration. Such binding arbitration shall be conducted within the City of Chicago at the International Centre for Dispute Resolution ("*ICDR*") or its successor, pursuant to its arbitration rules and procedures, except as modified by the Agreement of the parties. The arbitration shall be conducted by a single arbitrator selected by mutual agreement of the parties within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by the ICDR. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended), and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator is empowered to award attorney's fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement.

        B.      Nothing in this Agreement will prevent either party from resorting to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction or to avoid the barring of the claim under the applicable statute of limitations. In addition, resort by either party to negotiation, mediation or arbitration pursuant to this Agreement shall not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party to pursue any such judicial relief; provided, however, that irrespective of the filing of any such request for judicial relief the party shall continue to participate in the dispute resolution proceedings required by this paragraph. Any negotiation or mediation which takes place pursuant to this Agreement shall be confidential and shall be treated as a compromise and settlement negotiation for purposes of the Federal Rules of Evidence and State Rules of Evidence.

### 15.   Supplier's Title and Protection of Supplier's Rights.

        A.      Supplier's Title.  Supplier represents and warrants that it has the right to use and sublicense the Licensed Trademarks in the manner contemplated by this Agreement and that it has and will continue to have throughout the term of this Agreement all requisite authority to enter into and perform its obligations under this Agreement, and, subject to any exceptions set forth in any Country Addendum, Supplier knows of no allegations that its use or licensing of the Licensed Trademarks would infringe or violate the rights of any third party. Distributor acknowledges that notwithstanding the foregoing representations and warranties, certain brokers and distributors may have contractual rights to sell and/or distribute certain of the Licensed Products, at least until such products can be successful transitioned to Distributor. Distributor shall not at any time during the term of this Agreement contest or aid others in contesting the validity of the Licensed Trademarks. Supplier represents and warrants that it shall use reasonable efforts in good faith to maintain the registrations for the Licensed Trademarks in the United States and/or in the Territory, as applicable.

B.     Goodwill; Control of Licensed Trademarks.  Distributor acknowledges the substantial value of the goodwill associated with the Licensed Trademarks and agrees to use the Licensed Trademarks in the form and manner prescribed by Supplier and as set forth in this Agreement.  Distributor's use of the Licensed Trademarks and any goodwill generated from the use of the Licensed Trademarks by Distributor shall inure to the benefit of the owner of the Licensed Trademarks.  Apart from this Agreement, Distributor shall hereafter neither acquire nor claim any right, title, or interest of any kind or nature whatsoever in or to the Licensed Trademarks or the goodwill associated therewith.  Supplier has approval rights over all aspects of all uses by Distributor of the Licensed Trademarks, including, without limitation, in connection with packaging materials, labels, displays, promotional items, trade spending and advertising.  In the event Supplier and Distributor are unable to agree on uses by Distributor of the Licensed Trademarks, Distributor may submit the matter for resolution to Supplier's Senior Vice President of Marketing or to Supplier's President.

C.     Legend.  Distributor shall display the Licensed Trademarks only in such form and manner as is specifically approved by Supplier pursuant to the provisions of this Agreement.  Distributor shall not use the Licensed Trademarks in a manner which may reasonably give the impression that the Licensed Trademarks are owned by Distributor.  Where practical and appropriate or reasonably required by Supplier, all materials bearing the Licensed Trademarks shall include a notice that the Licensed Trademarks are owned by Supplier, the form of such notice to be approved by Supplier in writing prior to Distributor's use thereof.  The following form of notice is hereby approved by Supplier for use in the Territory:

> *"Starbucks ®, the Starbucks logo and [_____]are [registered] trademarks of Starbucks Coffee Co."*

*A comparable legend may be substituted with the prior written approval of Supplier.*

D.     Certain Usage Prohibited.  Distributor shall not use the Licensed Trademarks in a manner that would in any way disparage Supplier or the reputation of Supplier, nor shall Distributor take any action which could harm or jeopardize the Licensed Trademarks, or Supplier's or its Affiliates' (as the case may be) ownership thereof, in any way.  Except for the phrase "distributed by Kraft Foods Global, Inc." (or a comparable phrase approved in writing by Supplier), and except as otherwise provided in this Agreement, Distributor shall not use any trademark of any party other than Supplier on the Licensed Products without the express written consent of Supplier.

E.     Changes to the Licensed Trademarks.  Supplier shall have the right at any time to make additions to, deletions from, and changes to any or all of the Licensed Trademarks at its sole and complete discretion; provided, however, that Supplier shall give Distributor reasonable prior written notice thereof.  Distributor shall, after receipt of such written notice from Supplier, adopt and begin using any and all such additions, deletions and changes as soon as reasonably practicable after Supplier's adoption thereof.  Supplier shall pay or reimburse Distributor for Distributor's reasonable costs associated with adopting and using any such additions, deletions and changes beyond the first such addition, deletion or change in any three (3) year period, it being understood that Supplier shall not reimburse Distributor for any additions, deletions or changes resulting from Distributor's incorrect use of any Licensed

31

Trademark. Notwithstanding the foregoing, if Supplier requires that any such addition, deletion or change be made, Distributor shall be entitled to distribute and sell previously approved Licensed Products, and to use previously approved Materials, while adopting the additions, deletions and changes prescribed by Supplier, unless Supplier notifies Distributor in writing that such uses of Licensed Products or Materials allegedly infringe the rights of a third party.

### 16. Protection and Defense of Licensed Trademarks.

A. Execution of Instruments. Distributor agrees to execute, at Supplier's reasonable request and at Supplier's expense, any and all instruments as may be reasonably necessary or advisable to protect and maintain the interest of Supplier in the Licensed Trademarks.

B. Notice of Infringement. Distributor shall promptly notify Supplier of any apparent infringement of, challenge to Distributor's use of, or any claim by any person to any rights in, the Licensed Trademarks. Supplier shall promptly notify Distributor of any apparent infringement of, or any claim by any person to any rights in, the Licensed Trademarks that may materially adversely affect Distributor's use of the Licensed Trademarks under this Agreement.

C. Protection of the Licensed Trademarks. Supplier shall at all times have the right to take whatever steps it deems necessary or desirable, in its sole discretion, to protect the Licensed Trademarks from all harmful or wrongful activities of third parties. Such steps may include, but shall not be limited to, the filing and prosecution of: (i) litigation against infringement or unfair competition by third parties, (ii) opposition proceedings against applications for trademark or service mark registration for trademarks that are confusingly similar to any one or more of the Licensed Trademarks, (iii) cancellation proceedings against registration of trademarks that are confusingly similar to any one or more of the Licensed Trademarks, and (iv) other appropriate administrative actions, and Distributor shall cooperate with Supplier, at Supplier's request, in any such actions and Supplier shall be responsible for Distributor's reasonable expenses incurred in such cooperation.

D. Allegations of Infringement. Supplier shall at all times have the right to take whatever steps it deems necessary or desirable to defend all claims that the use of the Licensed Trademarks infringes the rights of a third party. If Distributor is named as a party to such a claim and Supplier is not so named, Supplier shall defend such action at its own expense. Distributor shall cooperate in such defense, and Supplier shall be responsible for Distributor's reasonable expenses incurred in such cooperation.

### 17. Miscellaneous.

A. Representations and Warranties. Each of Distributor and Supplier hereby represents and warrants to the other that (i) it has full corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and (ii) this Agreement has been duly authorized by all necessary action on its part.

B. Force Majeure. Neither party to this Agreement shall be held liable for any delay of or failure to comply with any of the terms of this Agreement, nor shall any such delay or failure be deemed a default or give rise to a right to terminate this Agreement, when

32

such delay or failure has been caused primarily by any circumstances beyond the reasonable control and without fault of the party affected including (without limitation) fire, labor dispute, strike, war, insurrection, government restrictions, or act of God ("Force Majeure Event"), *provided* that such party uses due diligence to mitigate the effects of the Force Majeure Event on the performance of its obligations under this Agreement.

C.    <u>Notices</u>.

(i)    Any notice, demand or other communication required or permitted to be given or made hereunder shall be in writing and shall be well and sufficiently given or made if to the address set forth below and:

    (a)    enclosed in a sealed envelope and delivered during normal business hours on a Business Day and left with a receptionist or other responsible employee at the relevant address set forth below in this Agreement;

    (b)    sent by certified mail deposited in a post office within the United States or, with respect to issues only relevant to a Country, the Country;

    (c)    sent by facsimile or sent by other means of recorded electronic communication during normal business hours on a Business Day and confirmed by mail as aforesaid; or

    (d)    sent by a reputable air courier for overnight delivery.

(ii)    Any notice, demand or other communication so given or made shall be deemed to have been provided and to have been received on:

    (a)    the day of delivery, if delivered as aforesaid;

    (b)    on the third Business Day after the postmark date thereof (excluding each day during which there exists any general interruption of postal service due to strike, lockout, labor disturbance or other cause), if mailed as aforesaid;

    (c)    on the day of sending if sent by facsimile or other means of recorded electronic communication (or on the next Business Day if sent on a day other than a Business Day); or

    (d)    on the air courier's scheduled day of delivery if sent by air courier.

(iii)    All significant notices or other communications to be sent under this Agreement shall be sent to the parties at the following addresses, subject to each party's right to change its address for notice from time to time by giving notice in writing of such change.

CHIDMS1/2462750.7

| If to Supplier: | Starbucks Corporation |
| | 2401 Utah Avenue South |
| | Seattle, Washington 98134 |
| | Attn: President, Global Consumer Products |

With a copy to:     Starbucks Corporation
2401 Utah Avenue South
Seattle, Washington 98134
Attn.: General Counsel

If to Distributor:  Kraft Foods Global, Inc.
Three Lakes Drive
Northfield, IL 60093
Attention: GVP & President, NA Beverages

With copy to:       Kraft Foods Global, Inc.
Three Lakes Drive
Northfield, IL 60093
Attention: General Counsel

(iv)    Notwithstanding the foregoing, routine notices and communications hereunder (e.g., quarterly reports, requests for review of materials and the like) may be sent to employees of the other party responsible therefore.

D.      Relationship.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, franchise or agency relationship between the parties hereto or shall be deemed to render either party liable for any of the debts or obligations of the other.  Neither party shall in any way be considered an agent or representative of the other in any dealings with any third party, and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

E.      Sole Agreement; Release and Discharge.  Subject to Section 18, effective as of the Effective Date, this Agreement and the schedules and exhibits attached hereto and thereto shall constitute and contain the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  Subject to Section 18, this Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.  Subject to Section 18, effective as of the Effective Date, this Agreement shall supersede all prior agreements, discussions and negotiations between the parties with respect to the Territory as defined herein, provided that the US Supply and License Agreement shall remain in full force and effect.

34

F.    No Waiver.  The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the party of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

G.    Construction.  The captions of the various articles and sections of this Agreement have been inserted for the purpose of convenience of reference only, and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.  The recitals set forth prior to Section 1 of this Agreement are statements setting forth the intentions of the parties and shall not be deemed to create, modify, supersede or eliminate any obligation of the parties under this Agreement.

H.    Invalidity.  If any provision or provisions of this Agreement, or any portion of any provision hereof or thereof, shall be deemed invalid or unenforceable pursuant to a final determination of any arbitrator or court of competent jurisdiction, or as a result of future legislative action, such determination or action shall be construed so as not to affect the validity or effect of any other portion hereof or thereof, unless, as a result of such determination or action, the consideration to be received or enjoyed by any party hereto would be materially impaired or reduced. The parties agree to attempt in good faith to substitute for any invalid or unenforceable provision a valid and enforceable provision which achieves to the greatest extent possible the same effect as would have been achieved by the invalid or unenforceable provision.

I.    CHOICE OF LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO THE SUBSTANTIVE LAWS, BUT NOT THE PRINCIPLES OF CONFLICTS OF LAWS, OF THE STATE OF NEW YORK AS IF THIS AGREEMENT WERE NEGOTIATED, EXECUTED, AND TO BE FULLY PERFORMED IN THE STATE OF NEW YORK.

J.    Compliance with Laws.  Supplier and Distributor shall, at their own cost and expense, obtain all licenses, permits and other governmental approvals which may be required in the Territory for performance of their respective obligations hereunder.

K.    Counterparts.  This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

L.    Arm's Length Contract.  This Agreement has been negotiated "at arm's length" by the parties hereto, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof. Accordingly, in construing the provisions of this Agreement neither party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

M.    Survival of Terms.  Any provisions of this Agreement which by their terms would be reasonably expected to survive termination or expiration of this Agreement shall

35

continue in effect following such termination or expiration, including but not limited to Sections 6, 7.D, 7.F, 11, 12, 14,16 and 17.

### 18.  Country Addenda.

A.   Operation.   The parties and/or Supplier Affiliates, and Distributor Affiliates may enter into one or more Country Addenda for the purpose of implementing this Agreement in the Territory, including carrying out the parties' respective obligations under Sections 2, 3, 4, 6, 7, 8, 9, 10, 11, 15 and 16. Supplier and Distributor agree that the execution of Country Addenda by Supplier, Supplier Affiliates, Distributor, and Distributor Affiliates shall in no way limit or reduce the obligations of either party under this Agreement except that in the event of a conflict between the terms of this Agreement and a Country Addendum the terms of the Country Addendum shall control.

B.   Enforcement.   The parties acknowledge and agree that with respect to each Country Addendum entered into by Supplier Affiliates and Distributor Affiliates, Supplier shall be fully responsible and liable for all obligations of the relevant Supplier Affiliate, and Distributor shall be fully responsible and liable for all obligations of the relevant Distributor Affiliate. Supplier shall have the right to enforce this Agreement (including the terms of all Country Addenda) on behalf of itself and each Supplier Affiliate that enters into a Country Addendum, and to assert all rights and exercise and receive all benefits of all remedies (including monetary damages) of each such Supplier Affiliate, to the same extent as if Supplier were such Supplier Affiliate, subject to the limitations of liability applicable under this Agreement. Distributor shall have the right to enforce this Agreement (including the terms of all Country Addenda) on behalf of itself and each Distributor Affiliate that enters into a Country Addendum, and to assert all rights and exercise and receive all benefits of all remedies (including monetary damages) of each such Distributor Affiliate, to the same extent as if Distributor were such Distributor Affiliate, subject to the limitations of liability applicable under this Agreement. Any and all disputes arising under or relating to any Country Addendum shall be subject to the provisions of Section 14. Subject to Section 18.A any amendment, variation or modification to this Agreement will be binding upon each Supplier Affiliate, and Distributor Affiliate that are parties to Country Addenda, whether such Country Addenda were entered into before or after the said amendment, variation or modification came into effect.

36

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.


**STARBUCKS CORPORATION**

By: _____

Name: _____

      Gerardo López

Its: Senior Vice President, Global
Consumer Products


**KRAFT FOODS GLOBAL, INC.**

By: _____

Name: _____

      Jeri Finard

Its:  Executive Vice President and
Chief Marketing Officer


37

Schedule 1a – Methodology for Calculating Fully Landed Costs [Needs language from Starbucks regarding global standard for costs in each plant]

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Coffee[2] | Standard | Fiscal year period moving average roasted coffee cost adjusted for appropriate yield and fill weight to calculate true green coffee cost, with the moving average cost applied for each type of coffee uniformly regardless of channel of distribution for both non-licensed and Licensed Products. | Periodic Moving Average vs. Standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Green Coffee Burden | Standard | Shipping costs from origin countries to FOB destination factored for yield | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Packaging | Standard | Bill of material for all packaging element costs and their individual standard costs, with the same bill of material cost applied for similar package types regardless of channel of distribution for both non-licensed and Licensed Products. | Annual standard and variance created by mix and volume; roll stock and corrugate standards adjusted to moving average costs | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Conversion | Standard | Manufacturing costs including Supply Chain and Coffee Operations admin, direct and indirect manufacturing, and manufacturing overheads, with the same cost/lb allocation applied for each type of coffee uniformly regardless of channel of distribution for both non-licensed and Licensed Products. | Annual standard and variance created by mix and volume | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | Beginning of fiscal year |
| Coffee Manufacturing Variances | Actual | Supplier's fiscal year annual absolute conversion manufacturing standard vs. actual variances. | Allocated over/under absorption based on pounds shipped | End of fiscal year | N/A | N/A |
| Plant Distribution | Forecast | Distribution Costs, including Supply Chain Operations administrative costs, applied uniformly for both non-licensed and Licensed Products | Actuals vs. Forecast | End of fiscal year and end of second quarter | Beginning of fiscal year and beginning of third quarter | N/A |

38

CHDMS1/2462750.7

| Fully Landed Cost Component[1] | Costing Method | Cost basis | True up Method | True up Frequency | Pricing Update Frequency | Standards Update Frequency |
|---|---|---|---|---|---|---|
| Freight Out including Customs charges | Direct | Actual freight from carrier | N/A | N/A | N/A | N/A |

(1)   For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to Distributor within 30 days after the end of each true up period and incorporated into the subsequent quarter's Variable Product Margin Payments calculation pursuant to Section 7A.

(2)   In the event some Coffee is purchased using Commodity Futures and/or Price to Be Fixed (PTBF) contracts, a common average rate per pound allocation of the costs is to be applied for each type of coffee uniformly, regardless of channel of distribution for both non-licensed products and Licensed Products.

39

CHIDMS1/2462750.7

**Schedule 1c – Licensed Trademarks**

STARBUCKS

STARBUCKS LOGO:



CHIDMS1/2462750.7

## Schedule 1d – Form of Distributor's P&L Statement and Methodology for Calculating Distributor's Operating Contribution

### Form of Distributor's P&L Statement for Canada

| | Line Number | Fiscal Year |
|---|---|---|
| Volume - Pounds | 1 | Actual |
| Gross Revenue | 2 | Actual |
| Local Currency/Lb. | 3 | =Line 2/Line 1 |
| Unsaleables & Distressed | 4 | Actual |
| Allowances | 5 | Actual |
| Incentives to Consumers | 6 | Actual |
| Variable Trade | 7 | See following table in this Schedule 1d |
| Fixed Trade | 8 | See following table in this Schedule 1d |
| Slotting Fees/New Distribution Cost | 9 | See following table in this Schedule 1d |
| Total Trade | 10 | =Line 7+Line 8+Line 9 |
| Net Revenue Rate Local Currency/Lb | 11 | =Line 12/Line 1 |
| Net Revenue | 12 | =Line 2-Line 4-Line 5-Line 6-Line 10 |
| Product Cost | | |
| Product Cost | 13 | See Schedule 1a |
| Local Currency/Lb. | 14 | = Line 13/Line 1 |
| Distribution and Warehousing | 15 | See following table in this Schedule 1d |
| Local Currency/lb. | 16 | =Line 15/Line 1 |
| Other Manufacturing Costs | 17 | Actual |
| Total Product Cost | 18 | =Line 13+Line 15+Line 17 |
| Local Currency/lb. | 19 | =Line 18/Line 1 |
| Marginal Contribution | 20 | =Line 12-Line 18 |
| Local Currency/lb. | 21 | =Line 20/Line 1 |
| Dedicated Advertising | 22 | See following table in this Schedule 1d |
| Consumer and Other Promotion | 23 | See following table in this Schedule 1d |
| Total ACO | 24 | =Line 22+Line 23 |
| Fixed Warehousing Costs | 25 | See following table in this Schedule 1d |
| Selling/Marketing Admin/Marketing Research/Quality Assurance | 26 | See following table in this Schedule 1d |
| Operating Contribution | 27 | =Line 20-Line 24-Line 25-Line 26 |

## Schedule 1d (continued) – Methodology for Calculating Selling, Distribution & Management Costs for Canada

| Cost Component | Costing Method | Cost basis | True up Method (1), (2) | True up Frequency | Standards Update frequency (1) | P& L Line Number in Which Costs are Recorded |
|---|---|---|---|---|---|---|
| Distribution | Rate per net lb for each product form | Estimated freight charges (both into Distributor's DC and from DC to customer) given product characteristics of Licensed Products. | Period Actuals vs Standard | Annually | Bi-Annually | Line 15 |
| Warehousing (Variable) | Rate per net lb for each product form | Estimated warehouse handling given product characteristics of Licensed Products driven off of forecast pallet throughputs. | Period Actuals vs Standard | Annually | Annually | Line 15 |
| Warehousing (Fixed) | | Licensed Products expected % of Total Warehousing costs applied against Total Distributor's expected warehouse management overhead. Driven off of forecast pound throughputs. | Period Actuals vs Standard | Annually | Annually | Line 25 |
| Sales Force Expense | Forecast % of Gross Revenue for all Licensed Products sold by Distributor's Sales Force (one average rate across all channels) | Forecast % of Gross Revenue determined as forecast of Distributor's Sales Force total cost divided by forecast of Distributor's total Gross Revenue generated by the Sales Force, or such other allocation method as may be used in the Country, including allocation based on 50% Volume and 50% Gross Revenue. | Actuals | Annually for actual Licensed Products Gross Revenue. Annually for total Sales Force Cost and total Gross Revenue generated. | Annually | Line 26 |
| Commissions | Direct forecast | Commissions charged by brokers for selected channels as specified in broker contracts. | Actuals | Quarterly | Annually | Line 26 |

| Cost Component | Costing Method | Cost basis | True up Method [1],[2] | True up Frequency | Standards Update frequency [1] | P& L Line Number in Which Costs are Recorded |
|---|---|---|---|---|---|---|
| Advertising & Promotion Expenses (including all forms of Trade Spending). | Program forecasts | Individual program, campaign, or promotion cost forecast | Annual budget accrued annually to match revenues with fourth quarter reflecting balance of annual actual | Annually | Annually | Line 7, 8, 9 for Trade Spending; Line 22 for Dedicated Advertising; Line 23 for Consumer/Other Promotion |
| Direct Staffing & Related Expenses[3] | Direct forecast | Salaries, Benefits & Expenses Associated with FTE including agreed half-time, plus miscellaneous expenses (e.g., team travel, meetings, allocated office expenses, etc.) | Actuals | Annually | Annually. | Line 26 |

[1]   Distributor's Fiscal Year (calendar year).

[2]   For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Supplier within 30 days after the end of each true up period and incorporated into the subsequent quarter's Variable Product Margin Payment calculation pursuant to Section 7A.

[3]   Annual forecast allocation to Licensed Products, as reviewed and approved by the International Oversight Committee

## Form of Distributor's P&L Statement for UK

| Proposed Revised P&L Statement (Orbis Based) | | |
|---|---|---|
| | **Line Number** | **Fiscal Year** |
| PLV999999 Trade Volume Lbs | 1 | Actual |
| PLV459999 Trade Volume - Tons | 2 | =Line 1*2.2046 |
| PL201010 Gross Sales - Trade | 3 | Actual |
| Local Currency/Lb. | 4 | =Line 3/Line 1 |
| PL201020 Sales Returns | 5 | Actual |
| PL201030 Other Returns and Allowances | 6 | Actual |
| PL201050 Cash Discounts | 7 | Actual |
| PL201060 Non-Performance Deals | 8 | Actual |
| PL202069 Customer Incentives | 9 | See following table in this Schedule 1d |
| PL202070  80 Other Trade Incentives | 10 | Actual |
| Net Revenue Rate Local Currency/Lb | 11 | =Line 12/Line 1 |
| PL202099 Net Operating Revenues | 12 | =Line 3-Line 5-Line 6-Line 7-Line 8-Line 9-Line 10 |
| Product Cost | | |
| PL211010 Variable Product Cost | 13 | See Schedule 1a |
| Local Currency/Lb. | 14 | = Line 13/Line 1 |
| PL211040 Fixed Cost U/O Absorption | 15 | See Schedule 1a |
| PL211050 Free Goods to Consumers | 16 | Actual |
| PL211060 Inventory Write-Off | 17 | See following table in this Schedule 1d |
| PL212010 Distribution Expense | 18 | See following table in this Schedule 1d |
| PL212020 Warehousing Expense | 19 | See following table in this |

| | | | Schedule 1d |
|---|---|---|---|
| | Local Currency/lb. | 20 | =(Line 18+Line19)/Line 1 |
| | Total Product Cost | 21 | =Line 13+Line 15+Line 16+Line 17+Line 18+Line 19 |
| | Local Currency/lb. | 22 | =Line 21/Line 1 |
| PL213999 Available Profit | | 23 | =Line 12-Line 21 |
| | Local Currency/lb. | 24 | =Line 23/Line 1 |
| | PL214010 Advertising Expense | 25 | See following table in this Schedule 1d |
| | PL214020 Consumer Incentives | 26 | See following table in this |
| | PL214030 Other Promotion Expense | 27 | Schedule 1d |
| | PL214099 Advertising and Other Promotions | 28 | =Line 25+Line 26+Line 28 |
| | PL216010 Marketing Department Expense | 29 | |
| | PL217010 Total Selling Expense | 30 | See following |
| | PL218010 General and Administration | 31 | table in this Schedule d |
| | PL224100 Royalty Expense | 32 | See following table in this Schedule 1d |
| | PL227099 Total Other (Inc)/Exp | 33 | Actual |
| Operating Contribution | | 34 | =Line 23-Line 28-Line 29-Line 30-Line 31-Line 32-Line 33 |

**Schedule 1d (continued) – Methodology for Calculating Selling, Distribution & Management Costs for UK**

| Cost Component | Costing Method | Cost Basis | True up Method [(1), (2)] | True up Frequency | Standards Update Frequency [(1)] | P&L Line Number in Which Costs are Recorded |
|---|---|---|---|---|---|---|
| Promotion Expenses | Program Forecasts | Individual program, campaign, or promotion cost forecast. | Actual spends to reflect promotional campaigns agreed with retailers. | Bi-Annually | Annually | Line 6, 7, 8 & 10 |
| Customer Incentives – Couponing | Estimated redemption levels per activity | Amount to reimburse to retailers. | Accrual based on expected redemption. | Monthly | Annually | Line 9 |
| Inventory Write-Off | Up to budget | The cost of writing off or writing down inventory carried on the balance sheet which is no longer useable. | Year-end accrual based on planned future ROS & inventory levels. | Annually | Bi-Annually | Line 17 |
| Distribution | Rate per net lb for each product form | Estimated freight charges (both into Distributor's DC and from DC to customer) given product characteristics of Licensed Products | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 18 |
| Warehousing (Variable) | Rate per net lb for each product form | Estimated warehouse handling given product characteristics of Licensed Products driven off of forecast pallet throughputs. | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 19 |
| Warehousing (Fixed) | | Licensed Products expected % of Total Warehousing costs applied against Total Distributor's expected warehouse management overhead. Driven off of forecast pound throughputs. | Period Actuals vs Standard | Quarterly | Bi-Annually | Line 25 |
| Advertising Expenses | Program forecasts | Individual program or campaign | Annual budget accrued to match volume delivery with fourth quarter reflecting balance of annual actual. | Annually | Bi-Annually | Line 25, 26 & 27 |

| Cost Component | Costing Method | Cost Basis | True up Method [1], [2] | True up Frequency | Standards Update Frequency [1] | P&L Line Number in Which Costs are Recorded |
|---|---|---|---|---|---|---|
| Sales Force Expense | Forecast % of Gross Revenue for all Licensed Products sold by Distributor's Sales Force (one average rate across all channels) | Forecast % of Gross Revenue determined as forecast of Distributor's Sales Force total cost divided by forecast of Distributor's total Gross Revenue generated by the Sales Force, or such other allocation method as may be used in the Country, including allocation based on 50% Volume and 50% Gross Revenue. | Actuals | Monthly for actual Licensed Products Gross Revenue. Annually for total Sales Force Cost and total Gross Revenue generated. | Annually | Line 30 |
| Commissions | Direct forecast | Commissions charged by brokers for selected channels as specified in broker contracts. | Actuals | Quarterly | Annually | Line 30 |
| Direct Staffing & Related Expenses [3] | Direct forecast for FTE and expenses directly allocated to program | Salaries, Benefits & Expenses Associated with FTE including agreed half-time, plus miscellaneous expenses (e.g., market data, market research, team travel, meetings, HR and systems expenses, etc.) | Actuals | Quarterly | Annually | Line 29, Line 31 |

[1]   Distributor's Fiscal Year (calendar year).

[2]   For items with a true up methodology, the difference between the forecast/invoiced amount and the actual amount will be refunded to the appropriate party. The difference is derived based on the true up method. All true up differences arising from this schedule are to be reported in writing to the Supplier within 30 days after the end of each true up period and incorporated into the subsequent month's Distributor Payment calculation pursuant to Section 7A(iv).

[3]   Annual forecast allocation to Licensed Products, as reviewed and approved by the International Oversight Committee.

## Schedule 8.B(i) – Measurement Criteria
## Starbucks In-Store Conditions

### Key Measures of In-Store Conditions

Supplier and Distributor intend to maintain a presentation for the Starbucks branded Licensed Products in the coffee aisle that clearly positions Starbucks as the Super-Premium Coffee segment leader.   Supplier and Distributor will cooperate to continue to develop the brand positioning and brand equity of these Licensed Products through superior in-store presentations, including shelf presence, product quality, and product availability.

Supplier and Distributor agree that the principal means of achieving superior in-store presentation are one or more of the following, subject to the Country Addenda:

- Maximize rack placement
*Rationale:* Promotes branding, allows for proper display, and preserves shelf space.
*Defined Metric:* Store has Starbucks branded racks to hold all Starbucks SKUs in the coffee aisle.

- Minimize competitive product on Starbucks racks
*Rationale:* Implied association and/or third-party endorsement of the competitive product by Starbucks Coffee Company.
*Defined Metric:* Stores which have competitive product SKU tags displayed for placement on Starbucks racks.

- Minimize past-due product
*Rationale:* Applies the highest standards of excellence to the fresh delivery of our coffee to encourage the development of enthusiastically satisfied customers.
*Defined Metric:* Percentage of checked packages which are past-due.

- Minimize Out-of-Stocks
*Rationale:* Promotes brand equity, denotes category leadership, and increases sales.
*Defined Metric:* Percentage of stores with at least one out-of-stock SKU.

Supplier and Distributor may jointly establish measurable standards for some or all of the metrics listed above, to be set forth in the relevant Country Addendum, and may review each of the metrics set forth above, as measured by a Field Auditor or other means, provided, however, that failure to meet or exceed the Measurement Criteria shall not be the basis for a claim of Material Breach under Section 5.B(iii) or any other Section of the Agreement.  This review will focus on identifying deficiencies relative to the metrics, if any, and on cooperatively establishing strategies for addressing and resolving such deficiencies.  Such strategies will include an Action Plan as defined below. An "Action Plan" means a plan to be developed and pursued in good faith by Distributor, with consultation and approval from Supplier, to identify which stores and/or markets are causing a failure to meet the applicable Standard for the metric, and to identify and implement the most timely, efficient and effective means to address the failure.  The means of

48

addressing the failure may include (i) the deployment of Distributor's internal sales force to conduct in-store visits, (ii) calls on customers' regional and/or national headquarters to encourage resolution of the problems, (iii) additional focus by Distributor on its sub-distributors (if any) involved in the stores and markets where the problems are occurring, and (iv) market "blitzes" under which Distributor will retain third parties to conduct in-store visits to improve aisle conditions. Any costs associated with implementing the Action Plan shall be charged to the Distributor's P&L Statement. Any shortfall discovered by a Field Auditor or other party in the existing Measures of In-Store Conditions contemplated above will not be the basis for a Material Breach of Contract.

## Field Audit Methodology

### Objectives

Supplier and Distributor agree that a Field Auditor may use the following methodology to measure in-store conditions for the Starbucks branded Licensed Products in the Authorized Channels. The Field Auditor may measure some or all of the following objective criteria when measuring in-store conditions:

A.   Presence of Starbucks branded rack or other attractive rack (specify which)

B.   Presence of non-Starbucks SKU tags on Starbucks' rack

C.   Number of Facings by Starbucks SKU

D.   Total Starbucks Facings on rack

E.   Presence of competitive products on Starbucks racks (regardless of SKU tags)

F.   Presence of Starbucks products or SKU tags on non-Starbucks branded racks

G.   Presence of Starbucks products on shelf

H.   Presence of Shelf Tags for Starbucks products

I.   Out-of-Stocks for Starbucks products

J.   Number of Past Due Products (versus the total)

K.   Average # of Weeks to Expiration

L.   Time and day of observation

### Sample

The audit will use a rotating sample of stores in major markets. Markets and stores audited per market will be agreed upon by Supplier and Distributor prior to each audit.

### Store Selection Process

To maintain consistency in mix of retailers, store size and geography from audit to audit, Supplier and Distributor will provide a pool of stores from which the Field Auditor will select stores for auditing. Store selection will change from audit period to audit period.

49

**Schedule 9**

List of Committee Members

1.     Starbucks International Brand Management Team

- Hilde Anderson, Director Coffee International CPG
- Michael Haley, Category Manager International CPG

2.     Kraft International Brand Management Team

- **[TBD Director of International Starbucks Coffee at Kraft]**
- Maria Surricchio, Director Innovation Coffee EU
- Dana Somerville, Director Marketing, Canada

3.     International Oversight Committee

a.     Starbucks Delegates:

- Gerry Lopez – President CPG International
- Rich DePencier – Vice President CPG International
- TBD – Supply Chain

b.     Kraft Delegates:

- SVP, Global Partnerships
- GVP & President NA Beverages
- VP Coffee EU

50