# EXHIBIT 9

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. 215.963.5000
Fax: 215.963.5001
www.morganlewis.com



Morgan Lewis
COUNSELORS AT LAW

**William P. Quinn, Jr.**
215.963.5775
wquinn@morganlewis.com

November 4, 2010

**VIA HAND DELIVERY**

Aaron M. Panner, Esquire
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, DC  20036-3209

Re:     *Supply and License Agreement between Kraft Foods Global, Inc. ("Kraft") and
Starbucks Corporation ("Starbucks") dated March 29, 2004 ("Agreement")*

Dear Mr. Panner:

This firm is counsel to Kraft.  We write in response to your October 5, 2010 letter purporting, on
Starbucks' behalf, to (i) notify Kraft that it has materially breached the above-referenced
Agreement and (ii) terminate the Agreement effective March 1, 2011 unless the breaches
asserted in the letter are cured within 30 days.  Having analyzed the terms of the Agreement and
investigated the facts relevant to the assertions made in your letter, we have determined that they
are, without exception, baseless.

Although Kraft would regret a decision by Starbucks to terminate what has been a successful
partnership, it would respect such a decision provided it is carried out in accordance with the
governing contractual framework and in a manner that reflects the undeniable value of the
business Kraft has built.  From this perspective, Kraft finds your letter on Starbucks' behalf
disappointing, both in terms of its timing and content.  Over the years of the companies'
partnership, Kraft has delivered tremendous top and bottom line growth to the benefit of both
Starbucks and Kraft.  Indeed, gross revenues from the STARBUCKS, SEATTLE'S BEST, and
TAZO brands in the grocery channel have grown from less than $50 million in 1998 to more
than $500 million in 2010.  And, as discussed at greater length below, Kraft's strong
performance on behalf of Starbucks' brands has continued, even as the economy faltered and
competition intensified.

Aaron M. Panner, Esquire
November 4, 2010
Page 2



Given Kraft's exceptional track record, it is obvious that any decision of your client to end its partnership with Kraft is clearly not motivated by any genuine deficiencies in Kraft's performance but rather because it no longer suits Starbucks. This possibility was anticipated when the Agreement was negotiated. It therefore gives Starbucks the right to acquire the business by terminating the Agreement through the operation of Paragraph 5(B)(ii), which requires Starbucks to compensate Kraft in accordance with a formula based, in part, on the appraised fair market value of the business. Kraft's undeniably strong business results and consistent record of collaboration with Starbucks preclude termination on any other basis, including termination without compensation for alleged material breach.

Before turning to some of the reasons that lead us to our conclusion that the assertions in your letter lack foundation, we call your attention to the fact that Starbucks has never before accused Kraft of materially breaching the Agreement even though many of the breaches alleged in your letter, if they had occurred, would have been known to Starbucks years ago. Starbucks would have had many occasions to bring those to Kraft's attention: the parties are in contact on a daily basis and, moreover, regularly conduct joint Management Committee meetings to provide a forum for addressing performance issues as they arise.

We do not intend to recite in this letter all the many reasons why Starbucks' allegations of breach are unfounded. Nonetheless, several of them are worth noting because they leave no doubt that Starbucks' assertions are without merit and that its attempt to terminate the Agreement pursuant to Paragraph 5(B)(iii) will not succeed.

First, there is no truth in Starbucks' contention that Kraft has failed to use "commercially reasonable efforts . . . to market the Licensed Products in the Licensed Channels in the Territory." By any measure and as mentioned above, Kraft's overall performance under the Agreement and its effectiveness in promoting Starbucks' products have been outstanding. As a result, despite increasing competitive pressure, Starbucks remains the dominant player in the super premium coffee category. Your contention that it no longer enjoys that position is refuted by objective market data and the consensus of industry analysts.

In addition, since 2004, gross revenues, net revenues and market share, the key indicators of the health of the business, have been very strong. Recent softness of the business simply mirrored Starbucks' own experience with same-store cafe sales. Starbucks knows this well as Howard Schultz was outspoken about the dramatic effects of the "cataclysmic financial crisis" on the Starbucks brand, describing Starbucks as "a leading indicator of the recession." And as he himself put it, Starbucks had "become the poster child for excess, and if you want to be really smart, you should cut out that $4 cup of coffee."

At the same time Starbucks was faced with increasingly cost-conscious consumers, the Starbucks brand experienced unprecedented competitive pressure from Dunkin' Donuts, a popular and well-known brand, which had launched an aggressive and heavily funded campaign to capture market

Aaron M. Panner, Esquire
November 4, 2010
Page 3



share from Starbucks and others in the grocery channel. Yet Starbucks repeatedly thwarted what Kraft believes would have been highly effective attempts to grow sales and market share, including through innovation.

Despite the lack of support from Starbucks in the face of these formidable challenges, Kraft was able to prevent a precipitous decline in Starbucks' market position. The decline in sales was instead quite modest under the circumstances and was the unavoidable result of factors beyond Kraft's control, including Starbucks' broader brand management strategy. The proposition that Kraft failed to take reasonable measures to overcome these challenges is absolutely and totally refuted by the robust performance of the business in 2010.

Second, Starbucks' assertion that Kraft breached the Agreement by failing "to involve Starbucks in sales planning, presentations, and calls" is simply not true. Kraft has included Starbucks in the review and approval process for all sales presentation templates for major initiatives. The senior Kraft sales director responsible for Starbucks sales frequently meets and travels with Starbucks' National Sales Manager. He also reviews important sales-related issues with him in teleconferences conducted on a weekly basis. Kraft has been equally diligent in providing Starbucks with opportunities to attend all significant customer sales calls, including sales calls in which Starbucks has no contractual right to participate. Indeed, as recently as May of this year, Starbucks applauded the parties' "collaborative customer approach" with two of Kraft's largest and most important customers.

Third, in light of the objective facts revealed by our investigation, Starbucks' contention that Kraft breached Paragraph 9(B)(v) of the Agreement by failing to supply monthly or quarterly budgets is again factually not correct. Kraft has honored this obligation to the letter. On at least a quarterly basis, Kraft has supplied Starbucks with detailed budgets, including standardized P&Ls that reflect trade, advertising and promotions. Kraft has in fact gone well beyond its obligations under Paragraph 9(B)(v) by conducting quarterly budget reviews with Starbucks, making its finance staff available to answer Starbucks' questions on budget related issues and promptly providing any additional detail requested by Starbucks. Those within Starbucks' organization who have first-hand knowledge of the quality of Kraft's performance in this area apparently agree and have expressed their thankfulness and gratitude for providing detailed and extensive information in e-mails that were sent back to Kraft personnel.

Fourth, the allegations that Kraft breached the Agreement by failing to adopt an effective marketing campaign, failing to involve Starbucks in Kraft's market research and advertising activities and failing to obtain necessary advertising approvals are equally baseless. Throughout the parties' relationship, Kraft has worked closely with Starbucks to develop effective market research and new product strategies. At Kraft's invitation, Starbucks has participated in yearly situational assessments of the entire coffee category and periodic marketing mix analyses that explore key performance drivers as well as the efficiency and effectiveness of specific marketing elements. The results of Kraft's market research and consumer testing, which have been shared

Aaron M. Panner, Esquire
November 4, 2010
Page 4



and discussed with Starbucks, demonstrate the effectiveness of Kraft's marketing campaigns.

Kraft has also closely collaborated with Starbucks on all important advertising-related issues. It conducts weekly meetings with Starbucks' personnel to discuss advertising, consumer promotions, customer programs and other marketing elements. Kraft has likewise engaged Starbucks on all significant national advertising and consumer promotion efforts beginning with the formulation of strategy and continuing through final execution. In addition to working with Starbucks on advertising initiatives from the development process through final creative development and testing, both parties participate in weekly Advertising & Media meetings that include both advertising and media agencies, Kraft and Starbucks' marketing personnel, Starbucks' advertising personnel, and Kraft Consumer Insights personnel. Consistent with the Agreement, Kraft does not implement advertising plans or executions without Starbucks' review, input, and approval. Your letter's attempt to show otherwise with respect to a small number of specific executions overlooks the important distinction between national advertising, which is commissioned by Kraft, and customer programs, which are carried out and controlled by individual customers.

Fifth, the allegation that, in every year since 2004, Kraft failed to spend an amount "at least equal to the Minimum A&P Amount" as required by Paragraph 7(B) of the Agreement is again not true. The facts are that, in 2004, 2005, 2006, 2009, and 2010, Kraft spent more than the Minimum A&P Amount. In both 2007 and 2008, Starbucks agreed – explicitly and in writing – to a reduction in the required "minimum" amount. In both of those years, Kraft's actual reduction in A&P spending was less than the amount on which Starbucks agreed.

Sixth, the assertion that Kraft's sale of Yuban brand coffee violates the exclusivity obligation imposed by the Agreement is easily disproved. Apart from the fact that Yuban is not "generally priced" above $6.50 per pound, consumers clearly perceive Yuban as a mainstream coffee, not a "super premium" brand. Yuban therefore does not meet the Agreement's definition of "Super Premium Coffee," no matter how broadly that definition is construed, and consequently is not subject to the Agreement's exclusivity provision. In any case, Kraft has been selling Yuban since long before the Agreement was executed. Until now, Starbucks never suggested that Yuban is a "Super Premium Coffee" or that Kraft has failed to respect Starbucks' exclusivity rights under the Agreement.

Finally, inasmuch as there is no merit in any of Starbucks' contentions that Kraft has failed to meet its obligations under the Agreement, the question of whether Kraft has committed a breach sufficiently material to warrant termination of the Agreement does not arise. Even if Kraft had in some respect failed to fully perform its contractual duties, Starbucks could not plausibly contend that Kraft has committed a "Material Breach" as defined in the Agreement, *i.e.*, that Kraft has breached the Agreement in a way that "significantly impairs the value of [Starbucks'] bargained-for benefits" under the Agreement or "causes or threatens to cause [Starbucks] significant financial, brand equity and/or other injury." Nor can Starbucks possibly show that

Aaron M. Panner, Esquire
November 4, 2010
Page 5



Kraft is guilty of any failure that is so material to the parties' relationship as to justify termination under established contract law principles.

For all of these reasons, Kraft regards each of Starbucks' accusations that Kraft has materially breached the Agreement as groundless and its attempt to terminate the Agreement based on those alleged breaches as having no legal effect. We are confident that an arbitrator would agree, especially given the pretextual nature of Starbucks' breach allegations. Kraft will continue to operate the business in good faith and for the parties' mutual benefit and it expects Starbucks to do the same.

Very truly yours,

William P. Quinn, Jr.