# EXHIBIT 14

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209
—————
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 12, 2010

*By Electronic Mail*

William P. Quinn, Jr.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

Re:     *Termination of the Supply Agreement, International Supply Agreement, Tassimo Agreement, and Starbucks Tassimo Agreement*

Dear Mr. Quinn:

I write in response to your letters dated November 4, 8, and 9, 2010. Your letters contain several misstatements and errors of fact and of law. Before addressing your statements regarding Kraft's performance under the agreements between the parties, I will address some threshold matters related to the termination to ensure that there is no misunderstanding regarding Starbucks decision to terminate the agreements or Kraft's obligations as a result of that termination. I also address below the assertions related to Starbucks contacts with customers. Finally, I ask that Kraft desist from its false public statements regarding the parties' obligations under the Supply and License Agreement, entered into as of March 29, 2004 (the "Supply Agreement").

### *Termination and Dispute Resolution*

The Supply Agreement, as well as the International Supply and License Agreement (the "International Supply Agreement"), the Tassimo Supply and License Agreement (the "Tassimo Agreement"), and the Starbucks Tassimo Supply and License Agreement (the "Starbucks Tassimo Agreement"), *will* terminate on March 1, 2011. As you acknowledge, in my letter of October 5, 2010, Starbucks provided notice to Kraft of the circumstances constituting Material Breach of the Supply Agreement and notified Kraft that, absent cure, the Supply Agreement would terminate on March 1, 2011. Kraft did not make any effort to cure the breaches identified in my letter. Accordingly, Starbucks has the right to terminate the Supply Agreement pursuant to ¶ 5(B)(iii) thereof and has exercised that right, with the Supply Agreement to terminate on March 1, 2011. In addition, as stated in my November 5, 2010 letter, Starbucks is exercising its right to

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 2

terminate the International Supply Agreement, the Tassimo Agreement, and the
Starbucks Tassimo Agreement, also on March 1, 2011.

Because the agreements between the parties will terminate on March 1, 2011,
Kraft has an obligation, under ¶ 6(C) of the Supply Agreement, to ensure an orderly
transition. If Kraft fails to comply with its obligation in this regard, it will constitute a
further breach of the Supply Agreement (as well as the other agreements) for which
Starbucks reserves the right to seek damages.

While I understand that Kraft does not agree that it has materially breached the
Supply Agreement, your assertion that Starbucks termination of the Supply Agreement is
of "no legal effect" is both incorrect and unproductive. We have followed the required
procedure for termination of the Supply Agreement pursuant to ¶ 5(B)(iii), and Kraft has
no contractual basis for compelling continued performance by Starbucks. As you
implicitly acknowledged in your November 4 letter, if you disagree with our assertion,
your remedy is to pursue that claim through arbitration under ¶ 15(A) of the Supply
Agreement.

The statement in your November 8, 2010, letter that Starbucks should "look to
Paragraph 15 of the Agreement," ignores the fact that Starbucks did expressly notify the
Oversight Committee of the dispute in question in my October 5, 2010, letter. Because
the Oversight Committee has not met and 30 days have passed, there is no barrier to the
submission of this dispute to Arbitration at the election of either party. If Kraft disagrees,
then Kraft may instead choose to bring that dispute to the Oversight Committee under
¶ 15(A). In any event, however, nothing in ¶ 5(B)(iii) requires Starbucks to pursue any
particular dispute resolution procedure before terminating the agreement following the
30-day cure period, which has now elapsed.

Your suggestion that Kraft "will take immediate legal action" to prevent
Starbucks from terminating the Supply Agreement – to the extent you intend to refer to
the filing of an action for injunctive relief under ¶ 15(B) – is legally baseless. As you
have acknowledged, even if Startuckes did not properly terminate the Supply Agreement
under ¶ 5(B)(iii), it would have the right to terminate the Supply Agreement on six
months' notice under ¶ 5(B)(ii) without any showing of a Material Breach. Starbucks has
provided Kraft five months' notice to ensure an orderly transition. Even if Kraft's
position with respect to the permitted basis for Starbucks termination were correct –
which it is not – any harm that Kraft suffered as a result could be fully compensated
through monetary damages. Kraft's sole remedy, if it mistakenly believes that Starbucks
improperly terminated the Supply Agreement, is to seek monetary relief through
arbitration.

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 3

*Kraft Has Materially Breached the Supply Agreement*

My earlier letter dated October 5, 2010 (the "Notice Letter") set forth several ways in which Kraft had materially breached the Supply Agreement. Your arguments to the contrary ignore the facts and governing law.

*First*, your statement that Kraft's performance with respect to distribution of Starbucks products has been "strong" is directly contradicted by repeated statements of Kraft's own high level executives acknowledging the serious deficiencies in Kraft's performance over the last several years. Starbucks is one of the most successful consumer brands of all time. Despite that, Kraft has failed to maintain Starbucks unchallenged position in the Super Premium Coffee category and has failed to respond effectively to competitive entry by other brands, often acting (or failing to act) against Starbucks recommendations. Particularly in light of Kraft's failures to comply with specific obligations under the Supply Agreement – detailed in my previous letter and below – Kraft's performance cannot meet the "commercially reasonable" standard under ¶ 3(B) of the Supply Agreement.

*Second*, the Notice Letter made clear that Kraft had failed to permit Starbucks to attend "significant sales calls," in violation of ¶ 9(B)(iii). You responded with a blanket assertion that Kraft has been "diligent in providing Starbucks with opportunities to attend all significant customer sales calls." In fact, Kraft has ignored Starbucks repeated requests that a Starbucks representative attend all quarterly sales calls with its top nine customers. This is an example of a Material Breach that Starbucks has repeatedly called to Kraft's attention. Thus, as stated in the Notice Letter, Starbucks was able to attend only six of the more than 30 sales calls that Kraft conducted with these top nine customers in the past year. You have offered nothing to dispute these facts.

Kraft's Material Breaches of this provision continue. On October 26, 2010, for example, Kraft made a sales call to Safeway related to Seattle's Best Coffee. Starbucks learned of the sales call only days before, after an off-hand comment made by a Kraft sales representative. Although Starbucks representatives were able to attend this sales call, it became apparent that the sales call took place nearly two months *after* Safeway had made critical planning decisions in which Kraft failed to include Starbucks, thus preventing Starbucks from working with Safeway to ensure appropriate placement of Starbucks products in Safeway stores.

*Third*, the Notice Letter made clear that Kraft had failed to provide Starbucks with "detailed marketing trade budgets, including key assumptions" on at least a quarterly basis, in violation of ¶ 9(B)(v). You assert in generic terms that Kraft has provided Starbucks with "standardized P&Ls that reflect trade, advertising and promotions." But these "standardized P&L's" were too general to be meaningful and often provided no

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 4

detail beyond dollar amounts that Kraft had budgeted for broad categories such as
"Advertising" and "Consumer Promotions." Starbucks repeatedly complained about the
inadequacy of this documentation and Kraft's failure to provide the "detailed" budgets
contemplated by the Supply Agreement and the "key assumptions" underlying those
budgets.

*Fourth*, the Notice Letter provided examples of specific instances where Kraft
failed to involve Starbucks in planning, presentations and advertising programs, in
violation of ¶¶ 9(A)(ii) and 9(B)(i)-(iii).  You do not dispute that Kraft failed to involve
Starbucks at required stages in the Natural Fusions™ Campaign directed at Target Stores,
the Safeway BCA Program, the Publix television advertisement, the Kroger Look What's
New Program, and the Kraft.com website.  Instead, you argue that the examples do not
involve "national advertising" (though this is plainly not the case with regard to at least
the Kraft.com example).  But the relevant provisions are not limited to national
advertising; they require Kraft to ensure that Starbucks is involved in "*all* proposed
promotions, advertising, packaging and other programs and materials that support the
Licensed Products or use the Licensed Trademarks."  Supply Agreement ¶ 9(A)(ii)
(emphasis added); *see also id.* ¶ 9.B.  Kraft's failures to abide by these provisions – of
which the foregoing are just exemplary – constitutes a Material Breach.

*Fifth*, with respect to Kraft's sales and marketing of Yuban in violation of the
exclusivity provision of ¶ 3(C)(ii), you do not dispute that Kraft has sold Yuban at a price
higher than is permitted under the Supply Agreement.  Particularly in light of your efforts
to position Yuban as a "premium" brand (with additional efforts to distinguish Yuban
from other mass market brands), your sales and marketing of that brand constitutes a
Material Breach of the Supply Agreement.  That Kraft previously marketed Yuban
differently and sold it at a lower price, as you mention, is irrelevant.

*Sixth*, the Notice Letter made clear that Kraft did not spend the Minimum A&P
Amount as required by ¶ 7(B) for the years 2004, 2005, 2006, 2008, and 2009, and that in
2007, Kraft reduced spending by an amount greater that the parties agreed.  Your
response on this point does not square with the facts as Starbucks understands them.  I
would be happy to examine any documentation you have in support of your assertion.

*Seventh*, each of Kraft's breaches of the provisions in ¶¶ 7 and 9 of the Supply
Agreement, as set forth above and in the Notice Letter, is specifically defined by the
Supply Agreement as a Material Breach.  *See* Supply Agreement ¶¶ 7(B)(ii), 9(E).  That
settles the issue of whether the breaches are material: "Where the contract itself is clear
in making a certain event a material breach of that contract, a court must ordinarily
respect that contractual provision." 23 WILLISTON ON CONTRACTS § 63:3, at 441 (4th ed.
2002); *see, e.g., In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623-24 (3d. Cir. 2005).
You are therefore mistaken to claim that Starbucks would need to separately establish

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 5

that these breaches "significantly impair[] the value of [Starbucks] bargained-for
benefits" under the Supply Agreement or "cause[] or threaten[] to cause [Starbucks]
significant financial, brand equity and/or other injury" – though we believe that they have
done so.

*Eighth*, even if you were correct that Starbucks has "never before accused Kraft of
materially breaching the Agreement," that would provide no excuse for Kraft's Material
Breaches. The Supply Agreement explicitly provides that Starbucks shall not be
prejudiced based on any delay in contesting Kraft's Material Breaches.

> The failure or delay of either party to exercise its rights under this
> Agreement or to complain of any act, omission or default on the party of
> the other party, no matter how long the same may continue, or to insist
> upon a strict performance of any of the terms or provisions herein, shall
> not be deemed or construed to be a waiver by such party of its rights under
> this Agreement or a waiver of any subsequent breach or default of the
> terms or provisions of this Agreement.

Supply Agreement ¶ 18.F.

### *Contacts with Customers*

Your letter dated November 8, 2010, asserts that Starbucks "has been advising
Kraft's major CPG customers that Starbucks has 'severed' its contractual relationship
with Kraft and that, henceforth, Starbucks, rather than Kraft, will perform all sales and
marketing functions with respect to Starbucks products." That assertion and your
characterization of the remarks of Jeff Hansberry are not accurate.

Jeff Hansberry of Starbucks confirmed to Deannie Elsner of Kraft on Friday,
November 5, 2010 that Starbucks had communicated to Kraft's CPG customers its
"intent to end the distribution arrangement" with Kraft – an accurate statement. Your
assertion that Starbucks has created and must correct "misimpressions . . . in the minds of
Kraft's customers" is therefore unfounded, as is your assertion that Starbucks' actions
"constitute a clear and material breach of Starbucks' obligations under the Agreement."
It is not true that Mr. Hansberry "assured [Ms. Elsner] that Starbucks will refrain from
making similar representations [to Kraft's major customers] in the future." Mr.
Hansberry agreed, as a courtesy to Kraft and in the spirit of promoting an orderly
transition, to coordinate additional calls to customers with Kraft. That will, of course,
depend on Kraft's cooperation in ensuring a smooth transition.

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 6

### *False Public Statements by Kraft*

We ask that Kraft refrain from its incorrect public statements that the Supply Agreement is "perpetual" and that upon termination of the Supply Agreement, Starbucks will be required to pay the "fair market value of the business plus, in certain instances, a premium." As Kraft is aware, Starbucks has terminated the Supply Agreement pursuant to ¶ 5(B)(iii) thereof, and accordingly will have no obligation to make any payment to Kraft beyond those required under ¶ 6(A) thereof.

Furthermore, even if Kraft prevails on any eventual claim that Starbucks' termination of the Supply Agreement should be deemed to have occurred under ¶ 5(B)(ii), rather than ¶ 5(B)(iii) – and that Starbucks should therefore be liable to pay the "Fair Market Value of the Agreement" – it is not correct that the Supply Agreement is "perpetual."[1] The word "perpetual" does not appear anywhere in the Supply Agreement. To the contrary, the Supply Agreement states:

> This Agreement shall commence as of the Effective Date and continue *for a period of ten (10) years, unless sooner terminated* pursuant to the terms of this Agreement. This Agreement shall renew automatically for successive ten (10) year periods, *unless sooner terminated* pursuant to the terms of this Agreement.

*Id.* ¶ 5(A) (emphases added).

Courts examining virtually identical language have concluded that such provisions grant either party the right to terminate the contract at will at the end of the initial term. *See, e.g., Hurletron Inc. v. Eltex-Elektrostatik Gesellschaft mbH*, 116 F.3d 1482 (Table), *reported at* No. 96-4187, 1997 WL 345902, at *2-*3 (7th Cir. June 16, 1997) (holding that similar language gave either party the right to terminate at will following the initial term of the agreement and that any contrary interpretation would render the plain language of the contract "meaningless"). The initial term of the Supply Agreement – even assuming Kraft has not committed Material Breaches – would end in 2014. Moreover, the automatic renewal provision of the Supply Agreement applies by its terms only in circumstances where neither party has terminated the Agreement. Because Starbucks has terminated the Supply Agreement effective March 1, 2011, the automatic renewal provision does not apply.

\* \* \* \* \*

---

[1] At all events, the "premium" to which Kraft has publicly referred is unenforceable as an unlawful restraint of trade. *See, e.g., American Inst. of Chem. Eng'rs. v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982); *Baker's Aid v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1215 (E.D.N.Y. 1990)

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mr. William P. Quinn, Jr.
November 12, 2010
Page 7

      To the extent I can do anything to assist with the orderly transition contemplated by ¶ 6(C) of the Supply Agreement, please do not hesitate to let me know. Also, be assured that Starbucks is prepared to engage in good-faith discussions with Kraft to discuss a resolution of disputes between the parties without the necessity for litigation.

                    Sincerely,

                    Aaron M. Panner