UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

KRAFT FOODS GLOBAL, INC.,                    :          CASE NO. 10 CV 09085 (CS)

                Plaintiff,          :          **MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF**
    -against-                                      :          **PRELIMINARY INJUNCTION**

STARBUCKS CORPORATION,               :

              Defendant.          :

------------------------------------------------------- X

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................... 1

II.    BRIEF SUMMARY OF CASE ................................................ 1

III.   FACTUAL BACKGROUND .................................................. 5

    A.    The Agreements At Issue In This Case................................. 6

         1.   The R&G Agreement ...................................... 6

         2.   The Tassimo Agreements .............................. 8

    B.    Kraft's Success In Building The Kraft/Starbucks CPG Business........................ 10

    C.    Starbucks' Decision to Terminate the R&G Agreement and the Tassimo Agreements .................................. 12

    D.    Starbucks' Allegations Of Material Breach ........................ 15

    E.    Starbucks' Refusal To Comply With The Dispute Resolution Provisions of the R&G Agreement .............................. 16

    F.    Starbucks' Premature Attempts to Effectuate Termination of the Agreements .................................. 18

IV.   ARGUMENT .......................................................................... 19

    A.    If Starbucks Is Not Enjoined, Kraft Will Suffer Considerable Irreparable Harm .................................. 22

         1.   Starbucks' Frustration Of Kraft's Contractual Right To Arbitrate The Dispute Over Termination -- Before It Has Been Resolved in the Arbitration -- Constitutes Irreparable Harm As A Matter Of Law .................................. 22

         2.   Starbucks' Unilateral And Premature Termination Of The R&G Agreement Will Wrongfully Deny Kraft The Benefit Of Its Exclusivity Rights, Thereby Subjecting Kraft To An Unfair Competitive Disadvantage .................................. 26

         3.   Starbucks' Actions Have Caused, And Will Continue To Cause, Irreparable Harm To The Tassimo Business In The United States ........ 28

         4.   Starbucks' Disparagement Of Kraft And Its Interference With Kraft Customer Relationships Threaten To Cause Irreparable Harm...... 29

         5.   The Relevance of the R&G Agreement's Buyout Provision to the Irreparable Harm Inquiry .................................. 30

    B.    A Balancing Of Equities Weighs Heavily In Favor Of Kraft ............................ 33

    C.    Kraft Will Succeed On The Merits Of Its Arbitration Claims ............................ 35

V.    CONCLUSION.......................................................................... 38

# FEDERAL CASES

*Amoco Production Co. v. Village of Gamball, Alaska*, 480 U.S. 531 (1987)...................33

*Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990) .......................................24, 25

*Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) ................21

*Cablevision System Corp. v. Town of East Hampton*, 862 F. Supp. 875 (E.D.N.Y. 1994) ...........................................................................................................................36

*Citigroup Global Markets v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)....................................................................................19, 20, 35

*Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312 (2d Cir. 1982) ......................19

*Credit Suisse Sec. (USA) LLC v. Ebling*, No. 06-11339, 2006 U.S. Dist. LEXIS 86351 (S.D.N.Y. Nov. 27, 2006) ...................................................................................25

*Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972)....................25

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2nd Cir. 1953).......................33

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ........................................................................20

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ...............................20

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ..................20

*Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977)..............20, 21

*L.K. Comstock & Co., Inc., v. Thales Transport & Security, Inc.*, No. 09 cv 3352, 2009 U.S. Dist. LEXIS 791547 (E.D.N.Y. Sept. 2, 2009)..........................................25

*National Kitchen Prod., Inc. v. Kelmort Trading & Co.*, 1992 U.S. Dist. LEXIS 657..................................................................................................................................27

*Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*, 992 F.2d 430 (2nd Cir. 1993) .................26

*New York v. Nuclear Regulatory Commission*, 550 F.2d 745 (2nd Cir. 1977)..................21

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).........................................20

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) .............19, 21, 27 34

*Roso-Lino Beverage Distributing, Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124 (2d Cir. 1984).................................................................................21, 25

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2nd Cir. 1970)...................21,33

*Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966) .................................................20

*Supermarket Services, Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248 (S.D.N.Y. 1974)....................................................................................................27, 30

## TABLE OF AUTHORITIES
(continued)

**Page**

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986) ............................................25

*Two Wheel Corp.*, 506 F. Supp. 806 at 821-822 (E.D.N.Y. 1980) ....................................35

*Vestron*, 750 F. Supp. at 591 (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907-908 (2d Cir. 1990)) .............................................................................27

*Wechsler v. Hunt Health Systems, Ltd.*, 330 F. Supp. 2d 383 (S.D.N.Y. 2004) ...............36

*Winter v. NRDC, Inc.*, 129 S. Ct. 365 (2008) ..............................................................19, 20

### STATE CASES

*O.D.F. Optronics Ltd. v. Remington Arms Co.*, 2008 WL. 4410130 (S.D.N.Y. Sept. 26, 2008) ...................................................................................................21

### FEDERAL STATUTES

Fed. R. Civ. P. 65 ................................................................................................................19

### MISCELLANEOUS

Douglas Lichtman, *Irreparable Benefits,* 116 Yale L.J. 1284 (2007) ...............................27

Laycock, Douglas, The *Death of the Irreparable Injury Rule* (Oxford Press, 1991) ...................................................................................................................20

Leubsdorf, John, *The Standard for Preliminary Injunctions*, 91 HARV. L. REV. 525, 525 (1978) ..................................................................................................20

## I.     INTRODUCTION

This case arises out of a series of contracts between Plaintiff Kraft Foods Global, Inc. (*"Kraft"*) and Defendant Starbucks Corporation (*"Starbucks"*) pursuant to which Kraft owns the exclusive right to sell, market and distribute certain Starbucks products in the consumer packaged goods (*"CPG"*) market.  Starbucks has purported to terminate those contracts on the ground that Kraft materially breached one of them.  Kraft disputes Starbucks' allegations of material breach and thus denies that Starbucks has the right or power to terminate the contracts. As required by the contracts, Kraft initiated a binding arbitration in which the dispute over termination will be resolved.  However, rather than await the outcome of the arbitration, Starbucks has begun to effectuate the termination unilaterally. It intends to stop supplying its products to Kraft on or before March 1, 2011, which would have the effect of shutting down a business that Kraft has built over a 12 year period and that is now generating approximately $500 million in annual revenue.  Kraft therefore brought this action for the limited purpose of obtaining a preliminary injunction to restrain Starbucks from prematurely effectuating a termination of the parties' contracts, thereby maintaining the *status quo* pending a determination of the parties' respective rights and obligations in arbitration.  As demonstrated below, the case for such an injunction is compelling.

## II.    BRIEF SUMMARY OF CASE

In 1998, Kraft acquired from Starbucks the exclusive right to sell, market and distribute certain packaged Starbucks brand roasted whole bean and ground coffee (*"Starbucks CPG Products"*) in the CPG market, which consists of Kraft's customer base of grocery stores and other retail packaged food outlets.  In exchange, Starbucks receives a substantial portion of the revenues Kraft generates from the sale of those products.  The contract that governs the parties'

respective rights and obligations in relation to the sale of Starbucks CPG products ("*Kraft/Starbucks CPG Business*") is a March 29, 2004 Supply and License Agreement ("*R&G Agreement*" or "*Agreement*").[1]

Since 1998, Kraft has succeeded in establishing the Starbucks brand as the undisputed leader among "*super premium*" coffees sold in CPG channels.  It also has increased annual revenues from the sale of Starbucks CPG products from approximately $50 million to almost $500 million.  The business is, moreover, highly profitable for both parties.  In 2010 alone, Starbucks earned more than $100 million in profit from Kraft's sales of Starbucks CPG Products.

For reasons other than concerns about the success of Kraft's proprietorship of the Kraft/Starbucks CPG Business, Starbucks committed itself to taking over that business by terminating the R&G Agreement.  Faced with diminishing prospects for sales growth in its retail coffee cafe network, Starbucks has embarked on a new strategic path focused on expansion into new markets, especially the CPG market.  Starbucks cannot achieve its new goals so long as the R&G Agreement remains in effect.

Starbucks has an undisputed contractual right to terminate the R&G Agreement on 180 days advance notice provided that it compensates Kraft for the loss of its rights to the Kraft/Starbucks CPG Business in an amount tied to the business' fair market value as determined through a contractually mandated appraisal process.  Starbucks is unwilling to comply with that requirement.  Instead, it is trying to divest Kraft of its ownership of the Kraft/Starbucks CPG Business through other means.

At a meeting in August 2010, Starbucks offered to pay Kraft $750 million in exchange for termination of the agreements.  It told Kraft at the time that its desire to terminate was not the

---

[1]    The initial contract between Starbucks and Kraft relating to the Starbucks CPG Business was executed in 1998.  The R&G Agreement supersedes the 1998 contract.

product of dissatisfaction with Kraft's stewardship of the business, but rather is a necessary step toward implementation of Starbucks' strategic plan.  Kraft rejected Starbucks' offer because it is far less than the fair market value of the business.

Starbucks then suddenly changed course.  It notified Kraft that it intended to terminate the R&G Agreement based on allegations that Kraft has been in material breach of it for years. Those allegations lack substance and obviously were concocted to advance Starbucks' goal of taking over the Kraft/Starbucks CPG business.  For the most part, they involve events and circumstances that occurred years ago and about which Starbucks never previously complained. Starbucks alleges, for example, that Kraft has breached its exclusivity obligations under the Agreement by selling Yuban brand coffee.  Kraft has been selling Yuban coffee since long before entering into its Agreement with Starbucks but Starbucks never before suggested that the R&G Agreement prohibits Kraft from selling Yuban.

Kraft denies that Starbucks has grounds for terminating the R&G Agreement and therefore contends that its notice of termination was an empty act without legal effect.  Kraft has initiated a binding arbitration pursuant to mandatory dispute provisions set forth in the R&G Agreement, in which it seeks an adjudication of the validity of Starbucks' purported termination of the Agreement as well as an order requiring Starbucks to continue performing under the Agreement unless and until there is a valid termination of it.

The contractual dispute resolution process contemplates that Starbucks will refrain from taking steps to effectuate termination of the R&G Agreement pending the outcome of  the arbitration.  Starbucks refuses to do so, however.  Over Kraft's objection, it is unilaterally implementing a "transition" of the Kraft/Starbucks CPG business, not because it has a legal right to do so, but by virtue of its physical control over the supply of Starbucks CPG products that

Kraft sells under the Agreement.  Unless restrained, Starbucks will stop supplying those products to Kraft on or before March 1, 2011.  In addition, it has told Kraft's own customers that Kraft will no longer have the right or the ability to sell Starbucks CPG Products.  Consequently, if customers wish to continue purchasing Starbucks CPG products after March 1, 2011, they must implement operational changes that, as a practical matter, will prevent them from obtaining Starbucks products from any party other than Starbucks or Acosta, its new distribution partner.

Faced with Starbucks' defiance of its contractual obligations, Kraft seeks a preliminary injunction to maintain the *status quo* until the termination dispute is resolved in the contractually mandated arbitration by restraining Starbucks from continuing to effectuate termination of the agreements.  From both a practical and equitable standpoint, there is a compelling need for such an injunction.

The harm Kraft would suffer if Starbucks is permitted to continue unchecked would be irreparable and profound.  Given the nature of the contractual relationship, a unilateral termination would be tantamount to seizure of the Kraft/Starbucks CPG Business *before* Kraft has had an opportunity to avail itself of its contractual right to demonstrate in the arbitration that Kraft, not Starbucks, is the rightful owner of the business.  Although Kraft expects to prevail in the arbitration, a victory that comes after Starbucks has seized ownership of the Kraft/Starbucks CPG Business would be a hollow one.  As a practical matter, and as explained in more detail below, the business that Kraft built cannot be restored to Kraft after Starbucks has taken it away.  Kraft would thus be left with only a claim for damages, a remedy that would be wholly inadequate given the facts of this case.

In contrast, an injunction preserving the *status quo* for the roughly six months it will take to complete the arbitration would do Starbucks real no harm.  Starbucks would merely be

4

required to continue a business relationship that dates back to 1998 and which today is earning Starbucks annual profits exceeding $100 million.  There is, moreover, no credible argument that, should Starbucks prevail in the arbitration, it will have been prejudiced by the short delay in effectuating the termination.  Objective evidence demonstrates that, during the brief period during which the injunction would be in effect, the business will continue growing and is likely to yield Starbucks even greater profits than it has in the past.

In short, given that the validity of Starbucks' purported termination of the Agreement is dubious at best, and that allowing Starbucks to take over the Kraft/Starbucks CPG before its entitlement to terminate has been established would subject Kraft to considerable hardships without materially advancing any legitimate interests Starbucks may have, a preliminary injunction is clearly warranted.

## III.    FACTUAL BACKGROUND

Since its founding in the 1970s, Starbucks has been manufacturing and selling specialty coffee products through an international chain of retail coffee cafes.  Starbucks is now a leader in what is generally referred to as the "super premium" coffee segment, which commands higher prices than other coffee brands in other segments.  *See* Declaration of Lori Acker ("Acker Decl.") at ¶ 77.

Kraft is the largest food company in the United States and the second largest food company in the world.  Its products are found in more than 99 % of households in the United States.  Kraft sells primarily in the CPG market, which includes grocery and supermarket chains, wholesalers, super centers, club stores, mass merchandisers, distributors, convenience stores, drug stores, value stores and other retail food outlets.  *See* Acker Decl. at ¶ 7. The Kraft business unit responsible for U.S. coffee and other beverages, including Starbucks CPG Products,

employs approximately 500 people in Tarrytown, New York.

### A.     The Agreements At Issue In This Case

### 1.     The R&G Agreement[2]

In the late 1990s, Starbucks saw an opportunity to expand sales of its products beyond its retail cafe network by tapping demand for packaged R&G Starbucks coffee in grocery stores and other retail consumer packaged goods outlets, but it lacked the know-how, retailer relationships and infrastructure to succeed on its own.  It therefore entered into a contractual arrangement with Kraft, one of the largest CPG businesses in the world, under which Kraft, rather than Starbucks, would have the right to build sales of Starbucks products in the CPG market.  That relationship presently is governed by the R&G Agreement.

The Agreement vests in Kraft exclusive ownership of the right to sell Starbucks CPG Products so long as the Agreement remains in effect.  *See* R&G Agreement ¶ 3, attached as Exhibit 2 to the Declaration of William P. Quinn ("Quinn Decl.")  It is an *"evergreen"* contract in that its initial ten-year term (which runs until 2014) will renew automatically and repeatedly for successive ten-year terms.  *See id.* ¶ 5.A.  Thus, under the Agreement, Kraft effectively owns the Kraft/Starbucks CPG Business and will continue to do so indefinitely unless and until the R&G Agreement is terminated in a manner expressly permitted by its terms.[3]

The exclusivity obligations imposed by the R&G Agreement are mutual.  Just as the Agreement precludes Starbucks from competing with Kraft (directly or through other licensees) in the CPG market, it also prevents Kraft from selling other super premium coffees to its CPG

---

[2]     The contracts at issue in this case are governed by New York law.

[3]     The R&G Agreement is not simply a distributorship agreement.  Kraft does not render services to Starbucks nor does it act as an agent or *"middleman"* between Starbucks and the retailers that sell Starbucks CPG products to consumers.  Those retailers buy Starbucks CPG products from Kraft, not Starbucks.  Kraft, moreover, manages the Starbucks CPG Business and is, in essence, the proprietor of that business.

customers.  *See id.* ¶ 3.  Thus, by committing itself to the Starbucks brand, Kraft foreclosed itself

from pursuing other opportunities in the lucrative super premium coffee segment for as long as

the R&G Agreement remains in effect.[4]

Starbucks may terminate the R&G Agreement, and thus divest Kraft of its ownership of

the Kraft/Starbucks CPG Business, under only two circumstances that are relevant to this case.

First, Paragraph 5(B)(ii) of the R&G Agreement gives Starbucks the right to buy out Kraft's

rights under the Agreement (the *"Buyout Provision"*).  Specifically, it allows Starbucks to

terminate the Agreement on at least 180 days advance notice provided that it pays Kraft the *"Fair*

*Market Value"* of the Agreement (as defined in Paragraph 5(D) of the Agreement) plus a

premium of up to 35% (the "Buyout Payment").  The purpose of the requirement that Starbucks

compensate Kraft in an amount tied to the fair market value of the business upon termination is

to protect Kraft from the risk that Starbucks would sever the parties' relationship in a manner

that would deny Kraft the fruits of its investment in, and its successful development of, the

Kraft/Starbucks CPG Business.  The Buyout Provision is, in this respect, akin to an option to

purchase the business that Kraft built and which has enduring value to Kraft.

Second, Paragraph 5(B)(iii) of the Agreement allows Starbucks to terminate if Kraft

breaches the Agreement – but *only* if that breach constitutes a *"Material Breach"* as defined in

the Agreement.  A *"Material Breach"* is one that *"significantly impairs the value of [Starbucks']*

bargained-for benefits*"* under the R&G Agreement or *"causes or threatens to cause [Starbucks]*

significant financial, brand equity and/or other injury.*"*  In this way, the parties set a very high

bar for termination pursuant to Paragraph 5(B)(iii).  Even if Kraft were to breach, Starbucks

---

[4]     Securing Kraft's commitment to exploit demand for Starbucks products in the CPG market was a breakthrough
        for Starbucks.  In the words of Starbucks Chairman and CEO Howard Schultz: *"Thanks to Kraft, we are now*
        *in a position to provide Starbucks coffee through grocery stores nationally much quicker than we would have*
        *been able to do it ourselves."*

would not have the right to terminate unless the breach was so egregious as to deny Starbucks a fundamental benefit for which it had bargained.

Paragraph 15 of the R&G Agreement requires the parties to resolve disputes relating to the Agreement in the following manner:

> The parties hereto will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation, but submitting such claim or controversy to the oversight Committee.  However, at any time following the first to occur of (i) the first meeting of the Oversight Committee concerning such claim or controversy, or (ii) expiration of the thirty (30)-day period following a party's written request to the other party to submit such claim or controversy to the Oversight Committee if the Oversight Committee has not met to consider such claim or controversy within such thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration.  Such binding arbitration shall be conducted within the City of Chicago at JAMS or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures, except as modified by the Agreement of the parties.

The R&G Agreement also provides the parties with a mechanism for forcing the other to comply with their contractual obligations, including the requirement that disputes be resolved in accordance with Paragraph 15's dispute resolution process.  Paragraph 15(B) allows either party to resort "to judicial proceedings in the United States District Court for the Southern District of New York for the limited purpose of seeking a preliminary injunction . . ."

## 2.     The Tassimo Agreements

In 2006, Kraft and Starbucks agreed to expand their relationship into the single-cup beverage market (also known as the "on demand" market).  "Single-cup" brewers produce single servings of high quality coffee and other hot beverages in about one minute by forcing hot water through ground coffee (or tea leaves, cocoa mix, etc.) that has been packaged in a specialized container.  *See* Declaration of David C. Hyland ("Hyland Decl."), ¶ 3.  The market for single-cup systems is growing rapidly and is likely to be both a key driver of future coffee

sales and one of the most promising opportunities for product expansion.  Declaration of Stephen J. Schwarz ("Schwarz Decl."), ¶ 3.

Kraft entered the single-cup market in 2004 with the launch of the Tassimo line of brewers.  *See* Hyland Decl., ¶ 4.  Tassimo brewers use *"T Discs"* containing coffee, espresso, tea, hot chocolate, or milk (for cappuccino) to brew a single cup on demand.  Schwarz Decl., ¶ 2. The brewers incorporate Kraft's proprietary technology and are manufactured and sold by Bosch in certain grocery stores and other retail outlets, including Bed, Bath and Beyond and Macy's. Hyland Decl., ¶ 5.

Like some other single-cup systems, Tassimo is a closed brewing system, which means that only Tassimo T Discs can be used with Tassimo brewers and, conversely, Tassimo brewers work only with T Discs.  Hyland Decl., ¶ 6; Schwarz Decl., ¶ 5.  As a result, sales of Tassimo brewers drive sales of T Discs; the more Tassimo brewers sold, the more T Discs Kraft can sell to consumers.  Schwarz Decl., ¶ 9, 10.  Kraft is the exclusive manufacturer and distributor of Tassimo T Discs.  Hyland Decl., ¶ 6; Schwarz Decl., ¶ 5.  It has invested hundreds of millions of dollars in order to build Tassimo into a global single-serve platform.

In order to both boost sales of Tassimo brewers and give Starbucks a foothold in the growing single-cup market, Kraft and Starbucks entered into two agreements that give Kraft the exclusive right in specified channels to manufacture, market, distribute and sell T Discs containing Starbucks coffee and tea.  *See* Tassimo Agreements, ¶ 3; Quinn Decl., ¶ 3-4.  The first agreement, which was executed in August 2006 (*"2006 Tassimo Agreement"*), gave Kraft an exclusive license to sell Tassimo T Discs containing Seattle's Best coffee and Tazo brand tea in the United States.  *See* 2006 Tassimo Agreement, attached as Exhibit 3 to Quinn Decl.; Hyland Decl., ¶ 9.  The second, which was executed in July 2007, granted Kraft the exclusive right to

manufacture and sell T Discs containing Starbucks coffee in the United States as well as certain other countries (*"2007 Tassimo Agreement"*).  *See* 2007 Tassimo Agreement, attached as Exhibit 4 to Quinn Decl.  The 2006 Tassimo Agreement and the 2007 Tassimo Agreement (collectively, the *"Tassimo Agreements"*) expire on December 31, 2011 and December 31, 2015, respectively.  *See* 2006 Tassimo Agreement ¶ 5.A; 2007 Tassimo Agreement ¶ 5.A.

Kraft's exclusive rights under the Tassimo Agreements give the Tassimo system an important competitive advantage over competing single-cup systems.  *See* Hyland Decl., ¶ 10; Schwarz Decl. ¶ 6.  For consumers who favor Starbucks coffee and want to buy a single-cup brewer in Kraft's CPG channels, Tassimo is their only option.  Moreover, because consumer preferences heavily influence retailer buying decisions, the Starbucks exclusivity arrangement has been, and will continue to be, an important determinant of the success of the Tassimo business.  *See e.g.* Schwarz Decl. ¶¶ 6, 17-24, 28, 29.  As a result, Kraft's exclusivity rights are and will continue to be an important factor in Kraft's ability to increase its share of the single-cup market.  Kraft has, therefore, heavily promoted Tassimo in the U.S. as the only single-cup system that offers Starbucks' products and the results have been very positive.  *See* Hyland Decl., ¶ 15, 16, 17, 20.

**B.    Kraft's Success In Building The Kraft/Starbucks CPG Business**

As Starbucks had hoped, the size and profitability of the Kraft/Starbucks CPG Business grew rapidly under Kraft's proprietorship.  When Kraft acquired the rights to the business in 1998, Starbucks CPG Products were generating sales of approximately $50 million in annual revenue from a product portfolio limited to 16 unique products (*"SKUs"*) in 4,000 stores in 12 states.  Declaration of Mike Prchlik ("Prchlik Decl."), ¶ 10.  In the 12 years since Kraft acquired exclusive rights with respect to the Kraft/Starbucks CPG Business, Kraft's sales of Starbucks

CPG Products have grown to approximately $500 million in annual revenue, with a product portfolio of over 65 SKUs sold in 40,000 stores across all 50 U.S. states and in Canada. This represents a compounded average annual revenue growth rate in excess of 20%, which is well above the industry norm. *See* Acker Decl. at ¶ 72.

The rapid growth of the Starbucks business, both in Starbucks' retail cafe network and in Kraft's CPG channels, stalled with the onset of the 2008 recession, which led many consumers to reduce spending, especially on luxury items. As Starbucks Chairman and CEO Howard Schultz acknowledged in March 2009, *"Starbucks Coffee Co. ha[d] become the poster child for excess."* In its 2008 and 2009 fiscal years, Starbucks experienced eight consecutive quarters of declines in U.S. comparable retail cafe sales. *See* Acker Decl. at ¶ 73. The effects of the economic downturn were exacerbated by unprecedented competitive pressure in the away-from-home coffee market, especially from Dunkin' Donuts, which, beginning in 2007, launched a heavily funded campaign to capture market share from Starbucks. *See* Acker Decl. at ¶ 75.

Despite the negative effect of these factors on the Starbucks brand, Kraft successfully forestalled a precipitous decline in Starbucks' market position in the CPG market. The decline that Kraft did experience was comparatively modest under the circumstances and was the unavoidable result of the recession, competitive forces and other factors beyond Kraft's control. By way of comparison, the growth of the Kraft/Starbucks CPG Business has exceeded Starbucks' comparable store cafe sales revenue growth in 11 of the last 16 quarters. *See* Acker Decl. at ¶ 76. As a result of the measures that Kraft took to overcome the external forces it faced in recent years, the Kraft/Starbucks CPG Business is again experiencing robust growth. Revenues for Starbucks CPG Products are at an all-time high, with a year-to-date growth rate of 8% through November 2010. *See* Acker Decl. at ¶ 79. By comparison, during the same period,

total U.S. coffee industry sales have grown by only 2%. *See Id.*

Starbucks has frequently credited Kraft for the success of the Kraft/Starbucks CPG Business, lauding Kraft as an "outstanding" company.  In April 2010, Troy Alstead stated that the Kraft/Starbucks CPG Business had become "highly profitable" over the years, specifically citing Starbucks' success in "leverag[ing] the world-class capabilities that [Kraft has] in manufacturing, research and development and marketing distribution." *See Id.* at  ¶ 80.

Starbucks' praise of Kraft in private has been similarly effusive.  For example, in late 2009, John Culver, then President of Starbucks Global Consumer Products and Foodservice, complimented the Kraft team for driving positive results, stating "I also wanted to thank the entire team from both Kraft and Starbucks for a great meeting and more importantly for all of your efforts to get our packaged coffee business back on a positive growth track.  It is great to see that your efforts and focus on the business are having a positive effect on our base business, and for the first time in two years we have seen share growth for the month of October." *See Id.* at ¶ 81.

As recently as May 2010, Greg Price, a Starbucks Vice President with direct responsibility for the Kraft CPG relationship, expressed his excitement over the partnership with Kraft to Deanie Elsner, the newly appointed President of the Kraft Foods North American beverages business unit:

> Thank you for a great meeting today.  You had great insights, asked great questions, and helped set a great tone for our partnership moving forward, and I think the team left today's discussion jazzed and excited about []the road ahead. . . .  You've got a great team . . . .  That's it for now.  Welcome, thanks, and onward together."

*See Id.* at 83.

      **C.**        **Starbucks' Decision to Terminate the R&G Agreement and the Tassimo Agreements**

Starbucks has realized in recent years that the prospects for future growth in its traditional retail cafe business are diminishing. The United States is now saturated with Starbucks' retail outlets, with new stores often cannibalizing the sales of existing ones. Starbucks has therefore shifted its strategic focus toward what it perceives to be far greater growth opportunities in the CPG market. In the words of Starbucks CEO Howard Schultz, "[i]ncreasingly . . . we're viewing the CPG business as central to our overall business strategy: enabling our packaged coffee, tea and ready-to-drink businesses to leverage existing markets and brand awareness; providing us with channels and access to customers we have not otherwise been able to reach at retail." (Bloomberg Final Transcript of Starbucks Earning Call for Quarter 1 2009). Starbucks recently described the CPG business as "a huge opportunity for our company" and identified as one of its goals "expanding our footprint into grocery with a more focused sell into the CPG channel." (Bloomberg Final Transcript of Starbucks Earning Call for Quarter 3 2010).

As part of its strategy of expanding into new areas, Starbucks has also targeted the single-cup segment. Starbucks CEO Schultz was quoted as saying that Starbucks "is looking to expand its presence in the U.S. consumer packaged goods arena and will sell single-service coffee machines and instant coffee pods to accompany them." *See* Quinn Decl., ¶ 21. The Tassimo Agreements, however, preclude Starbucks from selling single-cup products in the channels specified in those agreements. *See* 2006 Tassimo Agreement ¶ 3.C; 2007 Tassimo Agreement ¶ 32.D; Hyland Decl., ¶ 10.

Because Starbucks cannot achieve its strategic and financial goals in either the CPG market or the single-cup segment so long as the R&G Agreement remains in effect, it has committed itself to achieving a termination of the R&G Agreement (which Starbucks contends would entitle it to also terminate the Tassimo Agreements). As Starbucks knows, Kraft has not

committed a Material Breach of the R&G Agreement.  It therefore also knows that the only

means through which it can terminate the R&G Agreement is by invoking its Buyout Provision,

which would obligate Starbucks to pay Kraft the Fair Market Value of the Agreement plus a 35%

premium.[5]  That is not an attractive option for Starbucks; given the tremendous profitability of

the Kraft/Starbucks CPG Business and its potential for rapid future growth, Starbucks would

have to pay a price far higher than it would like.

Consequently, rather than invoking the Buyout Provision, Starbucks attempted in early

2010 to negotiate a buyout of Kraft's ownership rights under the R&G Agreement at a far lower

price.  As an inducement, Starbucks offered to expand and strengthen the parties' alliance in the

single-cup market by making a substantial investment in the Tassimo business.  During the

parties' discussions of this possibility, Starbucks' senior management complained to Kraft's

senior management about certain operational issues relating to Kraft's performance under the

R&G Agreement.  None of them rose to the level of a material breach  Instead, Starbucks' claim

to be dissatisfied with Kraft's management of the Kraft/Starbucks CPG Business was merely a

negotiating tactic that Starbucks hoped would give it leverage in its attempt to achieve a

restructuring of the parties' contractual relationship.  Not surprisingly, therefore, the alleged

deficiencies noted by Starbucks' senior management were, for the most part, never mentioned by

the Starbucks personnel who had personal knowledge of Kraft's management of the

Kraft/Starbucks CPG Business.  For example, in May 2010, the newly-appointed President of

Kraft's North American Beverages Unit asked a joint Kraft/Starbucks team to assess "what is

---

5    As noted, Paragraph 5(B)(ii) of the R&G Agreement requires Starbucks to pay Kraft 135% of the Fair Market
     Value of the Agreement if, upon termination, Starbucks sells its products in the CPG market "in conjunction
     with a party other than" Kraft.  Starbucks has announced that it intends to sell Starbucks CPG products with
     Acosta Sales & Marketing.  It will thus have to pay Kraft a 35% premium if it terminates pursuant to the
     Buyout Provision.

working and what is not working" with respect to Kraft's performance under the R&G

Agreement.  *See* Acker Decl. at ¶ 78.  In the course of this assessment, Starbucks' managers did

not raise the issues that Starbucks' senior management noted earlier in the year in the context of

contract negotiations.

The parties' negotiations in early 2010 toward a restructuring of the contracts did not bear

fruit and thus did not achieve Starbucks' goal of terminating the R&G Agreement.  Therefore, in

August of this year, Starbucks again approached Kraft about its desire to take over the

Kraft/Starbucks CPG Business and offered to pay Kraft $750 million in exchange for a

consensual termination of the R&G Agreement and the Tassimo Agreements.  *See* Declaration of

Michael Waks ("Waks Decl.") ¶ 5, 6.  Starbucks assured Kraft that its desire to acquire the

Kraft/Starbucks CPG Business was motivated by its new strategic focus on the CPG market and

not dissatisfaction with Kraft's proprietorship of the Kraft/Starbucks CPG Business or Kraft's

performance under the R&G Agreement.  *See Id.* ¶ 8.  Kraft rejected Starbucks' offer of $750

million as far less than the fair market value of the Kraft/Starbucks CPG Business and, therefore,

far less than Starbucks would be required to pay under the Buyout Provision. *See Id.* at ¶ 7.

### D.    Starbucks' Allegations Of Material Breach

Rather than offering Kraft a fair price or invoking its rights under the Buyout Provision,

Starbucks, through its outside counsel, sent an October 5, 2010 letter to Kraft alleging that Kraft

had committed various "Material Breaches" of the Agreement.  *See* October 5, 2010 Letter from

Aaron Panner to Deanie Elsner, attached as Exhibit 8 to Quinn Decl.; Waks Decl., ¶¶ 8-11.  The

letter stated that Starbucks would terminate the Agreement effective March 1, 2011 unless Kraft

"cured" the "Material Breaches" within 30 days.  In a second letter Starbucks' outside counsel

sent on November 5, 2010, Starbucks purported to terminate the R&G Agreement effective

March 1, 2011 on the ground that Kraft had failed to "cure" the Material Breaches alleged in the October 5, 2011 letter.  As Starbucks knows, however, breaches that never occurred in the first place cannot be "cured."   The November 5, 2010 letter also purported to terminate the Tassimo Agreements (as well as an International Supply and License Agreement between Kraft and Starbucks, dated September 28, 2006), evidently on the ground that Starbucks had effected a valid termination of the R&G Agreement.  *See* November 5, 2010 Letter from Aaron Panner to Deanie Elsner, attached as Exhibit 10 to the Quinn Decl.

As discussed below, all of Starbucks' breach allegations are meritless.  Although many of the purported breaches allegedly occurred many months or years earlier, the October 5, 2010 letter was the first time that Starbucks asserted that it had grounds for terminating the R&G Agreement under Section 5(b)(iii).  Even if Starbucks' allegations were factually accurate (which they are not), they would not give Starbucks the right to terminate the R&G Agreement.  As noted, the R&G Agreement provides that a breach of the Agreement would generally warrant termination by the non-breaching party only if the breach were fundamental and caused or threatened to cause significant financial injury.  None of the breaches alleged by Starbucks approaches that standard.  Starbucks' failure to bring the purported breaches to Kraft's attention, standing alone, belies the notion that, if they occurred, they "significantly impaired" the value of the R&G Agreement to Starbucks or otherwise caused Starbucks substantial injury.

### E.   Starbucks' Refusal To Comply With The Dispute Resolution Provisions of the R&G Agreement

In a November 4, 2010 letter from its counsel, Kraft denied every one of Starbucks' breach allegations and presented a detailed point-by-point refutation of them.  *See* November 4, 2010 Letter from William Quinn to Aaron Panner, attached as Exhibit 9 to Quinn Decl. Starbucks was thus obligated to comply with the dispute resolution process mandated by

Paragraph 15 of the R&G Agreement before unilaterally acting on its attempt to exit the Agreement.  *See* R&G Agreement, ¶ 15.  Unfortunately, Starbucks has refused to do so.

In accordance with Paragraph 15, Kraft requested that the Oversight Committee be convened to consider in good faith the merits of Starbucks' breach allegations.  *See* November 15, 2010 Letter from Deanie Elsner to Jeff Hansberry, attached as Exhibit 22 to Quinn Decl.  It also requested that Starbucks provide the Oversight Committee with certain documents and information that would corroborate Starbucks' breach allegations if they were true.  *Id.* Starbucks refused to comply with either request.  The only reason it gave is that it does *"not see any purpose"* in addressing the *bona fides* of its breach allegations because Starbucks' entitlement to terminate based on those allegations *"is now settled under the terms of the Supply Agreement."  See* Letter from Aaron Panner to William Quinn dated November 16, 2010, attached as Exhibit 16 to Quinn Decl.

Starbucks also failed to submit the parties' dispute over a Material Breach and termination for resolution through binding arbitration.  Kraft therefore itself initiated arbitration proceedings on November 29, 2010.  *See* Demand for Arbitration, attached as Exhibit 19 to Quinn Decl.  Kraft seeks in the arbitration, among other things, a declaration that Starbucks' purported termination of the R&G Agreement and the Tassimo Agreements is invalid, as well as an order requiring Starbucks to continue honoring its obligations under those agreements unless and until it establishes that it has met the requirements for terminating them.  Kraft was forced to proceed both with its own demand for arbitration and with this suit for interim injunctive relief solely because of Starbucks' refusal to comply with the parties' binding dispute resolution process.[6]

---

[6]     Paragraph 15 of the Agreement obligates the parties to address the termination dispute in

**F.     Starbucks' Premature Attempts to Effectuate Termination of the Agreements**

Rather than awaiting the contractually required arbitral adjudication of Kraft's challenge to the validity of Starbucks' purported termination, Starbucks is treating termination as a *fait accompli*.  In a November 4, 2010 earnings call, Starbucks announced that it is ending its relationship with Kraft, but never mentioned that Kraft has vigorously contested all of Starbucks' breach allegations in writing and challenged the validity of Starbucks' attempt to terminate.  (Starbucks Earnings Call Transcript for Quarter 4 2010).

Starbucks has confirmed that it will cut off the supply of its products on March 1, 2011, the effective date of the purported termination.  Worse, Kraft recently obtained from Starbucks information indicating that Starbucks may stop supplying Starbucks products to Kraft even *before* March 1, 2011.  *See* Declaration of John Brill ("Brill Decl."), at ¶ 9.  This would constitute a clear and indefensible breach of Starbucks' contractual obligations to Kraft even if Starbucks' purported termination of the R&G Agreement were valid.

Starbucks has also contacted Kraft's customers directly for the purpose and with the effect of disrupting Kraft's relationships with those customers and ultimately preventing Kraft from continuing to sell Starbucks products in the CPG market.  Acker Decl., at ¶ 92; Prchlik Decl., at ¶ 26,28, 30-34.  Both Starbucks and Acosta, Starbucks' new distribution partner, have notified Kraft's major retail CPG customers that Starbucks has *"severed"* its relationship with

---

"good faith" and in the "spirit of mutual cooperation."  In defiance of that obligation, Starbucks have been confrontational in every respect.  Since announcing its purported termination of the R&G Agreement, Starbucks has repeatedly disparaged, and continues to disparage, Kraft in statements to the public.  On November 29, 2010, for example, Starbucks issued a press release disparaging Kraft and accusing it of failing to live up to its obligations under the Agreement.  It also provided the media with a copy of its October 5, 2010 letter accusing Kraft of materially breaching the R&G Agreement, while failing to provide Kraft's November 4, 2010 letter refuting those allegations.  These and other public statements by Starbucks have misled the public about the quality of Kraft's performance and the legal status of the R&G Agreement.

Kraft and that it will take control of the Kraft/Starbucks CPG Business effective March 1, 2011. Prchlik Decl., at ¶ 30.  They are also successfully pressuring those retailers to convert their order entry systems in the expectation that, after that date, they will be able to purchase Starbucks CPG products only from Starbucks and Acosta.  Once a retailer has completed the conversion, it will no longer have the practical ability to purchase Starbucks products from Kraft.

Starbucks' disparagement and diversion of business from Kraft's CPG customers are clear and deliberate breaches of the R&G Agreement and constitute tortious interference between Kraft and its customers.  Starbucks' actions are inevitably causing considerable confusion and disruption in the marketplace as well as serious damage to Kraft's reputation. *See* Waks Decl. ¶ 12; Prchlik Decl., at ¶¶ 26, 36; Acker Decl., at  ¶ 92.

## IV.    ARGUMENT

In this Circuit, a preliminary injunction should issue where the movant shows that *"it is likely to suffer possible irreparable injury if the injunction is not granted and 'either (1) a likelihood of success on the merits of its case **or** (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *quoting Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314-15 (2d Cir. 1982)(emphasis added); *see also Citigroup Global Markets v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010); *Winter v. NRDC, Inc.*, 129 S.Ct. 365, 374 (2008) (citations omitted); Fed. R. Civ. P. 65.

Where the movant is faced with a risk of irreparable injury, the preliminary injunction standard, as it applies to the merits of the underlying dispute, can be satisfied in either one of two ways.  Where the *"balance of hardships tip[s] decidedly"* in its favor, the movant need only

19

show that its position on the merits is a *"fair ground for litigation."* On the other hand, where a

likelihood of success on the merits is shown, the movant need not prove that the balance of

hardships heavily favors the issuance of an injunction.

A risk of irreparable harm exists if the threatened harm is neither speculative nor remote

and is an *"injury for which a monetary award cannot be adequate compensation." Jackson*

*Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (citing *Studebaker Corp. v.*

*Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966)); *see also Winter*, 129 S.Ct. 365, 374-375.

Moreover, because a motion for preliminary injunctive relief is an appeal to the court*'s*

equitable powers, whether to grant that relief is committed to the sound discretion of the trial

court. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990); *Jacobson & Co.,*

*Inc. v. Armstrong Cork Co.*, 548 F. 2d 438 (2d Cir. 1977), 441; *Winter*, 129 S.Ct. at 376.[7] As the

United States Supreme Court has observed, the criteria a district court is to apply in deciding the

motion are flexible and should account for the practical realities of the case:

> The essence of equity jurisdiction has been the power of the
> Chancellor to do equity and to mould each decree to the necessities
> of the particular case. Flexibility rather than rigidity has
> distinguished it. The qualities of mercy and practicality have made
> equity the instrument for nice adjustment and reconciliation
> between the public interest and private needs as well as between
> competing private claims.

*Hecht Co. v. Bowles*, 321 U.S. 321, 329-330 (1944); *see also* Laycock, Douglas, The *Death of*

*the Irreparable Injury Rule* (Oxford Press, 1991); Leubsdorf*,* John, *The Standard for*

*Preliminary Injunctions*, 91 HARV. L. REV. 525, 525 (1978).

The threat of "irreparable harm may be found where damages are difficult to establish

---

[7]     In exercising its discretion, the trial court is to balance the hardships faced by each party; the harm faced by the
party seeking an injunction must be weighed against any harm the other party may suffer if enjoined. *See*
*Citigroup Global Markets*, 598 F.3d at 30, 36 30 (*"*balance of the hardships*"* analysis designed to be
*"*flexible*"* so as to allow the court to provide equitable relief when warranted); *Reuters* at 909 (supplier*'s*
claimed harm that it will be forced to deal with a distributor with which it no longer has good relations is
*"*insignificant*"* in the *"*balance of the hardships*"* calculus).

and measure" or under other circumstances in which a monetary award would not be adequate compensation. *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir. 2004); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). The threat of irreparable harm exists whenever, "'but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action[,] the parties cannot be returned to the positions they previously occupied.'" *O.D.F. Optronics Ltd. v. Remington Arms Co.,* 2008 WL 4410130, at *7 (S.D.N.Y. Sept. 26, 2008) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir. 1999). A threat is imminent if it presents a significant likelihood of irreparable injury and not just a mere possibility. *See id.; New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2nd Cir. 1977) (harm must be neither *"*remote or speculative but . . . actual and imminent.*").*[8]

In this case, there is a compelling case for a preliminary injunction to maintain the *status quo* until the validity of Starbucks*'* purported attempt to terminate the Agreements is determined through arbitration. In the absence of such an injunction, Kraft will suffer irreparable harm in at least four different respects.

*First*, if Starbucks is permitted to effectuate a termination before the dispute over the validity of the termination has been adjudicated in accordance with the R&G Agreement*'*s dispute resolution provisions, Kraft*'*s contractual right to vindicate its position in the arbitration

---

[8]     Several of the factors to be considered in deciding whether to issue a preliminary injunction are of particular relevance here, including:  (i) an existing agreement between the parties to submit their disputes to binding arbitration; (ii) the relative uniqueness of the product at issue in cases involving distribution contracts that one party seeks to terminate; (iii) the damage that may be done to a party*'*s customer relationships through premature termination of a contract; and (iv) a *"*balancing of the equities,*"* i.e., an analysis not only of the harm that the non-moving party may suffer if enjoined, but also any unfair or *"*irreparable*"* benefit that the non-moving party may gain (and the corresponding harm that the moving party will suffer) in the absence of an injunction.  See e.g. Roso-Lino Beverage Distrib., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc., 749 F.2d 124 (2d Cir. 1984); Jacobson, 548 F.2d at 445; Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-908 (2d Cir. 1990); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2nd Cir. 1970).

and thereby remain in possession of the Kraft/Starbucks CPG Business will be frustrated.  This, in turn, would undermine the Agreement's dispute resolution procedure by denying Kraft the fundamental due process to which Starbucks agreed.  *Second*, Kraft will be placed at a substantial unfair competitive disadvantage because it will be cut off from selling Starbucks products to its CPG customers due to the unilateral decision of Starbucks but will remain bound by its obligation under the R&G Agreement to refrain from offering those customers a competing super premium coffee brand.  *Third*, Kraft's Tassimo business will lose the valuable competitive advantage of Kraft's exclusivity arrangement with Starbucks and will be seriously harmed in a way that cannot be compensated through money damages.  *Fourth*, Kraft will suffer considerable reputational harm, lose customer goodwill and be denied preferred status with certain key customers.

Moreover, it is highly likely that Kraft will prevail in the arbitration. To date, Starbucks has not substantiated its allegations of material breach and Kraft has compelling arguments to rebut them.  In reality, Starbucks is using its breach allegations as a pretext to put pressure on Kraft in its efforts to take over the Kraft/Starbucks CPG Business without honoring the Buyout Provision in the R&G Agreement.

Finally, equitable considerations weigh heavily in favor of Kraft.  If enjoined, Starbucks will suffer no harm. It will merely be required to continue – on an interim basis -- a 12-year course of conduct.  If, on the other hand, Starbucks is not enjoined, Kraft will suffer the irreparable harm that would flow from the forfeiture of a business that Kraft has built over those same 12 years, which is now generating $500 million in revenue annually.  Acker Decl., at ¶ 72.

**A.    If Starbucks Is Not Enjoined, Kraft Will Suffer Considerable Irreparable Harm**

22

**1.      Starbucks' Frustration Of Kraft's Contractual Right To Arbitrate The Dispute Over Termination -- Before It Has Been Resolved in the Arbitration -- Constitutes Irreparable Harm As A Matter Of Law.**

Under Paragraph 15 of the R&G Agreement, an arbitrator, not Starbucks, has the power to decide whether Kraft materially breached the R&G Agreement.  Unless and until Starbucks satisfies its burden of proving a material breach to an arbitrator, Starbucks cannot rightfully claim the power to terminate the R&G Agreement.  It can only assert that it has grounds for termination, an assertion that is, at best, dubious.

Paragraph 15 states that the parties "will attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation, by submitting such claim or controversy to the Oversight Committee." (Emphasis added).  It further states that disputes not resolved within 30 days of submission to the Oversight Committee must be resolved through binding arbitration.  Kraft has attempted to avail itself of its right to have the termination dispute resolved in accordance with this process.  By letter to Starbucks dated November 15, 2010, Kraft attempted to convene a meeting of the Oversight Committee "to consider Starbucks' allegations of breach and the validity of Starbucks' attempt to terminate the Supply Agreement." *See* Exhibit 22 to Quinn Decl.  Kraft also requested that, in connection with the meeting, Starbucks provide the Oversight Committee with basic information about the bases for Starbucks' breach allegations.  *Id.*

Starbucks refused both requests, stating that, because "Starbucks exercised its right to terminate the Supply Agreement, effective March 1, 2011 . . . [Starbucks does] not see any purpose in convening an Oversight Committee meeting with regard to what is now settled under the terms of the Supply Agreement." *See* November 16, 2010 Panner Letter, attached as Exhibit 16 to Quinn Decl.  Starbucks also failed to initiate an arbitration in order to adjudicate the merits

of its allegations of material breach as called for in Paragraph 15 in order to seek an adjudication in arbitration of its right to terminate for material breach.

In the face of Starbucks' refusal to proceed as the Agreement contemplates, Kraft initiated arbitration on November 29, 2010 to secure a declaration that Starbucks has no right to terminate the Agreement.  Kraft also seeks the remedy of specific performance of Starbucks' obligations under the Agreement, including the obligation to continue supplying Starbucks CPG products to Kraft.

Even before the arbitration has gotten underway, Starbucks is proceeding as if an arbitrator has already ruled in its favor:  For example, Starbucks has made clear that it will stop supplying Starbucks products to Kraft on, and possibly before, March 1, 2011.  Brill Decl., at ¶ 9. It has also advised Kraft's customers that Kraft will no longer have the right or the ability to sell Starbucks CPG products as of March 1, 2011 and, moreover, that Kraft customers that want to buy Starbucks CPG products after that date must make operational changes that, once completed, will prevent them from placing orders with Kraft.  Acker Decl., at ¶ 92 and documents attached as Exhibit 10 thereto.  Starbucks is thus carrying out what amounts to a forcible seizure of the Kraft/Starbucks CPG Business, not by operation of Starbucks' actual legal rights, but by virtue of its physical control over the products Starbucks is required to supply to Kraft under the terms of the R&G Agreement.

The Kraft/Starbucks CPG Business, once taken over by Starbucks and then redirected to serve Starbucks' own strategic objectives, cannot be restored to Kraft.  Consequently, if Starbucks is permitted to continue on this path, Kraft's claim in arbitration for specific performance of the R&G Agreement will become moot, *i.e.*, Kraft will have lost its ability to retain ownership of the Kraft/Starbucks CPG Business even though the arbitration is likely to

show that Starbucks does not have the right to terminate for material breach.  Kraft will be left with only a claim for damages, an inadequate remedy given the facts of this case.

As a matter of law, a denial of Kraft's right to a meaningful arbitration would constitute irreparable harm.  As the Second Circuit observed in *Blumenthal v. Merrill Lynch*, 910 F.2d 1049, 1053 (2d Cir. 1990), *"arbitration can become a 'hollow formality' if parties are able to alter irreversibly the *status quo* before the arbitrators are able to render a decision in the dispute."*  In keeping with the well-established federal policy favoring arbitral resolution of disputes, *"[a] district court must ensure that the parties get what they bargained for – a meaningful arbitration of the dispute."  Id.*  "[T]he only way to preserve the *status quo* during the pendency of the arbitration is by the granting of injunctive relief."  *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir. 1972); *see also, e.g., Blumenthal*, 910 F.2d at 1054 (holding that the *"issuance of an injunction to preserve the *status quo* pending arbitration fulfills the court's obligation under the [Federal Arbitration Act] to enforce a valid agreement to arbitrate"*);  *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986); *Roso-Lino Beverage Distrib., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124 (2d Cir. 1984); *L.K. Comstock & Co., Inc., v. Thales Transp. & Security, Inc.*, No. 09 cv 3352, 2009 U.S. Dist. LEXIS 79154*7 (E.D.N.Y. Sept. 2, 2009) (enjoining defendant from terminating contract pending resolution of parties' dispute in arbitration where, "[a]bsent an injunction, 'the harm [plaintiff] seeks to address via arbitration will occur before the arbitrator[s] can render a decision', depriving plaintiff of a meaningful opportunity to resolve the dispute through arbitration"); *Credit Suisse Sec. *USA) LLC v. Ebling*, No. 06-11339, 2006 U.S. Dist. LEXIS 86351 at *8 (S.D.N.Y. Nov. 27, 2006) ("Without a preliminary injunction, the harm that Petitioner seeks to address via arbitration will occur before the arbitrator can render a decision,

and Petitioner will lose its right to meaningfully resolve these…disputes via arbitration.  This constitutes irreparable harm.*").  Moreover, even without a clear risk of imminent irreparable harm, allowing Starbucks to bypass the agreed upon dispute resolution process would conflict with a clear judicial preference for enforcing contractual arrangements that contemplate an adjudication of termination disputes *before* termination occurs. *E.g., Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 434 (2nd Cir. 1993) (granting preliminary injunction pending arbitration based upon parties' contractual arrangement, because the "arbitration remedy for which Nemer and Eagle Sales bargained would remain a hollow formality were the *status quo* not preserved").

As these authorities illustrate, unless the Court issues a preliminary injunction maintaining the *status quo* pending the outcome of the arbitration, Kraft will lose its contractual right to retain ownership of the Kraft/Starbucks CPG Business by obtaining the specific performance of Starbucks' obligations under the R&G Agreement.  As a matter of law, that loss would constitute irreparable injury.

> **2.    Starbucks' Unilateral And Premature Termination Of The R&G Agreement Will Wrongfully Deny Kraft The Benefit Of Its Exclusivity Rights, Thereby Subjecting Kraft To An Unfair Competitive Disadvantage**

The R&G Agreement's exclusivity provisions give Kraft the exclusive right to sell Starbucks CPG Products to its customers, but they also preclude Kraft from selling super premium coffee brands other than Starbucks until there has been a valid termination of the Agreement.  Prchlik Decl., at ¶ 29.

In keeping with Kraft's position that Starbucks' attempt to terminate the R&G Agreement is legally ineffective, Kraft will continue to honor the Agreement, including its obligation to refrain from competing with Starbucks in the super premium coffee segment.  Starbucks, on the

other hand, will cut off its supply of Starbucks products to Kraft no later than March 1, 2011,

thus denying Kraft the benefit of its contractual right sell Starbucks CPG Products and, indeed,

to be the sole source of Starbucks products in the licensed CPG channels.  In other words, as an

inevitable consequence of Starbucks' actions before an arbitral ruling in the termination dispute,

Kraft would lose the competitive *benefit* of the R&G Agreement – the exclusive right to sell

Starbucks CPG Products – but would, at the same time, continue to bear the *burden* of the

contractual prohibition against selling competing super premium brands.  As a result, Kraft

would be placed at an unfair competitive disadvantage while Starbucks would gain an

"irreparable benefit."  *See generally* Douglas Lichtman, *Irreparable Benefits*, 116 Yale L.J. 1284

(2007).  The economic impact of this disparity in the parties' respective competitive positions

would be difficult if not impossible to measure with a reasonable degree of certainty and

therefore constitutes irreparable harm to Kraft as a matter of law.

Even if Kraft were able to introduce a competing super premium brand in the current

circumstances, Starbucks' unjustified denial of its ability to offer Starbucks CPG Products to

customers would constitute irreparable harm.  New York courts have long recognized that

"[t]erminating the delivery of a unique product to a distributor whose customers expect and rely

on the distributor for a continuous supply of the product almost inevitably creates irreparable

damage to the good will of the distributor."  *Vestron*, 750 F. Supp. at 591 (quoting *Reuters Ltd.

v. United Press Int'l, Inc.*, 903 F.2d 904, 907-908 (2d Cir. 1990)); s*ee also, e.g., National

Kitchen Prod., Inc. v. Kelmort Trading & Co.*, 1992 U.S. Dist. LEXIS 657, *4-5 ("A distributor

threatened with serious harm to its ability to compete, which harm is not fairly compensable in

money damages, may turn to equity for protection from the impending incalculable loss of

reputation and good will.");  *Reuters*, 903 F.2d at 907-909 (finding that a "preliminary

injunction is necessary to maintain the *status quo* until a full trial is had*"* where it would be difficult to replace the product in question, even if just for a short time); *Supermarket Servs., Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248, 1256-57 (S.D.N.Y. 1974) (finding that plaintiff would suffer irreparable harm in the form of loss of business reputation and good will, as well as an incalculable amount of lost sales, if it lost an entire line of products).

### 3.    Starbucks' Actions Have Caused, And Will Continue To Cause, Irreparable Harm To The Tassimo Business In The United States

The timing of Starbucks' purported termination of the Tassimo Agreements appears calculated to maximize the harm it will do to the Tassimo business.  As Starbucks knows, sales of Tassimo brewers during the holiday season are important to the profitability of the Tassimo business in the United States.  *See* Hyland Decl. ¶ 14, 20; Schwarz Decl. ¶ 11.  For that reason, in the months before Starbucks' purported termination of the Tassimo Agreements, Kraft implemented a plan for substantially increasing the number of US retailers offering the Tassimo system during the last quarter of 2010.  *See* Schwarz Decl., ¶ 7, 12, 14-16.

An important element of that plan emphasized the Tassimo/Starbucks exclusivity arrangement as a competitive advantage over competing single-cup systems.  *Id.*, ¶ 12, 13, 18-28. Starbucks itself encouraged Kraft to highlight the availability of Starbucks products with the Tassimo system in Kraft's promotional efforts.  Kraft's strategy was effective, resulting in a dramatic increase in the number of retailers carrying the Tassimo line.  *See* Schwarz Decl. ¶ 15, 16, 18-28.

Against this backdrop, Starbucks' November 5, 2010 notice purporting to terminate the Tassimo Agreements, if acted upon, will cause Kraft clear irreparable harm.  Losing what even Starbucks considers to be a powerful competitive advantage would inevitably undermine sales of Tassimo brewers.  And, because Kraft's revenues from T Discs sales are a function of the

number of Tassimo brewers in consumers' hands, it would also, in turn, reduce Kraft's sales of T Discs, including those containing non-Starbucks products.

Although Kraft anticipates that it will prevail in its position that Starbucks' attempt to terminate is invalid, the mere threat of termination by Starbucks has created considerable uncertainty in the marketplace about the future of the Tassimo/Starbucks alliance. *See* Hyland Decl., ¶ 21, 22; Schwarz Decl. ¶¶ 29-34..  For example, Publix, a major retailer, recently cancelled an order for Starbucks T Discs after being told by Starbucks that Starbucks T Discs will no longer be available after March 1, 2011. *See* Exhibit 23 to Quinn Decl.   Compounding that uncertainty is speculation, based in part on statements attributed to Starbucks, that Starbucks will soon begin to compete with Tassimo in the single-cup market.

The degree to which a loss of its exclusivity arrangement with Starbucks would erode Tassimo sales, and thus the quantum of Kraft's losses, would be difficult or impossible to measure with a reasonable degree of certainty.  Consequently, unless Starbucks is enjoined from further attempts to effectuate termination of the Tassimo Agreements and from continuing to sow uncertainty about the availability of Starbucks products to Tassimo users in the mid-term, Kraft will continue to suffer irreparable harm.  The only adequate remedy is judicial intervention that prevents the harm before it occurs.

### 4. Starbucks' Disparagement Of Kraft And Its Interference With Kraft Customer Relationships Threaten To Cause Irreparable Harm.

Since deciding that it wants to take the Kraft/Starbucks CPG Business away from Kraft, Starbucks has made repeated public pronouncements criticizing Kraft's performance under the Agreement – in stark contrast to Starbucks' prior commendation of that same performance. Acker Decl., at ¶¶ 80-81, 83, 86.  Even more concerning, Starbucks has continued to escalate the contacts it started making with Kraft's CPG customers on November 5, 2010, in an apparent

attempt to divert business from Kraft's customers to Starbucks and its new distribution partner, Acosta. *Id.* at ¶ 92; Prchlik Decl., at ¶¶30-31. In a December 1, 2010 letter, Starbucks essentially threatened Kraft, stating that unless Kraft gives into its demand for help in transitioning the CPG business to Starbucks, Starbucks *"will begin contacting customers regarding the transition (effective March 1, 2011) starting December 6th, 2010."* See December 1, 2010 Letter from J. Hansberry to D. Elsner dated December 1, 2010, attached to Prchlik Decl. at Ex. 3. On that same day, Starbucks CEO Howard Schultz reported to investors that *"I've been on the phone with the CEOs from – Mike Duke at Wal-Mart, Jim Sinegal at Costco, to Steve Burd [at Safeway], assuring them that this transition is not going to be anything but we will exceed expectations in all aspects of the CPG business transitioning from Kraft."* (Bloomberg Transcript from the December 1, 2010 Starbucks Investor Conference).

On December 6th, 2010, despite the early morning filing of the current Complaint, Starbucks expanded upon its misleading communications with Kraft's customers. Indeed, on that day, Starbucks sent a letter to Acosta, the apparent replacement for Kraft, stating that "Today, we are sending letters to customers to begin the transition process. . . As of today, December 6, 2010, we begin our journey together to assume control over the direct distribution of the largest component of our CPG business. *See* Acker Decl., at ¶ 89; Prchlik Decl., at ¶ 32.

Starbucks' tactics are damaging Kraft's reputation in the marketplace. From intentionally leaking Kraft internal correspondence to publicly making derogatory remarks, Starbucks is going to tarnish Kraft's goodwill with its customers, interfere with Kraft's ongoing ability to meet its contractual commitments to its customers, and cause Kraft's customers to question its capabilities. Acker Decl., at ¶ 85-86, 88, 90, 92; Prchlik Decl., at ¶ 29-31, 36-37. The harm that Kraft will suffer as a result of Starbucks' public attacks is irreparable and must be enjoined. *See*

*Supermarket,* 382 F. Supp at 1256 (granting injunction where "Service's reputation in the industry as a dependable distributor which offers a full line of non-food items is in jeopardy")

### 5. The Relevance of the R&G Agreement's Buyout Provision to the Irreparable Harm Inquiry

Starbucks has asserted that Kraft cannot establish a risk of irreparable harm because the R&G Agreement provides Kraft with an express monetary remedy if the arbitrator ultimately determines that Starbucks' termination of the Agreement was not warranted by a Material Breach on Kraft's part. According to Starbucks, that remedy is found in the R&G Agreement's Buyout Provision (Paragraph 5(B)(ii)), which entitles Starbucks to terminate the R&G Agreement without cause upon 180 days notice provided that Starbucks makes the Buyout Payment to Kraft (*i.e.*, 135% of the Fair Market Value of the Agreement, as determined in accordance with Paragraph 5(D) of the Agreement). Apparently, Starbucks' reasoning is that, if the arbitrator finds that there was no Material Breach, Starbucks would be contractually obligated to pay Kraft the amount Starbucks would owe if it had purported to terminate pursuant to the Buyout Provision.

Kraft agrees that, if Starbucks unilaterally seizes control of the Kraft/Starbucks CPG Business and the arbitrator later determines that Starbucks did not have the right to terminate for Material Breach pursuant to Paragraph 5(B)(iii), Starbucks will be legally obligated to pay Kraft the full Buyout Payment in accordance with Paragraph 5(B)(ii). Kraft further agrees that a binding affirmation of that obligation by Starbucks would provide Kraft with a monetary remedy that would adequately compensate Kraft for the some of the types of harm discussed in this memorandum.[9] If, however, Starbucks does not explicitly affirm that it will be required to pay

---

[9] The Buyout Payment would not by itself adequately compensate Kraft because Kraft would also be entitled to, e.g., lost profits for the period during which it was wrongfully dispossessed of the Kraft/Starbucks CPG Business.

Kraft the Buyout Amount if Kraft prevails in the dispute over material breach, Starbucks cannot in good faith argue, nor should the Court accept, that the Buyout Provision is an adequate remedy for the harm Kraft would suffer from a unilateral termination based on Starbucks' groundless allegations of Material Breach.

Moreover, even if Starbucks were to affirm on a binding basis that Starbucks will make the Buyout Payment if Kraft prevails in the arbitration, it does not follow that a preliminary injunction is unwarranted in this case.  The reason is that, in order to terminate pursuant to the Buyout Provision (*i.e.,* if Kraft has not materially breached the Agreement), Starbucks must give Kraft at least 180 days advance notice of termination.  This condition is vital to Kraft because it mitigates the risk that termination of the R&G Agreement would subject Kraft to an unfair competitive disadvantage.

Specifically, upon the effective date of a termination under the Buyout Provision, Kraft and Starbucks will cease sharing a mutual interest in seeing the Kraft/Starbucks CPG Business succeed and will instead become direct competitors in the super premium coffee segment.  The 180 day notice requirement gives Kraft a commercially reasonable period to prepare for the new competitive environment by introducing a different super premium coffee brand on or as close as possible to the effective date of the termination.  In the absence of this protection, Kraft would have no time to prepare for the loss of its ability to offer Starbucks CPG products to its customers and thus be denied a level playing field in competing with Starbucks and other premium brands.

If, on October 5, 2010, Starbucks had provided notice of termination pursuant to the Buyout Provision rather than a notice of termination for Material Breach, the termination would not have become effective any earlier than April 4, 2011.  Moreover, the validity of the

termination notice would not have been contested and, as a result, Kraft would have been able to prepare to replace Starbucks with a competing super premium brand on or close to that date. But, because Starbucks did not give notice of termination pursuant to the Buyout Provision, Kraft is now in a fundamentally different situation.  Consistent with Kraft's position that Starbucks' purported termination for Material Breach is invalid -- and in order to preserve its claim that the parties' respective rights and obligations under the Agreement will remain in effect indefinitely – Kraft remains bound by its own exclusivity obligations under the Agreement.

As a result, rather than having 180 days to prepare to continue competing in the super premium coffee category without the Starbucks brand, Kraft will, absent an injunction, be effectively locked out of the super premium coffee category indefinitely because, at least as of March 1, 2011, Kraft will be unable to sell either Starbucks products or any others that compete with Starbucks products.  This unfair competitive disadvantage would have long-term and unquantifiable consequences for Kraft, which would constitute irreparable harm as a matter of law.

### B.      A Balancing Of Equities Weighs Heavily In Favor Of Kraft.

In deciding whether to exercise its discretion to issue an injunction, the district court is to balance the *"competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."* *Amoco Production Co. v. Village of Gamball, Alaska*, 480 U.S. 531, 542 (1987); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2nd Cir. 1953); *Semmes Motors, Inc.  v. Ford Motor Co.*, 429 F.2d 1197 (2nd Cir. 1970).  This balancing test requires the court to assess the stakes for each side and to determine whether issuing a preliminary injunction would, on balance, be more equitable than denying one.  *See Citigroup Global Ltd.*, 598 F.3d at 35-36 (the *"balance of the hardships"* analysis is designed to

be *"flexible"* so as to allow the court to provide equitable relief when warranted, even if there are factual complexities that make it difficult to ascertain a likelihood of success on the merits).

In this case, a balancing of hardships – as well as every other equitable consideration – strongly favors Kraft.  The injunction Kraft seeks would merely preserve the *status quo* for the comparatively short period needed to adjudicate the termination dispute.  That would not be a hardship for Starbucks.  For more than 12 years, Starbucks has been supplying its products to Kraft, enabling Kraft to build a highly successful business that has been and continues to be highly profitable for Starbucks.  Requiring Starbucks to continue that course of conduct on an interim bases does not constitute a hardship.  That is especially true considering that the preliminary injunction would be short-lived and would give effect to the commitment Starbucks made to allow an arbitrator, rather than Starbucks, determine whether Starbucks has the right to terminate.  *See Reuters*, 903 F.2d at 909 (no hardship when defendant *"need do only what it has done for the past five years,"* which is continue to sell to plaintiff).

Moreover, Starbucks does not deny that it will continue to profit from the business if left in Kraft's hands while an injunction remains in effect.  Nor can Starbucks credibly argue that the value of the business to it would be diminished during that period.  To the contrary, the business is as strong as ever and, but for Starbucks' interference, would likely see continued revenue growth for the foreseeable future.  *See* Acker Decl., at ¶ 79. Paradoxically, the only threat posed to the continued success of the business is the disruption and uncertainty caused by Starbucks' attempt to wrest control of the Kraft/Starbucks CPG Business from Kraft without first establishing a right to do so.[10]

In contrast, if the *status quo* is not maintained until the arbitration is over, Kraft will

---

minated dealer).

suffer great hardship.  Starbucks will have succeeded in seizing control of a highly profitable

business in which Kraft has invested tremendous resources over a period of 12 years without

affording Kraft the procedural protections in the Agreement.  A forced termination by Starbucks

would be the functional equivalent of a hostile takeover of a business –  but without the essential

element of a fair payment to the shareholders of the target.

Moreover, once the business is in Starbucks' control, Kraft cannot be restored to the

position it would have been in had it remained in possession of it pending arbitration.  For that

reason, a subsequent determination in the arbitration that Starbucks lacked the right to terminate

would not cure the injury Kraft will have suffered.  Kraft would be left with only a claim for

damages, – rather than the bargained-for procedures in the Agreement.

Lastly, even if the absence of an injunction would not result in forfeiture of the

businesses, Kraft would still suffer the hardship that would flow from unfair competitive injury

to Kraft's business, the diminished opportunity for growth of the Tassimo business, and the

damage done to Kraft's reputation and customer relationships  *See* Section IV(A)(2)-(4), *supra*;

*Two Wheel Corp.*, 506 F. Supp. at 821-822 (holding that showing of irreparable harm *"goes a*

*long way towards"* satisfying the *"balance of hardships"* prong of the preliminary injunction

test) (citations omitted).

### C.    Kraft Will Succeed On The Merits Of Its Arbitration Claims.

Kraft is virtually assured of prevailing on the merits of its claim for a declaratory

judgment in the arbitration proceeding for two independent reasons:  (1) Starbucks can not show

that Kraft breached, much less materially breached, the R&G Agreement; and (2) even if there

were a material breach (and there is not), the doctrine of election of remedies precludes

Starbucks from terminating the Agreements as a matter of law.

Starbucks' allegations of material breach should be seen for what they truly are: a pretextual act intended to cause harm to Kraft and force Kraft to negotiate away its rights.  To terminate the R&G Agreement for material breach, Starbucks must prove that some defect in Kraft's performance has "*significantly impaired* the value of [Starbucks'] bargained-for benefits under [the] Agreement or…cause[d] or threaten[ed] to cause *significant* financial, brand equity and/or other injury to [Starbucks.]"[11]  (cite to contract)  Starbucks alleges several different breaches of the Agreement, each of which is flawed or factually unsupportable, and none of which meets the "material breach" standard set out by the Agreement, and the law.

Among  the clearest examples of the lack of merit in the allegations is Starbucks' conclusory contention that Kraft failed to use "commercially reasonable efforts" to market Starbucks products in the CPG market.  *See* October 5, 2010 Panner Letter, attached to Quinn Decl., at Ex 8.  The facts, however, establish a different story.  Kraft's overall performance under the Agreement and its effectiveness in promoting Starbucks CPG Products has been outstanding by any reasonable measure.  Over the last twelve years, revenues for the Kraft/Starbucks CPG Business have increased tenfold, from approximately $50 million to nearly $500 million, under Kraft's proprietorship.  Acker Decl., ¶ 72.  The geographic footprint has increased from 12 states to 50 states, with the number of stores in which Kraft has placed Starbucks products increasing from 4,000 to 40,000.  *Id*.  The year-to-date performance for 2010 has been strong, with revenues at an all-time high and growth over the last three quarters in the high single digits.  *Id*., ¶79.  Revenues of Starbucks coffee products managed by Kraft are at an all time high, with a year-to-date growth rate of 8%.  *Id*.  By any credible measure, Starbucks has benefited, not suffered, from Kraft's performance under the R&G Agreement.[12]  Indeed, Kraft has established Starbucks as the leading player in the super premium CPG coffee category, a position it

maintains to this day.  *Id.*, ¶ 77.

Equally without merit is Starbucks' accusation that Kraft is to blame for the "erosion" of Starbucks' market share, an apparent reference to the slight market share decline that Starbucks R&G Products in the CPG channel experienced in the midst of the financial crisis in 2008-2009. The decline was modest considering the widely recognized consumer shift toward lower-priced brands, unprecedented competition in the CPG channel, and other factors beyond Kraft's control, including Starbucks' own conduct.  *Id.*, ¶ 76.  Starbucks' contention to the contrary is not credible, particularly given that it experienced even greater decline in its same store retail cafe revenues over the same period.

Moreover, several of Starbucks' breach allegations are so lacking in factual support  that Starbucks' reliance on them raises a serious question as to whether Starbucks' effort  to terminate crosses into the realm of bad faith.  For example, Starbucks asserts that "[s]ince at least 2004, Kraft has not provided Starbucks with monthly or quarterly budgets, despite repeated requests by Starbucks, and the budgets that Kraft did provide were not sufficiently detailed to be meaningful."  *See* October 5, 2010 Panner Letter, attached to Quinn Decl., at Ex 8.  In truth, Kraft has supplied Starbucks with detailed budgets on at least a quarterly basis, including standardized profit and loss statements that reflect trade, advertising and promotions.  Acker Decl., ¶¶ 53, 55.  Kraft has also conducted quarterly budget reviews with Starbucks and made its finance staff available to Starbucks to answer budget-related questions.  *Id.*, ¶¶ 55 - 59-60. Indeed, Starbucks personnel with actual knowledge of this issue have praised Kraft for its performance in this respect.  In a recent e-mail, a Starbucks manager thanked Kraft profusely for the high quality of budget information he received from Kraft, describing it as "amazingly detailed and extremely helpful!!"  He also congratulated Kraft for "setting the bar so high" and

for providing "more than [he] could have ever hoped for."  *Id.*, ¶ 58.

Starbucks also alleges that Kraft breached the R&G Agreement by failing "to involve Starbucks in sales planning, presentations, and calls."  *See* October 5, 2010 Panner Letter, attached to Quinn Decl., at Ex. 8.  Again. the facts show otherwise.  At Kraft's invitation, Starbucks has been extensively involved in the review and approval process for sales presentation templates for major initiatives.  Prchlik Decl., ¶¶ 18-21_.  The senior Kraft director responsible for Starbucks sales frequently meets and travels with Starbucks' National Sales Manager.  Prchlik Decl., at ¶ 14.  Together they review important sales-related issues in weekly teleconferences.  *Id.*  Starbucks recently congratulated the parties' "collaborative customer approach" in working with two of Kraft's largest and most important customers. (May 26, 2010 MCM meeting).

In short, Kraft has a very high likelihood of success on the merits in the arbitration, which weighs heavily in favor of granting the injunction.

**V.    CONCLUSION**

For the foregoing reasons, Kraft respectively requests that its Motion for Preliminary Injunction be granted.

Dated:  New York, New York.
       December 23, 2010

*Of Counsel:*

William P. Quinn (pro hac admitted)
wquinn@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Phone: 215.963.5000
Fax: 215.963.5001

      *-and-*

Kathleen A. Waters (pro hac admitted)
kwaters@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
300 South Grand Avenue, 22nd Floor Los
Angeles, CA 90071-3132
Phone: 213.612.2500
Fax: 213.612.2501

*Attorneys for Plaintiff Kraft Foods Global, Inc.*

Respectfully submitted,

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0600
212.309.6000

By:             /s/                
    Michael S. Kraut
    mkraut@morganlewis.com