**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

KRAFT FOODS GLOBAL, INC.,

        Plaintiff,

    v.

STARBUCKS CORPORATION,

        Defendant.

Civil No. 10-9085 (CS)
ECF Case

**STARBUCKS CORPORATION'S INITIAL MEMORANDUM IN OPPOSITION TO
KRAFT FOODS GLOBAL, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Maria Barton
Paul Serritella
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
Tel. (212) 906-1200
Fax (212) 751-4864

Joseph S. Hall (JH-2612)
Aaron M. Panner (*pro hac vice*)
Wan J. Kim (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Tel. (202) 326-7900
Fax (202) 326-7999
jhall@khhte.com
apanner@khhte.com
wkim@khhte.com

*Counsel for Defendant Starbucks Corporation*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................3

    A.    The R&G Agreement .......................................................................................3

    B.    The Tassimo Supply and License Agreement, the International Supply and License Agreement, and the Starbucks Tassimo Supply and License Agreement.................................................................................5

    C.    Kraft Materially Breaches the R&G Agreement .........................................6

    D.    Starbucks Terminates Its Relationship with Kraft....................................8

    E.    Kraft's Failure To Ensure an Orderly Transition for the Sale of the Licensed Products ........................................................................................9

ARGUMENT .................................................................................................................11

I.    KRAFT CANNOT SHOW THAT IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF ................................................12

    A.    Because Starbucks Has the Undisputed Right To Terminate the R&G Agreement, Kraft Cannot Claim Any Cognizable Harm to Its Business ......................................................................................................12

    B.    Denial of Kraft's Request for a Preliminary Injunction Will Not Prevent Kraft from Vindicating Its Rights in Arbitration....................................21

         1.    The R&G Agreement Does Not Require the Parties To Complete Dispute Resolution Before Exercising Termination Rights ...............................................................................21

         2.    No Preliminary Injunction May Issue Pending Arbitration Absent a Showing of Irreparable Harm ....................................23

II.    THE BALANCE OF EQUITIES WEIGHS DECIDELY IN FAVOR OF STARBUCKS ........................................................................................................24

CONCLUSION...............................................................................................................26

# TABLE OF AUTHORITIES

Page

**CASES**

*Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990) ..........................................24

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)..............................................20

*Connecticut Res. Recovery Auth. v. Occidental Petroleum Corp.*,
    705 F.2d 31 (2d Cir. 1983)..................................................................................22, 24

*Credit Suisse Sec. USA LLC v. Ebling*, No. 06-11339, 2006 U.S. Dist.
    LEXIS 86351 (S.D.N.Y. Nov. 27, 2006)..............................................................24

*Daly v. U.S. Fencing Ass'n*, No. 07-1167, 2007 WL 1120461
    (E.D.N.Y. Apr. 16, 2007)........................................................................................14

*Doldo Bros. v. Coors Brewing Co.*, No. 7:08 Civ. 206, 2008 WL 657252
    (N.D.N.Y. Mar. 7, 2008)...................................................................................15, 17

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256
    (10th Cir. 2004)........................................................................................................16

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223 (3d Cir. 1987) .......................................13, 14

*Envirogas Inc. v. Walker Energy Partners*, 641 F. Supp. 1339
    (W.D.N.Y. 1986) .....................................................................................................26

*Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972)................24

*Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*, No. CV-09-0237,
    2009 WL 790312 (E.D.N.Y. Mar. 23, 2009).....................................................16, 17

*Gidatex, S.r.L. v. Campaniello Imp., Ltd.*, 13 F. Supp. 2d 417
    (S.D.N.Y. 1998).......................................................................................................20

*Helios & Matheson North Am., Inc. v. Vegasoft Oy*, No. 07 Civ. 3600,
    2007 WL 1541204 (S.D.N.Y. May 24, 2007) ................................................15, 16, 17

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755
    (2d Cir. 1979)...........................................................................................................16

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ..............16

*Jamaica Ash & Rubbish Removal v. Ferguson*, 85 F. Supp. 2d 174
    (E.D.N.Y. 2000)........................................................................................................17

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ......................11, 15

*Kamerling v. Massanari*, 295 F.3d 206 (2d Cir. 2002)..................................................12

*L.K. Comstock & Co. v. Thales Transp. & Sec., Inc.*, No. 09-cv-3352,
2009 U.S. Dist. LEXIS 79154 (E.D.N.Y. Sept. 2, 2009)..................................24

*Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182 (S.D.N.Y. 1990).................12, 15, 16, 19

*Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Publ'g, Inc.*,
652 F. Supp. 804 (S.D.N.Y. 1986)............................................................16, 19

*Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986)....................15

*Merit Capital Group, LLC v. Trio Indus. Mgmt., LLC*, No. 04 Civ. 7690,
2005 WL 53283 (S.D.N.Y. Jan. 10, 2005) .............................................12

*Monserrate v. New York State Senate*, 599 F.3d 148 (2d Cir. 2010)...........................11

*NAACP, Inc. v. Town of East Haven*, 70 F.3d 219 (2d Cir. 1995) .........................12, 19

*National Kitchen Prods., Inc. v. Kelmort Trading & Co.*, No. 91 Civ.
7540, 1992 WL 18805 (S.D.N.Y. Jan. 24, 1992) .............................................18

*Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*, 992 F.2d 430 (2d Cir. 1993) ...............22

*Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169 (2d Cir. 1995)....................................16, 19

*Proctor & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339
(S.D.N.Y. 2008) ............................................................................................15

*Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490 (2d Cir. 2002) ...................11

*Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*, No. 86 CV
534, 1986 WL 13950 (E.D.N.Y. Sept. 9, 1986) .............................................17

*Reuters Ltd. v. UPI*, 903 F.2d 904 (2d Cir. 1990)........................................................17

*Rosso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New
York, Inc.*, 749 F.2d 124 (2d Cir. 1984)........................................................24

*Shephard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447,
1999 WL 7289641 (S.D.N.Y. Sept. 17, 1999)...........................................16, 17

*Supermarket Servs., Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248
(S.D.N.Y. 1974) ............................................................................................18

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986) .....................................24

*Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995)........................16

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995)..........................................20

*Transperfect Translations Int'l, Inc. v. Merrill Corp.*, No. 03 Civ. 10146,
    2004 WL 2725032 (S.D.N.Y. Nov. 30, 2004)..................................................................20

*Vestron, Inc. v. National Geographic Soc'y*, 750 F. Supp. 586
    (S.D.N.Y. 1990).............................................................................................................17, 18

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) ..........................................11, 12

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
    No. 03-CV-8843, 2010 WL 3155176 (S.D.N.Y. July 30, 2010)................................16, 17

**RULES**

Fed. R. Evid. 408 ...........................................................................................................................8

# INTRODUCTION[1]

Injunctive relief is an "extraordinary remedy" that issues only to prevent irreparable injury.  Kraft cannot demonstrate that, in the absence of injunctive relief, it will suffer any irreparable injury from the termination of the March 29, 2004 Supply and License Agreement (the "R&G Agreement").[2]  To the contrary, even assuming Kraft's legal claim has merit, any injury Kraft might suffer is fully compensable by money damages.  By contrast, leaving Kraft in control of distribution of Starbucks' products pending a resolution of the parties' dispute – allowing Kraft to do lasting damage to Starbucks' brand – threatens harm to Starbucks that is both immediate and difficult to calculate.   For both reasons, the Court should deny the motion.

Nothing in the R&G Agreement – and no legal principle – gives Kraft the right to injunctive relief pending arbitration in the absence of a showing of irreparable harm.  No such showing can be made here.  Starbucks has the right to terminate the R&G Agreement (and all of the parties' other agreements) for any reason.  To satisfy its burden, Kraft must demonstrate that it will suffer irreparable injury *not* because the R&G Agreement will end, but because Starbucks seeks to terminate that agreement pursuant to one provision (the "Material Breach" provision) as opposed to another (the "Termination-at-Will" provision).  The only meaningful difference between the two provisions is the amount of money that Starbucks is obligated to pay to Kraft.  Such a purely monetary dispute never justifies injunctive relief.

Even if Starbucks did not have the undisputed right to terminate, Kraft would still suffer no irreparable harm from the end of the R&G Agreement.  The agreement is not material to

---

[1] As the Court directed, Starbucks addresses only the irreparable harm element (and the closely related issue of threatened harm to Starbucks) in this memorandum.  If necessary, Starbucks will show that Kraft cannot demonstrate a likelihood of success on the merits in a separate filing.

[2] Declaration of William P. Quinn, Esquire [Dkt. No. 22] (filed Dec. 23, 2010) ("Quinn Decl."), Exh. 2 [Dkt. No. 22-02].

Kraft's overall business or revenues. Kraft is the largest food company in the United States –
and one of the largest companies in the world. The R&G Agreement accounts for a minute
portion (approximately 1%) of Kraft's annual revenues. Moreover, Starbucks has given Kraft
many months notice to allow it to plan for life after Starbucks. For this reason, among others,
Kraft does not – and cannot – allege that this termination will have any significant impact on the
company as a whole.

Kraft's primary claim for irreparable harm is that, absent an injunction, it will be denied
its "right to a meaningful arbitration." Kraft Mem.[3] 25. But *any* claim based on allegedly
wrongful termination of a contract may result in a post-termination adjudication – by a court or
an arbitrator – and those proceedings are not any less "meaningful" because an injunction has not
issued. Kraft and Starbucks are already in the midst of the arbitration that is required by the
R&G Agreement. Kraft will be able to vindicate its asserted rights in that proceeding.

Finally, the balance of the equities weighs decidedly against issuing an injunction here.
Such an intervention into the commercial marketplace would harm Starbucks' efforts to plan and
execute its marketing plans for 2011, perpetuate customer confusion, and, even worse, leave
Kraft in charge of Starbucks' products – which would give Kraft the ability and the incentive to
downplay Starbucks coffee in favor of Kraft's competing coffee brands such as Maxwell House,
Yuban, and Gevalia. By Kraft's own account, Starbucks is subject to significant competition,
and, in the absence of vigorous and sophisticated promotional efforts, its market share will
continue to erode – as it has done every year under the R&G Agreement. Forcing Starbucks to
leave its brands in Kraft's hands would cause lasting harms to Starbucks that clearly outweigh
any potential harms to Kraft from the agreement's termination.

---

[3] Kraft's (Amended) Memorandum of Points and Authorities in Support of Preliminary
Injunction [Dkt. No. 24] (filed Dec. 24, 2010) ("Kraft Mem.").

## FACTUAL AND PROCEDURAL BACKGROUND

Starbucks is the world's premier roaster and retailer of specialty coffees.  The Starbucks brand has consistently been recognized as among the most valued and respected brands in the world.  *See* Declaration of Robert Blattberg ¶ 21 (filed Jan. 6, 2011) ("Blattberg Decl.").

Kraft is the largest food company in the United States and owns or distributes more than 150 different brands, which it sells primarily in the consumer packaged goods ("CPG") market.[4] *See id.* ¶ 7.  Kraft's beverage category – which includes not just coffee, but also tea, packaged juice, and powdered drinks – represents a small fraction of Kraft's overall business, accounting for 6.4% of Kraft's total net revenues.  *See id.* ¶ 9.  Kraft currently sells several brands of coffee. In addition to Starbucks and Seattle's Best Coffee, which is also owned by Starbucks, Kraft sells Maxwell House, Yuban, Sanka, Gevalia, and several other brands.  *See id.* ¶ 10.  Kraft's sales of Starbucks CPG coffees account for only 1% of Kraft's annual net revenues.  *See id.* ¶ 13.

### A.    The R&G Agreement

In the late 1990s, Starbucks sought to capitalize on its retail coffee house success and the strength of the Starbucks brand by expanding its operations into the CPG channel.  In September 1998, Starbucks entered into an agreement with Kraft, pursuant to which Kraft agreed to sell, market, and distribute Starbucks coffee products in the CPG channel.  In March 2004, Starbucks and Kraft entered into the Roast and Ground ("R&G") Agreement, which superseded the parties' 1998 agreement.  Under the R&G agreement, Kraft was given the "exclusive right to market, distribute and sell" Starbucks' roast and ground coffee, including Starbucks and Seattle's Best Coffee branded coffee (collectively, the "Licensed Products"), in grocery stores, club stores, and certain other retail outlets in the United States.  R&G Agreement ¶ 3.A.

---

[4] The CPG market includes grocery stores, mass merchandise stores, club stores, natural food stores, military exchanges and commissaries, and drug stores.

Kraft sells several other coffee brands, including Maxwell House, Yuban, and Sanka, in the Licensed Channels.[5]  The annual revenue generated from those Kraft coffee brands far surpasses the annual revenues generated from Starbucks coffees.  For instance, Maxwell House alone generates $1.5 billion in annual revenue, three times the annual revenue generated by all the Starbucks coffee brands distributed by Kraft.  *See* Blattberg Decl. ¶ 14.  The R&G Agreement also permits Kraft to sell Gevalia, a "super premium coffee" as defined by the R&G Agreement, "through the internet, direct mail or food service operations, or in kiosks located outside the Licensed Channels."  R&G Agreement ¶¶ 1, 3.C(ii).

The R&G Agreement contains highly detailed provisions requiring Kraft to share pertinent information and collaborate with Starbucks in marketing, branding, and sales efforts. For instance:

- Paragraph 9.B(i) to (iii) requires Kraft to reasonably involve Starbucks "in all significant sales planning" and to permit Starbucks "the right to review significant sales presentations" and attend "significant sales calls."  R&G Agreement ¶ 9.B(i)-(iii).

- Paragraph 9.A(ii) requires Kraft to "submit to [Starbucks] Brand Management Team, for [Starbucks] approval, all proposed promotions, advertising, packaging and other programs and materials that support the Licensed Products or use the Licensed Trademarks . . . during the concept or initial planning stages and again at the final stage prior to launch."  *Id.* ¶ 9.A(ii).

- Paragraph 9.B(iv) requires Kraft to "consult with [Starbucks] on all marketing research conducted by or on behalf of [Kraft] regarding the Licensed Products" and to "promptly provide [Starbucks] with copies of all marketing research reports received by [Kraft], including interim and draft reports."  *Id.* 9.B(iv).

- Paragraph 9.B(v) requires Kraft to provide "detailed marketing and trade budgets, including key assumptions, monthly to the extent such reports are regularly generated by [Kraft] on a monthly basis, otherwise quarterly."  *Id.* ¶ 9.B(v).

---

[5] "Licensed Channels" is defined by the R&G Agreement to mean "Retail Grocery Stores, Club Stores, Drug Stores, Natural Food Stores, Military Exchanges and Commissaries and Mass Merchandise Stores, plus any online sites owned, operated, licensed or authorized by (or otherwise co-branded with) a retail business primarily engaged in a Licensed Channel."  R&G Agreement ¶ 1.

To facilitate certainty, the R&G Agreement explicitly states that Kraft's failure to comply with any of these provisions "shall constitute a Material Breach of this Agreement."  *Id.* ¶ 9.E.  A related provision requires Kraft to spend for marketing and promotions an amount "at least equal to the Minimum A&P Amount," *id.* ¶ 7.B(i) (which is based on the annual sales of Starbucks' products, *see id.* ¶ 1), and that a failure to do so also "shall constitute a Material Breach of this Agreement," *id.* ¶ 7(B)(ii).  The R&G Agreement also contains a "No Waiver" provision, which provides that any "failure or delay . . . to complain of any act, omission or default . . . no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed to or construed to be a waiver."  *Id.* ¶ 18.F.[6]

B.    The Tassimo Supply and License Agreement, the International Supply and License Agreement, and the Starbucks Tassimo Supply and License Agreement

In addition to the R&G Agreement, Kraft and Starbucks have executed three other supply and licensing agreements.  On September 28, 2006, the parties entered into the International Supply and License Agreement[7] (the "International Agreement") for the sale and distribution of Starbucks branded coffee in certain countries outside the United States.  The parties also entered into two agreements relating to Kraft's proprietary line of Tassimo single-serve brewers.  On August 9, 2006, the parties entered into the Tassimo Supply and License Agreement[8] (the "Tassimo Agreement") for the sale and distribution of Tassimo products bearing the Seattle's Best Coffee and Tazo trademarks.  Finally, on July 27, 2007, the parties entered into the

---

[6] Contrary to Kraft's contention (at 6), the R&G Agreement is not "evergreen."  The agreement defines ten-year terms, with the initial term expiring in March 2014.  *See* R&G Agreement ¶¶ 1, 5.A.

[7] Quinn Decl. Exh. 5 [Dkt. No. 22-05].

[8] Quinn Decl. Exh. 3 [Dkt. No. 22-03].

Starbucks Tassimo Supply and License Agreement[9] (the "Starbucks Tassimo Agreement") for the sale and distribution of Tassimo products bearing the Starbucks trademarks.  As Kraft acknowledges, each of these three agreements may be terminated by either party upon the termination of the R&G Agreement.  *See* Complaint [Dkt. No. 1] ¶ 96 (filed Dec. 6, 2010); *see also* International Agreement ¶ 5.B(ix); Tassimo Agreement ¶ 5.B(viii); Starbucks Tassimo Agreement ¶ 5.B(vi).

      C.     <u>Kraft Materially Breaches the R&G Agreement</u>

Since 2004, Kraft has failed to perform its obligations under the R&G Agreement.  In violation of the terms of the R&G Agreement, for example, Kraft consistently blocked Starbucks from attending sales calls with retail customers and withheld sales presentations and other materials.  In addition, Kraft frequently designed and implemented sales, advertising, and promotional programs without input from, or even notice to, Starbucks.  This lack of transparency extended into Kraft's advertising and marketing projections and budgets, which were either not provided to Starbucks at all or, if provided, were too non-specific to be meaningful.[10]

By early 2010, it was evident that Kraft was not meeting its obligations under the R&G Agreement.  Despite overall growth in the premium coffee CPG market, Starbucks' market share declined *every year* since the R&G Agreement was signed, falling from 32.7% in 2004, to 26.7% at the start of 2010.  Declaration of Jeff J. Hansberry ¶ 2 (filed Jan. 6, 2011) ("Hansberry Decl.").

In January 2010, following a meeting among the companies' executives, Howard Schultz, CEO of Starbucks, sent an email to Irene Rosenfeld, CEO of Kraft, and Anthony Vernon,

---

[9] Quinn Decl. Exh. 4 [Dkt. No. 22-04].

[10] Pursuant to this Court's scheduling order, these issues will be discussed in detail in Starbucks' filing regarding likelihood of success on the merits.

President of Kraft for North America, reiterating Starbucks' concerns and emphasizing that Starbucks "cannot accept the continued share erosion and lack of progress we are experiencing down the grocery aisle."  Declaration of Aaron M. Panner (filed Jan. 6, 2011) ("Panner Decl."), Exh. 1.  Mr. Schultz further explained that Starbucks "store business around the world is showing dramatic improvement, yet our packaged coffee CPG business with Kraft is either in retreat (in the UK/Europe) or continuing to deteriorate (in North America).  And, candidly, we have heard nothing so far to suggest that we have any reason to expect a reversal of these trends anytime soon."  *Id.*  Ms. Rosenfeld responded that same day, noting that Kraft is "no happier about the state of our joint business than you are."  *Id.*  Mr. Vernon was even more candid, stating that the relationship is indeed "very broken," because Kraft had "neglected th[e] relationship badly in North America."  *Id.*  Tellingly, Mr. Vernon ensured Starbucks that Kraft was "on a mission to fix the sins of the past."  *Id.*[11]

Kraft's performance did not improve.  Starbucks' CPG division suffered a poor first quarter in 2010, and there were no signs that Kraft would be able to reverse the steady decline in Starbucks' CPG sales.  Starbucks attempted to negotiate an amicable termination of the parties' relationship.  To that end, in March and April 2010, Starbucks initiated discussions that led to an agreement in principle:  the parties agreed to wind down the R&G Agreement in exchange for Starbucks' commitment to remain on the Tassimo platform and a $500 million payment.  But after this handshake deal, Kraft suddenly changed course in late April, demanding an additional $200 million from Starbucks (for a total payment of $700 million).  *See* Answer [Dkt. No. 26] ¶ 7 (filed Dec. 27, 2010).

---

[11] In another email from Kraft's Senior Vice President of U.S. Coffee, Lorraine Hansen, to Mr. Schultz and others, dated January 18, 2010, Ms. Hansen writes that "[o]ur Starbucks R&G business results were unacceptable" and that, "[i]n the last 2 years, no one has been more disappointed in the state of our business than me."  Panner Decl. Exh. 2.

On April 22, 2010, Mr. Schultz sent an email to Ms. Rosenfeld expressing Starbucks' "shock[ ] and disappoint[ment]" that Kraft was "revers[ing] its commitment."  Panner Decl. Exh. 3.  Adverting to the fact that Starbucks had sought to end the relationship on amicable terms rather than holding Kraft accountable for its obligations under the terms of the R&G Agreement, Mr. Schultz stated to Ms. Rosenfeld that "[a]rbitration is not what I want, but sadly that is where we are headed."  *Id*.[12]

  D. <u>Starbucks Terminates Its Relationship with Kraft</u>

On October 5, 2010, Starbucks sent a letter to Kraft specifying Kraft's material breaches of the R&G Agreement.  *See* Quinn Decl. Exh. 8 [Dkt. No. 22-08].  Invoking Paragraph 5.B(iii), Starbucks gave notice that it would terminate the R&G Agreement effective March 1, 2011, unless Kraft cured the material breaches within 30 days.  Starbucks also submitted these issues to the Oversight Committee established by the R&G Agreement, pursuant to Paragraph 15.A.

On November 4, 2010, Kraft sent a letter denying in broad strokes that anything was wrong.  *See id*. Exh. 9 [Dkt. No. 22-09].  Kraft made no attempt to cure its material breaches, nor did it seek to discuss these matters with the Oversight Committee.  Because the R&G Agreement expressly provides that Starbucks could terminate the agreement "upon a Material Breach of this Agreement by [Kraft] which is not cured within thirty (30) days after notice to the breaching party," R&G Agreement ¶ 5.B(iii), Starbucks exercised its right to terminate the R&G

---

[12] Although Kraft's preliminary injunction complaint and motion reference further discussions that the parties had in August 2010, those discussions were in the nature of privileged settlement discussions and are inadmissible under Federal Rule of Evidence 408.  Accordingly, Starbucks will not respond to those allegations here and reserves the right to file a motion to strike those allegations from Kraft's complaint.

Agreement effective March 1, 2011, and notified Kraft accordingly.  *See* Quinn Decl. Exh. 10 [Dkt. No. 22-10].[13]

On November 29, 2010, Kraft filed a demand for arbitration, seeking a declaratory judgment that it had not committed any material breaches of the R&G Agreement.  *See id.* Exh. 19 [Dkt. No. 22-19].  The arbitration submission form contained an "Election for Expedited Procedures," but Kraft did not seek expedition.  *See id.* at 4.  The parties are currently engaged in that arbitration, and an arbitrator has been appointed.

On December 6, 2010, Kraft filed a preliminary injunction complaint in this Court but did not move for any relief.  *See* Complaint.  On December 23, 2010, more than eleven weeks after Starbucks informed Kraft that it intended to terminate the R&G Agreement, Kraft filed the present motion for a preliminary injunction.  *See* Plaintiff's Notice of Motion for Preliminary Injunction [Dkt. No. 15] (filed Dec. 23, 2010).

E.     Kraft's Failure To Ensure an Orderly Transition for the Sale of the Licensed Products

Paragraph 6.C of the R&G Agreement requires Kraft to "act in good faith to make an orderly transition for the sale of the Licensed Products following termination of this Agreement." R&G Agreement ¶ 6.C.  Kraft has violated, and continues to violate, this requirement. Starbucks' business leaders have repeatedly asked their Kraft counterparts to plan for an orderly transition but Kraft has refused to acknowledge these requests and, instead, has directed all Starbucks related inquiries to Kraft's outside counsel.  *See* Hansberry Decl. ¶ 5.  Additionally, Kraft has announced that it "has no intention of transitioning the business to Starbucks."  Quinn Decl. Exh. 15, at 1 [Dkt. No. 22-15]; *see also* Panner Decl. Exh. 4 (December 21 email from

---

[13] Starbucks also informed Kraft that it was exercising its right to terminate the International Agreement, the Tassimo Agreement, and the Starbucks Tassimo Agreement on March 1, 2011. *See* Quinn Decl. Exh. 10 [Dkt. No. 22-10].

9

Lori Acker stating that "we have been instructed not to engage in any discussions relating to 'transition'" and that "any request Starbucks has relating to Starbucks alleged transition should be directed to counsel for Kraft").  Even more egregious, Kraft recently sent a cease and desist letter to Acosta, Starbucks' marketing partner to replace Kraft as of March 1, 2011, threatening Acosta with a tortious interference claim if it attempts to distribute or market any Starbucks products "either before **or after** March 1, 2011."  Hansberry Decl. ¶ 9 & Exh. C (emphasis added).  By these actions, Kraft openly admits it will not transition the business and has gone so far as to intentionally and deliberately interfere with Starbucks' ability to transition the business.

Moreover, Kraft has made misleading public statements that "[u]ntil there is resolution to this situation, the Kraft Foods Sales team continues to represent the Starbucks brand at retail." Panner Decl. Exh. 5.[14]  These communications create uncertainty in the marketplace and interfere with Starbucks' contractual right to terminate the R&G Agreement on March 1, 2011. At the same time, Kraft has apparently begun its own planning efforts for the post-termination period.  For instance, according to press reports, Kraft recently sent out a request for proposal to numerous advertising firms for marketing and advertising plans to help Kraft expand its super premium coffee, Gevalia, into the CPG market.  *See* Blattberg Decl. ¶ 14.

Kraft's efforts to interfere with an orderly transition of the CPG business have caused significant harm to Starbucks.  As Kraft acknowledges, retail customers typically make decisions concerning assortments (*i.e.*, which stock keeping units (SKUs) they will carry) and merchandising (*i.e.*, which products they will display, feature in advertisements, and offer price

---

[14] Although Kraft asserts that it "recently obtained from Starbucks information indicating that Starbucks may stop supplying Starbucks products to Kraft even *before* March 1, 2011," Kraft Mem. 18, Starbucks has no intention or incentive to do so.  Starbucks will ensure that Kraft has sufficient inventory to fully stock retail shelves until Starbucks takes over its distribution on March 1, 2011.  Any confusion in this regard is nothing more than the result of Kraft's refusal to discuss transition planning with Starbucks.

reductions for) anywhere from three to six months in advance.  *See* Declaration of Lori Acker ¶ 38 [Dkt. No. 21] (filed Dec. 23, 2010); Hansberry Decl. ¶¶ 6, 11.  Most retail customers are therefore currently putting together their assortments and merchandising plans for 2011 and will finalize most of these activities during the first part of 2011.  *See* Hansberry Decl. ¶ 6.  Although Kraft has been informing retail customers that it will continue to distribute Starbucks coffee until the arbitration is resolved, it is simultaneously telling retail customers that it cannot commit to merchandising plans for 2011 because it has yet to finalize its supply plans with Starbucks.  *See id.* ¶¶ 7-8.  As a result, Starbucks has lost and will continue to lose key assortment and merchandising opportunities, which will have a severe impact on Starbucks' sales and market share in 2011 and beyond.[15]  *See id.* ¶¶ 9-10; Blattberg Decl. ¶¶ 19-20.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy," *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990), which may only be granted when the party seeking that extraordinary relief demonstrates:  "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor," *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002).[16]  "[A] showing of irreparable harm" is "the most important prerequisite for the issuance

---

[15] Moreover, at least one retail customer has been unwilling to speak with Starbucks altogether regarding its merchandising plans for 2011 given the pending litigation, thereby depriving Starbucks of the ability to plan for the transition and causing harm to Starbucks' business that could extend well into 2011.  *See* Hansberry Decl. ¶ 8.

[16] The court of appeals recently acknowledged that this standard may be in tension with *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008), and other Supreme Court decisions.  *See Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (reserving question).  Under the *Winter* standard, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

of a preliminary injunction."  *NAACP, Inc. v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.

1995).  "A moving party must demonstrate that irreparable injury . . . is likely before any other

requirement for the issuance of an injunction may be considered."  *Merit Capital Group, LLC v.

Trio Indus. Mgmt., LLC*, No. 04 Civ. 7690, 2005 WL 53283, at *2 (S.D.N.Y. Jan. 10, 2005); *see

Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002); *see also Lanvin Inc. v. Colonia, Inc.*,

739 F. Supp. 182, 192 (S.D.N.Y. 1990) ("Failure to show irreparable harm is sufficient grounds

for denying preliminary relief even if the other requirements of the preliminary injunction

standard are met.").

## I.   KRAFT CANNOT SHOW THAT IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.   Because Starbucks Has the Undisputed Right To Terminate the R&G Agreement, Kraft Cannot Claim Any Cognizable Harm to Its Business

Kraft fails to make out any showing of irreparable harm because the harms it complains

of are fully compensable through money damages.  That is especially clear here because

Starbucks has the undisputed right to terminate the R&G Agreement at any time.

**1.**   Under Paragraph 5.B(ii), Starbucks may terminate the R&G Agreement "at any

time after five (5) years from the Effective Date" of the agreement on 180 days written notice.

R&G Agreement ¶ 5.B(ii).  That initial five-year period expired in October 2008.  Accordingly,

Kraft had no expectation that Starbucks would continue to perform under the R&G Agreement

after October 2008.  To the contrary, Starbucks could terminate the agreement at any time

thereafter and for any reason.

---

harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an
injunction is in the public interest."  129 S. Ct. at 374.  Under both standards, a plaintiff must
show a likelihood of irreparable harm.  Under the Supreme Court's standard, Kraft's failure to
show that the balance of equities tips in plaintiff's failure – discussed *infra* Part II – is
independently sufficient to defeat a motion for preliminary injunction.

In this instance, Starbucks did not invoke the agreement's Termination-at-Will provision, but terminated instead under Paragraph 5.B(iii), which permits either party to terminate "upon a Material Breach of this Agreement by the other party" that is not "cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach." *Id.* ¶ 5.B(ii). Nevertheless, the fact that Starbucks had the right to terminate the R&G Agreement is dispositive of Kraft's claim of irreparable harm, because it means that the only cognizable harm is Starbucks' invocation of one contractual termination provision rather than another.

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 227 (3d Cir. 1987), illustrates the point. In that case, a non-profit company producing healthcare publications sought a preliminary injunction preventing the defendant publisher from terminating an agreement to print and market plaintiff's publications. The defendant terminated the agreement, based on plaintiff's alleged breaches of its obligations under the agreement. Plaintiff disputed that it had breached; the district court found a likelihood of success on the merits and further found that, without revenues from the agreement, plaintiff would be forced to discharge nearly two dozen employees and suffer "loss of good will and reputation." *Id.* at 226. Finding that this sufficed to demonstrate irreparable harm, the district court granted the injunction. The Third Circuit reversed. It assumed that plaintiff would succeed on the merits, but it found that plaintiff failed to establish irreparable harm because "the agreement does not entitle [plaintiff] absolutely to [defendant's] performance for ten years." *Id.* Rather, the agreement contained a separate termination provision (which defendant had not relied on) that gave defendant the right to terminate at will on 90 days prior written notice, if defendant gave plaintiff a right of first refusal to purchase or license printing and marketing services from defendant. The court of appeals acknowledged that "[b]y alleging a material breach . . . [defendant] seeks to avoid the first refusal provisions of the

contract." *Id.* at 227.  Nevertheless, the "loss or injury for which [plaintiff] would be entitled to compensation" if defendant failed to invoke the proper termination provision "is not what it would suffer because of [defendant's] lack of performance until the end of the ten-year term, but the value of the first refusal provision." *Id.*  Because plaintiff had "produced no evidence bearing on the value of the first refusal and limited time extension," it had produced no evidence of any injury, "let alone . . . whether it is irreparable." *Id.*[17]

The same principle applies here.  Kraft concedes that Starbucks could have terminated the R&G Agreement pursuant to Paragraph 5.B(ii).  *See* Kraft Mem. 2.  Accordingly, the only harm that could form the basis for relief is the harm stemming from the differences between termination under that provision and termination for Material Breach.  The only such differences are (1) the amount of money that Starbucks must pay to Kraft[18] and (2) the amount of notice to which Kraft is entitled.  As to the first, any harm to Kraft is self-evidently compensable by money damages.  As to the second, Starbucks gave Kraft five months notice of its intent to terminate the R&G Agreement.  Kraft offers no evidence that a reduction in the notice period from six months to five will cause it any harm, much less harm that is not compensable by money damages as may be determined in arbitration.[19]

---

[17] *See also Daly v. U.S. Fencing Ass'n*, No. 07-1167, 2007 WL 1120461, at *3 (E.D.N.Y. Apr. 16, 2007) ("Even if the plaintiff prevails on the merits at trial and can show that the Agreement was not properly terminated in May, 2006, [plaintiff's] relationship with the defendant will not continue beyond July, 2007.  The absence of any prospects for continuing this business militates against a finding that in the absence of injunctive relief plaintiff will suffer irreparable harm based on the loss of his business.  Under these circumstances, it is clear that money damages will adequately compensate plaintiff for any lost sales during this three month period.").

[18] The payment under Paragraph 5.B(ii) is based on fair market value of the R&G Agreement.  Because Starbucks intends to distribute its products directly, the maximum payment for which it could be liable under that provision (assuming that any enhancement above fair market value is enforceable) would be 120% of fair market value.

[19] Kraft offers only lawyer's argument that, if the "validity of the termination notice" had not been "contested," Kraft "would have been able to prepare to replace Starbucks with a competing

Kraft does not contest the legal principle. Instead, it argues that, unless "Starbucks . . . explicitly affirm[s]" that it will be liable for the Buyout Amount (a certain measure of money damages) "if Kraft prevails," Starbucks is somehow barred from arguing that monetary damages would be adequate. Kraft Mem. 31-32. Kraft cites nothing for this assertion, and it is without merit. The point is that Kraft's claimed harm is the loss of money, which simply does not provide a basis for injunctive relief.

2.      In all events, the harms to its business of which Kraft complains – the loss of the exclusive right to distribute Starbucks packaged coffees, the potential impact on the Tassimo business, and Starbucks' supposed "attacks" on Kraft's performance – could not justify injunctive relief. "An essential component of an 'irreparable' injury is that it is 'incapable of being fully remedied by money damages.'" *Helios & Matheson North Am., Inc. v. Vegasoft Oy*, No. 07 Civ. 3600, 2007 WL 1541204, at *2 (S.D.N.Y. May 24, 2007); *see also JSG Trading*, 917 F.2d at 79 ("[I]rreparable injury is one that cannot be redressed through a monetary award."). Thus, "[w]here money damages are adequate compensation[,] a preliminary injunction should not issue." *JSG Trading*, 917 F.2d at 79.[20]

---

super premium brand." Kraft Mem. 32-33. This argument is a non sequitur. Nothing under the R&G Agreement prevented Kraft from beginning to prepare to replace Starbucks as soon as it obtained notice of Starbucks' intent to terminate; notably, Kraft does not deny that it has already begun to do so. *See* Blattberg Decl. ¶ 14. If Kraft sat on its hands, any harm that it suffers could have been avoided had Kraft acted with reasonable prudence, and such self-inflicted harm cannot be the basis for injunctive relief. *See Lanvin*, 739 F. Supp. at 192-93 (noting that "[a] movant for extraordinary relief cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm. . . . Nor can it claim irreparable harm when its delay is itself the cause of whatever harm it alleges."). In any event, any delay in market entry can be calculated in the pending arbitration and compensated through money damages.

[20] *See also Loveridge v. Pendelton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986) ("[W]here money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law."); *Proctor & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 353 (S.D.N.Y. 2008) ("[T]he Second Circuit has articulated the 'general proposition that irreparable harm exists only where there is a

a.        The loss of the exclusive right to distribute a product "is typically compensable in monetary damages."  *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, No. 03-CV-8843, 2010 WL 3155176, at *10 (S.D.N.Y. July 30, 2010); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) (explaining that "courts do not automatically, nor as a matter of course," conclude that irreparable harm arises from breach of an exclusivity agreement, but "[r]ather, they examine whether the harms alleged by the party . . . are in fact irreparable"); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72-73 (2d Cir. 1979).  Accordingly, courts routinely deny motions for preliminary injunctions in cases involving allegedly wrongful termination of exclusive distribution arrangements.[21]

This is particularly clear because distribution of Starbucks coffees makes up only a small percentage of Kraft's business.  As set forth above, Kraft is the largest food company in North America, representing more than 150 brands and generating annual revenues of $48 billion.  Revenues from the sales of Starbucks packaged coffees account for only around 1% of Kraft's annual revenue.  Kraft cannot seriously allege that losing a single brand would cause the "catastrophic impairment" to its business that this Court has required to demonstrate irreparable harm.  *See*, *e.g.*, *Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 808 (S.D.N.Y. 1986) ("the argument that a four percent business loss will 'financially

---

threatened imminent loss that will be very difficult to quantify at trial.'") (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)).

[21] *See*, *e.g.*, *Pettereit v. S.B. Thomas, Inc.*, 63 F.3d 1169 (2d Cir. 1995); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2d Cir. 1979); *Jackson Dairy*, 596 F.2d 70; *Doldo Bros. v. Coors Brewing Co.*, No. 7:08 Civ. 206, 2008 WL 657252, at *6 (N.D.N.Y. Mar. 7, 2008); *Shephard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447, 1999 WL 7289641, at *8 (S.D.N.Y. Sept. 17, 1999); *Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*, No. CV-09-0237, 2009 WL 790312, at *7 (E.D.N.Y. Mar. 23, 2009); *Helios*, 2007 WL 1541204, at *4.

cripple' plaintiff [was] wholly unpersuasive"); *Lanvin*, 739 F. Supp. at 193 (loss of 10% of gross sales not irreparable harm); *Doldo Bros.*, 2008 WL 657252, at *5 (loss of brand representing 10% of total sales and 15% of total gross profits of exclusive distributor insufficient to establish irreparable harm); *Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*, No. 86 CV 534, 1986 WL 13950, at *11 (E.D.N.Y. Sept. 9, 1986) (no irreparable harm where sale of beers at issue constituted between 17% and 29% of distributor's total sales). Kraft does not claim that it will suffer the loss of a single customer or any meaningful harm to its goodwill or reputation as a result of the loss of the right to distribute Starbucks coffees.[22] Mere "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Shephard Indus.*, 1999 WL 7289641, at *8.[23]

Kraft cites no case where a court found irreparable harm on comparable facts. In *Reuters Ltd. v. UPI*, 903 F.2d 904 (2d Cir. 1990), the court based its finding of irreparable harm on evidence provided that several of UPI's customers had threatened to cancel their subscriptions if it could no longer provide Reuters photographs, at a time when UPI was in financially shaky condition. *See id.* at 908; *see also Helios*, 2007 WL 1541204, at *4 (finding that loss of right to distribute software did not constitute irreparable injury and distinguishing *Reuters* on grounds that the pictures at issue were "integral to the larger product line"). In *Vestron, Inc. v. National*

---

[22] Under the agreement, "any goodwill generated from the use of the Licensed Trademarks by Distributor shall inure to the benefit of the owner of the Licensed Trademarks" – *i.e.*, to Starbucks, not to Kraft. R&G Agreement ¶ 16.B.

[23] *See Fox Ins.*, 2009 WL 790312, at *7 (movant's "speculative and conclusory" allegations that retailer "*may* cease doing business with [movant]" insufficient to establish irreparable harm); *Helios*, 2007 WL 1541204, at *4 (denying plaintiff's motion for preliminary injunction where there was no evidence, except for speculative testimony, that plaintiff could lose business as a result of defendants' breach); *World Wide Polymers*, 2010 WL 3155176, at *11 ("'[T]here is no irreparable harm where the loss of goodwill is doubtful and the loss of a profitable line of business is compensable by monetary damages.'") (quoting *Fox Ins.*, 2009 WL 790312, at *7); *Jamaica Ash & Rubbish Removal v. Ferguson*, 85 F. Supp. 2d 174 (E.D.N.Y. 2000).

*Geographic Society*, 750 F. Supp. 586 (S.D.N.Y. 1990), the plaintiff was "committed to its subdistributors to supply them" with the defendant's documentations, and "[f]ailure to do so will result in litigation . . . incalculable loss of revenues on other titles if their distribution is affected, and diminution of good will"; because "distribution . . . was cut off almost at its inception," it was "impossible to project future sales," rendering monetary damages uncertain. *Id*. at 591.  In *National Kitchen Products, Inc. v. Kelmort Trading & Co.*, No. 91 Civ. 7540, 1992 WL 18805 (S.D.N.Y. Jan. 24, 1992), the plaintiff was threatened with "irreparable harm to [its] reputation as a distributor and its relationships with [subdistributors]," which would "result in the loss of other relationships, both actual and potential." *Id*. at *2.  And in *Supermarket Services, Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248 (S.D.N.Y. 1974), the court found that plaintiff "ha[d] lost one customer," "w[ould] be unable to supply its remaining customers," "w[ould] in all probability lose those customers," and could possibly lose customers in other lines of business as well. *Id.* at 1256-57.  Kraft does not claim the threatened loss of even one of its tens of thousands of customers.

        **b.**      Kraft's claims related to the Tassimo platform fail for similar reasons.  At the outset, Starbucks has the undisputed right to terminate the Tassimo agreements when the R&G Agreement terminates.  *See* Tassimo Agreement ¶ 5.B(viii); Starbucks Tassimo Agreement ¶ 5.B(vi).  Thus, the same analysis that applies to the R&G Agreement applies here as well: Kraft must show that a brief extension of the life of the Tassimo agreements would avert the supposed harms to Kraft.  Yet it makes no attempt to satisfy that showing.  To the contrary, Kraft claims that mere "uncertainty in the marketplace about the future of the Tassimo/Starbucks alliance" is sufficient to cause the harm of which it complains, and a preliminary injunction will

do nothing to alleviate that uncertainty.  Such speculative future events provide no support for a claim of irreparable harm.

In any event, Kraft fails to establish that any speculative losses to its Tassimo line are material.  *See Petereit*, 63 F.3d at 1186.  Kraft provides no information concerning Tassimo revenues, nor the likely affect on those revenues from the loss of the right to sell Starbucks "T Discs."[24]  Much more is required to satisfy the requirements for a preliminary injunction:  "[a] moving party must show that the injury it will suffer is likely and imminent, not remote or speculative."  *Town of East Haven*, 70 F.3d at 224; *see also Litho Prestige*, 652 F. Supp. at 808 (holding that allegations that termination of contract would impair a party's reputation, absent supporting evidence that other businesses might actually refuse to do business with the party, were "highly speculative" and insufficient to establish irreparable harm); *Lanvin*, 739 F. Supp. at 193 ("[Distributor] suggested that the loss of [supplier] will disrupt sales and cause it to lose customers.  Conclusory statements to this effect are insufficient to establish irreparable harm. This is particularly so where, as here, the allegations of irreparable harm through loss of customers is asserted only by the movant itself, without adequate evidence of how such losses would take place and how the movant would be injured thereby.") (citation omitted).

**c.** Kraft also complains that Starbucks' "public pronouncements criticizing Kraft's performance under the Agreement" and its contacts with CPG customers will "tarnish Kraft's goodwill with its customers, interfere with Kraft's . . . ability to meet its contractual

---

[24] Included in Kraft's materials is the report of an investment analyst that confirms Kraft's share of sales of coffee pods at a mere 5% of overall coffee pod sales in 2009, far behind Green Mountain (Keurig) and Sara Lee (Senseo).  *See* Declaration of David C. Hyland [Dkt. No. 19] (filed Dec. 23, 2010), Exh. 1 [Dkt. No. 19-01], at 7.

commitments to its customers, and cause Kraft's customers to question its capabilities."  Kraft

Mem. 29, 30.  These complaints do not justify any equitable relief.[25]

*First*, there is simply no basis for any allegation that Starbucks will not continue to

supply Kraft with adequate supplies to allow Kraft to continue to carry out its distribution

function until March 1, 2011.[26]  To the contrary, Starbucks has made every effort to work with

Kraft to ensure an orderly transition; Kraft – despite an unconditional contractual obligation to

do so – has refused to cooperate.  So long as Kraft clearly communicates to Starbucks its

requirements, Starbucks will ensure that Kraft is adequately supplied.  Starbucks has no interest

in having empty shelves or unhappy customers.

*Second*, Starbucks began to approach customers to make plans for post-termination

distribution only when Kraft made clear that it would not cooperate in an orderly transition.

Kraft cannot claim that such activity violates any obligation that Starbucks owes to Kraft under

the R&G Agreement.  To the contrary, such activity is necessary to mitigate the harm that

Kraft's refusal to cooperate in the transition is causing Starbucks.

---

[25] If Kraft believed that Starbucks' termination would cause "great uncertainty and confusion [among Kraft's] customers," Complaint ¶ 109, there is no justification for Kraft's decision to wait more than two months after Starbucks communicated to Kraft that the R&G Agreement would terminate on March 1, 2011, to seek any relief.  "A party's delay in moving for preliminary injunctive relief undercuts the sense of urgency that typically accompanies such a motion, and a lengthy delay can altogether preclude the granting of a preliminary injunction." *Transperfect Translations Int'l, Inc. v. Merrill Corp.*, No. 03 Civ. 10146, 2004 WL 2725032, at *4 (S.D.N.Y. Nov. 30, 2004) (citation omitted); *see Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) Accordingly, " '[c]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.' "  *Transperfect Translations*, 2004 WL 2725032, at *4 (quoting *Gidatex, S.r.L. v. Campaniello Imp., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (two months)).

[26] As Kraft acknowledges, the only reason that the spreadsheet Starbucks sent to Kraft is cut off as of January 29, 2011, is because of an issue with Starbucks' system.  *See* Declaration of John Brill ¶ 9 [Dkt. No. 18] (filed Dec. 23, 2010) (acknowledging that "Starbucks provided an explanation of system issues for this shortened supply plan").

*Third*, to the extent Starbucks' public statements regarding Kraft's performance have hurt Kraft's reputation, that harm is one that is simply irrelevant to Kraft's request for injunctive relief.  Starbucks is entitled to the opinion that Kraft's performance under the R&G Agreement has been poor – indeed, Kraft itself has acknowledged that its performance was poor – and is equally entitled to express that opinion publicly.  Any complaint that Kraft may have on this score is beside the point.

### B.   Denial of Kraft's Request for a Preliminary Injunction Will Not Prevent Kraft from Vindicating Its Rights in Arbitration

Kraft argues that unless Starbucks is enjoined from terminating the R&G Agreement, Kraft's contractual right to arbitrate the dispute over termination would be "frustrated."  But nothing in the R&G Agreement gives Kraft a right to arbitrate the parties' dispute before Starbucks may exercise its right to terminate the agreement.  And, in any event, to obtain an injunction pending arbitration – as in the case of any preliminary injunction – Kraft must show irreparable harm, which it cannot do.

### 1.   *The R&G Agreement Does Not Require the Parties To Complete Dispute Resolution Before Exercising Termination Rights*

The plain terms of the R&G Agreement are inconsistent with Kraft's claim that a potential controversy over an alleged Material Breach must be resolved before a party to the agreement may exercise its termination right.  Paragraph 5.B(iii) states that the agreement may be terminated "[b]y either party, upon a Material Breach of this Agreement which is not cured within (30) days after notice to the breaching party of the circumstances constituting the Material Breach."  R&G Agreement ¶ 5.B(iii).  Here, Starbucks provided notice and Kraft failed to cure. The R&G Agreement does not require Starbucks to satisfy any other condition in order to exercise its termination right.

Nothing in the Dispute Resolution provisions of the R&G Agreement alters that conclusion.  Paragraph 15.A provides for the submission of any claim or controversy arising under the R&G Agreement to the Oversight Committee, and further provides that "if the Oversight Committee has not met to consider [a] claim or controversy [arising out of the R&G Agreement] within [a] thirty (30)-day period, either party may by written notice to the other demand that the dispute be submitted to arbitration."  *Id.* ¶ 15.A.[27]  Nothing in the R&G Agreement, however, makes the exercise of any termination right under Paragraph 5 conditional on exhaustion of the dispute resolution process laid out in Paragraph 15.[28]  To the contrary, in virtually any case where a party relies on a Material Breach as the basis for termination, the other party will dispute the claim – and the drafters of the R&G Agreement would have known that.  Nevertheless, the trigger for termination under Paragraph 5.B(iii) is *only* notice and a failure to cure within 30 days.  This conclusion also follows from the structure of the agreement.  Given

---

[27] The R&G Agreement also provides that a party may seek a preliminary injunction in this Court.  *See* R&G Agreement ¶ 15.B.  Starbucks does not dispute that this Court has jurisdiction to consider Kraft's motion; at the same time, nothing in Paragraph 15.B relieves Kraft of the obligation to satisfy the ordinary requirements for obtaining injunctive relief.

[28] Accordingly, this case is not like those in which parties agree that, in the event of dispute, the status quo will be maintained pending resolution of the dispute.  For example, in *Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*, 992 F.2d 430 (2d Cir. 1993), the franchise agreement at issue provided that "[i]f the arbitration provision is invoked when the dispute between the parties is . . . the legality of . . . adding a new [Jeep-Eagle] dealer of the same line-make . . . [Eagle Sales] will stay the implementation of the decision to . . . add such new [Jeep-Eagle] dealer . . . until the decision of the arbitrator has been announced."  *Id.* at 432.  Even in such a case – where the issue is the "more flexible" inquiry into whether specific performance should be ordered, *id.* at 433 – the party seeking equitable relief must still show irreparable harm and the inadequacy of money damages, *see id.* at 435-36.  Starbucks and Kraft, however, did *not* agree to include that type of provision; Kraft is therefore attempting to gain benefits and impose obligations on Starbucks to which the parties did not agree.  *See, e.g.*, *Connecticut Res. Recovery Auth. v. Occidental Petroleum Corp.*, 705 F.2d 31, 32, 34 (2d Cir. 1983) (vacating injunction prohibiting termination pending arbitration on the ground that the parties' failure to "expressly condition termination . . . on prior arbitration" indicated that "maintenance of the status quo . . . was not contemplated by the parties" despite contractual clause requiring the parties to "continue to perform their obligations under this Agreement during the pendency of any arbitration") (internal quotation marks omitted).

the timeline established in Paragraph 15, any dispute over the notice of Material Breach could not be submitted to arbitration before the party giving notice has the right to terminate.  It therefore follows that the procedure for seeking arbitration as set forth in Paragraph 15 could not be a condition precedent to termination under Paragraph 5.B(iii).

Furthermore, although Starbucks did provide notice to the Oversight Committee of its intention to terminate the R&G Agreement because of Kraft's Material Breaches,[29] Kraft made no timely effort to engage in any dispute resolution in response.  Instead, it waited until the last day of the cure period and sent a letter simply disputing that any Material Breach had occurred.  Three weeks later, Kraft initiated the arbitration that is required by the R&G Agreement for "any claim or controversy" and in which the parties are now engaged.

Any claim by Kraft that it has been deprived of its right to arbitrate the parties' dispute under the R&G Agreement is accordingly incorrect.  Kraft has initiated arbitration and the parties will resolve any dispute regarding any damages Starbucks may owe Kraft related to termination of the R&G Agreement, damages Kraft owes to Starbucks for its willful breach of the orderly-transition provision of the agreement, and any other contractual disputes between the parties.  Kraft will be able to put forth all of its claims against Starbucks in the arbitration and if they prevail, any harm Kraft has suffered because Starbucks terminated the R&G Agreement pursuant to Paragraph 5.B(iii) (rather than pursuant to the Termination-at-Will provision, Paragraph 5.B(ii)) will be remediable through money damages.

---

[29] *See* Quinn Decl. Exh. 8 [Dkt. No. 22-08] (Letter from A. Panner to D. Elsner (Oct. 5, 2010) ("This letter also provides notice of these material breaches to the Oversight Committee, pursuant to paragraph 15 of the Agreement.")).

## 2. No Preliminary Injunction May Issue Pending Arbitration Absent a Showing of Irreparable Harm

To the extent Kraft argues that, because a preliminary injunction is sought pending resolution of a dispute in arbitration, the party seeking the injunction need not demonstrate irreparable harm, that argument is legally incorrect.

When a party seeks a preliminary injunction pending arbitration – as when it seeks a preliminary injunction pending litigation in court – it must justify extraordinary equitable relief. "[I]ssuance of a status quo injunction pending commercial arbitration requires a demonstration of supporting equitable factors such as absence of an adequate remedy at law or a danger of irreparable harm." *Connecticut Res. Recovery Auth.*, 705 F.2d at 35; *see also Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986) (holding that a court "can grant injunctive relief in an arbitrable dispute pending arbitration, *provided* the prerequisites for injunctive relief are satisfied") (emphasis added). Thus, where a party seeking a preliminary injunction pending arbitration fails to make out a showing of irreparable harm, the injunction is denied for that reason. *See Litho Prestige*, 652 F. Supp. at 811-12.[30]

---

[30] None of Kraft's cases is to the contrary. *Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990), did not address whether injunctive relief barring termination was appropriate, but rather whether the court had the *authority* to award injunctive relief. *See id.* at 1050 (holding that "the district court had jurisdiction to enjoin plaintiffs pending arbitration"). In each of the other cases Kraft relies on, the court recognized that "[t]he fact that a dispute is to be arbitrated . . . does not absolve the court of its obligation to consider the merits of a requested preliminary injunction." *Rosso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d Cir. 1984); *see also Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1066 & n.1 (2d Cir. 1972) (analyzing termination of service contract under which the parties expressly stipulated that the services were so unique that the loss of them could not be adequately compensated by money damages); *L.K. Comstock & Co. v. Thales Transp. & Sec., Inc.*, No. 09-cv-3352, 2009 U.S. Dist. LEXIS 79154, at *7 (E.D.N.Y. Sept. 2, 2009) (requiring showing of irreparable harm); *Credit Suisse Sec. USA LLC v. Ebling*, No. 06-11339, 2006 U.S. Dist. LEXIS 86351, at *8 (S.D.N.Y. Nov. 27, 2006) (same).

## II.     THE BALANCE OF EQUITIES WEIGHS DECIDELY IN FAVOR OF STARBUCKS

Kraft's inability to demonstrate irreparable harm is enough to defeat its motion.  But Kraft's request for injunctive relief should be denied for the additional reason that the balance of equities weighs decidedly in favor of Starbucks.  It is Starbucks, rather than Kraft, that faces the threat of harm that cannot be compensated through monetary damages if an injunction is granted.

Were the Court to grant Kraft's requested relief, Starbucks would be forced to continue to rely on Kraft to distribute and promote its packaged coffee in the critical CPG channel.  Kraft will negotiate with retailers with respect to shelf placement; work with retailers to develop in-store promotions; and help to determine whether Starbucks is featured in retailers' marketing materials.  Such decisions have a significant impact on product sales.  Brands that are not promoted with vigor and sophistication, that have poor shelf placement, and that are not marketed effectively will suffer lost sales as a result.  *See* Blattberg Decl. ¶¶ 17-18.  The competitive threat to Starbucks is keen, because rival brands – including Dunkin' Donuts coffee – spend heavily on promotion and have been effectively marketed.  *See id.* ¶ 17.

The risk of injury to Starbucks is further compounded by the fact that, during the time that an injunction would remain in effect, Kraft will not only be distributing Starbucks products; it will simultaneously be preparing to market its own super premium coffee in direct competition with Starbucks.  As set forth above, Kraft is already in negotiations with advertising agencies to market its Gevalia coffee in the CPG channel.  *See supra* p. 10; Blattberg Decl. ¶ 14.  For as long as an injunction continues, Kraft will be able to prepare the groundwork for its own brand – perhaps by taking advantage of its access to retailers subtly to promote the expected launch of Gevalia – while neglecting Starbucks (or worse).

Starbucks, unlike Kraft, does not sell scores of other brands.  Starbucks is a coffee company; if perpetuation of the R&G Agreement leads to further erosion of Starbucks' market position, the loss to Starbucks will be both difficult to calculate and difficult to remedy.  As Professor Blattberg explains, companies frequently reassign shelf space based on changes of market share.  *See* Blattberg Decl. ¶ 17.  If the sales of Starbucks CPG products decline, Starbucks may be placed in the position of having to generate increased sales from a weaker position in retail stores across the country.

An injunction would not only weaken the long-term sales of Starbucks CPG products; it could also threaten the company's critical brand equity.  Starbucks is one of the most valued and respected brands in the world.  *See id.* ¶ 21.  It has achieved this position through a determined focus on producing quality coffee products and fostering an image as a company dedicated to professionalism, excellence, and unmatched customer service.  As a result of these efforts, customers have come to expect the same high level of quality in all Starbucks stores around the world and across all Starbucks products.  The manner in which Starbucks products are marketed and sold in the CPG market reflects on this image.  If Kraft does a poor job of managing the Starbucks brand during the period that an injunction remains in effect, the impact may be felt across all segments of Starbucks' business.[31]

---

[31] By contrast, Kraft's brand equity is not at stake in this dispute.  There is no evidence that consumers who purchase Starbucks coffee in retail outlets have any idea that they are purchasing a product sold by Kraft, much less that they view the quality of Starbucks coffee as a reflection of Kraft.  And to the extent that Kraft argues that the dispute between the parties itself has damaged its brand equity, that damage has already been done, in large part by Kraft's filing of this action.  *See Envirogas Inc. v. Walker Energy Partners*, 641 F. Supp. 1339, 1344 (W.D.N.Y. 1986) ("Ironically, it appears to the court that a large part of the predicted damage to [plaintiff's] reputation has already been suffered, due in part to the termination notice and in part to the very filing of this lawsuit and the application for preliminary relief.").

## **<u>CONCLUSION</u>**

Because Kraft cannot show irreparable injury resulting from Starbucks' decision to

terminate the R&G Agreement, and because the balance of equities weighs strongly in favor of

Starbucks, Kraft's motion for a preliminary injunction should be denied.


|  |  |
|---|---|
| | s/ Joseph S. Hall |
| Maria Barton | Joseph S. Hall (JH-2612) |
| Paul Serritella | Aaron M. Panner (*pro hac vice*) |
| LATHAM & WATKINS LLP | Wan J. Kim (*pro hac vice*) |
| 885 Third Avenue | KELLOGG, HUBER, HANSEN, TODD, |
| New York, NY 10022-4834 |    EVANS & FIGEL, P.L.L.C. |
| Tel. (212) 906-1200 | 1615 M Street, N.W. |
| Fax (212) 751-4864 | Suite 400 |
| | Washington, D.C. 20036 |
| | Tel. (202) 326-7900 |
| | Fax (202) 326-7999 |
| | jhall@khhte.com |
| | apanner@khhte.com |
| | wkim@khhte.com |

*Counsel for Defendant Starbucks Corporation*