IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KRAFT FOODS GLOBAL, INC.,

    Plaintiff,

v.

STARBUCKS CORPORATION,

    Defendant.

Civil No. 10-9085 (CS)
ECF Case

## DECLARATION OF PROF. ROBERT C. BLATTBERG

I, Robert C. Blattberg, hereby state as follows:

### Background and Experience

1.    I am the Professor Emeritus of Marketing at the Kellogg Graduate School of Management at Northwestern University, as well as the Timothy W. McGuire Distinguished Service Professor of Marketing and the Director of the Center of Marketing Technology and Information at the Tepper School of Business at Carnegie-Mellon University. Until 2008, I served as the Polk Brothers Distinguished Professor of Retailing at the Kellogg School, prior to which I was the Charles H. Kellstadt Professor of Marketing and the Director of the Center for Marketing Information Technology at the University of Chicago.

2.    I received a B.A. in Mathematics from Northwestern University and M.S. and Ph.D. degrees in Industrial Administration from Carnegie-Mellon University. During my career, I have taught marketing strategy, marketing management, retailing behavior, and statistics.

3.    My primary research is in the areas of marketing information technology, database marketing, sales promotions, and retailing. My articles on these subjects have appeared

in the Journal of Marketing Research, Management Science, Marketing Science, Econometrica, the Journal of Marketing, the Journal of Direct Marketing, and other leading academic journals. I have authored or co-authored the following books: Sales Promotions (Prentice-Hall, 1990); The Marketing Information Revolution, (Harvard Business Press, January 1994); Customer Equity (Harvard Business Press, 2001); Assessing and Capturing the Soft Benefits of Scanning; and Database Marketing: Theory and Practice (Springer 2008). In addition, I authored a five-part set of guides on Category Management, which was published in 1995 and 1996 by the Food Marketing Institute.

4. I have consulted extensively for retailers and consumer products companies, including Anheuser-Busch, Rand McNally, Kellogg's, Miller Brewing, IAMS, Warner-Lambert, Hallmark, Teradata, Sears, PPR, Kroger, Rite Aid, Best Buy, A.T. Kearney, T. Rowe Price, Information Resources, American Express, Bank One, and Acosta. In addition, I have provided consulting services for consumer data suppliers, including A.C. Nielsen and NPD Research.

5. I have previously testified as an expert witness in trial or depositions on over 20 occasions in state and federal court litigation. My testimony has been cited by the federal and state courts. I am being compensated for my time at my standard rate of $725 per hour. My compensation is in no way contingent on the outcome of this matter.

6. My opinions in this matter are based on my knowledge and experience, my familiarity with both parties to this action, as well as my review of materials relating to this litigation. Specifically, I have reviewed the Complaint filed by Kraft, as well as the Memorandum of Law and accompanying declarations filed in support of its Motion for a preliminary injunction. In addition, I have reviewed several of Kraft's filings with the U.S.

Securities and Exchange Commission as well as relevant marketing materials and press releases issued by Kraft.

### Kraft's Role in the CPG Market

7.     I am very familiar with plaintiff Kraft Foods Global, Inc., and its parent company, Kraft Foods, Inc. (both referred to as "Kraft"). Kraft is the largest food company in the United States, and the second-largest food company in the world. According to its filings with the SEC, Kraft owns or distributes over 150 different brands, which it sells primarily in the consumer packaged goods ("CPG") market. Some of Kraft's larger brands include Maxwell House, Oreo, Jell-O, Nabisco, and Oscar Mayer. Kraft's brands are sold in grocery stores, discount chains, drug stores, gas stations, and in numerous other locations throughout the world. Prior to 2007, Kraft was a subsidiary of Altria, formerly known as Philip Morris. Kraft is now an independent publicly-traded company.

8.     Kraft's stable of brands is constantly changing. For instance, this past year, Kraft purchased British chocolate and candy manufacturer Cadbury for approximately $19.4 billion. In recent years, Kraft has sold a wide variety of brands it previously owned, including Cream of Wheat (sold to B&G Foods in 2007 for approximately $200 million), DiGiorno and other frozen pizza brands (sold to Nestle for $3.7 billion in 2010), Altoids and Life Savers (sold to Wrigley for $1.48 billion in 2005), and Post Cereals (sold to Ralcorp Holdings for approximately $2.6 billion in 2008).

9.     Beverages comprise a fraction of Kraft's overall portfolio of brands. According to Kraft's recent SEC filings, U.S. beverage sales made up approximately 6.4% of Kraft's net revenues. This product category includes not just coffee, but also packaged juice and powdered drinks such as Kool-Aid, Crystal Light, Capri Sun, and Tang.

10. Kraft currently sells several brands of coffee throughout the world. In addition to the Starbucks brands that are the subject of this action, Kraft also sells Maxwell House coffee, Yuban coffee, Café HAG, Sanka, Carte Noire, General Foods International coffees (currently sold as Maxwell House International Café), Gevalia coffee, Grand Mere coffee, Jacobs coffee, Kenco coffee, Nabob coffee, and Onko coffee, according to its most recent annual report. Kraft sells several of these brands, including Maxwell House, Yuban, Sanka, and Maxwell House International, in the U.S. CPG market, alongside the Starbucks coffees that it distributes.

11. Distribution agreements, through which a manufacturer outsources the distribution of some or all of its products in one or more retail channels and geographic areas, are common in the CPG industry. Companies also may rely on a third party to provide sales and marketing services for its consumer products. Because such agreements are common, and because the marketplace for CPG is very competitive, producers of CPG do change their distribution and/or sales partners on occasion.

### The Impact of an Injunction on Kraft

12. I am generally familiar with the terms of the 2004 agreement between Starbucks and Kraft (the "R&G Agreement"), through which Kraft has the exclusive right to sell Starbucks coffee in the CPG market in certain channels. I understand that Starbucks has terminated that contract, effective March 1, 2011, based on several material breaches by Kraft of the contract's terms, and that Kraft denies that it has breached the contract. I am also aware that Kraft is seeking a preliminary injunction in this Court in order to prohibit Starbucks from terminating the contract.

13. I understand that Kraft has alleged that brands covered by the R&G Agreement generate approximately $500 million in annual CPG sales. According to the company's public

statements, Kraft expects to generate approximately $48 billion in net revenue this year. As discussed above, U.S. beverage sales made up approximately 6.4% of Kraft's net revenues. Based on these figures, the sale of Starbucks brands generates approximately 16% of Kraft's U.S. beverage revenue and slightly more than 1% of Kraft's total revenue.

14. While Kraft does not publicly report revenue totals for its other coffee brands, a 2009 report by the investment research company Morningstar estimated that Maxwell House alone generates $1.5 billion in revenue for Kraft—or three times the revenue produced by Starbucks brands. *See* "Kraft May Sell Maxwell House," *Morningstar.com* (Oct. 16, 2009), *available at* http://quicktake.morningstar.com/Stocknet/san.aspx?id=311940 (attached hereto as Exhibit 1). Starbucks sales therefore comprise just a fraction of Kraft's total coffee business. Moreover, Kraft may distribute another premium coffee to replace Starbucks, such as its Gevalia brand of coffee. While I understand that the R&G Agreement currently generally prevents Kraft from selling Gevalia coffee in channels where it distributes Starbucks coffee, that restriction will be lifted when the agreement terminates on March 1, 2011. A recent news report confirms that Kraft is seeking to broaden its efforts to market and grow its Gevalia coffee. Andrew McMains, "Kraft Seeking New Ideas on Gevalia," Adweek.com (Dec. 30, 2010), *available at* http://www.adweek.com/aw/content_display/esearch/e3iaab5654aa0d93ba9fba393fd4ae838bd (attached hereto as Exhibit 2).

15. Based on my experience in the retail sector, and based on Kraft's size and diversity of products, I see no basis for any concern that the loss of the right to distribute Starbucks coffee will materially affect Kraft's prospects as a food company. Kraft had $4.3 billion in earnings in 2009. Even assuming that Kraft does nothing to try to replace Starbucks by

5

distributing some other premium coffee, the loss of Starbucks brand will not have any impact on the remaining 99% of Kraft's business.

16. Furthermore, according to Kraft's own publicity materials, Kraft distributes 11 brands with revenues exceeding $1 billion—including Maxwell House—and 70 brands with revenues greater than $100 million. Kraft has described itself as a "global powerhouse" with an "unrivaled portfolio of brands people love." Kraft Press Release, "Kraft foods lays out its new global growth strategy" (Sept. 15, 2010), *available at* http://www.kraftfoodscompany.com/ mediacenter/country-press-releases/us/2010/multi_media_09152010.aspx. As a result, the loss of the Starbucks brand will not affect Kraft's relationships with grocery retailers or its ability to gain access to those retailers for distribution of its brands.

## The Impact of an Injunction on Starbucks

17. The market for premium coffee in grocery stores and similar outlets is highly competitive. While some customers show a high degree of brand loyalty, others will switch among brands. For such consumers, factors such as shelf placement and in-store promotions can significantly affect their choice of brand. As a result, brands with unfavorable placement and minimal or ineffective in-store advertising and promotions will almost certainly see their sales negatively affected. For this reason, companies must be both vigorous and sophisticated in their dealings with retailers to ensure that their brands receive favorable placement and promotion. Furthermore, the market has become more competitive in recent years, as new entrants such as Dunkin' Donuts have aggressively marketed their coffee.

18. A company that falls short in these areas, even for a brief period of time, may struggle to recover the resulting loss in market share. Major retailers frequently reassign shelf

space based on recent performance, so even a short-term reduction in market share can have lasting negative consequences on a brand.

19. As stated above, I understand that Starbucks has informed Kraft that the termination of the R&G Agreement will be effective March 1, 2011. Until that date—and beyond, if Kraft obtains an injunction—Kraft will have minimal incentive to promote Starbucks coffee in the CPG market and to reset planograms[1] to maintain or enhance the placement of Starbucks coffee on the shelf. This is so because Starbucks competes with Kraft coffee brands such as Maxwell House, Yuban – as well as any other brands that Kraft chooses to sell in the U.S. CPG market, such as its reported efforts to increase promotion of Gevalia coffee. Kraft therefore has an obvious incentive *not* to promote Starbucks' products in the months leading up to the termination of the agreement—and instead to shift these resources to promoting its own coffee brands—in order to drive Starbucks' consumers to its own brands. Further, I understand that Starbucks would be powerless to combat these efforts in these retail channels so long as the R&G Agreement remains in place. It follows that this harm to Starbucks would be prolonged and exacerbated if Kraft obtains injunctive relief that extends the R&G Agreement indefinitely.

20. As a result, the potential harm faced by Starbucks if the R&G Agreement remains in effect beyond March 1, 2011, is significant. For as long as it is bound by the agreement, Starbucks will be forced to rely on Kraft, soon to be one of its largest competitors, to promote and distribute its products in the critical CPG market. And Starbucks, unlike Kraft, does not have dozens of other brands to fall back on.

21. Brand equity is important to all companies, but it is particularly important to a company such as Starbucks. The Starbucks brand has consistently been recognized as among the

---

[1] A planogram is a diagram used to map out where particular products are displayed in a store.

7

most valued and respected brands in the world. *See* Millward Brown Optimor, Top 100 most valuable global brands, at 17, 20 (2010), *available at* http://www.millwardbrown.com/Sites/mbOptimor/Ideas/BrandZ_Rankings/BrandZTop100.aspx. Any erosion of Starbucks' brand equity could have serious long-term consequences for the company.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on January 6, 2011.

_____
ROBERT C. BLATTBERG

# EXHIBIT 1

Return to: Previous Page

# Kraft May Sell Maxwell House

by Erin Swanson, CFA | 10-16-09 | 10:31AM

The New York Post reports that Kraft is in talks with Sara Lee to sell its Maxwell House coffee business, a move we had expected the packaged food firm would consider in order to support a higher price or increase the cash consideration of its offer for Cadbury . We're maintaining our fair value estimates for the firms.

We estimate that the Maxwell House coffee brand generates about $1.5 billion in annual revenue, with Kraft's entire coffee portfolio (including Maxwell House, Jacobs, and Sanka) accounting for $6 billion in sales, or about 14% of total revenue. Using J.M. Smucker's acquisition of the Folgers brand from Procter & Gamble last year as a proxy (which totaled about 2.3 times sales based on our estimate), we believe Kraft could generate $3 billion by selling Maxwell House, assuming a 2 times sales multiple.

Although Sara Lee has been focused on improving its existing operations and has a balance sheet leverage ratio in line with other packaged food firms (debt/capital is 0.58), at first blush it appears to us that Sara Lee could have a hard time swallowing a $3 billion deal; its market capitalization is roughly $7.5 billion, and earnings before interest and taxes cover interest expense just 4 times. However, Sara Lee has already committed to sell its international body-care business, which is expected to provide nearly $1.9 billion in proceeds, of which $1 billion is committed to share repurchases. Also, we believe the sale of its international household segment is imminent, which could generate another $1.5 billion-$2.0 billion in proceeds, assuming a similar multiple. As a result, we contend that the use of these funds would make the purchase of Maxwell House more feasible for Sara Lee. We will update our analyses as we gain more insights.

Return to: Previous Page

# EXHIBIT 2





Powered by Clickability

## Kraft Seeking New Ideas on Gevalia
**Brand marketing has been limited**

Dec 30, 2010

-Andrew McMains

Kraft Foods is seeking new creative ideas on its Gevalia brand of coffee and coffeemakers, amid a bid by Starbucks to end its retail distribution deal with Kraft, according to sources.

For a dozen years, Kraft has distributed Starbucks coffee at supermarkets and other retail outlets. Starbucks sought to end the deal in November, and Kraft is **now challenging the move** in federal court.

Such a split would raise the stakes on the marketing of Kraft's other coffee brands, including Maxwell House, Tassimo and Gevalia.

To date, Gevalia marketing has been limited to direct mail and an occasional direct-response TV spot. Sources expect Kraft to broaden such efforts as the brand moves beyond mail-order distribution and into retail stores. As such, Gevalia's marketing budget will likely grow.

Kraft's creative search includes the incumbent, Interpublic Group's Draftfcb, as well as WPP Group's Taxi, independent Droga5 and Being, a unit of Omnicom Group's TBWA, sources said. Each agency is pitching out of its New York office. Client executives have briefed the shops and final presentations are slated for next month, said sources.

The agencies either declined to comment or could not be reached. The client did not return messages.

Being and Droga5 are Kraft roster shops, with the former handling creative duties on Planters, Wheat Thins and Tassimo; and the latter, on Athenos. Taxi does not have any Kraft business.

Gevalia is believed to supply about $2 million in revenue to Draftfcb, which has seen its roster shop status decline this year, with the loss of brands such as **Kraft Macaroni & Cheese**, Wheat Thins, Chips Ahoy, Fig Newtons and Nabisco 100-Calorie Packs.

The agency, however, still handles creative duties on Oreo, Cool Whip, Jell-O, A1 and Velveeta.

**Links referenced within this article**

-Andrew McMains
http://www.adweek.com/aw/content_display/esearch/mailto:andrew.mcmains@adweek.com
now challenging the move
http://online.wsj.com/article/SB10001424052748704278404576037942691494946.html
Kraft Macaroni & Cheese
http://www.adweek.com/aw/content_display/news/account-activity/e3ie2e67226d2672c9826b24d1964a0c46f

**Find this article at:**
http://www.adweek.com/aw/content_display/esearch/e3iaab5654aa0d93ba9fba393fd4ae838bd

☑ Uncheck the box to remove the list of links referenced in the article.

© 2008 Nielsen Business Media, Inc. All rights reserved.