UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KRAFT FOODS GLOBAL, INC.,                              :

          Plaintiff,                              :

    -against-                              :       CASE NO. 10 CV 09085 (CS)
                                    ECF Case
STARBUCKS CORPORATION,                              :

          Defendant.                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>DECLARATION OF STEPHEN J. HOCH, Ph.D</u>

I, Stephen J. Hoch, hereby depose and state as follows:

1.      Since 1995, I have held the position of Professor of Marketing at the Wharton School, University of Pennsylvania.  I was the Chairperson of the Marketing Department for six years and am currently the John J. Pomerantz Professor of Marketing and past-director of Wharton's Baker Retailing Initiative.  Prior to joining the faculty at the Wharton School, I was the Robert P. Gwinn Professor of Marketing and Behavioral Science at the University of Chicago, Graduate School of Business from 1989 to 1995.  I was also the Director of the Micro-Marketing Project and the American Greetings Research Council II.  During the time period from 1983 to 1989, I served as an Assistant Professor and later as an Associate Professor at the University of Chicago, Graduate School of Business.  Prior to joining the University of Chicago, I was a Lecturer in Marketing at the Graduate School of Management and Division of Continuing Education at Northwestern University from 1981 to 1983.

2.      Prior to obtaining my Ph.D., I was National Sales Manager for Walt Disney Music Company, responsible for all marketing and promotion activities.

3.      In addition to my teaching duties over the past twenty-plus years, I have authored numerous articles on marketing, with a particular emphasis on consumer and managerial decision making, retail merchandising (pricing, promotion, and assortment), and private label products.  I have received a number of awards for my articles and publications, including Alpha Kappa Psi awards from the Journal of Marketing for the article making the most significant contribution to marketing practice (1989 and 1995), the Best Article award from the Journal of Retailing (1994), and First Place in the National Dissertation Competition of the American Marketing Association (1984).

4.      I sit on the editorial boards or am an associate editor of a variety of academic journals, including Journal of Consumer Research, Journal of Marketing Research, Journal of Retailing, and Management Science.  I also serve as a reviewer for numerous journals, including Journal of Experimental Psychology, Organizational Behavior and Human Decision Processes, and Marketing Science.  I am Past President of the Association for Consumer Research and a member of a number of other professional associations, including the American Marketing Association, Institute for Management Science, and the American Psychological Society.

5.      I also have provided consulting services for a number of retailers, including Dominick's, Wal-Mart, Price Chopper, Dollar General, CVS, Sears, Home Depot and others, and consumer goods manufacturers including General Mills, Kraft, P&G, Colgate, Lever, Gillette, Coca-Cola, American Greetings, 3M, and many others. I was Principal Consultant at Proteus Design from 2004-2009, a marketing design consultancy in Cambridge, MA, with many mid-market consumer goods clients.

6.      I hold a Ph.D. in Marketing from Northwestern University, which I received in 1983.  I also obtained an M.B.A. in Marketing from the University of California, Los Angeles, in

1976, and a Bachelor's degree in Human Biology with a minor in Economics from Stanford University in 1974.  A current copy of my *curriculum vitae*, which includes a list of publications, is attached as Appendix A to this Report.  My prior testimony is listed in Appendix B.  I am being compensated for my time in this matter at my usual rate of $800 per hour, and is not contingent in any way on the outcome of this proceeding.

7.      My opinions in this proceeding are based on my knowledge and experience, my familiarity with both litigants – Kraft Food Global, Inc. ("Kraft") and Starbucks Corporation ("Starbucks") – and my review of certain documents relating to this litigation, including, but not limited to, the 2004 Supply and License Agreement between Starbucks and Kraft ("2004 Supply Agreement"), Kraft's complaint, its motion for preliminary injunction and the papers supporting that motion, and Starbucks' opposition to Kraft's motion, including the declarations submitted in support of that opposition.

## Kraft & the Consumer Packaged Goods Market

8.      Consumer Packaged Goods ("CPG") are consumable goods such as food, beverage, and non-food grocery products.  The CPG market channels include grocery and supermarket chains, wholesalers, club stores, mass merchandisers, distributors, drug stores and other retail food outlets.

9.      Kraft is a major player in the CPG market.  Kraft's size, however, does not make it immune from competition generally or in any market segment.  Nor does Kraft's size make it immune from harm in the market place.  Kraft faces extraordinary competition in the CPG market generally and in every one of their market segments.  Kraft has multiple competitors, both large and small, in the CPG marketplace.  Improving market position or introducing a new product in any segment of the CPG market requires multiple different assets, capabilities and

resources.  Time is an especially critical factor as well, because the fast moving CPG market demands that brands produce a constant stream of new product innovations, extensions, and improvements or risk market share erosion, or worse brand obsolescence. New product development is a lengthy and costly activity requiring extensive consumer and market research and analysis, and investment in production capabilities.  Once a new product comes to market , at a minimum, many months of additional investment to develop brand awareness and brand loyalty, including consumer advertising, securing of retail distribution, and in-and-out of store promotion to promote trial and repeat.

### Kraft & the CPG Coffee Segment

10.     Kraft sells its coffee products to grocery and supermarket chains, wholesalers, club stores, mass merchandisers, distributors, drug stores and other retail food outlets.  If the common denominator for success in real estate is "location, location, location," then the analog for success in the CPG industry is "placement, placement, placement" as in shelf placement and shelf space.  Many large national retailers partner with one company, a "Category Captain," to help design the most effective strategy for the presentation of a individual category, including coffe, on the retailer's shelves.  Category Captains are selected for many reasons, such as category knowledge and marketing/consumer expertise.  One critical factor in the selection of a Category Captain is a company's product portfolio.  A retailer prefers to have a Category Captain whose product portfolio mirrors, to the greatest extent possible, the portfolio of products sold by the retailer.  If a company has a full range of coffee products, then it often follows that such a company has the category knowledge and consumer expertise to help a retailer, in as unbiased a manner as possible, fashion an effective assortment, shelf space, and pricing and promotion strategy for its coffee offerings (*i.e.*, to determine which coffee products to sell, where

and how much to place on the shelf, profit maximizing prices and promotion). Since most major national retailers have a full-spectrum coffee portfolio including instant, regular ground and beans, and super premium variants, they invariably will pick as their Category Captain a CPG company that also has a full spectrum of successful coffee brands.

11.     The value of a Category Captaincy to a CPG company such as Kraft is hard to quantify, because the benefits that flow from such a position influence not only the company's relationship with the particular retailer for whom it is a Category Captain, but also the company's position in that particular market segment. In other words, the benefits that flow from being a Category Captain are many and they are tangible and intangible, quantifiable and incalculable.

12.     To date, Kraft has been able to create and maintain a strong position in the CPG coffee segment, due, in part, to the fact that Kraft holds the Category Captain position in more than 60% of the stores in which it distributes coffee.

## Kraft & Starbucks

13.     One of the important provisions in an exclusive long-term supply contract, such as the one between Kraft and Starbucks, is the termination provisions and procedures. It would be important for a company like Kraft to have negotiated an agreement that has very limited conditions upon which termination can be effectuated as is the case with this 2004 Supply Agreement. These limitations are to protect Kraft's investment in the business and in foregoing other opportunities as a result of the exclusivity provision. It is also important for third-parties, such as retailers, who depend for their success on stability and continuity of product supply. Termination provisions and procedures assume even greater significance where, as with Kraft and Starbucks, the relationship has been a long term success.

14.     The termination provision that Kraft and Starbucks negotiated in Paragraph

5(B)(ii) provides for an orderly and cooperative transition, by providing Kraft with compensation (the Fair Market Value of the business plus a premium) and time (not less than 180 days).  This provision would provide the parties with a time period of certainty under which both parties understood and agreed that there was to be a termination.  This provision, including the notice period, would be critical to Kraft for several reasons.  For example, because customer good will and business reputation are so important in the CPG segment, having no fewer than 180 days of certainty for communications with customers would be critical in order to avoid disruptions in the normal course of business.

15.     Moreover, every day of notice is essential because the 2004 Supply Agreement is exclusive and Kraft would need the time to develop, license, or acquire new product(s) to fill the void created with loss of the Starbucks' Super Premium brands.  The development or securing of a competitive super premium coffee brand will take time and Kraft cannot rush a product to market.  Introducing a new product into the CPG market is a high-risk proposition because the failure rate for new products is very high generally and failure tends to be even higher in saturated markets, such as the one for premium coffees.  The inherent risks in the market place are exacerbated by the manner in which Starbucks seeks to terminate the Agreement, exposing Kraft to any number of commercial setbacks including damage to Kraft's relationships with retailers, especially the all-important large, national retailers, leaving a potential hole in Kraft's coffee portfolio, and jeopardizing Kraft's standing as Category Captain with many retailers.  If Kraft were to convince retailers to adopt a new super premium coffee brand which then did not turn into a market success, it would suffer tremendous reputational harm along with the momentary costs of having to compensate retailers for the wasting of the retailer's efforts.

16.     At most, the 180 days provided for in the 2004 Supply Agreement under

Paragraph 5(b)(ii) gives Kraft a running start to either license another brand or develop a new brand organically. Put a little differently, each one of those 180 days is valuable. The loss of any significant portion of that time period (e.g., 30 days) could make the difference between success and failure.

### Kraft & the Likely Harm in the Absence of a Preliminary Injunction

17.    The harm that Kraft is likely to suffer in the absence of a preliminary injunction is significant, multidimensional, and not easily calculable.

18.    First, the deprivation to Kraft of anything less than 180 days notice in a time of certainty would be harmful to Kraft in a way that is not quantifiable. Kraft would lose valuable time to develop a competing product. Without a competing product, Kraft may lose good will, may suffer reputational harm and may lose important, non-tangible, awards such as Category Captaincy. It is very important for Kraft to go to market with a competitive super premium coffee. However, if Kraft goes to market with a replacement without spending the time to fully develop the product, Kraft runs the risk of launching an unsuccessful product, which would cause other non-monetary harm to Kraft.

19.    Second, if Kraft loses the business on March 1, 2011 and then is awarded the business back later in the year at the conclusion of the arbitration proceeding, the business will not be the same at that point and Kraft will not be able to be returned to the same position it was in prior to March 1, 2011. It would be difficult to quantify the harm to Kraft in this regard because there are short term and long term costs as a result of the impact on consumers, impact on retailers and impact on the business of multiple transitions.

20.    Third, on the current course, the harm to Kraft is likely to be significant because it represents a lost business opportunity in an expanding market – the CPG super premium coffee

segment and the growing market for sinlge cup beverages.  Without knowing for certain that Kraft is free of its exclusivity obligations under the 2004 Supply Agreement, Kraft is unable to take the steps necessary to replace, in an effective and efficient way, the Starbucks' brands with one or more suitable replacements.  As a result, Kraft's coffee portfolio will be without a key component at a critical moment in the evolution of the market.

21.     The harm is multidimensional because the lost opportunity translates into more than lost sales of Super Premium coffee.  Without a shelf-ready replacement for the Starbucks' brands (*i.e.*, a less than full-spectrum coffee portfolio), Kraft may lose its Category Captaincy with one or more major retailers, leading to the prospect of lost sales across its entire coffee portfolio, not just the Super Premium segment.  In addition, a demotion from a Category Captaincy would lead to a loss of good will for Kraft, and a diminished business reputation, losses for which there is no reasonable means of calculation.  In fact, we are just starting to see evidence of the consumer and retailer confusion and dissatisfaction.

22.     To lose one or more critical brands in a saturated market without having a ready replacement may mean that Kraft's position in the CPG coffee segment is adversely affected for a considerable period of time, especially when a major retailer reallocates shelf space and placement only on an annual or semi-annual basis.  In other words, without having a replacement, even for a short period of time under current market conditions may mean being "out" for an extended period due to the large number of established competing brands.  The longer Kraft is without an established replacement, the more that absence will likely affect sales of their other coffee products and the longer it will delay Kraft's restoration or promotion to a Category Captain.

23.     The fact that Kraft is a large company with a diverse product line does not

insulate Kraft from harm.  Neither Kraft's overall commercial success nor its position as a market leader in other CPG product lines (e.g., cheese products) will allow it to make up in the coffee segment for a loss of a super premium brand, especially one with the brand equity of Starbucks.

24.     Given the strength of the performance of the Starbucks products in the CPG markets in 2010, I do not believe there would be harm to Starbucks to continue under the current Agreement during the limited period of time necessary to complete the arbitration.

25.     In short, Kraft faces the likely prospect of a cascade of calculable and incalculable losses in the absence of preliminary injunction, losses that may be difficult to recoup in the future, if at all.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct.

Dated:  January 13, 2011


_____

Stephen J. Hoch