IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KRAFT FOODS GLOBAL, INC.,<br><br>      Plaintiff,<br><br>    v.<br><br>STARBUCKS CORPORATION,<br><br>      Defendant. | Civil No. 10-9085 (CS)<br>ECF Case |

**STARBUCKS CORPORATION'S FURTHER MEMORANDUM IN OPPOSITION TO KRAFT FOODS GLOBAL, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Maria Barton
Paul A. Serritella
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
Tel. (212) 906-1200
Fax (212) 751-4864

Joseph S. Hall (JH-2612)
Aaron M. Panner (*pro hac vice*)
Wan J. Kim (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Tel. (202) 326-7900
Fax (202) 326-7999
jhall@khhte.com
apanner@khhte.com
wkim@khhte.com

*Counsel for Defendant Starbucks Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

I. KRAFT HAS MATERIALLY BREACHED THE R&G AGREEMENT ......................... 2

    A. Kraft's Performance Has Not Been Commercially Reasonable ............................. 2

    B. Kraft Refused To Allow Starbucks To Participate Fully In Sales And Marketing ................................................................................................................ 5

        1. Kraft Has Failed To Involve Starbucks in Significant Sales Planning, Failed to Permit Starbucks To Review Significant Sales Presentations, and Failed To Permit Starbucks To Attend Significant Sales Calls ................................................................................. 6

        2. Kraft Has Failed to Obtain Necessary Approval for Advertising from Starbucks ................................................................................................ 8

        3. Kraft Has Failed to Provide Starbucks With Detailed Budgets and Market Research ............................................................................................. 9

II. STARBUCKS HAS NOT WAIVED THE REMEDY OF TERMINATION ................. 10

CONCLUSION .......................................................................................................................... 11

# TABLE OF AUTHORITIES

Page

**CASES**

*American Movie Classics Co. v. Time Warner Entm't, L.P.*, No.
603625/03, 2005 WL 3487852 (N.Y. Sup. Ct. July 8, 2005) ............................................. 11

*Breckenridge Pharm., Inc. v. Midland Healthcare, LLC*, No. 07 Civ.
11114, 2008 WL 3833780 (S.D.N.Y. Aug. 11, 2008) ......................................................... 6

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master
Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ................................................................................ 1

*Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269 (E.D.N.Y.
2010) .................................................................................................................................... 1

**TREATISE**

Samuel Williston, 23 *Williston on Contracts* § 63:3 (4th ed.) ............................................... 6

## INTRODUCTION

The distribution relationship between Starbucks and Kraft is ending because Kraft's performance as a distributor of Starbucks products has been unacceptably poor – falling below the standard of commercially reasonable efforts that the parties' agreement requires – and because Kraft has refused, despite Starbucks' repeated and urgent efforts, to honor its obligation to include Starbucks as a full partner in the sales and marketing effort for Starbucks products in the Consumer Packaged Goods ("CPG") channel.  The result of Kraft's breaches has been that CPG performance has lagged badly.  Starbucks market share in the CPG channel has actually *fallen* despite the extraordinary goodwill associated with the Starbucks brand, as sales have stagnated.  And, throughout the distribution relationship, Kraft has repeatedly displayed its lack of concern for the Starbucks brand, and its lack of willingness to treat Starbucks as a full partner in the CPG business.

Kraft's claim that it will prevail by showing that it did not breach the March 24, 2004 Supply and License Agreement ("R&G Agreement") ignores not only objective market evidence that Kraft's performance has lagged, but also the admission of Kraft's senior executives that Kraft "neglected th[e] Starbucks' relationship badly in North America."  And it ignores objective evidence that Kraft failed to comply with specific obligations under the agreement that were added to ensure that Starbucks would be able to play a role as a full partner in the CPG business.  Kraft's material breaches of the R&G Agreement – and the unacceptable business performance that has resulted – mean that Kraft's claim of wrongful termination will fail.

## ARGUMENT

To show a likelihood of success on the merits, Kraft must show more than a mere "possibility" that it will prevail; rather, Kraft must demonstrate that "it is likely to succeed" on its underlying claim. *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 294 (E.D.N.Y. 2010); *cf. Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010).  Because Kraft has repeatedly breached the R&G Agreement –

including in ways that are specifically defined under the R&G Agreement as material breaches giving rise to a right to terminate the agreement – it cannot meet this burden.[1]

## I. KRAFT HAS MATERIALLY BREACHED THE R&G AGREEMENT

Kraft has breached the R&G Agreement in two fundamental ways. First, it has failed to use commercially reasonable efforts to market Starbucks products in the CPG channel, leading to business results deemed unacceptable even by Kraft's own employees. Second, Kraft has disregarded specific obligations under the R&G Agreement, which were added in 2004 for the express purpose of ensuring that Kraft could no longer exclude Starbucks from full participation in the marketing and sales process for Starbucks products.

Both sets of breaches justify termination under the agreement's terms. The R&G Agreement gives either party the right to terminate the agreement based on a "Material Breach" by the other. *See* R&G Agreement ¶ 5.B(iii).[2] Any breach that "significantly impairs the value of the other party's bargained-for benefits under this Agreement or which causes or threatens to cause significant financial, brand equity and/or other injury" is a Material Breach. *Id.* ¶ 1. In addition, "[b]reaches of certain provisions of this Agreement" – including provisions at issue in the parties' dispute – "have been specifically described as Material Breaches." *Id.*

### A. Kraft's Performance Has Not Been Commercially Reasonable

The most important reason for Starbucks' decision to terminate the R&G Agreement is that Kraft's performance – the poor business results it has achieved – reflects a failure to meet

---

[1] There is no dispute that if Starbucks properly terminated the R&G Agreement, it properly terminated the remaining agreements – including the Tassimo agreements – as well. The additional, independent bases for termination of the Tassimo agreements – including Kraft's breach of its obligation to disclose any consumer or product quality issues that might affect Starbucks – will be addressed in detailed, confidential filings in the pending arbitration between the parties.

[2] Paragraph 5.B provides: "This Agreement may be terminated prior to the expiration of the term hereof as follows … (iii) By either party, upon a Material Breach of this Agreement by the other party which is not cured within thirty (30) days after notice to the breaching party of the circumstances constituting the Material Breach." Starbucks provided that notice and gave Kraft an opportunity to cure, and also brought the issue to the attention of the Oversight Committee. *See* Declaration of Wm. P. Quinn, Esq. [Dkt. No. 22] (filed Dec. 23, 2010) ("Quinn Decl."), Quinn Decl. Exh. 8 [Dkt. No. 22-08]. In keeping with its arrogant and dismissive attitude towards Starbucks' concerns, Kraft ignored the letter, refused to discuss it on a business level, and made no attempt to discuss cure. *See id.* Exh. 9 [Dkt. No. 22-09]. There is thus no dispute that Starbucks termination is *procedurally* entirely proper.

2

the standard of "commercially reasonable efforts" as required by Paragraph 3(B). Kraft's CEO claimed that Kraft was "no happier about the state of our joint business" than Starbucks. Declaration of Aaron Panner [Dkt. No. 34] (filed Jan. 6, 2011) ("Panner Decl."), Exh. 1, at 2. She was wrong – Starbucks was far unhappier.

*First*, business results have been – to use Kraft's own term – "unacceptable." *Id*. Exh. 2, at 1. The parties' relationship began in 1998, at a time when the Starbucks brand was already a powerhouse that was driving expansion well in excess of 20% each year.[3] With Kraft's existing distribution infrastructure, it should have been straightforward to achieve much higher levels of growth – after all, Kraft was not just bringing a new brand of premium coffee into the CPG channel, but was effectively introducing a new premium coffee *category* for which there was tremendous untapped demand.[4] As expected, initially sales rose – taking sales to $174 million by 2000 – but almost immediately growth began to falter. *See* Declaration of Michelle Waits ¶ 14 (filed Jan. 14, 2011) ("Waits Decl."). Even though Starbucks' overall business continued to grow by more than 20% per year (a rate it met every year until 2007), growth of the CPG coffee business quickly fell, first to the low teens, and then to single digits – evidence of Kraft's failure to take advantage of the huge competitive advantage that the Starbucks brand offered. *See id*. Given the nature of the opportunity and Kraft's existing infrastructure, such anemic results do not reflect commercially reasonable marketing efforts.

*Second*, Kraft has allowed itself to be been beaten by Starbucks' competitors. As the premium coffee segment has grown and customers have increasingly moved away from mass market brands to super-premium coffee, Starbucks has actually *lost* market share. That share loss has been dramatic – from a nearly one-third share of CPG premium coffee sales in 2005 to

---

[3] *See* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NjkxMDd8Q2hpbGRJRD0tMXxUeXBlPT M=&t=1.

[4] To illustrate what the parties thought was achievable, in their amended 1998 Supply Agreement (Quinn Decl., Exh. 1 [Dkt. No. 22-01]), they set out Performance Goals for Kraft, which would have required Kraft to achieve $425 million in sales for Starbucks coffee by 2003. *See id*. ¶ 5.B(ii). Kraft's sales are barely at that level today, even including sales of Seattle's Best Coffee ("SBC"), which was not added to the portfolio until 2004. Moreover, the parties set a goal for growth after 2003 of 20% per year. *See* 1998 Supply Agreement ¶ 5(B)(ii). Kraft has *never* achieved that growth (except between 2004 and 2005, when SBC was added). Waits Decl. ¶ 14.

just over one-quarter share by 2009. *See* Declaration of Jeff J. Hansberry ¶ 2 [Dkt. No. 32] (filed Jan. 6, 2011). Had Kraft maintained Starbucks' share in the CPG channel from near its peak (let alone achieved growth, as it should have done), revenues would currently be $100 million higher. *See* Waits Decl. ¶ 15.

*Third*, that loss of market share is attributable to commercially unreasonable business decisions that Kraft made despite Starbucks' strong objections. For example, in 2008, at a time when – by Kraft's own account – competition was increasing and a deteriorating economy made consumers especially price sensitive, Kraft imposed a dramatic price increase that did not reflect increases in underlying costs. *See id.* ¶ 43. Starbucks recommended against the price increase, but Kraft dismissed Starbucks' concerns and proceeded. *See id.* The result was predictable – a sharp share decline. *See id.* ¶ 45. Starbucks' share has never recovered, even when Kraft was finally induced to reduce the price increase.[5] Similarly, in the fourth quarter of 2009 (the first quarter of Starbucks' fiscal year 2010), Kraft – contrary to the representations it had made to Starbucks – sharply cut back on promotional spending, presumably to meet its own profit targets for the year. *See id.* ¶ 47. The result was a disastrous quarter, just at a time when the business was slowly stabilizing after the decline Kraft had earlier caused. *See id.*

*Fourth*, even in areas where Kraft's sheer size and infrastructure should provide it the greatest advantage – as with keeping retail outlets fully stocked – Kraft's performance has inexplicably lagged. In the R&G Agreement, the parties set targets for certain key in-store metrics of the effectiveness of Kraft's distribution effort. *See* R&G Agreement Schedule 8.B(i). Among these metrics are goals for out-of-stocks (that is, stores with at least one Starbucks product out of stock) and placement of Starbucks-preferred racks. *See id.* These metrics reflect critical elements of the distribution effort for Starbucks products. Yet Kraft has failed, by a

---

[5] Kraft's seeks to justify its anemic performance by pointing to increasing competition and a declining economy. *See* Kraft Mem. at 11. This provides no excuse. The problem has not been lack of growth in the premium segment; the problem is that competitors – even those at a higher price point – were able to capture share from Starbucks. The "evidence" that Kraft marshals in support of this claim is illustrated – a comment by Starbucks CEO related to sales in Starbucks coffeehouses of prepared coffee – had nothing to do with sales in the CPG channel and is not relevant to explaining any drop in Starbucks' market share in that channel.

4

considerable margin, to meet those targets.  Independent data show that, while the target for out-of-stocks is 25%, the level of out-of-stocks in 2009 was 42%.  *See* Waits Decl. ¶ 38.  Although the target for rack placement is 80% (a target that Kraft achieved in the initial year of the R&G Agreement) in 2009 Kraft achieved only 69% rack placement.  *See id.*  And Starbucks has seen repeated examples of store sets (the manner in which coffee products are presented on the shelves, which is generally standardized across individual stores within a chain) that afford Starbucks poor placement and which exhibit a "picked-over" look, reflecting Kraft's poor out-of-stock performance.  *See id.* ¶¶ 35, 36.  This poor execution translates into lost sales.

Kraft has argued that it has grown the CPG business successfully and Starbucks wants to take back its business without paying for it.  Kraft could not be more wrong.  If Kraft had made a reasonable effort to grow the business, it would have thrived and Starbucks would have no basis for complaint.  Instead, Starbucks has had to watch its brand suffer in the CPG market because of Kraft's neglect.  Nor is Starbuck's dissatisfaction with its poor performance a recent development – a pretext for taking back a successful business, as Kraft would have it.  Starbucks is guilty of nothing except patience with Kraft's failure to address the deficiencies in its performance.  Starbucks has tried to work with Kraft continually on the distribution relationship, to no avail.  Kraft may also argue that while it has conceded that the performance of the business was "unacceptable," Kraft's efforts were nevertheless "commercially reasonable."  Given the objective evidence of Starbucks' share decline and Kraft's own admissions, it will not prevail on that argument.  And Kraft cannot dispute that a failure to comply with this fundamental obligation under the R&G Agreement is a Material Breach justifying termination.

> **B.   Kraft Refused To Allow Starbucks To Participate Fully In Sales And Marketing**

Kraft has been distributing Starbucks coffees since 1998, but significant problems with the relationship required a major renegotiation of the agreements between the parties in 2004.  Among other issues, one focus of that renegotiation was Starbucks' demand that Kraft give it a

5

greater role in the planning and execution of the CPG business. A new Paragraph 9(B), captioned "Management of the Agreement," requires Kraft:

- to reasonably involve Starbucks "in all significant sales planning"
- to permit Starbucks the right to "review significant sales presentations"
- to permit Starbucks to "attend … significant sales calls"
- to "consult with [Starbucks] on all marketing research" and to provide Starbucks with all reports
- to provide "detailed marketing and trade budgets, including key assumptions"

These new obligations supplement Kraft's obligation to submit for Starbucks approval all proposed promotions, advertising, packaging and other programs and materials during the concept or initial planning stages and again at the final stage prior to launch. Paragraph 9(E) of the R&G Agreement states that Kraft's failure to comply with any of these provisions "in any material respect . . . shall constitute a Material Breach of this Agreement."[6] Kraft has materially failed to comply with several provisions of Paragraph 9.

### 1. *Kraft Has Failed To Involve Starbucks in Significant Sales Planning, Failed to Permit Starbucks To Review Significant Sales Presentations, and Failed To Permit Starbucks To Attend Significant Sales Calls*

One of the critical bargained-for benefits included in the R&G Agreement was the right that Starbucks gained to be fully involved in significant aspects of sales planning and execution.[7] Kraft has systematically deprived Starbucks of that right, over Starbucks' repeated protests.

*First*, Kraft conducts a series of annual internal planning meetings focused specifically on Starbucks products for each of Starbucks' "Top 9" customers. *See* Declaration of Larry Cronin

---

[6] "Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision." Samuel Williston, 23 *Williston on Contracts* § 63:3 (4th ed.); *Breckenridge Pharm., Inc. v. Midland Healthcare, LLC*, No. 07 Civ. 11114, 2008 WL 3833780, at *5 (S.D.N.Y. Aug. 11, 2008) (plaintiff was "contractually entitled to terminate the Agreement" because defendant had failed to meet certain milestones set by the agreement, which the agreement defined as a material breach).

[7] Paragraph 9 also requires Kraft to give Starbucks the "reasonable opportunity to be involved in all significant sales planning" regarding the sale of Starbucks coffee in the CPG market. R&G Agreement ¶ 9(B)(i). In addition, this paragraph specifically gives Starbucks "the right to review significant sales presentations" as well as the right to attend "significant sales calls" for accounts selected by Starbucks. *Id.* ¶ 9(B)(iii). A breach of either provision is entitles Starbucks to terminate the agreement. *See id. ¶* 9.E.

¶ 13 (filed Jan. 14, 2011) ("Cronin Decl.").[8]  Larry Cronin, who is the Director of National Retail Merchandising for Starbucks' Consumer Packaged Goods Division and who oversees sales aspects of the Kraft-Starbucks relationship, has asked Kraft that he be invited to *all* of these planning meetings.  *See id.* ¶ 14.  But Kraft has permitted him to attend only two of the approximately 27 such meetings over the last three years.  *See id.* ¶ 15.

*Second*, Kraft has failed to comply with its obligation to give Starbucks the opportunity "to review significant sales presentations"—again, despite multiple requests from Starbucks that it be permitted to do so.  *See id.* ¶ 23.  In most cases where Starbucks has been excluded from sales calls, Kraft has not given Starbucks any opportunity whatsoever to review presentations in advance.  *See id.*  In those rare instances in which Kraft has given Starbucks a copy of a sales presentation prior to a sales call, it has typically done so just prior to the sales call itself, such that any meaningful review and comment by Starbucks has been impossible.  *See id.*

*Third*, Starbucks also has the right to attend all significant sales calls with these same Top 9 customers.  *See id.* ¶ 20.  Kraft makes *at least* three to five sales calls to each of these customers during the course of a year.  *See id.* ¶ 19.  But Mr. Cronin was allowed to attend approximately six customer sales calls in 2010, five in 2009, and four in 2008.  *See id.* ¶ 21.  Indeed, Kraft has even excluded Starbucks' employees from sales calls focused on new, important Starbucks product launches.  *See id.* ¶ 22.

Mr. Cronin has raised this issue with his counterpart repeatedly but to no avail.  *See id.* ¶ 10.  When Starbucks raised this issue again in its letter of October 5, 2010, Kraft's response was similarly high-handed and dismissive:  it waited until the cure period had practically expired and then simply denied that any breach had occurred.

The opportunity to participate in the sales effort for Starbucks coffee goes to the very heart of the parties' agreed-to roles in the relationship.  As Mr. Cronin explains in the declaration attached hereto, Starbucks involvement in sales efforts is critical to ensure that Starbucks brand

---

[8] Starbucks' "Top 9" customers are its nine largest customers in the CPG market, who account for approximately 73% of Starbucks' sales.  *See* Cronin Decl. ¶ 13.

7

and its products are effectively presented to CPG retailers.  *See id.* ¶ 6.  Starbucks is, for Kraft, just one brand among many dozens.  *See id.*  By contrast, when Starbucks has been included in sales efforts, it has been able to present its products and its brand much more effectively than Kraft's sales personnel, who have no particular commitment to or knowledge of Starbucks as a company.  *See id.* ¶ 7.  Kraft's deliberate exclusion of Starbucks from sales efforts has not only hampered sales, but it has also hampered Starbucks' ability to build direct relationship with CPG retailers – something it has a right to do under the R&G Agreement.

### 2. *Kraft Has Failed to Obtain Necessary Approval for Advertising from Starbucks*

Paragraph 9.A(ii) of the R&G Agreement requires Kraft to "submit to [Starbucks'] Brand Management Team, for [Starbucks'] approval, all proposed promotions, advertising, packaging and other programs and materials that support the Licensed Products or use the Licensed Trademarks."  The agreement requires Kraft to do so both "during the concept or initial planning stages and again at the final stage prior to launch."  R&G Agreement ¶ 9.A(ii).  The ability to control the way in which the Starbucks brand is presented in advertising and promotion is critical to Starbucks' ability to protect its brand image.  Yet Kraft, on repeated occasions, has failed to comply with this basic requirement.  *See* Waits Decl. ¶¶ 19-31 (citing examples involving Safeway, Publix, Kroger, and others).

Kraft has effectively conceded that it has failed to comply with this provision on several occasions, but suggests that it is under some lesser contractual obligation with regard to advertisements that are run by third parties (as some, but not all, of the examples were) that with respect to Kraft's own advertising.  *See* Declaration of Lori Acker ¶¶ 21-22 [Dkt. No. 21] (filed Dec. 23, 2010).  This is incorrect.  The R&G Agreement gives Kraft the right to "use the Licensed Trademarks solely in connection with the full exploitation of [its] rights and the performance of [its] obligations under this Agreement," but only "[o]n the terms and conditions" of the R&G Agreement.  R&G Agreement ¶ 2(A).  Kraft is required to submit to Starbucks "*all* proposed promotions, advertising, packaging and other programs" related to Starbucks products.

8

*Id.* ¶ 9(A)(ii) (emphasis added). Kraft material failure to comply with this obligation is not excused by any supposed delay on the part of third parties.

The R&G Agreement defines the failure to obtain advertising approvals as a Material Breach; moreover, Starbucks' right to ensure proper control over the manner in which its brand is portrayed is fundamental. As explained in the accompanying declaration of Michele Waits, Vice President of Marketing in Starbucks CPG Group, Starbucks has a critical interest in the way in which the Starbucks brand is used in advertising and promotion. *See* Waits Decl. ¶ 5. If the Starbucks brand is portrayed in a way that is inconsistent with the premium nature of the brand, it can be damaging to all segments of Starbucks' business. *See id.* Giving Starbucks the right to be involved in the development and approval of all advertising is one way in which the R&G Agreement recognizes the importance of protecting the Starbucks brand and the goodwill associated with it.

Starbucks has repeatedly raised its concerns over advertising approvals with its Kraft counterparts. *See id.* ¶¶ 19-31. Nevertheless, these problems have persisted.

### 3.     *Kraft Has Failed to Provide Starbucks With Detailed Budgets and Market Research*

The R&G Agreement requires Kraft to provide Starbucks with "detailed marketing and trade budgets, including key assumptions, monthly to the extent such reports are regularly generated by [Kraft] on a monthly basis, otherwise quarterly" as well as "all marketing research conducted by or on behalf of [Kraft] regarding" Starbucks products. R&G Agreement ¶ 9.B(iv), (v). Any breach of this requirement is a Material Breach of the contract, entitling Starbucks to terminate the agreement. *See id.* ¶ 9(E).

Kraft has never provided Starbucks with monthly marketing or trade budgets. *See* Waits Decl. ¶ 40. And, until recently, the only quarterly "budget" Kraft typically provided was a summary spreadsheet, which wholly lacked the detail required by the R&G Agreement; instead, these spreadsheets listed only the "rolled-up" total amounts that Kraft anticipated spending on

9

broad categories such as advertising, consumer promotions and trade.[9] *See id.* No further detail was provided in these spreadsheets beyond these general categories, nor was there any discussion of "key assumptions" underlying these top-line numbers, as required by the R&G Agreement. Although Kraft's performance in this regard has recently improved, its long-term failure to provide such budgets – despite Starbucks' requests – hampered Starbucks' ability to participate meaningfully in marketing planning and to gauge Kraft's performance against the plan.

Kraft has likewise failed to live up to its obligation to provide Starbucks with all marketing data. *See id.* ¶ 41. While Starbucks cannot know for certain what Kraft did *not* provide, in the last two-and-a-half years, Kraft has provided only three detailed "Brand Health Trackers" analyzing the key drivers affecting Starbucks sales and market share. *See id.* Starbucks repeatedly asked Kraft to provide such reports, along with other relevant market research, but Kraft failed to comply.

## II. STARBUCKS HAS NOT WAIVED THE REMEDY OF TERMINATION

Kraft suggests that Starbucks' claims are barred either by waiver or by the doctrine of election of remedies (though it does not develop the argument). That is incorrect.

*First*, the R&G Agreement contains a broad no-waiver provision, which provides:

> The failure or delay of either party to exercise its rights under this Agreement or to complain of any act, omission or default on the part[] of the other party, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by such party of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

R&G Agreement ¶ 18(F). Under New York law, such no-waiver clauses "are valid and enforceable." *American Movie Classics Co. v. Time Warner Entm't, L.P.*, No. 603625/03, 2005 WL 3487852, at *12 (N.Y. Sup. Ct. July 8, 2005) (collecting cases). Kraft's Material Breaches – coupled with its refusal to cure when it had the opportunity – give Starbucks the right to

---

[9] "Trade spending" refers to payments to retailers for discounts to customers, favorable shelf placement, in-store displays, or other promotions.

terminate the Agreement.

*Second*, there is no merit to the claim that Starbucks somehow elected not to invoke its remedy in response to any particular breach. Kraft's failure to comply with its obligation has been continuing, and many of the breaches do go back for many years, but Starbucks cannot be penalized for its efforts to make the relationship work, nor can it be penalized for attempting to work with Kraft to end the relationship amicably. Kraft repaid Starbucks' effort with broken promises and gamesmanship. Kraft has only itself to blame for its predicament.

## CONCLUSION

For the foregoing reasons, Kraft cannot demonstrate a likelihood of success on the merits of its claims.

| | |
|---|---|
| Maria Barton<br>Paul Serritella<br>LATHAM & WATKINS LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>Tel. (212) 906-1200<br>Fax (212) 751-4864 | s/ Joseph S. Hall<br>Joseph S. Hall (JH-2612)<br>Aaron M. Panner (*pro hac vice*)<br>Wan J. Kim (*pro hac vice*)<br>KELLOGG, HUBER, HANSEN, TODD,<br>  EVANS & FIGEL, P.L.L.C.<br>1615 M Street, N.W.<br>Suite 400<br>Washington, D.C. 20036<br>Tel. (202) 326-7900<br>Fax (202) 326-7999<br>jhall@khhte.com<br>apanner@khhte.com<br>wkim@khhte.com |

*Counsel for Defendant Starbucks Corporation*

11